UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



——————————————————————————— x

IN RE THE BEAR STEARNS COMPANIES,
INC. SECURITIES, DERIVATIVE, AND ERISA
LITIGATION

       :   Master File No.
       :   08 M.D.L. No. 1963 (RWS)

This Document Relates To:

       :   CLASS ACTION

    Securities Action, 08-Civ-2793 (RWS)

       :   JURY TRIAL DEMANDED

       :   ECF CASE

——————————————————————————— x


### CONSOLIDATED CLASS ACTION COMPLAINT
### FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

GLOSSARY OF DEFINED TERMS .................................................................. viii

I.      NATURE AND SUMMARY OF THE ACTION ..................................... 2

II.     JURISDICTION AND VENUE .............................................................. 5

III.    PARTIES ................................................................................................ 6

        A.      Lead Plaintiff .............................................................................. 6

        B.      Bear Stearns Defendants ............................................................. 7

                1.      The Bear Stearns Companies Inc. ................................... 7

                2.      Officer Defendants .......................................................... 7

        C.      Auditor Defendant ...................................................................... 9

IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ....... 9

        A.      Bear Stearns' Storied Past .......................................................... 9

        B.      The Boom in Debt Securitization ............................................... 11

        C.      Bear Stearns' Securitization Business ........................................ 13

                1.      Bear Stearns' Mortgage Origination and Purchasing Business ............. 14

                2.      Bear Stearns' RMBS Business ....................................... 17

                3.      Bear Stearns' CDO Business .......................................... 17

        D.      Bear Stearns' Business Practices Amplify its Risk Exposure ........... 18

                1.      Bear Stearns' Concentration in Mortgage-Backed Debt ........... 18

                2.      Bear Stearns' Leveraging Practices ............................... 19

                3.      Bear Stearns' Backing of the Hedge Funds .................... 20

        E.      Bear Stearns' Misleading Models and Inadequate Risk Management ........... 23

                1.      Bear Stearns' Misleading Valuation and Risk Models ........... 23

                        a.      The Importance of Valuation Models ................... 24

|   | b. | Bear Stearns' Valuation Models Were Misleading ................... | 25 |

|   | c. | The Importance of Value at Risk Models .................................. | 27 |

|   | d. | Bear Stearns' Value at Risk Models Were Misleading ............. | 30 |

| | 2. | Bear Stearns' Impoverished Risk Management Program ...................... | 31 |

| F. | Bear Stearns Hides its Mounting Exposure to Loss ............................................ | 33 |

| | 1. | Early Warnings ...................................................................... | 33 |

| | 2. | Bear Stearns' Deception Begins ........................................... | 36 |

| G. | The Implosion of the Hedge Funds .................................................................... | 45 |

| H. | Repercussions of the Hedge Funds' Implosion ................................................. | 52 |

| I. | Bear Stearns' Catastrophic Collapse ................................................................. | 61 |

| J. | Post Class Period Events ................................................................................... | 69 |

| K. | Defendants' Fraudulent Statements Adversely Impacted Current and Former Company Employees ................................................................... | 71 |

| | 1. | The RSU Plan ........................................................................ | 71 |

| | 2. | The CAP Plan ........................................................................ | 72 |

| | 3. | Defendants' Fraud Harmed Holders of RSU and CAP Plan Units ......... | 72 |

| L. | The SEC Comment Letters ................................................................................ | 73 |

| M. | Bear Stearns' Practices Violated Accounting Standards .................................... | 76 |

| | 1. | GAAP Overview .................................................................... | 76 |

| | 2. | Fraud Risk Factors Present at Bear Stearns ........................... | 79 |

| | | a. | Fraud Risk Factors Applicable to Depository and Lending Institutions .................................................... | 79 |

| | | b. | Risk Factors Applicable to Brokers and Dealers in Securities ...................................................................... | 81 |

| | 3. | Audit Risk Alerts ................................................................... | 82 |

| | 4. | Bear Stearns Falsely Represented that its Internal Controls Over Financial Reporting Were Effective ...................................................... | 84 |

|  |  | a. | Risk Management ................................................................88 |
|  |  | b. | Pricing Models and VaR Systems ................................89 |
|  | 5. |  | GAAP Violations Relating to the Company's Financial Statements......90 |
|  |  | a. | Bear Stearns Misstated Its Exposure to Loss from the Failed Hedge Funds ................................................90 |
|  |  | b. | Bear Stearns' Financial Statements Misrepresented its Exposure to Decline in the Value of RIs ....................94 |
|  |  | c. | GAAP Violations Related to Failure to Appropriately Determine the Fair Value of Financial Instruments..................99 |
|  |  | d. | Bear Stearns Failed to Provide Adequate Disclosure About Risk and Uncertainties....................................104 |
|  |  | e. | Bear Stearns Failed to Provide Reliable Disclosures to Investors in Accordance with SEC Regulations ......................106 |
| N. | Bear Stearns' Practices Violated Banking Regulations ...................................107 |
|  | 1. | Overview of Capital Requirements......................................................107 |
|  | 2. | Bear Stearns Failed to Take Timely and Adequate Capital Charges....109 |
|  | 3. | Inflation of Capital By Using Incorrect Marks ...................................110 |
|  | 4. | Misrepresentations to Regulators Relating to VaR..............................111 |
| V. | DEFENDANTS' SCIENTER ..................................................................112 |
|  | A. | James E. Cayne ..............................................................................112 |
|  | B. | Alan D. Schwartz ..........................................................................115 |
|  | C. | Samuel L. Molinaro, Jr. .................................................................116 |
|  | D. | Warren J. Spector...........................................................................120 |
|  | E. | Alan C. Greenberg .........................................................................121 |
|  | F. | Michael J. Alix...............................................................................123 |
|  | G. | Jeffrey M. Farber ...........................................................................124 |
|  | H. | Corporate Scienter .........................................................................125 |

VI.   ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER
      DEFENDANTS' SCIENTER ................................................................. 126

      A.    General Allegations of Scienter ................................................... 126

      B.    Abnormal Profit Taking ............................................................... 129

VII.  DELOITTE'S DEFICIENT AUDITS OF BEAR STEARNS'
      FINANCIAL STATEMENTS ............................................................. 133

      A.    Overview of Allegations Against Deloitte ................................... 133

      B.    Deloitte's Certifications .............................................................. 134

      C.    Overview of GAAS ...................................................................... 135

      D.    GAAS Required Deloitte to Consider Risk Factors as Part of Audit
            Planning ...................................................................................... 136

            1.    Fraud Risk Alerts Relevant to Deloitte's Audit of Bear Stearns .......... 136

            2.    Audit Risk Alerts Relevant to Deloitte's Audit of Bear Stearns .......... 137

            3.    Deloitte's Experience Auditing the Hedge Funds ................. 138

      E.    Red Flags Recklessly or Deliberately Disregarded by Deloitte ...................... 139

            1.    Bear Stearns' Misleading Fair Value Measurements ............................ 139

            2.    Bear Stearns' Failures to Disclose Risks Inherent In Its Financial
                  Statements ........................................................................... 142

            3.    Bear Stearns' Misleading Accounting Treatment of the Hedge
                  Fund Bailout ........................................................................ 143

            4.    Bear Stearns' Failure to Disclose Critical Information Relating to
                  the Company's Valuation of Its Financial Instruments ...................... 144

            5.    Bear Stearns' Inadequate Internal Controls ......................... 146

            6.    Bear Stearns' Deficient Internal Audit Function ................... 152

VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING
      STATEMENTS ................................................................................. 154

      A.    Statements Relating to Fiscal Year 2006 and Fourth Quarter 2006 ................. 154

            1.    December 14, 2006 Press Release ........................................ 154

a. December 14, 2006 Press Release Statements Regarding the Company's Fourth Quarter 2006 Results ........................................................................155

b. Press Release Regarding Fiscal 2006 Results ..........................156

2. Fourth Quarter 2006 Earnings Conference Call ..................................156

3. Form 10-K for Fiscal Year 2006 ...........................................................158

a. The Company's Financial Results and Assets .........................159

b. The Company's Risk Management Practices ...........................159

c. The Company's Exposure to Market Risk ...............................162

d. The Company's Compliance With Banking Regulations ...............................................................................162

e. The Company's Internal Controls ...........................................163

f. Deloitte's Certification ............................................................164

B. Statements Relating to Fiscal Year 2007 Results .........................................164

1. First Quarter 2007 Results ....................................................................164

a. First Quarter 2007 Press Release .............................................164

b. First Quarter 2007 Conference Call ........................................166

c. First Quarter 2007 Form 10-Q ................................................168

2. Second Quarter 2007 Results ................................................................172

a. Second Quarter 2007 Press Release .........................................172

b. Second Quarter 2007 Conference Call ....................................173

c. June 22, 2007 Press Release ....................................................174

d. Second Quarter 2007 Form 10-Q ............................................175

3. August 3, 2007 Press Release and Conference Call ............................180

4. Third Quarter 2007 Results ...................................................................182

a. Third Quarter 2007 Press Release ...........................................182

    b. Third Quarter 2007 Conference Call .......................................184

    c. Third Quarter 2007 Form 10-Q.................................................185

   5. November 14, 2007 Write Downs .......................................................189

   6. Fourth Quarter and Fiscal Year 2007...................................................190

    a. Press Release...........................................................................190

    b. Fourth Quarter 2007 Conference Call......................................192

   7. Fiscal Year 2007 Form 10-K ..............................................................193

    a. The Company's Financial Results ...........................................194

    b. The Company's Risk Management Practices ...........................195

    c. The Company's Exposure to the Market Risk.........................197

    d. Compliance With Banking Regulations....................................198

    e. The Company's Internal Controls.............................................199

    f. Deloitte's Certification.............................................................200

  C. Additional False and Misleading Statements in Calendar Year 2008 .............200

IX. LOSS CAUSATION.................................................................................................204

X. CLASS ACTION ALLEGATIONS .........................................................................206

XI. PRESUMPTION OF RELIANCE .............................................................................209

XII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................211

CLAIMS FOR RELIEF ........................................................................................................211

COUNT  I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder (Against All Defendants) ....................................................211

COUNT  II For Violation of Section 20(a) of the Exchange Act (Against the Officer
Defendants)...............................................................................................................214

COUNT  III For Violations of Section 20A of the Exchange Act (Against Defendants
Cayne, Schwartz, Spector, Molinaro, Greenberg, and Farber)...................................215

PRAYER FOR RELIEF ............................................................................................216

DEMAND FOR JURY TRIAL ...............................................................................218

## GLOSSARY OF DEFINED TERMS

2008 OIG Report: A report entitled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program."

AAG: AICPA Industry Audit and Accounting Guides.

AAM: AICPA's annual Audit and Accounting Manual.

ABS: Asset-backed securities.

ABS CDOs: Asset-backed collateralized debt obligations-related investments.

ABX: An index that tracked synthesized subprime mortgage performance, refinancing opportunities, and housing price data into efficient market valuation of subprime RMBS tranches.

Advisers Act: U.S. Investment Advisers Act of 1940.

AICPA: American Institute of Certified Public Accountants.

Alix: Michael J. Alix, who served as the Company's Chief Risk Officer from February 3, 2006 until the Company's demise in 2008.

Alt-A Mortgages: Mortgages made to borrowers who are considered less than prime because they are unable to document their income and assets, have  high debt-to-income ratios, and/or have troubled credit histories.

APB: Accounting Principles Board Opinions.

ARAs: Audit Risk Alerts.

ARB: AICPA Accounting Research Bulletins.

AS: Auditing Standard.

AU §: Sections of the Statements of Auditing Standards, which are codified by the American Institute of Certified Public Accountants.

Basel II: Recommendations on banking laws and regulations issued in June 2004 by the Basel Committee on Banking Supervision, an institution created by the central bank governors of the Group of Ten Nations.

Basel II Guidelines: Basel II.

Basel Committee: Basel Committee on Banking Supervision, an international banking group that advises national regulators, such as the SEC.

B&D AAG: AAG that was applicable to Brokers and Dealers in Securities.

Bear Stearns: The Bear Stearns Companies Inc., Bear, Stearns & Co. Inc., and Bear Stearns Asset Management.

Bear Stearns Defendants: The Bear Stearns Companies Inc.; James E. Cayne; Alan D. Schwartz; Warren Spector; Samuel Molinaro; Alan C. Greenberg; Michael Alix and Jeffrey Farber.

BEARRES: Bear Stearns Residential Mortgage Corporation.

Broker-Dealer Risk Assessment Program:  A program requiring broker dealers that are part of a holding company structure with at least $20 million in capital to file with the SEC certain disaggregated information about their finances.

BSAM: Bear Stearns Asset Management, a wholly-owned subsidiary of The Bear Stearns Companies Inc.

CAP:   Capital Accumulation Program.

Captive Originations: mortgages originated by BEARRES and ECC that were sent directly into the securitization process at Bear Stearns.

CAQ: Center for Audit Quality.

Cayne: James E. Cayne, a director, Chairman of the Board and Chief Executive Officer of Bear Stearns during the Class Period.

Cioffi: Ralph Cioffi, the Bear Stearns trader who started and managed the High Grade Fund, a Managing Director of BSAM and a Director of BSC.

CDOs: Collateralized debt obligations.

CDO Report: Report issued by an employee of BSAM, on April 19, 2007, showing that the CDOs in the Funds were worth substantially less than previously thought.

CDO Squared: A CDO backed by other CDO notes.

CES: Closed end second lien loans.

CF Division: SEC Division of Corporation Finance, charged with ensuring that investors are provided with material information in order to make informed investment decisions.

CFO: Chief Financial Officer.

The Class:  All persons and entities which, between December 14, 2006 and March 14, 2008, inclusive, purchased or otherwise acquired the publicly traded common stock or other equity securities, or call options of or guaranteed by Bear Stearns, or sold Bear Stearns put options, either in the open market or pursuant or traceable to a registration statement, and were damaged thereby (the "Class").  The Class shall also include all persons who received Bear Stearns CAP

Plan Units and Restricted Stock Plan Units that had fully vested, entitling them to an equivalent number of shares of Bear Steams Stock upon settlement at the end of a deferral period, as a part of their compensation as an employee with the Company and participation in its RSU Plan and the CAP Plan.

Class Period: December 14, 2006 – March 14, 2008, inclusive.

Company: The Bear Stearns Companies Inc.

COMs (or Offering Memoranda): Confidential Offering Memoranda.

COO: Chief Operating Officer.

COSO: Committee of Sponsoring Organizations of the Treadway Commission.

CSE: Consolidated Supervised Entity.

Deloitte: Deloitte & Touche LLP, the external auditor for Bear Stearns during the Class Period.

Dimon: JPMorgan CEO Jamie Dimon.

D&L AAG: The AAG for Depository and Lending Institutions.

Domestic Funds: The High Grade Domestic Fund and the High Grade Enhanced Domestic Fund.

ECC: Encore Credit Corporation , which the Company purchased in early 2007.

EMC: EMC Mortgage Corporation, a Bear Stearns subsidiary.

EPD: Early Payment Default, which is the failure of a borrower to make their first three payments on a mortgage.

Equity Tranche: The most dangerous segment of a CDO which bears the first risk of loss.

Exchange Act: Securities Exchange Act of 1934, codified as 15 U.S.C. §78(a).

Farber: Defendant Jeffrey M. Farber, a Senior Vice President, and the Controller and Principal Accountant for the Company during the Class Period.

FAS: Statements of Financial Accounting Standards.

FASB: Financial Accounting Standards Board.

FASCON: FASB Concept Statements.

FIN: FASB Interpretations.

FPD: First Payment Default, the failure of a borrower to make even their first payment on a mortgage.

FSP: FASB Staff Opinions.

GAAP: U.S. Generally Accepted Accounting Principles.

GAAS: Generally Accepted Auditing Standards.

Goldman: Goldman Sachs & Co.

Greenberg:  Defendant Alan C. "Ace" Greenberg, Chairman of the Executive Committee of Bear Stearns during the Class Period.

Hedge Funds: The High Grade Fund and the High Grade Enhanced Fund.

HELOCs: Home-equity lines of credits.

High Grade Fund: a hedge fund managed by BSAM under the supervision of defendant Spector. The High Grade Master Fund included two entities. Bear Stearns High Grade Structured Credit Strategies Fund, L.P. was a Delaware partnership responsible for raising money from U.S. investors to be placed in the High Grade Master Fund.  Bear Stearns High Grade Structured Credit Strategies (Overseas) Ltd. was a Cayman Island corporation responsible for raising money from foreign investors to be placed in the High Grade Master Fund.

High Grade Enhanced Fund:  A hedge fund managed by BSAM under the supervision of defendant Spector.  The High Grade Enhanced Fund was structured similarly to the High Grade Fund, but allowed for a much greater amount of leverage, thereby increasing potential returns.

IPO: Initial public offering.

JPMorgan: JPMorgan Chase & Co.

Lead Plaintiff: The State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges Retirement System.

Level 1: Assets that are valued using the Mark-to-Market valuation technique.

Level 2: Assets that are valued using the Mark-to-Model valuation technique.

Level 3:  Assets that are thinly traded or not traded at all and are given values based on valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement.   The techniques are developed by management.

Leverage:  The use of borrowed money secured by assets in order to invest in assets with a greater rate of return than the cost of borrowing.

LTV: Loan to value ratios.

Maiden Lane: Maiden Lane LLC, the entity set up to hold $30 billion of Bear Stearns' assets in conjunction with the takeover of Bear Stearns by JPMorgan.

<u>Margin Call</u>: When a lender demands more collateral or a return of part or all of the money loaned in response to declining collateral values.

<u>Mark-to-Market</u>: The valuation method for assets traded in an active market, classified as Level 1 assets.

<u>Mark-to-Model</u>: The valuation method for assets whose values are based on quoted prices in inactive markets, or whose values are based on models using either directly or indirectly observable inputs over the full term, or most of the term, of the asset or liability, classified as Level 2 assets.

<u>MBS</u>: Mortgage Backed Securities.

<u>MD&A</u>: Management's Discussion & Analysis section of SEC filings.

<u>Mezzanine Tranche:</u> Lower rated tranche of a CDO which bears the greater risk of loss than the tranches above it.

<u>Molinaro</u>: Defendant Samuel J. Molinaro, Jr., Chief Financial Officer and Executive Vice President of Bear Stearns.  On August 5, 2007, he was also appointed COO.

<u>NAR</u>: National Association of Realtors.

<u>Net Capital Rule</u>: Rule 15c3-1 of the Exchange Act.

<u>No-Doc Loans</u>: Loans that required no documentation to corroborate the borrowers' and brokers' representations about the borrowers' income and assets.

<u>Nonprime Mortgages</u>: Subprime and Alt-A mortgages.

<u>No-Ratio Loans</u>: Loans that required less (or no) documentation to corroborate the borrowers' and brokers' representations about the borrowers' income and assets.

<u>OCIE</u>: SEC Office of Compliance Inspections and Examinations.

<u>Officer Defendants</u>: Individual Defendants Cayne, Schwartz, Spector, Molinaro, Greenberg, Alix and Farber.

<u>OIG</u>: Office of the Inspector General of the Securities Exchange Commission.

<u>PCAOB</u>: Public Company Accounting Oversight Board.

<u>PPP</u>: Preliminary Performance Profiles.

<u>Punk Ziegel</u>: Punk Ziegel & Co.

<u>Ratings Agencies</u>: U.S. commercial credit rating agencies Standard & Poor's, Moody's and Fitch.

RMBS: Residential Mortgage Backed Securities.

Repo: Repurchase agreement. A repo allows a borrower to use a financial security as collateral for a cash loan at a fixed rate of interest. In a repo, the borrower agrees to immediately sell a security to a lender and also agrees to buy the same security from the lender at a fixed price at some later date.

Retained Interests:  Especially risky tranches of RMBS kept by Bear Stearns as a result of the securitization process.

RSU: Restricted Stock Units.

Sarbanes-Oxley Act: Sarbanes-Oxley Act of 2002.

Schwartz: Defendant Alan D. Schwartz, Co-President and Co-Chief Operating Officer of Bear Stearns.  He became sole President on August 5, 2007.

Scratch and Dent Loans: Risky mortgages that were already in default that were purchased by Bear Stearns in the hopes of bringing the borrower back into compliance and securitizing the loan.

SEC: The Securities and Exchange Commission.

Securities Act: Securities Act of 1933, codified as 15 U.S.C. §§ 77k, 77l and 77o.

SFAS 5: Statement of Financial Accounting Standards No. 5, Accounting for Contingencies, issued in March 1975 by the FASB.

SFAS 115: Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity, issued in December 1993 by the FASB.

SFAS 140: Statement of Financial Accounting Standards No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities.

SFAS 157: Statement of Financial Accounting Standards No. 157, Fair Value Measurements, issued by the FASB in September 2006.

SMRS: The State of Michigan Retirement Systems (consisting of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges Retirement System).

SOP: AICPA Statements of Position.

SOP 94-6: AICPA's Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties.*

S&P: Standard & Poor's, including the Standard & Poor's Rating Service.

Spector: Defendant Warren J. Spector, Co-President, Co-COO, and a director of Bear Stearns. On August 5, 2007, Spector resigned those positions.

Stated Income Loans: Loans that required less documentation to corroborate the borrowers' and brokers' representations about the borrowers' income and assets.

Subprime Mortgages: Especially risky mortgages made to borrowers who have a heightened risk of default, such as those who have a history of loan delinquency or default, those with a recorded bankruptcy or those with limited debt experience.

Synthetic CDOs: A synthetic security that mimics or references a CDO.

Synthetic Securities:  A type of derivative, namely insurance contracts where the party buying the insurance paid a premium equivalent to the cash flow of an underlying RMBS which it was copying, and the counterparty insured against a decline or default in the underlying RMBS security.

TABX: An index that tracked synthesized subprime mortgage performance, refinancing opportunities, and housing price data into efficient market valuation of Mezzanine CDO tranches.

Tannin: Matthew M. Tannin, Chief Operating Officer of the Hedge Funds, a Managing Director of BSAM and a Director of BSC.

TM: The SEC's Division of Trading and Markets.

VaR: Value at Risk.

Court-appointed Lead Plaintiff, The State Treasurer of the State of Michigan, Custodian of the Michigan Public School Employees Retirement System, State Employees' Retirement System, Michigan State Police Retirement System, and Michigan Judges Retirement System (collectively, the "Lead Plaintiff" or "SMRS"), individually and on behalf of a class of similarly situated persons and entities, by its undersigned counsel, for its Consolidated Class Action Complaint for Violations of the Federal Securities Laws asserting claims against The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company") and the other Defendants named herein, allege the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.[1]

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon an investigation by its counsel which included, among other things: (i) review and analysis of documents filed publicly by Bear Stearns with the Securities and Exchange Commission (the "SEC"); (ii) review and analysis of press releases, news articles, and other public statements issued by or concerning Bear Stearns and other Defendants named herein; (iii) review and analysis of research reports issued by financial analysts concerning Bear Stearns' securities and business; (iv) the September 25, 2008 Report of the Office of Inspector General of the SEC entitled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" and "SEC's Oversight of Bear Stearns and Related Entities: Broker-Dealer Risk Assessment Program"; (v) interviews of numerous former Bear Stearns executives and employees; (vi) review and analysis of news articles, media reports and other publications concerning the mortgage banking and lending industries; and (vii) review and

---

[1] A glossary of certain defined terms in this Complaint and terms that are specific to Bear Stearns' business and the mortgage banking industry appears after the table of contents.

analysis of certain pleadings filed in other pending litigation naming Bear Stearns as a defendant or nominal defendant.  Lead Plaintiff believes that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after plaintiffs have a reasonable opportunity for discovery.

## I.     NATURE AND SUMMARY OF THE ACTION

1.      As more fully set forth in paragraph 803 below, Lead Plaintiff brings this federal securities class action on behalf of itself and on behalf of a class consisting of all persons and entities that, between December 14, 2006 and March 14, 2008, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock or other equity securities, or call options of or guaranteed by Bear Stearns, or sold Bear Stearns put options and were damaged thereby (the "Class" or "Plaintiffs").

2.      Since its founding in 1923, Bear Stearns was widely regarded as one of the preeminent investment banks of the world and as a shrewd manager of risk.

3.      Beginning early in this decade, however, Bear Stearns embarked on a business plan that left it extraordinarily vulnerable to volatility in the housing market.  It purchased and originated enormous numbers of unusually risky mortgages to securitize and sell, and maintained billions of dollars of these assets on its own books.  The Company used the assets on its books as collateral to purchase even larger quantities of debt, and to finance the ballooning costs of its daily operations.  The future of the highly-leveraged Company had come to depend on the accuracy of its assessments of the value of these securities and the risk that their value might decline.

4.      The investing public was unaware that even before the Class Period began, the Company had secretly abandoned any meaningful effort to manage the huge risks it faced.  In

2005 and again in 2006 the SEC privately warned the Company of crucial deficiencies in models it used to value mortgage-backed securities and to assess risk, both critical tools for managing the Company's exposure to market declines.  The SEC regulators told the Company that the mortgage valuation models it used failed to incorporate data about risk of default, and that its value at risk models did not account for key factors such as changes in housing prices.

5.      Instead of revising its models to accurately reflect a rapidly accelerating downturn in the housing market, the Company bolstered the value of its stock by persisting in using its misleading mortgage valuation and value at risk models in an effort to conceal the extent of its exposure to loss.  Indeed, throughout the Class Period, the Company reported value at risk figures to investors that were far lower and more stable than its peers.

6.      At the same time, Bear Stearns falsely represented to the public that it regularly reviewed and updated its valuation and risk models to ensure their accuracy.  Analysts, impressed by the strength of the Company's revenues and the apparent conservatism reflected in its risk management practices, recommended Bear Stearns to investors as a sound investment.

7.      The collapse of two massive hedge funds overseen by the Company in the Spring of 2007 dramatically increased Bear Stearns' exposure to the growing housing crisis.  When Bear Stearns bailed out one of the funds, the Company effectively took onto its own books nearly two billion dollars of the hedge funds' subprime-backed assets that were worthless within weeks.  Instead of revealing its losses on this collateral at the time of the bailout, the Company hid the extent of the declines, and continued to offer false and misleading asset valuations and value at risk numbers to the public, further inflating the price of its stock.  The Company falsely stressed that any issues with the hedge fund collapse "were isolated incidents and [were] by no means an indication of broader issues at Bear Stearns."

8.      By the late fall of 2007, the Company's losses had become too big to conceal and it began to write down billions of dollars of its devalued assets.  Surprised investors and analysts became concerned that they had not been given an accurate picture of the Company's exposure to losses.  The Company's lenders, fearing that Bear Stearns might not be creditworthy, became unwilling to lend it the vast sums necessary for its daily operations.

9.       In its public statements in December of 2007 and January of 2008, the Company continued to hide its steep slide, offering the public misleading accounts of its earnings and asset values.  However, Bear Stearns' trading partners grew increasingly suspicious that the Company was in precarious straits.

10.      On Wednesday, March 10, 2008, rumors began to circulate on Wall Street that Bear Stearns was facing a liquidity problem.  The Company issued a press release denying the rumors and stated that its "balance sheet, liquidity and capital remain strong."  On March 12, 2008, Bear Stearns' CEO Alan Schwartz appeared on CNBC to reassure investors that Bear Stearns had ample liquidity and that he was "comfortable" that Bear Stearns would turn a profit in its fiscal first quarter and that there was no threat to the Company's liquidity.  By the next evening,  Thursday, March 13, 2008, Schwartz was making frantic phone calls to the Federal Reserve and to JPMorgan-Chase & Co. ("JPMorgan") hoping for a last minute rescue to avoid bankruptcy the next day.

11.      On the morning of Friday, March 14, 2008, it was revealed that JPMorgan would provide short-term funding to Bear Stearns while the Company worked on alternative forms of financing.  Bear Stearns' stock plummeted on the news, falling from $57 per share to $30 per share, a 47% one-day drop.

12.     Over the weekend of March 15 and 16, JPMorgan bankers scoured Bear Stearns' books and, with multi-billion dollar backing from the Federal Reserve, agreed to purchase Bear Stearns for $2 per share.  JPMorgan's CEO Jamie Dimon told investors on a conference call on Sunday evening, March 16, 2008, that, after examining Bear Stearns' books, it had found that the Company faced $40 billion in credit exposure, including mortgage liabilities, and a $2 per share offer price was necessary to protect JPMorgan.  JPMorgan's offer was particularly stunning in light of the fact that the Company's Manhattan headquarters alone was worth $8 per share.

13.     Indeed, Dimon later stated that, without the Federal Reserve's provision of $30 billion in funding, the deal "would have been very hard to do.  Without the Fed to help mitigate the risk, to protect us from an over concentration in some risky assets, I'm not sure it was doable at all."

14.     On March 17, 2008, upon the revelation of the Company's full exposure to loss, Bear Stearns' stock was in a free fall, closing at below $5 ($4.81) per share, an 84% drop from its previous close.  While JPMorgan would eventually increase its bid to $10 per share, the Company's investors had already suffered historic losses.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b 5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b 5.

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 and 1337(a).

17.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c).  Many of the acts and

omissions charged herein, including the preparation and dissemination to the public of materially

false and misleading information, occurred in substantial part in the Southern District of New

York.  Bear Stearns maintained its corporate headquarters and principal executive offices in this

District throughout the Class Period.

18.      In connection with the acts and conduct alleged herein, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the United States mails, interstate telephone communications, and the facilities of national

securities exchanges and markets.

### III.      PARTIES

#### A.      Lead Plaintiff

19.      Lead Plaintiff SMRS serves the working and retired public servants of four SMRS

systems: the Public School Employees Retirement System; the State Employees' Retirement

System; the State Police Retirement System; and the Judges Retirement System.  The

beneficiaries of the SMRS include 563,576 people and include one out of every eighteen

Michigan citizens.  Within these systems, four defined benefit pension plans and two defined

contribution pension plans are administered with combined assets of nearly $64 billion, making

the SMRS the fourteenth largest public pension system in the U.S., the twentieth-largest pension

system in the U.S., and the thirty-ninth largest pension system in the world.  In 2006, the SMRS

paid out $4.6 billion in pension and health benefits.

20.      As set forth in the amended certification annexed hereto as Exhibit A, Lead

Plaintiff SMRS purchased Bear Stearns common stock on the open market during the Class

Period and suffered damages as a result of the misconduct alleged herein.

B.   **Bear Stearns Defendants**

1.   **The Bear Stearns Companies Inc.**

21.   Defendant The Bear Stearns Companies Inc. is and at all relevant times was organized and existing under the laws of the State of Delaware, with its principal place of business at 383 Madison Avenue, New York, New York.  At all relevant times Bear Stearns, through its various subsidiaries, provided a broad range of financial services to clients and customers worldwide.  Bear Stearns held itself out as a leading financial services firm with core business lines including institutional equities, fixed income, investment banking, global clearing services, asset management, and private client services.

22.   On May 30, 2008, a wholly-owned subsidiary of JPMorgan Chase & Co. merged with, and into, Defendant Bear Stearns Companies, with Bear Stearns Companies continuing as the surviving corporation and as a wholly-owned subsidiary of JPMorgan & Chase Co.

2.   **Officer Defendants**

23.   Defendant James E. Cayne ("Cayne") was at all relevant times a director, Chairman of the Board, and Chief Executive Officer of Bear Stearns.  Although Cayne resigned from his position as CEO on January 8, 2008, he continued to serve as Chairman of the Company's Board of Directors throughout the Class Period.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Cayne sold 219,036 shares for a total realized value of $23,010,474.

24.   Defendant Alan D. Schwartz ("Schwartz") was Co-President and Co-Chief Operating Officer ("COO") of Bear Stearns from June of 2001 to August of 2007.  He became sole President on August 5, 2007, and remained in that position until January 5, 2008, when he was named CEO of the Company.  Schwartz served on the Company's Board of Directors

throughout the Class Period.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Schwartz sold 91,233 shares for a total realized value of $9,867,001.

25.     Defendant Warren J. Spector ("Spector") was Co-President, Co-COO of the Company from June of 2001 to August of 2007, and served as a director of Bear Stearns from 1990 until August of 2007.  On August 5, 2007 Spector resigned those positions.  However, he remained an employee of the Company with the title Senior Managing Director until December 28, 2007.  During his tenure as Co-President and Co-COO, all divisions of the Company save investment banking reported to Spector, including the two large hedge funds that were heavily invested in mortgage-backed securities.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Spector sold 116,255 shares for a total realized value of $19,066,373.

26.     Defendant Alan C. Greenberg ("Greenberg") was Chairman of the Executive Committee of Bear Stearns during the Class Period.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Greenberg sold 371,986 shares for a total realized value of $34,594,027.

27.     Defendant Samuel L. Molinaro Jr. ("Molinaro") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Bear Stearns.  On August 5, 2007, he was also appointed COO.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Molinaro sold 38,552 shares for a total realized value of $4,230,828.

28.     Defendant Michael Alix ("Alix") was the Senior Managing Director and Global Head of Credit Risk Management for the Company during the Class Period.

29.     Defendant Jeffrey M. Farber ("Farber") was a Senior Vice President, Controller and Principal Accountant for the Company during the Class Period.

8

30.     Cayne, Schwartz, Spector, Greenberg, Molinaro, Alix and Farber are collectively referred to as the "Officer Defendants."  The Bear Stearns Companies Inc. and the Officer Defendants are collectively referred to as the "Bear Stearns Defendants."

31.     The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Bear Stearns' quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance.

### C.     **Auditor Defendant**

32.     Deloitte & Touche LLP ("Deloitte") was, at all relevant times, the independent outside auditor for Bear Stearns.  Deloitte provided audit, audit-related, tax and other services to Bear Stearns during the Class Period, which included the issuance of unqualified opinions on the Company's financial statements for fiscal years 2006 and 2007 and management's assessments of internal controls for the same years.  Deloitte consented to the incorporation by reference of its unqualified opinions on the Company's financial statements and management's assessment of internal controls for fiscal years 2006 and 2007.

## IV.     **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

### A.     **Bear Stearns' Storied Past**

33.     Bear Stearns was the fifth largest investment bank in the world before its stunning collapse in March 2008.  For decades, Bear Stearns had been known as one of the most conservative of the Wall Street firms due to the perception that it took a cautious approach to risk.  In fact, the Company survived the Great Depression without laying off any of its employees and, until December 2007, had never posted a loss.

34.     As a registered broker-dealer, Bear Stearns was subject to a regulatory scheme called the "Broker-Dealer Risk Assessment Program."  The program was created in 1990, when Section 17(h) of the Exchange Act was amended to require broker dealers that are part of a holding company structure with at least $20 million in capital to file with the SEC certain disaggregated information about their finances.

35.     The Broker Dealer Risk Assessment Program called for staff in the SEC's division of Trading and Markets ("TM") to monitor events that might threaten broker-dealers, customers, and the financial markets.  Although TM officially tracked the filing status of 146 broker-dealers in the program, during the Class Period it only reviewed in detail the filings of the seven most prominent firms, including Bear Stearns, that elected to participate in the SEC's Consolidated Supervised Entity ("CSE") program.  The CSE program allowed the SEC to supervise participating broker-dealer holding companies on a consolidated basis.

36.     While Bear Stearns was among the smallest of the CSE firms, it experienced rapid growth through the 1990s.  By 1992, the Company's earnings had doubled to over $295 million, the best year in its history to date.  During the same year, the Company managed more than $13 billion in initial public offerings ("IPOs") for a variety of U.S. and foreign corporations. Moreover, the Company had become a leader in clearing trades for other brokers and brokerages.

37.     In 1993 Defendant Cayne succeeded Defendant Greenberg as CEO, but Greenberg stayed on as Chairman of the Board, and then as Chairman of the Company's Executive Committee starting in 2001.  While Bear Stearns under Cayne became a larger and more profitable firm, its business model was essentially unchanged.  Its time-tested businesses— trading, mortgage underwriting, prime brokerage, and private client services— still received the bulk of the Company's capital and management attention.

38.     At the beginning of the new century, with the economy weakening, Bear Stearns was in an increasingly precarious position.  By mid-2000, Bear Stearns' stock price was in a two-year slump.  As one of Wall Street's last independent financial services firms, the Company struggled to keep up with competitors.

**B.      The Boom in Debt Securitization**

39.     Soon after the turn of the new century, the Company's fortunes began to change. In the first years of this decade, persistently low interest rates and technical innovations lead to a boom in debt issuance— to back mortgages, credit card receivables, or leveraged buyouts.  As a result, the Company experienced explosive growth in one area of business—debt securitization.

40.     Debt securitization involves pooling and repackaging of cash flow-producing financial assets into securities that are sold to investors.  The securities that are the outcome of this process are termed asset-backed securities ("ABS").  When mortgages are packaged together for securitization, they are referred to as Mortgage Backed Securities ("MBS"), and when the mortgages are residential, those securities are referred to as Residential Mortgage Backed Securities ("RMBS").

41.     RMBS are, in turn, divided into layers based on the credit ratings of the underlying assets.  The typical structuring of an RMBS is set out in the chart below.



42.    The credit quality of asset-backed securities such as RMBS can be more volatile than general corporate debt.  If the value of the underlying assets declines, the affected securities can experience dramatic credit deterioration and loss.

43.    The "B-Pieces" of an RMBS, that is, its riskier parts, can be pooled together to form a kind of asset-backed security called a collateralized debt obligation ("CDO").  CDOs are then once again divided by the CDO issuer into different tranches, or layers, based on gradations in credit quality.

44.    While the top tranche of a CDO may be rated "AAA," CDOs are generally formed from RMBS that are rated BBB or lower.  Accordingly, even the best tranches of a CDO are a very risky form of security.  Lower-rated tranches of CDOs, such as the "mezzanine" tranches, bear even greater risk of loss.  The most dangerous segment of a CDO is termed the "equity" tranche, and bears the first risk of loss.

45.    Through the first part of this decade, mezzanine CDOs offered for sale proliferated, making up more than 75% of the total CDO market by April of 2007.  The

mezzanine CDOs were stuffed with cash flows from especially risky types of residential mortgage loans, termed "subprime" or "Alt-A."

46.     Subprime loans are made to borrowers who have a heightened risk of default, such as those who have a history of loan delinquency or default, those with a recorded bankruptcy, or those with limited debt experience.

47.     Alt-A loans, although considered less risky than subprime loans, are still more risky than prime loans.  Alt-A loans are typically made to borrowers with problems including lack of documentation of income and assets, high debt-to-income ratios, and troubled credit histories.  Subprime and Alt-A mortgages are collectively referred to herein as "nonprime" mortgages.

48.     Between 2003 and 2007, the total proportion of risky nonprime loans wrapped into the majority of all mezzanine CDOs increased dramatically marketwide, as set out in the chart below.

### Mezzanine CDOs: Average Collateral Composition

| CDO Vintage | % Assets Subprime | % Assets Alt-A | % Assets CES | % Assets Other CDOs | Total Nonprime |
|---|---|---|---|---|---|
| 2003 | 33.7% | 7.6% | 1.8% | 7.0% | 50.1% |
| 2004 | 43.2% | 10.1% | 2.7% | 5.9% | 61.9% |
| 2005 | 55.1% | 9.3% | 2.2% | 5.9% | 72.5% |
| 2006 | 64.2% | 6.9% | 2.1% | 5.5% | **78.7%** |
| 2007 | 62.9% | 5.8% | 0.8% | 6.9% | **76.4%** |

Source: Standard & Poor's

### C.     Bear Stearns' Securitization Business

49.     Bear Stearns was in an ideal position to benefit from the market for CDOs backed by higher-risk nonprime mortgages, in that it was vertically integrated in that business—it

originated and purchased risky home loans, packaged them into RMBS, collected these RMBS to form CDOs, then sold CDOs to investors.  As a result of this process, it also acquired a large exposure to declines in the housing and credit markets.

      **1.**      **Bear Stearns' Mortgage Origination and Purchasing Business**

50.     Through its subsidiaries, Bear Stearns originated and purchased vast numbers of risky residential mortgage loans during the Class Period.

51.     The Company originated loans through two wholly-owned subsidiaries, the Bear Stearns Residential Mortgage Corporation ("BEARRES") and later through Encore Credit Corporation ("ECC"), which the Company purchased in early 2007.  ECC was strictly a "subprime" lender; it specialized in providing loans to borrowers with compromised credit.

52.     BEARRES had several products available to subprime borrowers, but also made Alt-A loans to borrowers with somewhat better, but still compromised credit.  ECC began operating under the BEARRES name in October of 2007, but still retained distinct product lines.

53.     Many of the mortgages originated by BEARRES and ECC were "stated income," "no ratio," and "no-doc" loans that required less (or no) documentation to corroborate the borrowers' and brokers' representations about the borrowers' income and assets.

54.     Moreover, the Company actively encouraged its loan originator subsidiaries to offer loans even to borrowers with poor credit scores and troubled credit histories.  According to Confidential Witness Number 1 ("CW 1"), an Area Sales Manager who began work for ECC in January of 2006 and continued working at BEARRES until February of 2008, CW 1's office was under great pressure to "dig deeper" and originate riskier loans that "cut corners" with respect to credit scores or loan to value ("LTV") ratios.

55.     As a result of these lax standards, the Company approved the great majority of all loan applications it received.  While the national rejection rate was 29% in 2006, BEARRES rejected only 13% of applications in the same period.

56.     In 2006 alone, using these questionable lending practices, BEARRES and ECC originated 19,715 mortgages worth $4.37 billion.  Because these were "captive" originations, the mortgages originated by BEARRES and ECC were sent directly into the securitization process at Bear Stearns.

57.     As a result of Bear Stearns' hunger for loans to securitize, it also purchased huge numbers of risky loans originated by other companies through its EMC Mortgage Corporation ("EMC") subsidiary.  From 1990 until 2007, EMC purchased over $200 billion in mortgages.

58.     The loans the Company purchased by this means were often as suspect as the loans it originated.  Confidential Witness Number 2 ("CW 2"), a Quality Control and Reporting Analyst at EMC from April 2006 through August 2007, reviewed and examined loan origination and loan portfolio statistics on subprime loans purchased by EMC, and also created reports for upper management at EMC.  CW 2 confirmed that EMC would buy almost everything, including extremely risky loans where the borrower's income and ability to pay could not be verified.

59.     According to Confidential Witness Number 3 ("CW 3"), a former Collateral Analyst with the Company who worked for Bear Stearns in the first half of 2007, the Company understood that the loans it was purchasing through EMC were unusually risky.  CW 3 reported that during the latter part of 2006 and the beginning of 2007 EMC was "buying everything" without regard for the riskiness of the loan.  CW 3 explained that because of the potential for profits from securitizing these loans Bear Stearns managers looked the other way and did not enforce basic underwriting standards.

60.     Confidential Witness Number 4 ("CW 4"), an Underwriting Supervisor and Compliance Analyst for EMC from September 2004 until February 2007, reported that the Bear Stearns traders responsible for buying the loans were fully aware of the weakness of the underlying loans.  According to CW 4, the traders ignored CW 4's due diligence findings that borrowers would be unable to pay.

61.     Bear Stearns also began funding and purchasing even riskier closed-end second-lien ("CES") loans and home-equity lines of credit ("HELOCs").  Most of these loans were made to borrowers with poor credit.  Moreover, they were secured by secondary liens on the home, meaning that, should the home go into foreclosure, Bear Stearns would only be paid after the first mortgage was satisfied and was more likely not to be paid in full if the value of the home dropped.  By the end of 2006, EMC had purchased $1.2 billion of HELOC and $6.7 billion of second-lien loans.  Once these loans were purchased, they would go directly into the securitization process.

62.     Finally, through EMC, Bear Stearns aggressively purchased exceptionally risky mortgages that were already in default in the hopes of bringing the borrower back into compliance and securitizing the loan along with other acquired and originated mortgages-so-called "scratch and dent" loans.  A special desk at Bear Stearns was designated to securitize the "scratch and dent" loans and sell them to investors.

63.     Given the Company's poor underwriting standards and devil-may-care attitude towards purchasing mortgages originated by other companies, the loans that it purchased to package into RMBS and CDOs were especially vulnerable to declines in housing prices.

### 2. Bear Stearns' RMBS Business

64.     After Bear Stearns acquired a sufficiently large pool of risky mortgages to securitize, it took the individual nonprime home loans and wrapped them into an RMBS.  Some RMBS it sold to investors, and others it packaged into CDOs.

65.     Especially risky tranches of RMBS were kept on the Company's books as "Retained Interests."  Throughout the Class Period, the amount of these especially risky RMBS that the Company kept as retained interests steadily grew, from $5.6 billion as of November 30, 2006 to $9.6 billion by August 31, 2007.

### 3. Bear Stearns' CDO Business

66.     In order for the Company to assemble RMBS into CDOs, a further step was required.  Each CDO was set up as a new entity, typically an offshore limited liability entity, with its own assets and liabilities.  Further, the CDOs produced by Bear Stearns incorporated cash flows from pools of risky subprime and "Alt-A" home mortgage loans.

67.     Nearly all of the CDOs Bear Stearns structured during the Class Period were backed, in addition to RMBS, by derivatives or "synthetic securities," which were, in effect, insurance contracts where the party buying the insurance paid a premium equivalent to the cash flow of an underlying RMBS which it was copying, and the counterparty insured against a decline or default in the underlying RMBS security.  In other words, a synthetic security is akin to a "side bet" on the performance of certain assets.  Such CDOs are called "Synthetic CDOs." A CDO backed by other CDO notes is called a "CDO squared."

68.     One of Bear Stearns' primary functions as a CDO underwriter was determining the marketable size of each CDO.  This determination was based on three things: the supply of collateral that would make up the assets of the CDO, the market demand for the securities issued

by the CDO, and the risk-taking ability of the Company—that is, Bear Stearns' ability to retain unsold CDO securities and to insure the CDO against losses.

69.     In order to sell CDOs that were as large as possible, the Company retained increasing amounts of the CDOs it packaged on its books.  By August of 2007, this figure had reached $2.072 billion.

### D.     Bear Stearns' Business Practices Amplify its Risk Exposure

70.     During the Class Period, the Company's growing accumulation of subprime-backed RMBS and CDOs, combined with its leveraging practices, left it extraordinarily vulnerable to declines in the housing market.  This vulnerability was only exacerbated by the Company's management and implicit backing of two enormous hedge funds holding subprime-backed securities.

### 1.     Bear Stearns' Concentration in Mortgage-Backed Debt

71.     According to documents privately submitted to the SEC, even before the Class Period began, on multiple occasions the amount of mortgage securities held by the Company exceeded its own internal limits on concentration.

72.     Shortly after Bear Stearns' March 2008 collapse, Senator Charles Grassley, Ranking Member of the United States Senate Committee on Finance, issued a request that the SEC's Office of the Inspector General ("OIG") analyze the SEC's oversight of the CSE firms, with a special emphasis on Bear Stearns.

73.     To assist in this audit, the OIG retained Professor Albert Kyle of the University of Maryland, an acclaimed expert on capital markets.  Professor Kyle analyzed TM's oversight of Bear Stearns, and from information submitted to the SEC, analyzed Bear Stearns' capital, liquidity, and leverage ratios.  Professor Kyle also examined the Company's access to secured and unsecured financing, and its compliance with industry and worldwide banking guidelines.

74.     To prepare the report, the SEC relied on an extensive collection of internal memoranda and other documents relating to TM's oversight of Bear Stearns, including non-public correspondence between TM and the Company's top executives.

75.     The OIG issued its conclusions in a September 25, 2008 Report, titled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" (the "2008 OIG Report").

76.     In the report, the OIG stated that "[b]y November of 2005 the Company's ARM business was operating in excess of allocated limits, reaching new highs with respect to the net market value of its positions." Such a large concentration of business in this area left the Company very exposed to declines in the riskiest part of the housing market.

### 2.     Bear Stearns' Leveraging Practices

77.     The Company's exposure to declines in the value of the loans backing its assets was vastly magnified by its leveraging practices. In leveraging, a company takes out a loan secured by assets in order to invest in assets with a greater rate of return than the cost of interest for the loan. Leverage allows greater potential returns to the investor than otherwise would have been available, but the potential for loss is also greater because if the investment becomes worthless, the loan principal and all accrued interest on the loan still need to be repaid.

78.     Indeed, as a company's leverage ratio increases, its exposure to loss increases dramatically. As set out in the chart below, a leverage ratio of four to one increases losses by about 15%, while a leverage ratio of 35 to one magnifies losses by more than 100%.



79.     During the Class Period, the Company used the assets on its books as collateral for purchases costing many times the equity it possessed.  In 2005, the Company was leveraged by a ratio of approximately 26.5 to 1.  By November of 2007, the Company had leveraged its net equity position of $11.8 billion to purchase $395 billion in assets—a ratio of nearly 33 to 1.  As a consequence, even a small decline in the value of its assets it held could have catastrophic effects on the Company's finances.  For example, a 3% decline in asset values would wipe out 100% of equity.

80.     Because of the interest charges the Company had to pay to support its soaring leverage ratio, the amount of cash the Company needed to finance its daily operations increased dramatically during the Class Period.  By the close of the Class Period, Bear Stearns' daily borrowing needs exceeded $50 billion.

###     3.     Bear Stearns' Backing of the Hedge Funds

81.     Another key source of the Company's exposure to the subprime market came through its relationship with two large hedge funds that it managed and that bore its name.

20

82.     In October of 2003, the Company staked a young trader named Ralph Cioffi ("Cioffi") to start the High Grade Structured Credit Strategies Fund, LP (the "High Grade Fund") which was housed in Bear Stearns Asset Management.  The High Grade Fund, which was under the supervision of defendant Spector, consisted of two separate entities.  The Bear Stearns High Grade Structured Credit Strategies Fund, L.P., a Delaware partnership, was responsible for raising money from U.S. investors to be placed in the High Grade Master Fund.  Bear Stearns High Grade Structured Credit Strategies (Overseas) Ltd., a Cayman Island corporation, was responsible for raising money from foreign investors to be placed in the High Grade Master Fund.

83.     In August of 2006 Cioffi created the High Grade Structured Credit Strategies Enhanced Leverage Fund, LP ("the High Grade Enhanced Fund") (the High Grade Master Fund and the High Grade Enhanced Fund are collectively referred to as the "Hedge Funds").  The High Grade Enhanced Fund was structured similarly to the High Grade Fund, but allowed for a much greater amount of leverage, thereby increasing potential returns.

84.     An important selling point for investors in the Hedge Funds was the funds' relationship with Bear Stearns.  Bear Stearns was known as a leader in CDOs and other exotic securities.  The Hedge Funds were marketed as safe investments because of Bear Stearns' expertise and the use of the Company's proprietary systems to identify and manage risk.

85.     Moreover, Bear Stearns was involved in virtually every part of the Hedge Funds' business.  Bear, Stearns Securities Corporation, a wholly-owned subsidiary of the Company, served as the prime broker for the Hedge Funds, and PFPC Inc., another Bear Stearns subsidiary, was the Hedge Funds' administrator.  BSAM was the investment manager for the Hedge Funds.  Defendant Spector himself was ultimately responsible for the business of both of the funds.

86.     The Hedge Funds invested according to a strategy developed by BSAM.  The Hedge Funds' objective was to provide current income and capital appreciation in excess of LIBOR by investing primarily in High Grade structured financed securities, with an emphasis on long positions in triple-A and double-A rated asset backed securities, such as CDOs.  The High Grade Fund increased its returns through the use of leverage: taking the CDOs it had purchased and borrowing against them, cheaply, through repurchase or "repo" agreements with counterparties.

87.     In a repo, a borrower agrees to immediately sell a security to a lender and also agrees to buy the same security back from the lender at a fixed price at some later date.  Because cash obtained through a repurchase agreement is secured by the collateral provided, it is a cheaper source of financing than unsecured loans with higher interest rates.

88.     The loan proceeds from the repurchase agreements were used to buy additional CDOs, and the proceeds (in the form of interest payments) from those investments would finance additional borrowing.

89.     Fortunately for the Hedge Funds, because of BSAM's role as an asset manager, they had in Bear Stearns a lender willing to extend large amounts of cash in exchange for collateral drawn from the Hedge Funds' risky CDO assets.  In fact, Bear Stearns was one of the few repurchase lenders willing to take the Hedge Funds' CDOs as collateral for short term lending facilities.

90.     The Hedge Funds, through BSAM, entered into many repurchase agreements on favorable terms with Bear Stearns as the counterparty.  When, in the summer of 2006, Bear Stearns entered into a temporary moratorium on repurchase agreements between the Hedge Funds and the Company, it briefly deprived the Hedge Funds of an important source of

financing.  In an e-mail from Cioffi to Tannin in September, 2006, Cioffi underscored the

importance of Bear Stearns' role as a lender willing to take on the Hedge Funds' risky subprime-

backed collateral:

> Do we have an official mandate to terminate our relationship with
> Bear?  This hurts our investors as it eliminates a repurchase
> counterparty (reducing liquidity) and eliminates a source of trading
> secondary CDOs.  Bear is among the best (reducing liquidity) and
> further eliminates a source for assets.

91.     As a result of the Company's willingness to support the Hedge Funds by offering

cash in exchange for subprime mortgage-backed CDOs of questionable value, Bear Stearns'

exposure to declines in the subprime market skyrocketed.

**E.      Bear Stearns' Misleading Models and Inadequate Risk Management**

92.     The Company's assumption of vast amounts of risk and aggressive leveraging

practices was especially reckless given that, even before the Class Period began, the Company

knew there were grave deficiencies in the models it used in valuing mortgage-backed assets and

assessing its exposure to loss.  It had twice been informed by the SEC that these models failed to

incorporate key indicators of a declining housing market.  Moreover, the Company failed to take

basic steps to ensure that its risk management department functioned independently and

effectively.

**1.      Bear Stearns' Misleading Valuation and Risk Models**

93.     The 2008 OIG Report identified crucial deficiencies in models that the Company

used for valuation and risk management purposes.

### a.      The Importance of Valuation Models

94.     The valuation of assets is governed by Statement of Financial Accounting Standards No. 157, Fair Value Measurements ("SFAS 157").  Although SFAS 157 took effect on November 15, 2007, Bear Stearns opted to comply with the standard beginning January of 2007.[2]

95.     SFAS 157 required that Bear Stearns classify its reported assets into one of three levels depending on the degree of certainty about the asset's underlying value.  Assets that were easy to value because traded in an active market, such as shareholder's equity, were classified as Level 1 ("mark-to-market").

96.     Level 2 ("mark-to-model") assets consisted of financial assets whose values are based on quoted prices in inactive markets, or whose values are based on models – but the inputs to those models are observable either directly or indirectly for substantially the full term of the asset or liability.

97.     Level 3 assets, because they are thinly traded or not traded at all, have values based on valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement.

98.     To value opaque Level 3 assets, companies rely on models developed by management.  With respect to valuing mortgage-related securities, these models should incorporate assumptions critical to determining fair value such as the (i) interest rate environment (including term structure or "yield curve" and volatility), (ii) market liquidity levels, (iii) credit exposure and (iv) the economic environment including housing prices and default rates.

---

[2] Prior to the Company's adoption of SFAS 157, it was subject to similar provisions under SFAS 115.

99.     The information supplied by valuation models is incorporated into other models used to assess risk and hedge investments, such as the models measuring Value at Risk ("VaR"), described at paragraphs 115 to 117 below.

**b.      Bear Stearns' Valuation Models Were Misleading**

100.     Even before the Class Period began, the Company knew that declining housing prices and rising default rates were not reflected in the mortgage valuation models that were critical to the valuation of its Level 3 assets.

101.     In its 2008 Report, the OIG stated that, prior to the Company's approval as a CSE in November of 2005, "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked."

102.     As a result, during the 2005 CSE application process, TM told Bear Stearns that "[w]e believe that it would be highly desirable for independent Model Review to carry out detailed reviews of models in the mortgage area."

103.     According to the 2008 OIG Report, these concerns were again communicated to the Company in a December 2, 2005 memorandum from the SEC Office of Compliance Inspections and Examinations ("OCIE") to defendant Farber, then a Senior Managing Director and the Company's Controller and Principal Accounting Officer.  Farber reported to defendant Molinaro, CFO and Executive Vice President.

104.     TM documents cited in the 2008 OIG Report reflect that nearly a year after its admission to the CSE program, on September 20, 2006, Bear Stearns' risk management personnel gave a presentation to the TM division regarding the models that Bear Stearns used to price and hedge various financial instruments.  The 2008 OIG Report stated that as a result of the presentation, TM concluded, among other things, that Bear Stearns' "model review process lacked coverage of mortgage-backed and other asset-backed securities" and that "the sensitivities

to various risks implied by the models did not reflect risk sensitivities consistent with price fluctuations in the market."

105.    The 2008 OIG Report also revealed that TM's discussions with risk managers in 2005 and 2006 indicated that Bear Stearns' pricing models for mortgages "focused heavily on prepayment risks" but that TM documents did not reflect "how the Company dealt with default risks."

106.    Defendant Cayne, the CEO of the Company, and defendant Molinaro, the CFO of the Company, were aware of the SEC's concerns about Bear Stearns risk management program. According to a February 8, 2008 presentation by defendant Molinaro at a Credit Suisse Financial Services Forum, the Company's risk management structure "reports directly to the CFO." Moreover, it stated that the Company's "CEO is intimately engaged in the risk management process."

107.    Despite its awareness of TM's concerns, the Company made no effort to revise its mortgage valuation models to reflect declines in the housing market.  In fact, according to Confidential Witness 5 ("CW 5"), a former employee of the model validation department at Bear Stearns during the latter half of the Class Period, Tom Marano, the head of the Company's mortgage trading desk, was "vehemently opposed" to the updating of the Company's mortgage valuation models.

108.    This witness' statement is consistent with the findings in the 2008 OIG Report, which concluded that the Company did not begin to make any effort to incorporate measures reflecting declines in housing prices into its mortgage models until "towards the end of 2007"— long after the Company had acquired a huge hoard of highly illiquid mortgage-backed assets.

109.    In fact, the OIG concluded,

**the reviews of mortgage models that should have taken place before the subprime crisis erupted in February of 2007 appears to have never occurred**, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008.

110.     As the housing market plummeted throughout 2007 and into 2008, Bear Stearns continued to rely on its flawed valuation models which exacerbated the spread between the true value of their assets and the value Bear Stearns was publicly reporting.  Level 3 assets, including retained interests in RMBS and the equity tranches of CDOs, made up 6-8% of the Company's total assets at fair market value in 2005, and increased to 20-29% of total assets between the fourth quarter of 2007 and the first quarter of 2008.

111.     According to the Company's Form 10-K for the period ending November 30, 2007, the majority of the growth in the Company's Level 3 assets in 2007 came from "mortgages and mortgage-related securities"—the very assets that the Company was valuing using its misleading models.  Indeed, as of August 31, 2007, the Company carried $5.8 billion in Level 3 assets backed by residential mortgages, a figure that grew close to $7.5 billion by November 30, 2007.

c.     <u>The Importance of Value at Risk Models</u>

112.     The SEC's second criticism of the Company's models related to Bear Stearns' assessment of risk.

113.     Broadly, risk is defined as the degree of uncertainty about future net returns, and is commonly classified into four types.  *Credit risk* relates to the potential loss due to the inability of a counterpart to meet its obligations.  *Operational risk* takes into account the errors that can be made in instructing payments or settling transactions, and includes the risk of fraud and regulatory risks.  *Liquidity risk* is caused by an unexpected large and stressful negative cash flow over a short period.  If a firm has highly illiquid assets and suddenly needs some liquidity, it

27

may be forced to sell some of its assets at a discount.  Finally, *market risk* estimates the uncertainty of future values, due to the changing market conditions.

114.    The most prominent of these risks for investment bankers is market risk, since it reflects the potential economic loss caused by the decrease in the market value of a portfolio. Because of the crucial role that market losses can play in the financial health of investment banks, they are required to set aside capital to cover market risk.

115.    Value at Risk ("VaR") is one method of quantifying market risk.  It is defined as the maximum potential loss in value of a portfolio of financial instruments with a given probability over a certain horizon.  For example, a one-day 5% VaR of negative $1 million implies the portfolio has a 5% chance of losing $1 million or more over the next day.

116.    Companies measure VaR using models that are intended to capture different variables that may lead to loss.  One input to the VaR models is the data supplied by valuation models, such as models used to value mortgages and mortgage backed assets.

117.    VaR models are used by investment banks to ensure that a company is maintaining sufficient capital to cover risks associated with potential market decline.  If the company's VaR is high, it must increase the amount of capital it sets aside in order to mitigate potential losses or reduce its exposure to high risk positions.

118.    When the Basel Committee on Banking Supervision, an international banking group that advises national regulators, decided that investors and regulators needed more accurate ways to gauge the amount of capital that firms needed to hold in order to cover risks, Bear Stearns, together with other Wall Street firms, successfully lobbied the Basel Group to allow them to use their internal VaR numbers for this purpose.

119.     In an August 5, 2003 letter to the Board of Governors of the Federal Reserve

System ("August 5, 2003 letter"), defendant Michael Alix, the Company's Head of Global Risk

Management and the Chairman of the Risk Management Committee of the Securities Industry

Association, described then-current capital requirements as "excessive."  He advocated for the

adoption of a new "flexible capital regime that relates regulatory requirements to observable

risk," one that would turn on the use of VaR models.  He explained:

> Investment banks typically value risk assets, including loans, on a
> mark-to-market basis, and estimate risk to that market using
> various tools, including robust VaR models.  Risk models are
> continuously enhanced to incorporate new products and markets,
> and may be used by investment banks to measure the risk of
> activities that are considered under Basel II as part of the banking
> book.

120.     Defendant Alix recommended in his August 5, 2003 letter that regulators rely on

VaR "[t]o the extent that an institution can produce reliable mark-to-market values and robust

VaR base-based estimates."

121.     This use of VaR was incorporated into the requirements for CSE program

participants when the CSE program was launched in 2004.  Companies participating in the

program were required to regularly supply their VaR numbers to federal regulators and to the

public.

122.     During Alix's June 22, 2004 testimony before the House Financial Services

Subcommittee, Alix touted the benefits of the CSE program's adoption of VaR as a measure of

assessing the "true risks" faced by investment banks.  He stated that:

> the framework will permit securities firms registered under it to
> determine the regulatory capital for their broker-dealers by means
> of approved Value at Risk ("VaR") models. This will better align
> capital requirements with the true risks of the securities business,
> with the added benefit of harmonizing the SEC's capital rules with
> global standards as represented by Basel II.

####     d.     Bear Stearns' Value at Risk
####  Models Were Misleading

123.    According to the 2008 OIG Report, the Company knew before the Class Period

began that its VaR models would not reflect declines in the housing market, the heart of Bear

Stearns' business and its principal source of risk.  The 2008 OIG Report stated that in November

of 2005, the OCIE "found that Bear Stearns did not periodically evaluate its VaR models, nor did

it timely update inputs to its VaR models."

124.    Bear Stearns was warned of these deficiencies in a December 2, 2005

memorandum from OCIE to defendant Farber, the Company's Controller and Principal

Accountant.

125.    The OIG also found that:

> Bear Stearns' VaR models did not capture risks associated with
> credit spread widening…. These fundamental factors include
> housing price appreciation, consumer credit scores, patterns of
> delinquency rates, and potentially other data.  These fundamental
> factors do not seem to have been incorporated into Bear Stearns'
> models at the time Bear Stearns became a CSE.

126.    The 2008 OIG Report stated that in September of 2006, TM concluded after a

meeting with Company risk managers that the Company still had failed to improve the accuracy

of the models it used to hedge against risk.  In fact, according to the 2008 OIG Report, it was not

until "towards the end of 2007" that Bear Stearns "developed a housing led recession scenario

which it could incorporate into risk management and use for hedging purposes."

127.    Moreover, the OIG found that the mortgage-backed asset valuation inputs to the

VaR models employed by the Company were never updated during the Class Period, and were

still a "work in progress" at the time of the Company's March 2008 collapse.

128.     As the housing crisis spread during the Class Period, the Company knew that fundamental indicators of housing market decline, including falling housing prices and rising delinquency rates, were not reflected in the VaR figures it disclosed to the public.

## 2.     Bear Stearns' Impoverished Risk Management Program

129.     In its 2008 Report, the OIG was also highly critical of the minimal role that risk management played in Bear Stearns' overall business.  The 2008 OIG Report concluded that in 2006, as the Company's business was becoming increasingly concentrated in mortgage securities, the expertise of its risk managers was in "exotic derivatives" and in validating models for those derivatives.  Accordingly, the managers were ill-equipped to offer reliable assessments of risk associated with the mortgage securities that had come to be the largest and riskiest part of the Company's business.

130.     Moreover, the OIG saw ample evidence that during the Class Period Bear Stearns' trading desks had gained ascendancy over the Company's risk managers.  TM found that model review at Bear was less formalized than at other CSE firms and had devolved into a support function.  Indeed, the OIG concluded that "each of Bear Stearns' trading desks evaluated profits and risk individually, as opposed to relying on one overall firm-wide approach."

131.     As a result, the OIG investigators concluded that Bear Stearns reported different VaR numbers to OIG regulators than its traders used for their own internal hedging purposes.

132.     The OIG's conclusion is confirmed by Confidential Witness 6 ("CW 6") who reported that during his work as a model valuator at Bear, traders were able to override risk manager marks and enter their own, more generous, marks for some assets directly into the models used for valuation and risk management.  Traders did this by manipulating inputs into Bear Stearns' WITS system, which was the repository for raw loan data, including such crucial information as a borrowers' credit score, prepayments, delinquencies, interest rates and

foreclosure history.  Traders did so to alter the value of pools of loans to enhance their profit and loss positions at the end of the day.

133.    The OIG's expert also pointed out that the Company's risk managers sat at the same desks as the traders, an arrangement that reduces and potentially eliminates the independence of the risk management function.  This finding is consistent with the statements of CW 6, who asserted that that when there was a dispute regarding the value of assets traded, Phil Lombardo, the head of Bear Stearns' fixed income trading desk, would prevail over risk managers because of his close relationship with upper management.

134.    The 2008 OIG Report reveals other ways in which risk management responsibilities at Bear Stearns had been co-opted by the traders.  TM memoranda reflected that the risk management department was persistently understaffed, and that the head of the Company's model review program "had difficulty communicating with senior managers in a productive manner."  The OIG viewed this as an indicator that the Company's risk managers were telling its traders something they did not want to hear—that they were taking on too much risk.

135.    The 2008 OIG Report asserts that the reins on the Company's trading desks were loosened even further in March of 2007 with the resignation of the beleaguered head of model review at the Company.  According to the 2008 OIG Report, this vacuum in risk management gave trading desks more power over risk managers.  The Inspector General found that by the time a new risk manager arrived in the summer of 2007, the department was in a shambles, and risk managers were operating in "crisis mode."

136.     Indeed, according to CW 5, by October of 2007, just five months before the Company's collapse, "the entire model valuation team had evaporated, except for one remaining analyst."

F.     **Bear Stearns Hides its Mounting Exposure to Loss**

137.     The Company's huge exposure to loss in the housing market, combined with its misleading valuation and risk models, were to have terrible consequences for investors.  During the Class Period, as the housing market underlying the bulk of the Company's business began a titanic decline, the Company used its misleading models to inflate asset values and revenues and to offer the public artificially low calculations of its Value at Risk.

1.     **Early Warnings**

138.     The collapse in the housing market in late 2006 and 2007 did not come as a surprise to Bear Stearns.

139.     Beginning in early 2006, record numbers of subprime loans began to go bad as borrowers failed to make even their first payment ("First Payment Default" or "FPD"), or failed to make their first three payments ("Early Payment Default" or "EPD").  These defaults were not caused by higher resetting rates, which were still one to three years off, but instead indicated borrower inability to pay even the initial, low teaser rates.

140.     During 2005, only one in every 10,000 subprime loans experienced an FPD. During the first half of 2006, the FPD rate had risen by a multiple of 31; nationwide, about 31.5 out of every 10,000 subprime loans originated between January and June 2006 had a delinquency on its first monthly payment, according to Loan Performance, a subsidiary of First American Real Estate Solutions.

141.    Bear Stearns was well aware of the growth in EPDs.  In April of 2006, Bear Stearns' EMC Mortgage, reputed to be a primary EPD enforcer, sued subprime originator Mortgage IT over approximately $70 million in EPD buyback demands.

142.    Just a month later, in May of 2006, the California Association of Realtors lowered expectations for California home sales from a 2% decline (2006 sales vs. 2005 sales) to a 16.8% decline.

143.    In the same period, disasters in a U.K. subsidiary brought home to the Company the threat posed by lax underwriting standards to the values of its mortgages and mortgage-backed assets.  Between April and June of 2006, the Company faced repeated crises in its United Kingdom subsidiary as a result of poor performance of U.K. loans due to weak underwriting standards.  As a result, the Company was left holding some $1.5 billion in unsecuritized whole loans and commitments from this subsidiary.  According to Confidential Witness 7 ("CW 7"), a former head of model valuation at Bear Stearns at the time, top management at Bear Stearns were deeply concerned about the U.K. developments and defendant Spector personally made calls to investigate the crisis.

144.    Given the lax underwriting practices for the loans it packaged into CDOs and its careless standards for purchasing loans from other originators, there was every reason for Company management to believe that similar catastrophes awaited it in the United States. However, as the 2008 OIG Report points out, the Company did not "use this experience to add a meltdown of the subprime market to its risk scenarios."

145.    In May of 2006, after recent data demonstrated dramatically slowing sales, the highest inventory of unsold homes in decades, and stagnant home prices, the chief economist for

the National Association of Realtors ("NAR") – a long-time advocate of the "soft landing" school – admitted that "hard landings" in certain markets were probable.

146.    The monthly year-over-year data provided by the NAR showed that by August 2006, year-over-year home prices had in fact declined – for the first time in 11 years.  In fact, sales of existing homes were down 12.6% in August from a year earlier, and the median price of homes sold dropped 1.7% over that period.  Sales of new homes were down 17.4% in August of 2006.

147.    As 2006 progressed, evidence of the deflation of the housing bubble was everywhere.  Data aggregated in the NAR's monthly statistical reports on home sales activity, home sales prices, and home sales inventory revealed (1) accelerating declines in the numbers of homes sold during 2006, which continued and deepened throughout 2007; (2) steadily decreasing year-over-year price appreciation in early 2006, no year-over-year price appreciation by June 2006, and nationwide year-over-year price declines beginning in August 2006 and continuing thereafter; and (3) steadily rising amounts of unsold home "inventory," expressed in the form of the number of months it would take to sell off that inventory, rising 50% by August of 2006 and doubling by late 2007.

148.    By the end of 2006, EPD rates for 2006 subprime mortgages had risen to ten times the mid-2006 FPD rate; 3% of all 2006 subprime mortgages were going bad immediately.  The 2006 subprime mortgages from First Franklin Financial, Long Beach Savings, Option One Mortgage Corporation and Countrywide Financial had EPD rates of approximately 2%; those originated by Ameriquest, Lehman Brothers, Morgan Stanley, New Century and WMC Mortgage had EPD rates of 3-4%; and those originated by Fremont General had EPD rates

higher than 5%.  See Moody's Investors Service, 2006 Review and 2007 Outlook: Home Equity ABS, January 22, 2007, p. 12 at Figure 14.

### 2.   Bear Stearns' Deception Begins

149.   Despite this inescapable evidence of a rapid decline in housing prices, by the time of its September 2006 presentation to TM personnel, Bear Stearns had still failed to revise the valuation and risk models that it knew to be outmoded and inaccurate.  This was not an oversight.

150.   On December 14, 2006, Bear Stearns issued a press release regarding its fourth quarter and fiscal year end results for 2006, which closed on November 30, 2006.[3]  The release reported diluted earnings per share of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005, ending November 30, 2005.  It also stated that its net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005.

151.   The Company was only able to achieve these results by using valuation models that ignored declining housing prices and rising default rates.  By using these inaccurate models the Company avoided taking losses on its Level 3 assets, increasing its revenues and earnings per share and falsely inflating the value of its stock.

152.   During a press conference on December 14, 2006, defendant Molinaro fielded questions from analysts about the Company's exposure to the growing subprime crisis.  Jeff Harte, an analyst at Sandler O'Neill, asked Molinaro whether the increased defaults threatened to make the securitization of those mortgages, which were increasingly being originated by Bear Stearns, a risky business.  Molinaro responded "Well, I don't – no, it doesn't.  Because

---

[3] The Company's fiscal year ran from December 1 to November 30.

essentially we're originating and securitizing."  Molinaro's statement was false, in that the Company faced dangerous exposure through both the retained CDO tranches it kept on its books and the agreements it maintained with counterparties and CDOs.

153.     As a result of the Company's artificially inflated results and the false assurances by Molinaro, the Company's stock rose by $4.07, closing at $159.96.

154.     As the mortgage crisis worsened, the scope of the problems with subprime mortgages was reflected in two indices that closely tracked the markets for nonprime mortgages. The ABX index, launched in January of 2006, and the TABX index, introduced in February of 2007, synthesized subprime mortgage performance, refinancing opportunities, and housing price data into efficient market valuation of CDOs' primary assets – subprime RMBS tranches, via the ABX – and of Mezzanine CDO tranches, via the TABX.  These indices provided observable market indicators of CDO value.

155.     In fact, The Bank of International Settlements has observed that "ABX price information also seems to have been widely used by banks and other investors as a tool for hedging and trading as well as for gauging valuation effects on subprime mortgage portfolios more generally."

156.     In February of 2007, the ABX index, which tracks CDOs on certain risky subprime loans (those rated BBB), materially declined.  According to *Market Watch,* in early February, the ABX Index was above 90.  Then, the index had declined from 72.71 on February 22, 2007, to 69.39 on February 23, 2007.  An ABS strategist at RBS Greenwich Capital commented in a *Market Watch* article dated February 23, 2007 stated that "ABX needs protection sellers badly. . . Real (not perceived) problems in select mortgage pools and in the

subprime mortgage lending industry do not make for an ideal fundamental opportunity at this time."

157.    Further, immediately upon launch TABX tranches materially declined, indicating that the value of many CDOs had plunged.  As depicted in the chart below, the Senior TABX Tranche dropped from a price of nearly 100 in mid-February 2007, to around 85 by the end of February 2007.  Indeed, the TABX continued to fall significantly in the months after February 2007, also as shown in the chart below reflecting historical TABX data from Markit Group of London.



158.    Bear Stearns was aware of these declines because it was one of the 16 licensed market makers for the ABX and TABX.  The changes indicated that the exceptionally risky tranches of CDOs that the Company kept on its books as retained interests were rapidly losing value.  Because these assets were highly leveraged, their loss in value had serious repercussions for the Company.

159.    Even as the indices tracking subprime performance began to crater, the Company embarked on an aggressive expansion of its subprime business.  On February 12, 2007, the Company completed its acquisition of ECC, a major originator of subprime loans.

160.    Bear Stearns knew that investors would flee if they found out that the Company was failing to undertake any meaningful assessment of its exposure to risk while it aggressively expanded its exposure to subprime losses.

161.    Accordingly, in its Form 10-K for fiscal year 2006, filed February 13, 2007, the Company reported reassuringly low VaR numbers, including an aggregate risk of just $28.8 million – far lower than its peers.  This statement was wildly misleading, in that the Company knew that its VaR modeling failed to reflect its exposure to declining housing prices and rising default rates.

162.     Bear Stearns also asserted, "The Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."  In fact, the Company had undertaken no such review, and had been repeatedly warned by government regulators that its VaR models were inaccurate and out of date.

163.    The Company also asserted that it marked all positions to market on a daily basis and independently verified its inventory pricing.  It assessed the value of its Level 3 assets as $12.1 billion.

164.    These statements were materially misleading, in that the Company knew that the models it used to value its Level 3 mortgage-backed assets were badly out of date and did not reflect crucial data about housing prices and default rates.  It also knew that its hamstrung risk managers had little power to provide any independent review of these figures.

165.    Because the Company was failing to take appropriate losses on its Level 3 assets, the revenues and earnings per share it reported in its 2006 Form 10-K were false and misleading, artificially inflating the value of its stock.

166.    Defendants Cayne and Molinaro executed a certification of these statements, annexed as an exhibit to the Form 10-K filing, stating that they had put in place disclosure controls and procedures to ensure the accuracy of the Company's filings, and that they had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

167.    Accordingly, at the time the Company filed its Form 10-K for 2006, Defendants Cayne and Molinaro had taken care to inform themselves of the Company's improper risk management and valuation practices, and knew the harmful consequences this deception would have on investors.  Moreover, the SEC had reported its findings regarding the Company's deficient models to Molinaro's immediate subordinate, Farber.

168.    The Company's artificially low VaR numbers stood in sharp contrast to the risk exposures that many of its peers were reporting during the housing crisis.  For the first half of 2007, as other investment banks with substantial subprime holdings saw their VaR figures increase dramatically in tandem with rising problems in the housing market, Bear Stearns' reported VaR remained virtually unchanged and much lower than peers.



**Average Daily Value-at-Risk**

Sources: Company 10-K's and 10-Q's. The reported quarterly average of daily value-at-risk amounts is used.

169.    Bear Stearns' deception about its risk exposure had the desired effect, as analysts covering the Company took note of its remarkably low VaR numbers.  In a February 9, 2007 pre-filing comment, Credit Suisse analysts Susan Roth Katzke and Ross Seiden stated that Bear Stearns' "[m]anagement will continue to invest to grow revenues via new products and new geographies, rather than increasing VaR (**the latter has been the most stable amongst peers**)." (Emphasis added.)

170.    In a February 14, 2007 report, the same analysts were again struck by the Company's apparently rising revenues and low exposure to risk, observing:

> VaR and Revenue Growth; RoE and Book Value…Tying these elements together with valuation leads us to the conclusion that Bear ought to be a lower risk play in the brokerage group.  From a business perspective, note that Bear's revenue growth has kept pace with peers, with far less VaR.

171.     As a result of the Company's continuing misrepresentations about its 2006 results and its VaR exposure, its stock rose $5.71 on February 14, 2007, to close at $165.81.

172.     Three weeks later the Credit Suisse analysts were still touting the Company's strong revenue growth and unusually low VaR numbers.  In a March 5, 2007 report on the Company, they reported that:

> Not only has revenue growth been equal to or better than peers, the volatility of the revenue stream has been lower.  **This lower level of revenue (and earnings) volatility is consistent with Bear Stearns' less aggressive principal/proprietary trading posture-less VaR and lower loss rates.**
>
> What's driven above-average equities revenue growth for Bear Stearns?  Best we can tell, it's the combination of hedge fund client focus, personnel upgrades, and a somewhat increased capital commitment.  How much capital?  **Judging by the relatively low level of VaR committed to the business, we think Bear's willingness to use capital is still quite limited.**

173.     Less than two weeks later, on March 15, 2007, the Company issued a press release touting its results for the first quarter of 2007.  The press release provided, in relevant part, the following:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006.  Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006.  Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter.

174.     The Company knew these results were false and misleading because the encouraging revenue growth and earnings per share it reported were made possible by the fact that Bear Stearns relied on misleading valuation models.  These models failed to reflect the declining value of its highly illiquid Level 3 assets, which at that point made up more than ten percent of its total assets.

175.    The Company followed up the release with an even more deceptive conference call.  On March 15, 2007, Bear Stearns held its first quarter 2007 earnings conference call, conducted by the Company's CFO, defendant Molinaro.  When Molinaro was asked by a caller whether he saw any trends in the Company's Value at Risk, Molinaro stated that there would be "No real change.  Should be about the same."  Molinaro, as CFO of the Company, knew at the time that the Company had been repeatedly warned by the SEC that its VaR numbers did not reflect omnipresent indicators of a rapidly declining housing market.

176.    Molinaro had to parry more questions during the March 15, 2007 call from analysts regarding the Company's subprime exposure.  An analyst asked, "[D]id you take any write downs during the quarter and do you expect to as conditions have worsened?"  Molinaro responded that the subprime market was a small part of Bear Stearns' overall business, and the Company had reduced the number of subprime mortgages it was purchasing and securitizing.  Molinaro failed to explain that the Company was avoiding writing down its illiquid subprime-backed assets only by using inaccurate models to value them.

177.    Molinaro also stated in the March 15, 2007 call that the Company was well-hedged in the market for subprime-backed securities.  Because Molinaro understood that the VaR numbers the Company relied upon to calculate hedging ratios did not take housing market deterioration into account, he knew that these assurances were misleading.

178.    In fact, Molinaro actually boasted that the worsening outlook for housing would only *increase* the number of subprime-backed CDOs the Company would acquire.

> I think that the more likely scenario is there is going to be in dislocations like this, there's likely to be large bulk sales of assets, and certainly given the trouble that many companies have faced with their sub prime portfolios, there certainly would appear to be plenty of opportunity over the months and quarters ahead for that kind of activity.

43

179.     As a result of these deceptions the Company's quarterly results sent its stock up by $2.10, to close at $148.50.

180.     On April 9, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended February 28, 2007.  In it, Defendants made various representations concerning Bear Stearns' risk management and mortgage-related operations.  The Company asserted, *inter alia*, that it valued its Level 3 assets using "internally developed models or methodologies utilizing significant inputs that are generally less readily observable from objective sources."

181.     However, the Company did not disclose that it knew that the models it was using for this valuation were outdated and inaccurate, and that it made no effort to review and update its valuation models.

182.     The Company claimed that it engaged in an "ongoing internal review of its valuations" and that "senior management from the Risk Management and Controllers Departments" are responsible for "ensuring that the approaches used to independently validate the Company's valuations are robust, comprehensive and effective."  In fact, the Company's risk management department was in chaos, and its chief of model review had quit the Company less than a month earlier.  It also knew that no substantive review of its mortgage valuation or value at risk models had even been undertaken—indeed, its mortgage-backed asset valuation models were more than a decade out of date.

183.     In the same filing, the Company continued to offer materially false and misleading Value at Risk numbers to investors, stating that, in the midst of the worst housing downturn in decades, its Value at Risk numbers had *declined* since the Company's last filing, to an aggregate level of $27.9 million, using a one-day interval and a 95% confidence level.

184.    The Company hastened to allay any skepticism about this strange result, insisting that "[t]he Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."  It also stated that "[t]he Company utilizes a wide variety of market risk management methods, including trading limits; marking all positions to market on a daily basis; daily profit and loss statements; position reports; daily risk highlight reports; aged inventory position reports; and independent verification of inventory pricing."

185.    These statements were false and misleading, in that the Company had been repeatedly informed by the SEC that its VaR modeling did not reflect key market risks. Moreover, the Company knew that it had made no effort to review or update these defective models, and that its risk managers had no power to constrain the Company's trading desk.

186.    The first quarter 2007 10-Q also stated that the Company's net revenues for Capital Markets increased 15.4% to $1.97 billion for the 2007 quarter and that its total assets at February 28, 2007 increased to $394.5 billion from $350.4 billion at November 30, 2006.  These statements were false and misleading, because the Company only avoided taking losses on its Level 3 assets by using improper valuation models.  This avoidance of loss permitted the Company to increase its revenues and asset values, inflating the value of its stock.

187.    Defendants Cayne and Molinaro once again certified these statements, stating that they had made efforts to ensure the accuracy of the Company's reporting and the reliability of its internal controls.  Unbeknownst to Bear Stearns' investors, the scale of the Company's deception was about to get much larger.

G.    **The Implosion of the Hedge Funds**

188.    The rapid decline in the subprime mortgage market in early 2007 had devastating consequences for the Hedge Funds, which were heavily laden with subprime-backed assets.  The

implosion of the Hedge Funds contributed directly to the even larger crisis that would befall Bear Stearns just months later.

189.    As subprime mortgage risks materialized and subprime mortgage performance deteriorated during late 2006 and early 2007, the prices fetched by subprime loans on the secondary market (*i.e.*, the prices obtained by securitizers such as Bear Stearns) fell.  The end result was that by March of 2007 subprime origination had almost entirely collapsed.

190.    On February 8, 2007, HSBC, the largest originator of subprime loans during 2006, raised its subprime loan loss reserves to $10.6 billion to cover anticipated losses from its subprime lending.  During a February 8, 2007 conference call, HSBC officials explained that ARM resets were set to explode, and that subprime borrowers likely would not be able to make their payments when their rates rise.  Not surprisingly, HSBC also announced plans to cut back on further subprime lending and to eliminate all stated income lending.

191.    HSBC's February 2007 announcement proved to be a turning point in the industry.  The announcement made the scale of subprime risks widely apparent, and precipitated further and severe contraction in subprime origination.  Moreover, it caused indices tracking the securities backed by subprime mortgages to fall precipitously.

192.    As the indices fell, capital rapidly receded from the subprime industry.  With that withdrawal of capital, securitizers such as Bear Stearns found themselves increasingly unable to sell the subprime mortgages they repackaged to investors.  The decreased demand for RMBS and CDOs created a chain reaction.  Because the demand for RMBS and CDOs was decreasing, securitizer demand for subprime mortgages (to turn into RMBS) and for subprime RMBS (to turn into CDOs) was decreasing.  Because securitizer demand for subprime mortgages was decreasing, subprime mortgage origination itself decreased.

193.     Rather than explain these difficult market conditions to investors, BSAM misrepresented the Hedge Funds' subprime exposure to hedge fund investors in "Preliminary Performance Profiles" ("PPP").  For example, in monthly PPPs, BSAM represented that only 6-8% of the Hedge Funds' assets were invested in subprime RMBS.  However, unknown to the Hedge Funds' investors and the market, BSAM was only disclosing the Hedge Funds' direct subprime RMBS holdings.  In fact, the Hedge Funds held tremendous amounts of subprime RMBS indirectly through the CDOs it had purchased.

194.     The Hedge Funds' large and undisclosed exposure to subprime assets placed enormous stress on the Hedge Funds as the subprime mortgage crisis accelerated.  Returns in the subprime CDOs, and CDOs backed by slices of other CDOs, termed CDO-squares, diminished, thus creating diminishing yield spreads, leading to accelerating losses for the Hedge Funds.  As a result, the High Grade Enhanced Fund experienced its first negative return in February 2007.

195.     In an email dated March 1, 2007, Cioffi told BSAM managers not to "talk about [the February results] to anyone or I'll shoot you . . .I can't believe anything has been this bad."

196.     Declines in the High Grade Hedge Fund soon followed, resulting in its first negative return in March of 2007.

197.     Because Bear Stearns had effectively bankrolled the Hedge Funds by giving them huge sums of cash in exchange for their subprime-backed collateral, the Hedge Funds' crisis had serious implications for the Company.  Notwithstanding the fact that Defendant Spector, Bear Stearns' Co-President, directly oversaw the Hedge Funds and understood the gravity of their situation, his CFO Molinaro denied the existence of any trouble.

198.     On a March 15, 2007 conference call with analysts, Molinaro was asked "[c]an you give any insight about whether you've seen or had issues with margin calls or any kind of

difficulties in hedgefund-land given how volatile the Markets have been the last few weeks?"  In

response, Molinaro said that Bear Stearns' hedge funds were having no issues with margin calls:

"We haven't seen any difficulties.  I would say it's been, obviously there's a lot of market

volatility but we've had no difficulties there."

199.    In making this statement, Molinaro not only misrepresented the crisis facing the

Hedge Funds, but failed to disclose Bear Stearns' exposure to the declining value of the

subprime-backed Hedge Fund assets it held as collateral on its own books.

200.    The Hedge Funds' situation continued to deteriorate throughout the Spring of

2007.  On April 19, 2007, Matthew M. Tannin, Chief Operating Officer of the Hedge Funds,

reviewed a credit model that showed increasing losses on subprime linked assets.  Tannin agreed

with the model's assessment and, in a April 22, 2007 e-mail stated:

> IF we believe the runs [the analyst] has been doing are
> ANYWHERE CLOSE to accurate I think we should close the
> Funds now.  The reason for this is that if [the runs] are correct then
> the entire subprime market is toast … If AAA bonds are
> systematically downgraded then there is simply no way for us to
> make money- ever."

201.    Tannin concluded that "caution would lead us to conclude the [CDO report] is

right and we're in bad shape."  On May 13, 2007, Tannin reiterated to another BSAM manager

that "I think [the Enhanced Leverage Hedge Fund] has to be liquidated."

202.    Bear Stearns had much to fear in a liquidation of the Hedge Funds.  A forced "fire

sale" of the thinly traded CDOs held by the Hedge Funds could compel the Company to

acknowledge the huge declines in value in the subprime-backed assets it already held as

collateral and as retained interests, and would also reveal the fact that the Company had been

grossly overvaluing its Level 3 assets.  To avoid this, the Company became involved in an

intense effort to prop up the Hedge Funds.

203.     Defendant Spector, Bear Stearns' Co-President, personally made the decision to extend a line of credit to the High Grade Hedge Fund.  He decided to let the High Grade Enhanced Fund fail, because its high leverage ratios left it virtually unsalvageable.  The purpose of the facility was to allow the High Grade Hedge Fund to liquidate in an orderly way by gradually selling assets into the market without having other assets seized by repurchase agreements counterparties, who would mark the assets to their true value.

204.     In the midst of this turmoil, on June 14, 2007, Bear Stearns issued a press release regarding its second quarter 2007 results.  In it, the Company continued to hide its mounting losses on Level 3 assets, permitting it to misrepresent its revenues and earnings per share.

205.     On June 22, 2007, Bear Stearns announced that it was entering into a $3.2 billion securitized financing agreement with the High Grade Hedge Fund in the form of a collateralized repurchase agreement.  In exchange for lending the funds, Bear Stearns received as collateral CDOs backed by subprime mortgages allegedly worth between $1.7 to $2 billion.  Pursuant to the agreement, Bear Stearns gave up the right to collect all of the upside in the event that the collateral saw a miraculous increase in value.

206.     During a Friday, June 22, 2007 conference call arranged to explain the bailout, Defendant Molinaro, the CFO of Bear Stearns, took pains to explain that the Hedge Funds' problems with their subprime-backed assets did not extend to the securities that Bear Stearns itself held.  Molinaro failed to disclose that even prior to the bailout, Bear Stearns held large amounts of the Hedge Funds' toxic debt as collateral.  Moreover, by virtue of the bailout, Bear Stearns had just taken on an enormous amount more of the same illiquid and devalued securities.

207.     During the June 22, 2007 conference call, Molinaro was asked "To what extent has this event caused you to relook at some of your practices overall for Bear Stearns since you

49

are such a big player in the mortgage market?  I mean you have had the subprime problem for more than three months now.  Are there other trigger events we should pay attention to over the next year?"  Molinaro responded with the following:

> Well [] I don't know that it's causing us to have any different point of view on the activities in our mortgage business. ***Our mortgage business has basically been not affected by this and has not really been a part of this situation.***  So our mortgage business continues to operate in a very effective way.  Albeit in a more in a lower volume environment and a more difficult operating environment given the macro picture in the marketplace.
>
> As it relates to our Asset Management division, we feel that we have adequate controls in place.  Obviously if you have a problem like this, you are going to reassess those controls and look to strengthen them.  But I think the simple point in this Fund is that or these two Funds, they are invested in an asset class that went through a period of severe distress.

208.   During the same June 22, 2007 conference call, an analyst asked Molinaro for his current sense of the broader impact of the losses being experienced by the BSAM funds.

Molinaro stated:

> Well, I think clearly when you have a situation like this; it puts a lot of pressure on asset values and spreads in the marketplace.  That's undoubtedly happening.  I'm not expecting any material impact from that, at least as it relates to ourselves, can't speak to the broader market. ***We're not seeing any material difficulties in repo lines or in counterparties who are having difficulty away from this meeting margin requirements.  So, I would say, at least from our perspective, at the moment it appears to be relatively contained.***

(Emphasis added.)

209.   During the June 22, 2007 call, Mike Mayo**,** an analyst at Deutsche Bank, asked how Bear Stearns valued the collateral that it had received from the Hedge Funds.  Molinaro stated that "the collateral values that we have are a reflection of the market value levels that

we're seeing from our street counterparties."  In fact, the market for such securities had become highly illiquid, providing no basis for Molinaro's statements.

210.    On June 25, 2007, market reaction to the news of Bear Stearns' bailout of the High Grade Fund was sharply negative.  Investors, fearing that the collapse of the Hedge Funds reflected on the Company's own exposure, sent Bear Stearns' stock down by $4.65, to close at $139.10.

211.    The next day, June 26, 2007, defendant Cayne assured investors that "we see no material change in our risk profile or counterparty exposure as a result of the reaction in the marketplace regarding the situation surrounding these hedge funds."  The Company's share prices increased as a result.  Cayne's statement was materially false and misleading, in that the Company had effectively taken onto its books billions of dollars of worthless subprime-backed collateral, causing its risk exposure to grow enormously.

212.    According to Bear Stearns, by the end of June 2007, asset sales had reduced the loan balance to $1.345 billion, but the estimated value of the collateral securing the loan, the High Grade Hedge Fund's compromised CDOs, had deteriorated by nearly $350 million—that is, to approximately the value of the loan Bear Stearns had given the High Grade Hedge Fund.  Because the High Grade Hedge Fund had no other assets, any further declines in the value of the assets that Bear Stearns held as collateral would be borne directly by Bear Stearns.

213.    The 2008 OIG Report concluded that, given these circumstances, the Company should have taken this collateral onto its own books and taken an immediate charge against net capital.  Instead of immediately reflecting its assumption of the declining collateral onto its books, the Company delayed for months.  By doing so, the OIG stated, Bear Stearns was able "to delay taking a huge hit to capital."

214.     On July 18, 2007, Bear Stearns informed investors in the Hedge Funds that they would get little money back after "unprecedented declines" in the value of AAA rated securities used to bet on subprime mortgages.  According to the Company, estimates showed there was "effectively no value left" in the High Grade Enhanced Fund and "very little value left" in the High Grade Fund, Bear Stearns said in a two-page letter.

215.     Accordingly, the more than $1.3 billion in collateral drawn from the Hedge Funds subprime-backed assets that the Company had effectively taken onto its books by assuming the assets as collateral just a month earlier was nearly worthless as well.  Despite this fact, the Company did not reveal the enormous losses that it was absorbing.

216.     According to internal credit memoranda reviewed by the OIG, Bear Stearns ultimately did take much of the High Grade Fund's remaining collateral onto its books—but did not make the actual book entries until some time in the fall of 2007, months after the losses were actually incurred by the Company.  As set out below, the Company ultimately only wrote off a fraction of the worthless collateral it held that it had valued at $1.3 billion.

**H.     Repercussions of the Hedge Funds' Implosion**

217.     The implosion of the two Hedge Funds reverberated through both the financial markets and the Company's senior management.

218.     In the wake of Bear Stearns' assumption of billions of dollars of Hedge Fund collateral through the bailout, Bear Stearns' lenders increasingly questioned the true extent of the Company's exposure to loss.  As a result, they became unwilling to supply the Company the vast amounts of cash it needed to finance its daily operations and interest payments.  The 2008 OIG Report explained that the market no longer perceived the Company "to be sufficiently capitalized to justify extensive unsecured lending.  In this sense, Bear Stearns was not adequately capitalized."

219.     As set out in the 2008 OIG Report, Bear Stearns' declining ability to obtain unsecured financing meant that the Company had a strong incentive to lower capital costs by raising new equity capital, making the Company a safer bet for lenders offering unsecured financing.  However, instead of raising new capital, the Company steadily shifted its funding model from unsecured to secured financing, using its mortgage-backed assets as collateral.  In May of 2007, Bear Stearns' short term borrowing was 60% secured.  Just four months later, in September of 2007, it was 74% secured.  By March of 2008 it was 83% secured.

220.     Bear Stearns' principal source of secured financing was the market for repurchase or "repo" agreements.  By the end of the Class Period, Bear Stearns was funding its $50 billion daily needs by using 71% of its risky mortgage-backed assets as collateral for repo agreements.

221.     Given that the Company's mortgage-backed assets were serving to prop up the cash needs of the entire Company, Bear Stearns literally could not afford to reveal that they were rapidly losing value.

222.     Even financing through repo agreements was becoming difficult for the Company to secure.  Bear Stearns' repo agreement counterparties were increasingly suspicious that they were being duped about the value of the CDOs that the Company was using as collateral.  As a result, the 2008 OIG Report states that mark disputes between Bear Stearns and its counterparties became more common beginning in the summer of 2007.

223.     A mark dispute can occur when two parties to a repo agreement disagree about the value of the collateral.  If a lender believes that the collateral posted in a repo agreement has lost value, it can make a "margin call" on the borrower, demanding more collateral or a return of part or all of the money loaned.

224.     The 2008 OIG Report revealed that, during July of 2007, shortly after the Hedge Fund bailout, Bear Stearns told the SEC that there were two large dealers with whom it had mark disputes that were in excess of $100 million each.

225.     Because Bear Stearns knew that its assets were overvalued, it was frequently obliged to settle these disputes by paying money to its repo counterparties.  However, the Company could not afford to reveal that its mortgage-backed collateral was rapidly declining in value.  Accordingly, Bear Stearns continued to carry the assets on its books at full value even while conceding to its counterparties that the value of the collateral had declined.

226.     The 2008 OIG Report states that "[t]here are indications in the TM memoranda that Bear Stearns tended to use the traders' more generous marks for profit and loss purposes, even when Bear Stearns conceded to the counterparty for collateral valuation purposes."  By failing to record the assets at the lower compromise price, the Company was able to perpetuate its scheme to hide from investors the extent of its losses on the value of its mortgage-backed assets.

227.     Doubts about the Company's true exposure were slowly making their way to the market.  On July 31, 2007, Standard & Poor's analysts downgraded the Company's stock because, among other things, "widening credit spreads and increasing risk aversion may cause a slowdown in its investment banking operation."  The Company's stock fell $6.03 as a result, closing at $121.22.

228.     On August 3, 2007, Standard & Poor's Ratings Services said it had revised its outlook on Bear Stearns from stable to negative.  Notwithstanding the Company's denials, the ratings firm explained that "Bear Stearns has material exposure to holdings of mortgages and mortgage-backed securities (MBS), the valuations of which remain under severe pressure.  It

also has exposure to debt it has taken up as a result of unsuccessful leveraged finance underwritings, and it has significant further underwriting commitments."

229.    That same day, Bear Stearns issued a press release responding to the S&P downgrade:

> The Bear Stearns Companies Inc. (NYSE: BSC) said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns.  Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns.  S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these were ***isolated incidences and are by no means an indication of broader issues at Bear Stearns.***

230.    On the same day, Cayne and his top lieutenants arranged a conference call with investors and analysts to try to calm concerns.  They did this by touting the Company's illusory risk management program.

231.    After prefatory remarks by defendants Cayne and Molinaro, defendant Michael Alix, the Company's Chief Risk Officer, stated that "our fixed income franchises, particularly our mortgage and securitization businesses, have long focused on the origination, transformation and redistribution of risk.  We've always managed the risk in this process by adjusting the intake, the origination of risk, to the demand for the end products."  He added that "we run risk analytics to demonstrate that the Firm is well protected against further deterioration in both the subprime and Alt-A sectors across both whole loans and all securitization tranches."

232.    In fact, at the time of the August 3, 2007 conference call, Alix and the Company had already been informed that Bear Stearns' "risk analytics" did not take into account crucial information on risk of default and volatility in housing prices.  Moreover, as a result of the Hedge Fund bailout, Bear Stearns had just assumed as collateral more than a billion dollars worth of subprime-backed CDOs that were virtually worthless.  As the Company only held

approximately $11 billion in highly-leveraged net equity at the time, this was a very significant new exposure.

233.    On August 5, 2007, in an effort to restore investor confidence in the Company's management and to distance itself from the collapse of the hedge funds, Bear Stearns announced a management shake-up that included the ouster of Defendant Spector.  He was replaced by Defendant Schwartz as the Company's sole president.  Defendant Molinaro became the Company's Chief Operating Officer in addition to his continuing role as CFO.

234.    On September 20, 2007, Bear Stearns posted its results for the third quarter, ending August 31, 2007 (closing stock price $108.66).  It reported net income for the quarter of $171.3 million, or $1.16 a share, down from $438 million, or $3.02 a share, in the period a year earlier.  Net revenue for the Company, or total revenue minus interest costs, fell 37% to $1.33 billion, while net revenue at the fixed-income division dropped 88%, to $118 million from $945 million in the third quarter of 2006.  Return on equity stood at 5.3%, compared with 16% a year earlier.

235.    During a conference call with analysts and investors, Molinaro said that, despite adverse impacts from "losses incurred from the failure of the [in-house funds], … our counterparty exposures have been dramatically reduced and we've hedged remaining assets." When asked about "collateral damage that you might have suffered on the [BSAM] business [following the in-house hedge funds' collapse]", Molinaro responded that the damage "was relatively limited and we saw very few situations where clients moved their entire business … I think the crisis passed in mid-August things have returned to kind of a normal state … ***the worst is behind us there and business is normalizing and returning***."

236.    Bear Stearns' third quarter results and Molinaro's statements were false and misleading, in that they were achieved only by avoiding losses through the use of valuation methods that artificially boosted the values of the Company's growing hoard of Level 3 assets.

237.    The Company explained that its declining profits were the result of diminished fixed-income revenue coupled with a $200 million loss from its June Hedge Fund failures.  Of this figure, the Company stated that only $100 million represented decline in value of the collateral that the Company held as a result of the Hedge Fund bailout.

238.    This $100 million figure was a far cry from the Company's true losses due to the Hedge Fund collapse, which had left more than a billion dollars of worthless subprime CDOs on the Company's balance sheet.  The Company did not disclose the full amount of its losses on the collateral for fear that its lenders and counterparties would realize that it had been consistently overvaluing its assets.

239.    The small size of the write down falsely reassured the markets about the Company's exposure.  In a September 20, 2007 conference call with investors, an analyst asked "And – and then on the – on the $200 million writedown of the High Grade funds.  That effectively a writedown what was last reported a $1.3 billion balance?"  Company management responded:

> It basically – Roger, two big pieces to that.  About $100 million –
> it is almost split evenly.  About $100 million of that is the write-off
> of our investment in the fund and the write-off of receivables that
> we had from the funds related to predominantly related to
> management and performance fees that related to 2006.  And the
> balance of that was the mark on the inventory when we closed out
> the position.

240.    In fact, even by the Company's own estimations regarding the writedowns associated with the Hedge Fund, this statement was false and misleading.  The 2008 OIG Report states that the Company's internal documents reflect that it ultimately took a $500 million write

down in connection with the bailout some time in the fall of 2007.  The Company never disclosed this additional write down to investors, for fear that it would telegraph to the market the decline in the value of the other subprime-backed assets it carried on its books.

241.    On October 10, 2007, Bear Stearns filed its Form 10-Q for the quarterly period ended August 31, 2007, which included the same misleading financial results it reported on September 20, 2007.

242.    In addition, Defendants made various representations concerning Bear Stearns' risk management.  The Company stated that "I[n] recognition of the importance the Company places on the accuracy of its valuation of financial instruments as described in the three categories above, the Company engages in an ongoing internal review of its valuations."

243.    In fact, at the time this statement was made, the Company had been repeatedly warned that its mortgage valuation models were outdated and inaccurate, but had refused to revise them.

244.    The Company also stated that it "regularly evaluates and enhances [its] VaR models in an effort to more accurately measure risk of loss," and that its aggregate VaR was still only $35 million, well below its competitors.

245.    This statements were false and misleading, in that the Company understood that its VaR models did not reflect key data showing declines in the housing market, and had made no effort to revise them.

246.    On November 14, 2007, defendant Molinaro announced that Bear Stearns would write down $1.2 billion of its assets in the fourth quarter.  However, Molinaro attempted to reassure nervous investors by claiming that, in spite of the fact that Bear Stearns still bore more than a billion dollars of subprime exposure in the form of the collateral it had received from the

failed High Grade Fund, Bear Stearns had reduced its CDO holdings to $884 million as of

November 9, down from $2.07 billion at the end of August.  Molinaro claimed that during the

period between August 31, 2007 and November 9, 2007, the Company significantly increased its

short subprime exposures—that is, its insurance against declines in the subprime market—

reducing its reported August 31, 2007 net exposure of approximately $1 billion to a *negative* $52

million net exposure as of November 9, 2007.

247.    During an analyst conference call held on November 14, 2007, Molinaro was

asked what Bear Stearns was doing to "fight back" against "the impact of the unprecedented

times in the mortgage market compounded by fallout from the firm's mortgage hedge funds this

summer."  Molinaro responded that:

> the liquidity crisis [with the hedge funds] that did ensure during
> July and August did have some effect on the business …. we did
> see some balance migration, ***but importantly we're seeing balance
> is coming back …. where we look at balances, currently they
> have been basically steady from where we closed the third
> quarter at, and the business, I would say, is continuing to show
> improvement from where we the quarter at, and we think getting
> back on track for what should be a very strong 2008.***

(Emphasis added.)

248.    Peter Goldman of Chicago Asset Management was relieved, stating that "[w]e

didn't have a clear picture of their exposures.  Now we do, and it's much smaller than that of its

peers.''  Bear Stearns shares rose $2.58, or 2.6 percent, to $103.45 in New York Stock Exchange

composite trading.

249.    Investors and analysts did not realize that the extent of Bear Stearns' exposure

was in fact far from clear.  The Company still had more than a billion dollars in subprime backed

collateral from its Hedge Fund bailout to write down, and the Company's hedging efforts were

doomed by its failure to use accurate models to assess risk.  These secrets were becoming increasingly difficult for the Company to hide.

250.    On December 20, 2007, Bear Stearns announced that it would take the first quarterly loss in the Company's 84-year history (quarter closing on November 30, 2007 at $99.70 per share).  It reported that its fiscal fourth-quarter loss after paying preferred dividends was $859 million, or $6.90 per share, compared to a profit of $558 million, or $4 per share, a year earlier.  The Company had negative net revenue of $379 million, compared to revenue of $2.41 billion a year earlier.

251.    These figures were false and misleading, because reported losses would have been far greater but for the Company's use of misleading valuation models to inflate asset values and revenues.

252.    Notwithstanding Molinaro's assurance just weeks before that the Company's hedging efforts had resulted in a net negative exposure to subprime assets, the Company also announced on December 20, 2007 that it would write down $1.9 billion of its holdings in mortgages and mortgage-based securities – more than $700 million more than it had announced on November 14, 2007.

253.    The lack of any schedule giving details regarding the nature of the write downs left investors with little information about the nature of the Company's true exposure.  Write downs by other companies in the same period provided far more information, including the source of exposure (retained interest, derivatives, commitment to provide liquidity and/or credit support, or warehoused loans and mortgage-backed securities), the type of CDOs to which they were exposed (high grade, mezzanine, CDO-squared, etc.) and vintage of the subprime mortgages that underlie their CDO exposures.

254.    In their write downs, Bear Stearns' peers also provided other information with a bearing on the creditworthiness of the exposure and the extent of write-downs taken against par value, including the amount that was hedged and how it was hedged, how the exposures were valued, and the main drivers of value.  The fact that Bear Stearns was withholding such key information from investors began to fuel a consensus that the Company's risk was far greater than had been assumed and fanned investor anxieties about the Company.

255.    Major shareholders begin questioning Cayne's leadership.  On January 8, 2008, the Company announced that Cayne would step down as chief executive.  However, he would continue reporting for work at Bear Stearns' headquarters, attempting to get the Company badly needed funding.  Cayne was replaced as CEO by defendant Schwartz.

256.    Analysts such as Punk Ziegel & Co. ("Punk Ziegel") saw Cayne's departure as an indictment of the Company's failed risk management policies.

257.    Cayne's departure only raised investors' anxiety about the Company's exposure, and its stock dropped nearly 7%, to close at $71.17.

**I.      Bear Stearns' Catastrophic Collapse**

258.    In the weeks following Cayne's departure, Bear Stearns continued to try to reassure its shareholders.  On February 8, 2008, the Company asserted that it had increased its short subprime position from $600 million in November 2007 to $1 billion in an effort to hedge its trading positions in subprime mortgages.  Explaining the increase, Molinaro was quoted in a Bloomberg article as stating that one of the Company's biggest mistakes had been "not being conservative enough and bearish enough on the subprime market."  The firm has reversed "long" subprime trades that stood at $1 billion at the end of August, Molinaro said.

259.    The market was struck by the dissonance between Molinaro's statements and the Company's previous assurances that it dealt in less risky "agency" mortgages and was not

exposed to the subprime market.  Punk Ziegel's Richard X. Bove ("Bove") was openly skeptical.

In a report dated February 8, 2008 he stated that:

> the firm is marking down the value of its more questionable
> securities.  Bear has actually gone to a net short position in its
> CDO/subprime portfolio.  This latter condition is somewhat of a
> surprise since the company has argued, for almost ever, that it does
> not play the markets; it claims to be an agency-only company.  (So
> much for that concept.)

260.    Bove's chagrin was shared by the Company's lenders.  On March 6, 2008,

Rabobank Group, one of Bear Stearns' European lenders, told the brokerage that it wouldn't

renew a $500 million loan coming due later that week.  That meant Rabobank Group was

unlikely to renew an additional $2 billion credit agreement set to expire the following week.

261.    Moreover, analyst reports released the same day predicted that the Company's

quarterly results would be dogged with problems stemming from its fixed income business,

sending the Company's stock tumbling by more than $5, to close at $69.90.

262.    As a result, on Friday, March 7, 2008, the cost of credit default swaps on Bear

Stearns' debt surged.

263.    Bear Stearns again tried to stanch the market's loss of confidence with

announcements by senior management.  In a March 10, 2008 press release the Company said that

"[t]here is absolutely no truth to the rumors of liquidity problems that circulated today in the

market" and suggested that the Company had some $17 billion in cash.  The same day,

Defendant Greenberg claimed during an interview with CNBC that the Company had no

liquidity problems, calling such an assertion "ridiculous, totally ridiculous."

264.    This assertion did little to quell fear, because investors knew that Bear Stearns had

$11.1 billion in tangible equity capital supporting $395 billion in assets, a leverage ratio of more

than 35 to 1.  Almost daily, Bear Stearns had to renew a large percentage of its $102 billion

worth of open repurchase agreements - or short term loans from Wall Street dealers - or make up the difference out of its cash position.

265.     Interpreting Greenberg's announcement as a tacit admission that the Company faced liquidity problems, on March 10, 2008 investors sent the Company's stock down another $7, to close at $62.30.

266.     The morning of March 11, 2008 saw still another blow, when Goldman Sachs' ("Goldman") credit derivatives group sent its hedge fund clients an e-mail announcement about Bear Stearns.  In previous weeks, banks such as Goldman had done a brisk business agreeing to stand in for nervous institutions that feared Bear Stearns could not meet its obligations on an interest rate swap.  But in the March 11, 2008 email, Goldman told clients that, at least temporarily, it would not step in for them on Bear Stearns derivatives deals.

267.     Kyle Bass ("Bass") of Hayman Capital reported that he had a colleague call Goldman to see if it was a mistake.  "It wasn't," said Bass, himself a former Bear Stearns salesman.  "Goldman told Wall Street that they were done with Bear, that there was [effectively] too much risk.  That was the end for them."

268.     Hedge funds flooded Credit Suisse Group's brokerage unit with requests to take over trades opposite Bear Stearns.  In a mass email sent out that afternoon, Credit Suisse stock and bond traders were told that all such "novation" requests involving Bear Stearns and any other "exceptions" to normal business required the approval of credit-risk managers.

269.     Bear Stearns' counterparties began to back away from the Company.  Early in the morning on Tuesday, March 11, 2008, ING Groep NV informed Bear Stearns that it was pulling about $500 million in financing.  Staffers at the Dutch bank told Bear Stearns that ING's management "wanted to keep their distance until the dust settled."

270.    The same day, analysts at Punk Ziegel suggested that Bear Stearns' future profits were likely to be squeezed by its exposure to "esoteric securities."  The Company's stock dropped $3.75 as a result, closing at $62.97.

271.    The crisis of confidence accelerated rapidly.  Bear Stearns' cost of insuring $10 million of debt via credit default swaps, which had hovered near $350,000 in the month before, shot past $1 million.  By the end of March 11, 2008, the rate was irrelevant.  Banks simply refused to issue any further credit protection on the Company's debt.

272.    These developments had a devastating effect on the Company's liquidity. Liquidity is simply the measure of an organization's ability to meet its current financial obligations.  In banking, adequate liquidity means being able to meet the needs of depositors wanting to withdraw funds and borrowers wanting to be assured that their credit or cash needs will be met.

273.    According to a March 20, 2008 letter from SEC Chairman Cox to the Chairman of the Basel Committee on Banking Regulation, on March 11, 2008, the Company's liquidity pool stood at $15.8 billion, "adjusted for the customer protection rule."  By March 13, 2008, according to the letter, the pool stood at $2 billion—a loss of more than $13 billion over the course of March 12, 2008.

274.    On March 12, 2008 Defendant Schwartz, Bear Stearns' CEO appeared on CNBC and said that the Company's liquidity position and balance sheet had not weakened at all.  "We finished the year, and we reported that we had $17 billion of cash sitting at the bank's parent company as a liquidity cushion," he said.  "As the year has gone on, that liquidity cushion has been virtually unchanged."  Schwartz added that "We don't see any pressure on our liquidity, let alone a liquidity crisis."

275.    Schwartz's statement was false, in that the day before his assertion that the

Company's liquidity position was unchanged Bear Stearns' liquidity pool already had fallen to

an adjusted level of $15.8 billion.  Moreover, as Schwartz spoke on March 12, 2008, some $13

billion of the Company's cash was evaporating.

276.    Moreover, Schwartz specifically denied that the Company's risk had scared away

any counterparties:

CNBC:               Let me start off with this broad idea that's been in the
                    market now for a few days and pressuring your stock.
                    Namely, that counterparty risk is something – new
                    counterparty risk is something that a number of firms on
                    Wall Street no longer want to take in terms of dealing with
                    Bear Stearns.  Is that true?

SCHWARTZ:           No, it's not true.  We are – there's a been a lot of volatility
                    in the market, a lot of disruption in the market, and that's
                    causing some pressure administratively on getting some
                    trades settled up, but we're workin' hard gettin' that done.
                    We're in a constant dialogue with all of the major dealers
                    and the counterparties in the Street, and we're not being
                    made aware of anybody who is not taking our credit as a
                    counterparty.

CNBC:               All right, so when I'm told by a hedge fund that I know
                    well, that last night they tried to close out a mortgage – a
                    credit protection mortgage position with Goldman Sachs
                    that they had bought a year ago, Bear was the low bid, and
                    I'm told that Goldman would not accept the counterparty
                    risk of Bear Stearns.  You're saying you're not aware that
                    that would be the case.

SCHWARTZ:           I'm not aware that, you know, on a specific trade from one
                    counterparty to another and where you're a third-party, we
                    have direct dealings with all of these institutions, and we
                    have active markets going with each one, and our
                    counterparty risk has not been a problem.

277.    At the time he made this statement, Schwartz, as the Company's CEO, was only

too well aware that ING had pulled nearly half a billion in financing and that Goldman Sachs,

once a principal source of cash for the Company, had at least temporarily halted covering any more Bear Stearns risk.

278.    Moreover, according to the 2008 OIG report, the Company informed TM on March 12, 2008, the same day as Schwartz's statement, that "Bear Stearns paid out $1.1 billion in disputes to numerous counterparties in order to squelch rumors that Bear Stearns could not meet its margin calls."

279.    Investors were cheered by Schwartz' false optimism and the decline in the Company's stock value slowed, dropping only $1.39 for the day, closing at $61.58.

280.    In fact, the Company's liquidity was plummeting, falling to just $2 billion on March 13, 2008.

281.    On March 13, Renaissance Technologies Corp., a major hedge fund and trading client of the Company, said it was shifting more than $5 billion to Bear Stearns' competitors.

282.    On the evening of March 13, 2008 a desperate Schwartz telephoned JPMorgan CEO Jamie Dimon ("Dimon") in an effort to negotiate a rescue package.

283.    Dimon thought it was too risky for Morgan Stanley to lend the Company the $30 billion it needed to get through the following day, Friday.  Schwartz and Dimon determined that Bear Stearns had to be given access to the Federal Reserve's "window," a credit facility available to the nation's commercial banks, but not to investment banks.  The only way for the Federal Reserve to give the Company access to the window was to lend JPMorgan the money, allowing the bank to act as a bridge across which the Federal Reserve cash could stream into Bear Stearns.

284.    JPMorgan and Bear Stearns contemplated that the Company could get the facility though JPMorgan as part of a deal in which JPMorgan bought Bear Stearns.

285.    On March 14, 2008 at 9 A.M., Bear Stearns announced $30 billion in funding provided by JPMorgan and backstopped by the federal government.

286.    As a result, Bear Stearns' stock dropped nearly 40% in the first half-hour of trading, closing at $78.47.

287.    JPMorgan dispatched 16 teams of accountants, ultimately numbering more than 300 people, to Bear Stearns to meet with top management and assess the Company's books.  On Saturday night, March 15, after the reports from these due diligence teams began to make their way back to JPMorgan management, JPMorgan's Steve Black and Doug Braunstein called defendant Schwartz.  They told him that, given the state of the Company's exposure, JPMorgan's bid for the Company's stock would be low.

288.    During the call, Black stated that "[t]he fact you're at 32 doesn't mean much at this point."  Black suggested that a JPMorgan bid might be in the range of $8 to $12 a share.

289.    By the next morning, many JPMorgan executives were getting cold feet.  The more they studied the securities Bear Stearns owned, the worse the Company looked.  For instance, Bear Stearns had initially estimated it had $120 billion in so-called risk-weighted assets, those that might go bad.  By Sunday morning, JPMorgan executives felt the actual number was closer to $220 billion.

290.    By Sunday, March 16, JPMorgan had concluded that the deal was too risky, and had informed Schwartz that they were unwilling to undertake the purchase.

291.    JPMorgan relented only upon obtaining a promise from federal officials that taxpayers would foot the bill in the event that Bear Stearns defaulted on its securities.  Late in the

afternoon on Sunday, it told Bear Stearns that it would purchase the Company's shares for $2 per share.[4]

292.    The same afternoon, JPMorgan held a conference call addressing questions about the offer.  Analyst Guy Moszlowski of Merrill Lynch asked, "is there some reconciliation that you could give us in broad terms from the book value per share, which of course is a reported number of around $84 at last reporting, and the $2, other than the transaction related costs of $6 billion"?

293.    Mike Cavanaugh, the CFO of JPMorgan, responded:

> Yes, Guy, I think that the – all I can tell you is we did extensive work over a short period of time to get comfortable with putting together a transaction that made sense all around.  But obviously looking at our duties to JPMorgan shareholders and so the deal we've lined out – laid out, didn't result in the ability to pay more than the modest amount that was paid over to the Bear Stearns shareholders.

294.    The next day, Monday, March 17, Bear Stearns share prices tumbled to $4.81 as the market learned the true state of the Company's finances, a drop of 84%.

295.    On March 24, 2008, one week after announcing its takeover deal with Bear Stearns, JPMorgan raised its takeover offer for Bear Stearns to $10 per share, or about $2.1 billion, and agreed to take on the first $1 billion of Bear Stearns' losses while the Federal Reserve guaranteed $29 billion in losses.  The updated agreement also included a provision allowing JPMorgan to purchase 95 million newly issued shares of Bear Stearns common stock, or 39.5% of the Company, ahead of a shareholder vote on the acquisition deal.

---

[4] J.C. Flowers & Co., a leverage-buyout company, had also reviewed Bear Stearns books the same weekend, and made an unsuccessful  proposal to buy 90% of the Company at a price between $2.00 and $2.60 per share.

296.     The higher offer price reflected JPMorgan's efforts to quell shareholder opposition to the deal and discourage competitors.  Moreover, JPMorgan had been forced to renegotiate the price after it discovered that a mistake in the language of its guaranty agreement with Bear Stearns obligated JPMorgan to guarantee Bear Stearns' trades even if the Company's shareholders voted down the acquisition deal.

## J.     **Post Class Period Events**

297.     On April 3, 2008, the United States Senate Banking Committee, chaired by Senator Christopher Dodd of Connecticut, held hearings to discuss Bear Stearns' collapse. Senator Dodd disclosed that weeks before Bear Stearns' collapse he discussed with Schwartz whether Bear Stearns should have access to the Federal Reserve's "discount window" which allows commercial banks (but not investment banks like Bear Stearns) access to low interest loans to maintain liquidity.  Senator Dodd's disclosure indicated that Bear Stearns insiders, including Schwartz, were aware, weeks before investors, that Bear Stearns' liquidity was threatened by its deteriorating asset values.

298.     Shareholders approved the sale to JPMorgan on May 29, 2008.  Just prior to the vote approving the merger, Cayne apologized to shareholders for Bear Stearns' collapse.  Under the terms of the merger, shareholders received about $10 worth of JPMorgan shares for every Bear Stearns share they held as of the date of the merger.

299.     After the approval of the merger, JPMorgan moved aggressively to reorganize Bear Stearns, dismantling some of the subsidiaries most implicated in the Company's collapse. JPMorgan first closed down BSAM, the subsidiary responsible for the mismanagement of the Hedge Funds and for hiding true value of the Hedge Funds' assets from investors while, in the process, soliciting additional investments.  JPMorgan also did not acquire Bear Stearns' merchant banking unit, which was spun off into an independent entity.

300.     In June of 2008 the Department of Justice, through the U.S. Attorney for the Eastern District of New York, indicted Cioffi and Tannin, both Senior Managing Directors of BSAM and members of BSC's Board of Directors.  The indictment charged that Cioffi and Tannin misled investors regarding the value of MBS and CDOs containing MBS owned by the Hedge Funds.

301.     The indictment further charged that Cioffi's and Tannin's fraud caused $1.8 billion in losses to investors.  Cioffi and Tannin were formally arrested on June 19, 2008.  On the same day, the SEC filed a civil complaint against Cioffi and Tannin.  The allegations in the SEC's civil suit were similar, but also focused on Cioffi's and Tannin's attempts to solicit additional contributions to the Hedge Funds when they knew the funds were failing.  Both the indictment and the SEC complaint allege that key documents, including Cioffi's calendar and personal notes that could contain incriminating evidence, were destroyed by Cioffi and Tannin before the investigation began.

302.     As of July 3, 2008 the assets of Maiden Lane, the entity holding the $30 billion in Bear Stearns assets, had already decreased in value to $28.9 billion—almost $1.1 billion less than the value given to them by Bear Stearns just several weeks earlier.  By October 22, 2008, the value of the assets had dropped another $2.1 billion, to $26.8 billion.  All told, the assets held by Maiden Lane were actually worth 10.6% less than the value provided by Bear Stearns, another indication that Bear Stearns' valuation methods were deeply flawed.

303.     On September 27, 2008, the SEC Inspector General's Office released a report detailing Bear Stearns' misleading VaR and mortgage valuation models, as well as Bear Stearns' manipulation of asset values.  As alleged above, the practices discovered by the SEC's Inspector General had the effect of misleading investors about the value of the assets held on Bear Stearns'

70

books, the Bear Stearns' daily VaR and the risk involved with Bear Stearns' securitization business model, all of which fraudulently inflated Bear Stearns' share price.

### K. Defendants' Fraudulent Statements Adversely Impacted Current and Former Company Employees

304.   Defendants' materially false and misleading statements during the Class Period, as described at paragraphs 589 to 794 below, defrauded certain Class Members who are or were current and former employees of Bear Stearns, and whose compensation, in part, was in the form of restricted stock units ("Restricted Stock Units") and/or Capital Accumulation Plan units ("CAP Units")  issued pursuant to the Company's Restricted Stock Unit Plan (the "RSU Plan") and Capital Accumulation Plan (the "CAP Plan").  The Class includes only those holders of Restricted Stock Units and CAP Units whose rights to either Restricted Stock Units and/or CAP Units were vested, providing them a present entitlement to be paid and/or credited an equivalent number of shares of Bear Stearns common stock upon settlement at the end of a deferral period.

### 1. The RSU Plan

305.   Since at least 2000, the Company offered certain employees shares of its common stock through a Restricted Stock Unit Plan.  In April of 2007 the Company explained that the purpose of its Restricted Stock Unit Plan was to provide stock ownership to certain employees as an incentive for superior performance.

306.   The Company stated in April of 2007 that Restricted Stock Units could be granted to or for the benefit of any employee who held the position of a managing director or below. Employees who held the position of senior managing director or above were not eligible to be granted awards of restricted stock under the Plan.

307.   Each Restricted Stock Unit represented a right for one share of Common Stock to be delivered upon settlement at the end of a defined Deferral Period.  The Company established

and maintained an account for the participant to record Restricted Stock Units and transactions

and events affecting such units.

### 2.      The CAP Plan

308.    Since at least 2000, the Company offered certain employees compensation

through its CAP Plan that was tied to the value of the Company's common stock.  In April of

2007 the Company described the purpose of the CAP Plan as follows:

> to promote the interests of the Company and its stockholders by
> providing long-term incentives for the benefit of certain key
> executives of the Company, Bear Stearns and any of the
> Company's subsidiaries who contribute significantly to the long-
> term performance and growth of the Company.

309.    Employees eligible for participation in the CAP Plan included any individual

employed by Bear Stearns or any of its subsidiaries and affiliates as a Senior Managing Director

or an equivalent title.  Under the Plan, Bear Stearns credited to each Plan participant, as of the

last day of such Plan Year, a certain number of CAP Units.  Each CAP unit corresponded to a

single share of the Company's stock.  The Company determined the number of units to award by

dividing (i) an amount determined by the Board Committee with respect to such Participant, by

(ii) the Fair Market Value of Bear Stearns' common stock on the date of the grant action by the

Board Committee granting the Award.

310.    The Company purchased shares of Common Stock in the open market or in

private transactions during the term of the Plan for issuance to Participants in accordance with

the terms of the Plan.

### 3.      Defendants' Fraud Harmed Holders of RSU and CAP Plan Units

311.    Class Members with compensation packages including eligibility for Restricted

Stock and or CAP Units took these packages on the understanding that any stock received under

the Plans accurately reflected the true value of the Company's shares.  Such Class Members were

unaware when they took Units under these Plans that the value of the Company's stock had been artificially inflated by the Company's materially false and misleading statements and omissions. When the disclosure of the Company's fraud described at paragraphs 589 to 794 below caused Bear Stearns' share values to plummet, the RSU and CAP Plan Unit holders suffered enormous losses.

**L.      The SEC Comment Letters**

312.    An exchange of letters between Bear Stearns and the SEC's Division of Corporate Finance ("CF Division") offers ample evidence that the Company's public filings for fiscal years 2006 and 2007 failed to disclose material information about the Company's risk management practices and exposure to risk in the subprime market.

313.    The SEC's CF Division selectively reviews filings made under the Securities Act of 1933 ("Securities Act") and the Exchange Act to monitor compliance with those statutes' disclosure and accounting requirements.  In general, the SEC only selects for review a filing that "at least on its face, seems to conflict significantly with generally accepted accounting principles or Commission rules, or to be materially deficient in explanation or clarity."[5]

314.    In September of 2007, amidst what appeared to be a substantial increase in mortgage defaults and the deteriorating value of assets linked to mortgages (such as RMBS and CDOs containing RMBS), the SEC reviewed Bear Stearns' Form 10-K for 2006.  As a result of its review, in September 2007, SEC Accounting Branch Chief John Cash sent a comment letter to Defendant Molinaro requesting that Bear Stearns provide the SEC with certain "material

---

[5] March 20, 2002 Testimony by Harvey L. Pitt, Chairman of the U.S. Securities Exchange Commission, before the House Committee on Financial Services, at http://www.sec.gov/news/testimony/032002tshlp.htm#P124_30878.

information" not disclosed in the 2006 Form 10-K filing, including "a comprehensive analysis of

your exposure to subprime loans"  ("2006 Form 10-K comment letter").

315.    Specifically, the SEC asked Bear Stearns to:

-Quantify your portfolio of subprime residential mortgages.  If
practicable, please breakout the portfolio to show the underlying
reason for subprime definition, in other words, subject to payment
increase, high LTV ratio, interest only, negative amortizing, and so
on.

-Quantify the following regarding subprime residential mortgages.
Explain how you define each category;

-Non-performing loans;

-Non-accrual loans;

-The allowance for loan losses, and;

-The most recent provision for loan losses.

316.    In the 2006 Form 10-K comment letter, the SEC also requested information

regarding Bear Stearns' investments in subprime-backed securities that the Company had not

made available in its public filings.  The SEC requested that Bear Stearns:

-Quantify the principal amount and nature of any retained
securitized interests in subprime residential mortgages.

-Quantify your investments in any securities backed by subprime
mortgages.

-Quantify the current delinquencies in retained securitized
subprime residential mortgages.

-Quantify any write-offs/impairments related to retained interests
in subprime residential mortgages.

317.    In the same letter, the SEC asked that Bear Stearns supply it with previously

undisclosed information regarding its exposure to the special purpose entities that it created to

purchase subprime loans and issue securities, as well as its exposure related to warehouse lines

and reverse repurchase agreements involving subprime loans.

318.    Finally, the SEC asked that Bear Stearns "[p]rovide us with your risk management philosophy as it specifically relates to subprime loans."  The SEC requested information regarding, *inter alia*:

> -Your origination policies;
>
> -The purchase, securitization and retained interests in loans;
>
> -Investments in subprime mortgage-backed securities; and
>
> -Loans, commitments, and investments to/in subprime lenders.

319.    Pursuant to CF Rules, Bear Stearns was obliged to reply to these requests within ten days of its receipt of the letter.  Thus, Bear Stearns' reply was due on October 12, 2007.  As set out in the 2008 OIG Report, Bear Stearns obtained an extension to early November to file its response.  However, Bear Stearns, without explanation, did not file its promised response until January 31, 2008—*after* it filed its 10-K for fiscal year 2007.  Despite the fact that Bear Stearns had been put on notice by the SEC that disclosures regarding its subprime exposure and risk management policies were material to investors, the Company failed to incorporate any of the additional information sought by the SEC into its 2007 Form 10-K.

320.    Despite the fact that the Company was delaying any response to the SEC's pending questions, the Company falsely asserted in its Form 10-K filed January 29, 2008 that there were no "unresolved staff comments" in connection with its financial disclosures.

321.    The reasons for the Company's long delay in responding were apparent in the Company's response on January 31, 2008, less than three months before its collapse.  In reply to the 2006 10-K comment letter, Bear Stearns for the first time quantified its non-performing loans, non-accrual loans, allowances for loan losses and its most recent provision for loan losses. Bear Stearns also, for the first time, disclosed to the SEC its retained interests in subprime

mortgages and losses due to payment delinquencies and defaults in mortgages contained in its retained interest in the securitizations.

322.     Unfortunately for investors, the version of the Company's January 31, 2008 response that was released to the public redacted all relevant figures.  Moreover, by the time the SEC completed its review of the Company's response on April 2, 2008, Bear Stearns had imploded.

323.     In the 2008 OIG Report, the Inspector General concluded that the information regarding subprime exposure and risk management philosophy that the Company had omitted from its 2006 and 2007 Forms 10-K was "material information" that investors could have used "to make well-informed investment decisions."

### M.     **Bear Stearns' Practices Violated Accounting Standards**

324.     During the housing market declines of the Class Period, the Company's enormous exposure to losses on mortgage-backed securities made it especially critical that Bear Stearns ensure the accuracy of its reported results.  The Company failed to do so.  In fact, despite its public statements to the contrary, throughout the Class Period the Company suffered from a pervasive weakness in its internal controls, and repeatedly and systematically violated Generally Accepted Accounting Principles ("GAAP").

### 1.     **GAAP Overview**

325.     SEC Regulation S-X, 17 C.F.R. § 210.4 01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

326.     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public

companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB") and the American Institute of Certified Public Accountants ("AICPA").

327.    GAAP consists of a hierarchy of authoritative literature.  The highest authority is the FASB Statements of Financial Accounting Standards (FAS), followed by FASB Interpretations (FIN), FASB Staff Positions (FSP), Accounting Principles Board Opinions (APB), AICPA Accounting Research Bulletins (ARB), AICPA Statements of Position (SOP), and AICPA Industry Audit and Accounting Guides (AAG).  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements (FASCON).

328.    The AICPA issues industry specific Audit & Accounting Guides ("AAG") to provide guidance in preparing financial statements in accordance with GAAP.  The AAG for Depository and Lending Institutions ("D&L AAG") was applicable to Bear Stearns with respect to its mortgage banking activities, including mortgage originations, securitizations, and holdings of investments in debt securities (*e.g.*, Ch.4, Industry Overview – Mortgage Companies).  The D&L AAG interpreted GAAP pronouncements on the proper methods to assess fair value for financial instruments and RIs.

329.    In addition, there was an AAG that was applicable to Brokers and Dealers in Securities ("B&D AAG").  Among other applications, the B&D AAG provided guidance on GAAP related to Bear Stearns' trading of financial instruments.

330.    Bear Stearns was also expected to adhere to fundamental accounting principles that state a Company's financial statements should be presented in a manner which, among other things, should:

(a)    Provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASCON 1 ¶34);

(b)    Provide information about an enterprise's economic resources, obligations, and owners' equity.  That information helps investors, creditors, and others identify the enterprise's financial strengths and weaknesses and assess its liquidity and solvency.  (FASCON 1 ¶40);

(c)    Provide information about an enterprise's financial performance during a period.  "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance."  (FASCON 1 ¶42);

(d)    Include explanations and interpretations to help users understand financial information because management knows more about the enterprise and its affairs than investors, creditors, or other "outsiders" and can often increase the usefulness of financial information by identifying certain transactions, other events, and circumstances that affect the enterprise and explaining their financial impact on it. (FASCON 1 ¶ 54);

(e)    Be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting. (FASCON 2 ¶¶58-59);

  (f)  Be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASCON 2 ¶79);

  (g)  Be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent. (FASCON 2 ¶81); and

  (h)  Reflect that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  (FASCON 2 ¶¶95, 97).

  **2.**  **Fraud Risk Factors Present at Bear Stearns**

   **a.**  **Fraud Risk Factors Applicable to Depository and Lending Institutions**

331. Because of Bear Stearns' role in the mortgage origination market, it was subject to risks associated with depository and lending institutions.  One such risk factor identified by the AICPA in the applicable AAG in the section was "significant declines in customer demand and increasing business failures in either the industry or overall economy," including "deteriorating economic conditions…within industries or geographic regions in which the institution has significant credit concentrations."  (Ch. 5, Audit Considerations and Certain Financial Reporting Matters, Ex. 5-1, Fraud Risk Factors).  Given the widespread evidence of housing declines set out in paragraphs 138 to 148 above, this risk factor assumed particular gravity as the Class Period wore on.

332. Another AICPA risk factor set forth in the AAG specific to depository and lending institutions is "Unrealistically aggressive loan goals and lucrative incentive programs for

loan originations", as shown by, among other things, "relaxation of credit standards", and "excessive concentration of lending."

333.    Given the lax underwriting and loan origination standards described in paragraphs 53 to 63 above, Bear Stearns' financial disclosures were deeply susceptible to this form of risk. For example, Bear Stearns' 2006 Form 10-K disclosed that "Mortgage-backed securities revenues increased during fiscal 2006 when compared with fiscal 2005 on higher origination volumes from asset-backed securities, adjustable rate mortgage ("ARM") securities…"

334.    Bear Stearns did not disclose this critical information until January of 2008 pursuant to the SEC's efforts to seek expanded disclosure from the Company.  As described below at paragraphs 346 to 347 and 579, these "2/28 ARMs" carried a particularly high degree of risk of misstatement, and constituted the types of risk highlighted by the D&L AAG.  In fact, Bear Stearns delayed efforts to adopt stricter underwriting standards related to non-agency loan originations until the quarter ended August 31, 2007.

335.    The AICPA identifies another source of industry-specific risk as occurring when an institution has "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate (Significant estimates generally include…fair value determinations)" and when "material amounts of complex financial instruments and derivatives held by the institution that are difficult to value." Because such a large proportion of the Company's assets were Level 3 instruments valued using Bear Stearns' proprietary valuation models that required significant judgments by management, the Company faced significant risk of exposure to misstatement.

336.    The AAG identifies another risk factor for lenders as occurring when  "[v]acant staff positions remain unfulfilled for extended periods, thereby preventing the proper segregation

of duties", and when there exists an "[u]nderstaffed accounting or information technology department, inexperienced or ineffective accounting or information technology personnel, or high turnover."  As set out above at paragraphs 129 to 136, during the Class Period the Company's risk management desk virtually evaporated, leaving a single analyst in October of 2007, as the housing crisis reached a crescendo.

> **b.**       **Risk Factors Applicable to Brokers and Dealers in Securities**

337.     Due to Bear Stearns' role in trading financial instruments, the Company was subject to special risk factors applicable to brokers and dealers in securities, including those described in Ch.5, Appendix A, ¶ 5.195, Part 1 Fraudulent Financial Reporting.

338.     Among the risk factors the AICPA identifies for brokers and dealers are "concentration in a particular type of financial instrument" and "a failure by management and those charged with governance to set parameters (for example, trading limits, credit limits, and aggregate market risk limits) and to continuously monitor trading activities against those parameters."  As set out in the 2008 OIG Report, Bear Stearns repeatedly exceeded its own internal limits on concentration in mortgage-backed securities, invoking this risk.

339.     The AICPA identifies a further risk factor for broker dealers as being "A failure by management to have an adequate understanding of the entity's trading and investment strategies as conducted by the entity's traders, including the types, characteristics, and risks associated with the financial products purchased and sold by the entity."  As set out at paragraphs 137 to 187 above, throughout the Class Period the Company persisted in using valuation and VaR models it knew to be faulty in an effort to avoid disclosing its losses to the public.  Accordingly, Bear Stearns' management was deliberately "flying blind" with respect to the enormous risks the Company faced.

340.    Several specific conclusions of the 2008 OIG Report are also implicated by the AAG.  As set out above at paragraphs 134 to 135, the OIG concluded that during much of the Class Period the Company's risk management department was virtually deserted, preventing the department from functioning effectively.

341.    Moreover, the Company's efforts to delay taking a huge charge against capital, as described at paragraphs 212 to 213 above, invoked the B&D AAG's assessment of risk associated with "Intercompany transactions designed to improperly manage earnings."

342.    Finally, in that the B&D AAG warned accountants regarding the "[u]se of different valuations of same product in two related companies", the Company's accountants should have been especially wary of its practice of booking assets at full value even after making price concessions to counterparties in mark disputes and its knowledge that similar holdings of its hedge funds were worthless, as set out at paragraphs 222 to 226 above.  This risk was observed by the 2008 OIG Report to be present at Bear Stearns (*e.g.*, "…each of Bear Stearns' trading desks evaluated profits and risks individually, as opposed to relying on one overall firm-wide approach.").

### 3.    Audit Risk Alerts

343.    The AICPA issues Audit Risk Alerts ("ARAs") that are particularized by industry, including for the financial industry in which Bear Stearns participated.  The ARAs are used by industry participants, such as Bear Stearns and its auditor, Deloitte, to address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements.  The factors highlighted in the ARAs are most often summaries of existing industry-specific considerations such as those provided by, for example, the Office of the Comptroller of the Currency, the Federal Reserve, or the National Association of Realtors.

344.     It was also typical practice for the audit quality departments of major accounting firms such as Deloitte to integrate the ARAs into firm memoranda for purposes of disseminating that information to applicable clients and firm professionals.  The ARAs are included in the AICPA's annual Audit and Accounting Manual ("AAM").

345.     In particular, Farber, Bear Stearns' Senior Vice President-Finance and Controller, had previously been a partner with Deloitte.  Accordingly, Farber should have had familiarity with the existence and application of the ARAs.

346.     The 2006 ARA observed the following risk factors that were relevant to Bear Stearns' financial statements:

(a)      "Customers holding adjustable rate mortgages may not be able to make payments if interest rates rise significantly."  The ARA continued to say "Upon foreclosure, these financial institutions may not be able to liquidate underlying assets without absorbing significant losses…"  (2006 ARA 8050.37).

(b)      Any increase in originations of risky loan products, such as ARMs and Pay Option ARMs posed particular risks for entities that had not "developed appropriate risk management policies...."  (2006 AAM 8050.35)

(c)      Of significant relevance to Bear Stearns, the 2006 ARA heightened awareness that the value of these non-conforming products was often predicated on an assumption that home prices would continue to rise, which it observed was an assumption unlikely to be sustainable: "[S]ome of these [ARM] products assume a continued rise in home prices that may not continue."  (2006 AAM 8050.35)

347.     The 2007 ARA reiterated the factors observed in the 2006 ARA and expanded on the following risk factors:

(a)      It observed "This quarter's foreclosure starts rate is the highest in the history of the survey, with the previous high being last quarter's rate."  (2007 AAM 8050.27)

(b)      That the "American Banker recently reported that home resales hit a 4-year low due to continued price decline.  Many in the housing industry believe the decline in resales signifies a protracted housing slump.  Another issue contributing to sluggish home sales is the rising number of foreclosures of properties financed with subprime debt."  (2007 AAM 8050.30)

(c)      That "On June 29, 2007, the federal financial regulatory agencies (Board of Governors of the Federal Reserve System, FDIC, NCUA, 0CC, and OTS) issued the Statement on Subprime Mortgage Lending to address issues related, to ARMs.  …The agencies primary concern is the possibility of 'rate or payment shock' to the borrower that may result from the expiration of a fixed introductory rate to an adjustable variable rate for the duration of the loan."  (2007 AAM 8050.48)

348.    These risk factors were relevant for Bear Stearns to consider in the establishment of its internal controls and ultimately the preparation of its financial statements.  Moreover, these risk factors were generally observable to industry participants.  And so, Bear Stearns, with its access to material inside information regarding its specific high-risk environment, had an obligation to ensure that its certifications regarding the effectiveness of its internal control over financial reporting as well as the assertions it made in its financial statements, reflected appropriate consideration of these issues.

### 4.      Bear Stearns Falsely Represented that its Internal Controls Over Financial Reporting Were Effective

349.    Throughout the Class Period, Bear Stearns falsely asserted in its public filings that it maintained effective internal controls over financial reporting in clear violation of SEC rules.

The lack of effective internal controls at Bear Stearns facilitated its efforts to mislead investors because without those controls it was able to represent that:

(a)     It was exposed to significantly less risk than was truly inherent in the assets it possessed;

(b)     Its risk management personnel and procedures were effective and reliable, when Bear Stearns knew they were not;

(c)     It had properly recorded reserves for, and made adequate and complete disclosures about its failed hedge funds;

(d)     It was able to make reasonable estimates of the fair value of its financial instruments, when it knew at least its mortgage-related models were deficient;

(e)     The write-downs of the fair value of the Company's financial instruments and other securitization-related assets were adequate; and

(f)     Its reported revenue, earnings, and earnings-per-share were artificially inflated.

350.    Bear Stearns' 2007 Form 10-K filing asserted management's responsibility over internal controls:

> Management…is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. . . . In making its assessment of internal control over financial reporting, management [claimed to] use[ ] the criteria established in 'Internal Control-Integrated Framework' issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

351.    COSO defines "internal controls" in Chapter 1 of its Framework as follows:

> Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of

operations; (ii) Reliability of financial reporting; (iii) Compliance
with applicable laws and regulations.

352.     Moreover, COSO emphasizes the importance of a strong control environment,

which sets a positive "tone at the top" and then flows down through the Company.  The COSO

Framework Executive Summary identifies the pervasive influence that the control environment

has on the Company, as follows:

> The control environment sets the tone of an organization,
> influencing the control consciousness of its people.  It is the
> foundation for all other components of internal control, providing
> discipline and structure.  Control environment factors include the
> integrity, ethical values and competence of the entity's people;
> management's philosophy and operating style; the way
> management assigns authority and responsibility, and organizes
> and develops its people; and the attention and direction provided
> by the board of directors.

353.     In addition, the COSO Framework, Ch. 2, establishes that management's

philosophy and operating style directly affects the manner in which the company is managed, the

amount of risk that the company accepts and ultimately the success of the company.  Chapter 2

of the COSO Framework states:

> Management's philosophy and operating style affect the way the
> enterprise is managed, including ***the kinds of business risks
> accepted***…Other elements of management's philosophy and
> operating style include attitudes toward financial reporting,
> conservative or aggressive selection from available alternative
> accounting principles, ***conscientiousness and conservatism with
> which accounting estimates are developed***, and attitudes toward
> data processing and accounting functions and personnel. . . . ***The
> impact of an ineffective control environment could be far
> reaching, possibly resulting in a financial loss, a tarnished public
> image or a business failure.***

354.     Section 404 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act")

requires management to assess the effectiveness of the internal control structure and the financial

reporting for procedures.  Management is responsible for performing this assessment in the

context of a top-down risk assessment, which requires management to base both the scope of its assessment and the evidence gathered on risk.  Management's conclusion of its assessment of the effectiveness of the Company's internal control must be included in the Company's annual report.  Moreover, it was crucial for Bear Stearns to regularly monitor those controls to verify their operating effectiveness.

355.     Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls.

356.     Beginning in 2002, the Officer Defendants were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting."  Rule 302 states as follows:

> [E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting.

357.     In connection with the Company's 2006 Form 10-K, Defendants Cayne and Molinaro executed the applicable Rule 302 certification.

358.     Defendants Schwartz and Molinaro filed identical certifications with respect to the Company's 2007 Form 10-K.

359.     As explained above and in the Company's regulatory filings, in doing so the Officer Defendants represented to the marketplace that their assessment of internal controls over financial reporting was based upon the framework established by COSO.  Also, the Officer Defendants represented in the Company's Form 10-K filings that "management concluded that the Company's internal control over financial reporting was effective as of" the years ended November 30, 2006 and November 30, 2007.  These statements were false because Bear Stearns

concealed its lax risk management efforts which enabled vastly increased exposure to securities inextricably linked to subprime risk.  Furthermore, the lax risk management permitted incomplete and deficient pricing models, which was a material weakness that ultimately resulted in the overstatement of the fair value of its financial instruments as well as reported revenues and earnings.  As a result, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading because Bear Stearns' internal controls were ineffective.  The Officer Defendants' statements were false and misleading because Bear Stearns' internal controls were significantly deficient and ineffective to prevent or detect errors or misstatements in its operations, underwriting practices or financial reporting.

360.    Management's assessment of internal control over financial reporting was a critical metric for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws.  However, during the Class Period, as alleged herein, Bear Stearns did not properly assess its internal controls over financial reporting, thus it violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and Sarbanes-Oxley Act.

### a.    Risk Management

361.    In light of the 2008 OIG Report's specific criticisms of Bear Stearns' risk management program, the Company's assertion that it maintained effective internal controls was materially false and misleading.

362.    In the midst of the housing crisis in 2007, the Company's risk management department had virtually disappeared.  As set out in the 2008 OIG Report,

> [t]here was also turnover **of Bear Stearns' risk management personnel at critical times**.  Bear Stearns' head of model validation resigned around March 2007, precisely when the

subprime crisis was beginning to hit and the first large writedowns were being taken."

363.    Moreover, the 2008 OIG Report explains that:

there are indications…that the risk manager who left had difficulty communicating with senior managers in a productive manner.  In the opinion of the OIG expert, **difficulties in communication are a potential red flag** indicating that a risk manager could be telling the traders to take on less risk that they would otherwise choose to do (*i.e.*, information that the traders presumably would not want to hear)."

364.    Even before 2007, the few risk management analysts the Company did have were ill-suited to assess the risks facing Bear Stearns.  According to the 2008 OIG Report,

In 2006…Bear Stearns' business was becoming increasingly concentrated in mortgage securities, an area in which its model review still needed much work.  The OIG expert concluded that, at this time, the risk managers at Bear Stearns did not have the skill sets that best matched Bear Stearns' business model."  See also, *Id.*, "Given the risk managers' lack of expertise in mortgages, it would have been difficult for risk managers at Bear Stearns to advocate a bigger focus on default risk in its mortgage models.

365.    The Company had little interest in addressing the chaos in the risk management department, as it understood that effective risk management might reveal the actual extent of its exposure to the housing declines.

366.    As a result, according to the 2008 OIG Report,

the OIG expert concluded that the reviews of the mortgage models that should have taken place before the subprime crisis erupted in February 2007 appear to have never occurred, in the sense that it was still a work in progress when Bear Stearns collapsed in March 2008.

    **b.    Pricing Models and VaR Systems**

367.    The Company's assertion that it maintained effective internal controls was also materially false and misleading in light of the Company's decision to use valuation and risk models that did not reflect the impact of the housing crisis on its most important assets: MBS.

368.    As set out in the 2008 OIG Report,

> TM concluded that Bear Stearns model review process lacked
> coverage of mortgage-backed and other asset-backed securities, in
> part because the models were not used for pricing and in part
> because the sensitivities to various risks implied by the models did
> not reflect risk sensitivities consistent with price fluctuations in the
> market.

369.    The 2008 OIG Report stated that "Bear Stearns VaR models did not capture risks

associated with credit spread widening…These fundamental factors include housing price

appreciation, consumer credit scores, patterns of delinquency rates, and potentially other data.

These fundamental factors do not seem to have been incorporated into Bear Stearns' models at

the time Bear Stearns became a CSE."

370.    Because Bear Stearns did not update its VaR models on a timely basis, it was not

possible for Bear Stearns to have effective internal controls over financial reporting, despite its

certifications otherwise.

### 5.    GAAP Violations Relating to the Company's Financial Statements[6]

#### a.    Bear Stearns Misstated Its Exposure to Loss from the Failed Hedge Funds

371.    As described above, in June of 2007, Bear Stearns loaned $1.6 billion to the

BSAM "High Grade" fund in a last-ditch attempt to salvage the entity.  At that time, despite their

---

[6] The failures described herein apply to Bear Stearns' annual and interim financial statements.  APB
No. 28, Interim Financial Reporting ("APB 28"), states "Interim financial information is essential to
provide investors and others with timely information as to the progress of the enterprise."  (APB 28 ¶ 9)
In addition, in interim periods "Contingencies and other uncertainties that could be expected to affect the
fairness of presentation of financial data at an interim date should be disclosed in interim reports in the
same manner required for annual reports. Such disclosures should be repeated in interim and annual
reports until the contingencies have been removed, resolved, or have become immaterial." (APB 28 ¶22)
Bear Stearns' interim financial reporting was required to be on the same basis as its annual financial
reporting (APB 28 ¶ 10).

internal concerns otherwise, Bear Stearns' representatives claimed to the SEC that those loans were purportedly sufficiently collateralized by $1.7 to 2.0 billion of the fund's assets.

372.     During June of 2007, the loan balance was reduced to $1.345 billion through the funds sale of certain assets for repayment purposes.  However, in the same period, the value of the collateral had been reduced to an amount approximately equal to the size of the then-outstanding loan.

373.     This predicament implied that the collateral assets had lost at least $100 to $400 million of purported value in less than one month.

374.     In actuality, as a result of its inside knowledge of the asset composition comprising the collateral and the rapid loss of value of those assets even in June of 2007, Bear Stearns knew that the collateral of the assets provided by the hedge funds was clearly insufficient to guarantee the value of the loans it had extended.  Moreover, Bear Stearns knew that the hedge funds were otherwise incapable of repaying those loans.

375.     Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ("SFAS 5") was issued in March 1975 by the FASB.  The principles described in SFAS 5 set forth the standards of financial accounting and reporting for loss contingencies. SFAS 5 sets forth the standards Bear Stearns was required to adhere to in order to properly account for loss contingencies.

376.     SFAS 5 provides in paragraph 8:

> An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.       Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.      The amount of loss can be reasonably estimated.

377.    As described above, on July 18, 2007, Bear Stearns informed Hedge Fund investors that "unprecedented declines" in the value of the investments had been sustained.  The letters to the investors also disclosed that there was "effectively no value left'' in the High Grade Enhanced Fund and "very little value left'' in the High Grade Fund.  As a result, in accordance with SFAS 5, Bear Stearns should have taken an immediate loss on the remaining value of the loan of $1.345 billion in the quarter ended August 31, 2007.

378.    Instead of recording a loss of $1.345 billion, Bear Stearns recorded a mere $200 million in the quarter ended August 31, 2007 without providing any explanation for the determination of the amount of the loss or its justification for maintaining the remaining $1.1 billion of the loan value in its reported financial statements.  In fact, Bear Stearns' disclosures were vague as to whether the write-down was attributable to the loan or to the accrued income from management fees of the fund.  Specifically, it disclosed, "Included in the 2007 quarter results are losses of approximately $200 million representing the write-off of the Company's investment and fees receivable from the Funds, losses from the closure of the $1.6 billion secured financing agreement provided to the High Grade Fund and other directly related expenses."

379.    These issues concerning the rapid de-valuation of the collateral should also have raised alarm bells that any similar assets maintained by Bear Stearns needed to be subjected to similar fair value write-downs.  Bear Stearns permitted one trading desk, its hedge funds, to recognize valuation losses related to CDOs at the same time other trading desks, such as those in its prime brokerage business, used alternative valuation methods on similar assets to avoid such write-downs.

380.    Bear Stearns provided no further public disclosure about the losses it incurred related to its loans to the hedge funds.

381.    As more fully set forth below, Deloitte knew or should have known of an additional auditing red flag in the Company's related party transactions.

382.    The primary literature for related party transactions is FAS 57, *Related Party Disclosures*.  Related party transactions include transactions between affiliates, which are defined as "a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise" (FAS 57 ¶ 1).

383.    FAS 57 paragraph 3 states:

> Transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, freemarket dealings may not exist.  Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated."

384.    Under FAS 57, Deloitte was obliged to evaluate related party transactions with a high degree of professional skepticism.  If the parties to the transaction are related, it cannot be assumed that the recorded amounts properly reflect the true economic substance of the transaction.

385.    Indeed, GAAP provides detailed guidance as to specific disclosure requirements and audit procedures in SAS 45 and AU section 334, entitled *Related Parties*, that must be followed in order to provide the market with a better understanding of the transaction.

386.    Bear Stearns' related party transactions included the loans it provided to its failing High Grade Hedge Funds.  Accordingly, with respect to that transaction, Bear Stearns was required to disclose (FAS 57 ¶ 2):

(a)    The nature of the relationship(s) involved,

(b)     A description of the transactions for each of the periods for which income statements were presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements,

(c)     The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period, and

(d)     Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

387.     Furthermore, Bear Stearns should have provided specific disclosure concerning the outcome of the write-downs to the loans provided to the hedge-funds.  This obligation to disclose to investors did not expire at the time when, or if, Bear Stearns assumed the collateral onto its consolidated financial statements.

388.     As described above, however, the 2008 OIG Report observed that Bear Stearns eventually wrote down the value of collateral it acquired by at least $500 million in the fall of 2007.  Thus, it is clear that Bear Stearns failed to disclose at least $300 million of write-downs.  Moreover, notwithstanding the fact that the Company should have written off the entire value of the loan in the quarter ended August 31, 2007, Bear Stearns' financial statements failed to comply with GAAP because investors were inappropriately left in the dark about how the losses on the remaining $845 million exposure were ultimately recorded, or if those losses were in fact ever recognized prior to its collapse.

**b.     Bear Stearns' Financial Statements Misrepresented its Exposure to Decline in the Value of RIs**

389.     Statement of Financial Accounting Standards No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities ("SFAS 140"), was issued in

September 2000 by the FASB.  The principles described in SFAS 140 set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral."  In particular, SFAS 140 sets forth the standards to properly assess the fair value for RIs.  For purposes of Bear Stearns' financial statements, RIs were components of the revenue line item Principal Transactions and reported on the balance sheet as a component of financial instruments at fair value.

390.    Once RIs were initially recorded, Bear Stearns was required to determine the fair value of the RIs in each subsequent quarter.  For purposes of its 2006 financial statements, the methods prescribed by SFAS 140 for measuring the fair value of financial assets and liabilities were similar to those in SFAS 157, which required that the valuation assumptions be consistent with those that market participants would use in their estimates of values, including assumptions about interest rates, default, prepayment, and volatility.  (FAS 140, ¶¶ 68-70)  SFAS 157 defined the fair value requirements for purposes of the 2007 financial statements.  In all periods from the quarter ended February 28, 2007 to February 29, 2008, Bear Stearns reported with respect to RIs "The assumptions used for pricing variables are based on observable transactions in similar securities and are further verified by external pricing sources, when available."  This disclosure indicates that RIs were classified by Bear Stearns as Level 2 assets (see further discussion below).

391.    As the issuer of many securitizations, Bear Stearns often maintained the riskiest tranche (the one in the first loss position) on its books as RIs.  RIs provided Bear Stearns with an opportunity to receive additional cash flows if specific loan performance criteria were met.  Bear Stearns' valuation of its RI from securitizations was a critical metric for investors because it

indicated the financial health of the Company, given that the valuation of its RI was directly linked to Principal Transactions revenue and, ultimately, net income.

392.    In the fall of 2006, Bear Stearns represented to the SEC that it was (i) "moving away from holding residuals in its portfolio; (ii) attempting to sell aging residuals, and (iii) aware that its residuals on second lien mortgage securitizations were very risky."  Nevertheless, Bear Stearns' holdings of RIs continued to increase during this period, rising from $5.6 billion as of November 30, 2006 to $7.1 billion as of February 28, 2007.  This trend indicated either an increasing difficulty in selling RIs or that Bear Stearns' representations to the regulators were unreliable.

393.    By February of 2007, Bear Stearns had been forced to write-down nearly 30% of a portion of its RIs that were worth $300 million.  In the following quarter, losses on RIs rose to a total of $168 million on second lien inventory and $240 million on RMBS and structured products.  The 2008 OIG Report observed that Bear Stearns had been unable to predict these losses.  Bear Stearns' inability to predict such losses was in all probability attributable to its deficient pricing models.  Bear Stearns failed to make any disclosure of these losses in its Form 10-Q for the quarter ended May 31, 2007 or any other SEC filing.

394.    In fact, in its May 2007 Form 10-Q, Bear Stearns continued to tell users of its financial statements "Actual credit losses on retained interests have not been significant," which was entirely misleading.  Bear Stearns repeated this disclosure through the time of its collapse.

395.    Despite these escalating losses, Bear Stearns holdings of RIs continued to grow in both the quarter ended May 31, 2007 and August 31, 2007, ultimately reaching $9.6 billion – nearly two times the levels at which it had reported to the SEC that it was planning to take the opposite course.

396.    One of the important disclosures made by Bear Stearns concerning its RIs was that it quickly divested the related risks to the market.  For example, it disclosed that the weighted average holding period for RIs was 150 days as of November 30, 2006.  Accordingly, it is important to put the losses Bear Stearns was incurring in the context of the brief reported holding period.

397.    Specifically, if Bear Stearns had incurred total losses on RIs in excess of $400 million by May 31, 2007 even though its holding periods were only 150 days, Bear Stearns should have given appropriate consideration to the loss implications of potentially longer holding periods.  The reality confronting Bear Stearns at that moment in time was that the market liquidity for RIs was evaporating.  For example, in the quarter ended February 28, 2007, Bear Stearns reported that the new issue volume had decreased 11.9% compared to the prior year.  Although Bear Stearns did not measure the decline in volume in the May 2007 quarter, it observed revenues from its mortgage-related business "decline significantly."

398.    Moreover, as an originator of the mortgages underlying the RIs, Bear Stearns knew that valuation of the RIs was at serious risk because it was contingent on the assumption of home prices staying level or in any event not decreasing.  Specifically, because of the risk of payment shock at the time of the initial interest rate reset (*e.g.*, the risk described in both the ARA and broadly by the federal financial regulatory agencies), it was well-understood that borrowers would need to be able to refinance, which would at a minimum avoid principal losses to RI holders.  The ability to refinance rested on the continued availability of nonprime financing or an accumulation of equity in the home.  Even in early 2007, neither of these conditions was evident.

399.    In fact, as described above, Bear Stearns knew that (1) losses would rise higher into the RMBS tranche structures than initially expected; (2) RMBS (and CDO) credit ratings were no longer valid, because each tranche was not as far removed from real loss as its originally-assigned ratings indicated; and (3) the consequences would actually be most drastic for RIs (*i.e.*, the aspect of the structured financing closest to encroaching mortgage losses).

400.    The market for residential mortgage-related securities in these periods was in systematic decline by February of 2007.  This decline suggested that Bear Stearns' holdings of RIs were already illiquid.  Moreover, at least until the quarter ended May 31, 2007, Bear Stearns continued to originate risky non-agency related mortgages pursuant to its relaxed lending standards.  Accordingly, when the balance of RIs grew from November of 2006 through May of 2007, the resulting RIs generated were of the highest risk of loss.

401.    In addition to the general economically adverse valuation factors for RIs, Bear Stearns' pricing models for mortgage securities, which would have included RIs, were not reliable, and yielded overstated valuations.  In particular, its "Non-Investment Grade" RIs, which included those RIs with credit ratings below BBB-, were overstated (*i.e.*, amounts of at least $1.3 billion in all periods from February 28, 2007 onwards).  As an example of the faulty credit ratings, Bear Stearns reported in February of 2008 that it held $2.0 billion of retained interest in subprime ARM loans.  Nevertheless, the Non-Investment Grade RIs totaled only $1.3 billion. Therefore, even assuming that all of the subprime ARM loans were Non-Investment Grade, Bear Stearns attributed Investment Grade or higher credit ratings to at least $700 million of subprime RIs.

### c.   GAAP Violations Related to Failure to Appropriately Determine the Fair Value of Financial Instruments

402.   In December of 1993, the FASB issued SFAS No. 115 Accounting for Certain Investments in Debt and Equity ("SFAS 115").  SFAS 115 addresses the accounting and reporting for all investments in debt securities.  Those investments are to be classified in three categories: (1) trading, (2) available-for-sale, and (3) held for investment (SFAS 115 ¶ 6).  The accounting treatment for the specific investments depended upon its classification.

403.   Bear Stearns treated its financial instruments as trading securities.  As a result, Bear Stearns was required to report its financial instruments at fair value and included all unrealized gains and losses in earnings (SFAS 115 ¶ 12).  Bear Stearns reported the periodic fluctuations in the fair value of its financial instruments in its income statements within the revenue line-item Principal Transactions.  In the MD&A portion of its SEC filings, Bear Stearns further stratified revenue from Principal Transactions into (a) Fixed Income and (b) Equities.  Bear Stearns reported revenue from mortgage securitizations as well as the unrealized gains and losses from the fluctuations in the fair value of its financial instruments in the Fixed Income component of Principal Transactions.

404.   When the fair value of an investment is not readily available, there are several methods available to financial statement preparers to determine the fair value, including the use of pricing models (FASB Staff Implementation Guide for SFAS 115, Question 59).  In these instances, GAAP observes that it is important for a preparer to use the best information available in the circumstances to determine fair value.

405.   As a basis for its conclusions, SFAS 115 observed "Measuring investments at fair value is relevant and useful to present and potential investors, creditors, and others in making rational investment, credit, and similar decisions – the first objective of financial reporting as

99

discussed in FAS Con No.1, Objectives of Financial Reporting in Business Enterprises." (SFAS 115 ¶ 39) Moreover, SFAS 115 noted "…some depository institutions have failed, or experienced impairment of earnings or capital, because of speculative securities activities and that other institutions have experienced an erosion of the liquidity of their securities portfolios as a result of decreases in the market value of those securities. In a liquidity shortage, the fair value of investments, rather than their amortized cost, is the amount available to cover an enterprise's obligations." (SFAS 115 ¶ 41) This characterization of the need to reliably determine and report fair value was consistent with the predicament of Bear Stearns. In other words, market participants knew that Bear Stearns held speculative securities. And, once the market began to doubt the legitimacy of Bear Stearns' valuation claims, its liquidity evaporated.

406.    In September of 2006, the FASB issued SFAS No. 157, "Fair Value Measurements" ("SFAS 157"), which became effective for financial statements issued for fiscal years beginning after November 15, 2007. However, early adoption was permitted if the entity had not yet issued financial statements for that fiscal year. In its 2006 Form 10-K, Bear Stearns disclosed that it would adopt SFAS 157 early in the first quarter of fiscal 2007.

407.    SFAS 157 established a definition of fair value within GAAP as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." (SFAS 157 ¶ 5) This standard also clarified that a fair value measurement assumes that the asset or liability is exchanged in an orderly transaction between market participants to sell the asset or transfer the liability at the measurement date. An orderly transaction is a transaction that assumes exposure to the market for a period prior to the measurement date to allow for marketing activities that are usual and customary for transactions involving such assets or liabilities; it is not a forced transaction. (SFAS 157 ¶ 7) Nevertheless,

this definition of fair value was not conceptually different than the definition found in previous accounting literature in that it remained focused on the assumptions marketplace participants would use in pricing the asset or liability.

408.    This standard also established a framework for measuring fair value and required enhanced disclosures about fair value measurements.  It also requires companies to disclose the fair value of its financial instruments according to a fair value hierarchy.  The fair value hierarchy ranks the quality and reliability of the information used to determine fair values. Financial instruments carried at fair value are required to be classified and disclosed in one of the three categories of the hierarchy (SFAS 157 ¶¶ 22-30):

(a)    Level 1: Quoted market prices for identical assets or liabilities in active markets.

(b)    Level 2: Observable market-based inputs or unobservable inputs that are corroborated by market data.

(c)    Level 3: Unobservable inputs that are not corroborated by market.

409.    Companies such as Bear Stearns that reported Level 3 assets or liabilities were required to provide enhanced disclosure regarding the activities of those financial instruments.

410.    In its 2006 Form 10-K, Bear Stearns disclosed that it did not expect the adoption of SFAS 157 to have a material impact on the consolidated financial statements of the Company. In part, this particular disclosure was likely attributable to the fact that Bear Stearns had previously reported in its SEC filings that it aggregated its financial instruments in three broad categories, each of which resembled the stratifications subsequently required by SFAS 157. Bear Stearns had also provided specific disclosure of the aggregate dollar value of financial instruments aggregated into the third category (*i.e.*, "Financial Instruments Whose Fair Value Is

Estimated Based on Internally Developed Models or Methodologies Utilizing Significant Assumptions or Other Data That Are Generally Less Readily Observable from Objective Sources").

411.   In October 2007, the Center for Audit Quality ("CAQ"), which is associated with the AICPA, published an audit alert ("whitepaper") entitled "Measurements of Fair Value in Illiquid (Or Less Liquid) Markets."  This whitepaper similarly observed that the implementation of SFAS 157 was likely to have only a minimal effect on most entities.

412.   Throughout the Class Period, "Financial instruments owned, at fair value" was the largest balance sheet line item in Bear Stearns' financial statements, typically comprising one third of the Company's total assets.  "Mortgages, mortgage- and asset-backed" securities, in turn, were the largest component of Financial instruments owned, making up at least thirty percent of the Company's financial instruments from the first quarter of 2005 onwards.  This proportion peaked at 39.1% of Bear Stearns' total financial instruments, or about $57.5 billion, as of February 28, 2007.

413.   Bear Stearns' leverage caused its fair value measurements to have significant implications to its financial instruments.  Specifically, even minor adverse changes in its fair value assumptions had potentially devastating consequences for Bear Stearns' reported revenues.  As an example, during all periods from the first quarter of 2006 to the second quarter of 2007, Bear Stearns' revenue from Principal Transactions ranged from $1.1 billion to $1.5 billion.  These amounts were critically important to Bear Stearns' reported revenues during these periods, typically one-third of amounts reported.  However, if the fair value of only its mortgage-related financial instruments was reduced by an amount of even 3%, all of its reported Principal Transactions revenue would have been wiped out.  Any adverse adjustment to the fair value of

mortgage-related securities in excess of 3% would have caused reported revenue from Principal Transactions to turn negative.

414.    As described further below, starting at least by November of 2004, Bear Stearns consistently disclosed the dollar value of certain assets whose value had been established using internally-developed models (consistent with Level 3 in SFAS 157 vernacular).  As a percentage of total financial instruments, the Company's total Level 3 assets grew rapidly from 11% of its total financial instruments in the fourth quarter of 2006 to 29% of its total financial instruments by the first quarter of 2008.  Accordingly, throughout the Class Period, Bear Stearns was valuing at least 11%, and up to 29%, of its financial instruments using valuation models devised by the Company and dependent upon significant assumptions established by management.

415.    Bear Stearns revealed for the first time in its quarterly results for the fourth quarter of 2007 that mortgage securities, valued using the Company's mortgage valuation models, comprised approximately 70% of all its Level 3 financial instruments.  Level 3 residential mortgage-related assets totaled at least $5.8 billion and $7.5 billion as of August 31, 2007 and November 30, 2007, respectively.

416.    In addition, in all periods from at least the first quarter of 2007 through its collapse in March of 2008, Bear Stearns reported that Level 2 assets were in excess of $60 billion and comprised at least 50% of reported financial instruments owned.  Bear Stearns disclosed that Level 2 assets consisted of "financial instruments for which the Company does not receive quoted prices; therefore, models or other methodologies are utilized to value these financial instruments."  Since the reported fair value of Level 2 assets was also significantly dependent on valuation models, any flaws in those models had potentially devastating ripple

effects.  As of November 30, 2007, Bear Stearns reported that it held $28.9 billion of Level 2 mortgage-related securities.

417.     As described above, the SEC determined that Bear Stearns' mortgage valuation models, among other things, failed to incorporate indicators of declines in the house market.  In light of these defects and the downturn of the housing market during the Class Period, it was virtually inevitable that an overstatement of these assets, especially those Level 3 assets, would occur.

### d.     Bear Stearns Failed to Provide Adequate Disclosure About Risk and Uncertainties

418.     Bear Stearns was also required to provide disclosure about risk and uncertainties related to its financial statements.  These disclosures were guided in part by the AICPA's Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties* ("SOP 94-6").  In particular, Bear Stearns was required to disclose any vulnerability or risk inherent to its financial statements as a result of concentrations of risk.  (SOP 94-6 ¶ 20)  The concentrations highlighted include "revenue from particular products, services, or fund-raising events.  The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue."  (SOP 94-6 ¶ 22)

419.     These concentration disclosures are related precisely to the issues constituted by Bear Stearns' holdings of mortgage-related securities, and specifically subprime and CDO-related securities.  During 2007, Bear Stearns' periodic SEC filings contain only fleeting references to its concentration of exposure to subprime investments.  For example, in the first quarter of 2007, Bear Stearns reported that it subprime activities "have historically represented only a small portion of the Company's mortgage activities."

420.     The 2006 Form 10-K stated that Bear Stearns' "Maximum Exposure to Loss" to CDOs was $211.1 million.  In its Form 10-Q for the first quarter of 2007, Bear Stearns reported that its maximum exposure to CDOs had been reduced to $174.2 million.  And, at the end of the second quarter of 2007, the Company's Form 10-Q still only quantified $270.6 million of exposure to CDOs.

421.     By the third quarter of 2007, however, simultaneous to the initial public disclosure of its valuation markdowns, Bear Stearns stated that its maximum exposure to loss on CDOs had risen to $631 million.  This exposure was present even after $700 million of markdowns to mortgage-related assets had been recorded in the quarter ended August 2007. Bear Stearns' exposure to CDOs was growing at a time when its risk management function when prudent risk management should have been reducing CDO exposure.

422.     In contrast to its quantifications of reported maximum exposure, the Company recorded writedowns of $2.3 billion in the fourth quarter of 2007, of which CDOs were a "large component."  Even assuming that 50% of the markdowns were a "large component," the implication is that Bear Stearns understated its disclosed exposure to CDOs by a factor of two (*i.e.*, $631 million maximum exposure at August 31, 2007 and a $1.2 billion write-down).  After those write-downs, Bear Stearns reported that its maximum remaining exposure to CDOs as of November 30, 2007 was $409 million.  Yet, once again, in the first quarter, Bear Stearns recorded $600 million of valuation markdowns although the Company's disclosure of the specific assets subject to the markdowns was ambiguous.

423.     Bear Stearns' failure to provide meaningful disclosures of the concentrations of risk it had to the subprime and CDO market were particularly glaring in light of the failures of its hedge funds, which as described above, focused on CDO and CDO-related investments.  Thus, it

is logical that the SEC pursued more detailed disclosure from Bear Stearns via its comment letter related to its financial filings shortly after the failure of those hedge funds.  In all likelihood, the SEC sought to ensure that public investors, unlike the hedge fund investors, were aware of risk concentrations present in the Company's financial statements.  Indeed, this finding was presented in the 2008 OIG Report.

**e.      Bear Stearns Failed to Provide Reliable Disclosures
to Investors in Accordance with SEC Regulations**

424.     In addition to the financial statement disclosures described above, Bear Stearns was also required to provide certain additional information in the Management's Discussion & Analysis ("MD&A") section of its SEC filings.  (Regulation S-K §229.303(a))  The SEC required, among other considerations that "The registrant's discussion and analysis shall be of the financial statements and of other statistical data that the registrant believes will enhance a reader's understanding of its financial condition, changes in financial condition and results of operations."  (Instruction 1)  The SEC also required "The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant.  (Instruction 2) "

425.     MD&A is also required to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

426.     As described above, Bear Stearns' MD&A included disclosures of the amounts it reported as VaR as well as certain accompanying details, which as described above was among the most closely watched performance indicators by users of its financial statements.  As reported, Bear Stearns' VaR was lower than that of its peers, which suggested that Bear Stearns' financial statements reflected relatively low levels of risk.  In fact, the amounts Bear Stearns'

106

management reported as VaR were materially misleading because its VaR models were defective.  Thus, Bear Stearns' VaR failed to comply with SEC Regulations.

### N.  Bear Stearns' Practices Violated Banking Regulations

427.    In its Forms 10-K filed for fiscal years 2006 and 2007, Bear Stearns stated that "the Company is in compliance with CSE regulatory capital requirements."  This statement was materially false and misleading.

428.    In fact, during the Class Period, while Bear Stearns offered regulators data showing that it apparently met the CSE program's 10% minimum net capital requirements, the Company was only able to achieve this result by repeatedly violating regulatory requirements relating to the appropriate calculation of net capital.  As set out in the 2008 OIG Report, the Company violated these rules by (i) failing to take appropriate capital charges related to its collapsed hedge funds; (ii) inflating its profit and its capital by using inflated marks on assets subject to mark disputes; and (iii) falsely inflating its net capital by using misleading VaR models to calculate capital requirements.

### 1.  Overview of Capital Requirements

429.    Net capital, the value of a firm's assets less the value of its liabilities, is at the core of any bank's operations.  The more net capital a firm has, the better equipped it is to cover any unexpected losses.

430.    Capital requirements are one way of ensuring that banks hold sufficient net capital at all times to meet unexpected losses.  The principal sources of loss are market risks, credit risks and operational risks.  Capital requirements provide that a certain amount be set aside to cover potential risk for each kind of loss.  These amounts, taken together with adjustments for hedging or diversification, are called capital charges.  If the total capital charge is greater than the firm's

minimum required net capital, the firm needs either to raise more capital or reduce some of its risk.

431.     Registered broker-dealers are subject to the Net Capital Rule (Rule 15c3-1) (the "Net Capital Rule") under the Exchange Act.  The Net Capital Rule, which specifies minimum net capital requirements for registered broker-dealers, was designed to measure the general financial integrity and liquidity of broker-dealers and requires that at least a minimal portion of a broker-dealer's assets be kept in relatively liquid form.

432.     Under the Net Capital Rule, Bear Stearns was required to maintain a minimum net capital ratio of 10% – that is, Bear Stearns was required to maintain at least ten percent of its assets in cash or in securities that could be easily converted to cash.  If the overall value the assets Bear Stearns maintained on its books went up, then its net capital requirements went up as well.

433.     Upon Bear Stearns' approval as a CSE on December 1, 2005, the SEC permitted Bear Stearns to use a specified alternative method for calculating net capital in exchange for Bear Stearns' compliance with requirements of the CSE program.

434.     According to the SEC's Release No. 34-49830 "[u]nder the alternative method, firms with strong internal risk management practices may utilize mathematical modeling methods already used to manage their own business risk, including value-at-risk ("VaR") models and scenario analysis, for regulatory purposes,"  The release explains that the purpose of the alternative method of computing net capital is "to permit regulated companies to align their supervisory risk management practices and regulatory capital requirements more closely."

435.     The conditions of Bear Stearns' participation in the program and the alternative manner in which it was permitted to calculate net capital is set out in Appendices E and G to the

Net Capital Rule.  Appendices E and G permit the calculation of capital charges for market risk and derivative-related credit risk based on mathematical models, in a manner "consistent with the standards ('Basel Standards') adopted by the Basel Committee on Banking Supervision ('Basel Committee')".[7]

### 2.  Bear Stearns Failed to Take Timely and Adequate Capital Charges

436.    As the 2008 OIG Report points out, Bear Stearns' treatment of its hedge fund bailout ran afoul of the Basel II standards relating to capital charges.  In light of Appendix E's adoption of this standard, the Company's treatment of the hedge fund bailout violated the SEC's Net Capital Rule 1 as well.

437.    Basel II requires that "[w]hen a bank has been found to provide implicit support to a securitization, it will be required to hold capital against all of the underlying exposures associated with the structure as if they had not been securitized."

438.    The 2008 OIG Report pointed out that the High Yield Fund was financially distressed, and that the terms of the bailout repo agreement had resulted in the Company's assumption of all of the risk, and none of the possible upside, relating to the collateral it had received in the transaction.  Accordingly, the 2008 OIG Report concluded, "Bear Stearns' financing of the BSAM funds is conceptually similar to implicit support."

439.    The OIG explained that:

> Since Bear Stearns bore all of the downside risks, sound risk
> management (consistent with Basel II) requires that the impact on
> Bear Stearns' capital associated with these reports should have

---

[7]    The Basel Committee on Banking Supervision is an institution created by the central bank Governors of the Group of Ten nations.  It was created in 1974 and meets regularly four times a year. The Basel Committee on Banking Supervision provides a forum for regular cooperation on banking supervisory matters.  Its objective is to enhance understanding of key supervisory issues and improve the quality of banking supervision worldwide.  (http://www.bis.org/bcbs/)

> been at least as great  as the impact Bear Stearns would incur if it
> held that assets in its own trading book at the end of June 2007.

440.     Bear Stearns failed to take an appropriate charge against capital when it provided

the credit facility to the High Grade Fund.  The 2008 OIG Report states "TM memoranda

summarizing discussions with Bear Stearns' risk managers suggest that the capital charge

incurred by Bear Stearns at the end of June 2007 was far less than the capital charge consistent

with sound risk management."

441.     That is to say, by failing to include the Hedge Fund collateral on its books, Bear

Stearns was able to avoid having to increase the amount of net capital it needed to maintain in

order to meet the CSE's program's 10% ratio.

### 3.        Inflation of Capital By Using Incorrect Marks

442.     The 2008 OIG Report also explains that Bear Stearns' accounting treatment of

certain assets subject to mark disputes resulted in violations of capital rules.

443.     As the 2008 OIG Report explains, fair values of positions relating to derivative

transactions are used in estimating the capital charges and capital requirements corresponding to

the transactions.

444.     As set out in paragraphs 222 to 226 above, in the summer of 2007, mark disputes

between Bear Stearns and its repo counterparties became more and more common.  As a result of

these disputes, the Company made repeated concessions to its counterparties regarding the value

of assets it offered as collateral.  These amounts were sometimes very large, as in Company's

March 12, 2008 payment of $1.1 billion to its counterparties detailed in paragraph 278 above.

445.     The 2008 OIG Report explains that "there are indications in the TM memoranda

that Bear Stearns tended to use the traders' more generous marks for profit and loss purposes,

even when Bear Stearns conceded to the counterparty for collateral valuation purposes."  This

permitted Bear Stearns to record a gain on its books even while it conceded a loss in the dispute with the counterparty.

446.     The OIG states that "it is inconsistent with the spirit of Basel II for two firms to use a mark dispute as an occasion to increase their combined capital, as would occur when both parties to a trade book profit at the expense of the other simply because they each mark positions favorably for themselves."  In such a circumstance neither party would be acknowledging the reduction in the value of the disputed asset.

447.     As a result of its inflation of the value of the disputed assets, Bear Stearns was able to overstate its capital for the purposes of calculating its net capital requirement.

**4.     Misrepresentations to Regulators Relating to VaR**

448.     Because net capital turns on an accurate assessment of the risks facing a company, the reliability of models used to estimate risk, such as VaR, are crucial to determining appropriate capital charges and the calculation of net capital.

449.     Appendix E to the Net Capital Rule required Bear Stearns to submit to the SEC, on a monthly basis, "[a] graph reflecting, for each business line, the daily intra-month VaR."

450.     Moreover, under Appendix E of the Net Capital Rule, Bear Stearns was obliged to review its VaR models both periodically and annually.  The periodic review could be conducted by the broker's or dealer's internal audit staff, but the annual review had to be conducted by a registered public accounting firm.

451.     As described in paragraphs 100 to 105 above, the SEC repeatedly warned Bear Stearns that the VaR models it used to calculate net capital did not consider fundamental factors including changes in housing prices, consumer credit scores, patterns of delinquency rates, and other key data.  Accordingly, throughout the Class Period the net capital the Company reported to the regulators was misleading and inaccurate.

452.   Moreover, neither the Company nor its auditor, Deloitte, performed adequate reviews of key inputs into VaR during the Class Period.  Indeed, according to the OIG, "reviews of mortgage models that should have taken place before the subprime crisis erupted in February of 2007 appear to have never occurred."

## V.   DEFENDANTS' SCIENTER

### A.   James E. Cayne

453.   As Chief Executive Officer, Chairman of the Board, and director, Defendant Cayne participated in the issuance of, signed and certified Bear Stearns' materially false and misleading SEC filings, as required by Sarbanes-Oxley, issued during the Class Period through January 8, 2008, when he was forced to resign as CEO.

454.   Specifically, in connection with the Forms 10-K for 2006 and 2007, Cayne certified that he had put in place disclosure controls and procedures to ensure the accuracy of the Company's filings, and that he had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

455.   Also in connection with the Forms 10-K for 2006 and 2007, Cayne certified that he had:

> Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

456.     These disclosure controls, together with his position as the Company's CEO, meant that Cayne was aware that the Company had been warned by the SEC in 2005 and 2006 that its mortgage valuation and VaR modeling failed to reflect key indicators in the housing market.

457.     Indeed, according to a February 8, 2008 presentation by Defendant Molinaro to a Credit Suisse Financial Services Forum, the Company's CEO was "intimately engaged in the risk management process."

458.     Throughout the Class Period, Defendant Cayne also made a number of materially false and misleading statements regarding Bear Stearns' ABS exposure as well as the effectiveness of its risk monitoring procedures.

459.     Bear Stearns' acquisition and aggressive trading of risky ABS assets was fostered by Cayne who implemented a business strategy that required Bear Stearns to become an industry leader in the origination and securitization of ABS, including MBS.  It was Cayne who guided Bear Stearns' entrance into debt securitization.  However, as Bear Stearns was increasing its exposure to risk, Cayne knew it was doing so without effective policies and controls to ensure that Bear Stearns' exposure to risk was accurately communicated to its investors in direct contrast to its public statements.  Cayne was aware, or recklessly disregarded, the weaknesses in Bear Stearns' reporting and risk management processes.

460.     While Defendants told shareholders and investors that Bear Stearns' growth and concomitant expanding risk were prudent and keeping with sound risk control practices, Cayne knew, or was reckless in not knowing, that Bear Stearns' risk control models were severely flawed and not up-to-date.  Moreover, Cayne knew, or was reckless in not knowing that, according to the SEC Inspector General, Bear Stearns' own risk managers did not have an

expertise in the very assets upon which Bear Stearns had focused its investment strategy. Further, Cayne knew, or was reckless in disregarding, the fact that Bear Stearns publicly disclosed VaR was far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community.

461.    Cayne was aware of the Company's $1.3 billion bailout of the High Grade Fund. Cayne knew of the toxic assets housed in the High Grade Fund and knew, or recklessly disregarded, that the Company should have taken an immediate charge against net capital after it took the High Grade Fund's collateral onto its own books.  As alleged in paragraph 216, instead of immediately reflecting its assumption of the declining collateral onto its books, the Company waited months.  By doing so, the SEC Inspector General stated, Bear Stearns was able "to delay taking a huge hit to capital."

462.    Cayne also knew of Bear Stearns' stated reliance on GAAP accounting, and banking standards such as the Basel II Standards, but either ignored them or recklessly disregarded them.  For example, Cayne was aware of the FAS 157 requirement to accurately mark values to their market prices, and was further aware that Bear Stearns was not in compliance, because it either had no way of doing so, or had flawed models which rendered its financial statements false and misleading.  Likewise, although Bear Stearns maintained a capital cushion which was barely compliant with SEC guidelines[8], Cayne was aware that this cushion was the bare minimum required and, due to Bear Stearns' tremendous leverage, would not protect Bear Stearns in the event that creditors made margin calls caused by declining asset values.

---

[8] Schwartz testified to Congress that their capital cushion was, at times, well above the SEC requirement.

463.     Cayne was so  involved in the Company's failed business strategy – a business strategy that he knew, but failed to disclose to the market, was flawed – that when his resignation was announced, Bear Stearns share price plunged nearly 7%.

**B.      Alan D. Schwartz**

464.     As Chief Executive Officer, Co-President, Co-Chief Operating Officer, and director of Bear Stearns, Defendant Schwartz participated in the issuance of, and signed and certified as accurate and complete as required by Sarbanes-Oxley, Bear Stearns' materially false and misleading SEC filings issued during the Class Period.  Schwartz became sole President on August 5, 2007, and remained in that position until January of 2008, when he replaced Cayne as CEO.  Throughout the Class Period, Defendant Schwartz signed the Company's materially false and misleading Forms 10-K for the 2006 and 2007 fiscal years.

465.     According to a February 8, 2008 presentation by Defendant Molinaro to a Credit Suisse Financial Services Forum, Schwartz, the Company's CEO, was "intimately engaged in the risk management process."  Accordingly, Schwartz was aware that the Company had twice been warned by the SEC that its mortgage valuation and risk modeling failed to reflect key indicators in the housing market. Despite this knowledge, Schwartz signed SEC filings setting out, among other things, the value of level three assets and the Company's VaR, as described in paragraphs 589 to 790 below.

466.     Moreover, as alleged in ¶ 274 to 278 above, Schwartz offered false reassurances to the public while the Company's liquidity plummeted the week of March 10, 2008.  On March 10, 2008, the Company's liquidity pool had stood at $18.1 billion.  By the close of March 11, 2008, it had declined to $11.5 billion - a one-day loss of more than $6 billion.

467.     Feeling pressure to dupe the market into that Bear Stearns did not have a liquidity problem, Schwartz appeared on CNBC the morning of March 12, 2008.  As alleged in

115

paragraph 274, Schwartz stated,  "We finished the year, and we reported that we had $17 billion of cash sitting at the bank's parent company as a liquidity cushion.  As the year has gone on, that liquidity cushion has been virtually unchanged."  Schwartz added, "We don't see any pressure on our liquidity, let alone a liquidity crisis."

468.   The next day, the Company's liquidity stood at about $2 billion.  Accordingly, while Schwartz was speaking, nearly ten billion dollars of liquidity was evaporating from Bear Stearns.

469.   Moreover, Schwartz also knew, or was reckless in not knowing, that Bear Stearns' counterparties were deserting the Company. As alleged in paragraphs 266, 269, and 271, ING Groep NV informed Bear Stearns that it was pulling about $500 million in financing; banks were refusing to issue any further credit protection on the Company's debt; and Goldman Sachs, once a principal source of cash for the Company, had at least temporarily halted covering any more Bear Stearns risk.  This in turn lead other Bear Stearns counterparties to refuse to lend to the Company.

470.    Moreover, as the Company's CEO, Schwartz knew or was reckless in not knowing that on March 6, 2008, Rabobank Group, one of Bear Stearns' European lenders, told the brokerage that it wouldn't renew a $500 million loan coming due later that week.

C.    **Samuel L. Molinaro, Jr.**

471.   As Chief Financial Officer during the Class Period, and as of August 5, 2007 Chief Operating Officer of Bear Stearns, Defendant Molinaro participated in the issuance of, signed and certified as accurate and complete as required by the Sarbanes-Oxley Act, Bear Stearns' materially false and misleading SEC filings issued during the Class Period.

472.     Specifically, in connection with the Forms 10-K for 2006 and 2007, Molinaro certified that he had put in place disclosure controls and procedures to ensure the accuracy of the Company's filings, and that he had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

473.     Also in connection with the Forms 10-K for 2006 and 2007 Molinaro certified that he had:

> Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles[.]

474.     Moreover, according to a February, 2008 presentation given by Molinaro himself to Credit Suisse analysts, the Company's risk management structure reported directly to him.

475.     As alleged above in paragraphs 106,167 and 175, Molinaro knew, or recklessly disregarded, that Bear Stearns' internal controls were virtually non-existent with respect to risk management over MBS valuation and VaR.  As CFO of the Company and the head of its risk management structure, Molinaro knew about, or recklessly disregarded the existence of, the SEC's warnings about serious deficiencies in the Company's mortgage valuation and VaR models.  As alleged in paragraph 102, during the CSE application process, the SEC told Principal Accounting Officer Jeffrey Farber – Molinaro's direct report – that "[w]e believe that it would be highly desirable for independent Model Review to carry out detailed reviews of models in the mortgage area."  These concerns were again communicated to the Company in a December 2, 2005 memorandum from the SEC Office of Compliance Inspections and Examinations ("OCIE")

to Defendant Farber, who reported directly to Molinaro.  The disclosure controls and procedures that Molinaro purportedly put in place should have informed him that the SEC found the Company's risk management metrics deficient.

476.    The degree to which the SEC Inspector General found Bear Stearns' internal controls to be deficient raises the strong inference that Molinaro could not have believed, or recklessly disregarded the truth of, his Sarbanes-Oxley Act certification of the Company's internal controls.

477.    As Bear Stearns' CFO, and COO starting August 5, 2007, Defendant Molinaro participated in the issuance of, signed and certified Bear Stearns' materially false and misleading SEC filings as accurate and complete, as required by Sarbanes-Oxley.  During the Class Period, Molinaro signed and certified Bear Stearns' Form 10-Qs and Form 10-Ks filed with the SEC, and throughout the Class Period, Molinaro conducted quarterly earnings conference calls with shareholders and investors and made a number of materially false and misleading statements regarding Bear Stearns' ABS exposure as well as its risk-monitoring infrastructure.

478.    As Bear Stearns' CFO, Molinaro was responsible for monitoring Bear Stearns' internal controls and reporting the Company's risks.  In an investment bank such as Bear Stearns, a CFO must be fully aware of the bank's own securities because the CFO is responsible for obtaining the financing to purchase them.  Therefore, Molinaro could not have been ignorant about the existence, size and nature of Bear Stearns risky positions without having been reckless in his ignorance.  As the CFO of a major investment bank, Molinaro was acutely aware of the Fair Value reporting requirements and had purportedly implemented them at Bear Stearns. During the Class Period, Molinaro knowingly and recklessly caused Bear Stearns to issue and file financial statements and reports with the SEC that stated that Bear Stearns had implemented

accounting standards in line with GAAP requirements when, in fact, Bear Stearns was not complying with GAAP through its failure to accurately value the MBS and CDOs it carried on its books.

479.     Thus, while Molinaro was assuring analysts and the market that Bear Stearns had not suffered from any adverse marks in the mortgage area and its hedging activities, he knew or was reckless in not knowing that Bear Stearns was heavily exposed to deteriorating market conditions.

480.     Subsequent to the Hedge Funds' collapse, on November 14, 2007, Molinaro stated that Bear Stearns would write down $1.2 billion of its subprime holdings in the fourth quarter.  However, Molinaro attempted to reassure investors by claiming that, in spite of the fact that Bear Stearns still bore more than a billion dollars of subprime exposure in the form of the collateral it had received from the failed High Grade Fund, Bear Stearns had reduced its CDO holdings to $884 million as of November 9, 2007 from $2.07 billion at the end of August 2007. Molinaro claimed that during the period between August 31, 2007 and November 9, 2007, the Company significantly increased its short subprime exposure.  However, Molinaro knew, or was reckless in not knowing, that Bear Stearns' valuation models could not accurately value the CDO and subprime exposure which he was allegedly "disclosing" to the market.  It became further apparent to Molinaro that the figures disclosed to the market were inaccurate when, notwithstanding Molinaro's assurance just weeks before that the Company's hedging efforts had resulted in a net negative exposure to subprime assets, on December 20, 2007, the Company wrote down $1.9 billion of its holdings in mortgages and mortgage-based securities – over $700 million more than it had announced on November 14, 2007.  On November 14, 2007, Molinaro knew this additional write down was necessary, or was reckless in not knowing.

481.     As CFO, Molinaro also knew of Bear Stearns' stated reliance on GAAP

accounting and banking standards such as the Basel II Standards but either ignored them or

recklessly disregarded them.  For example, Molinaro was aware of the SFAS 157 requirement to

accurately mark values to their market prices, but was aware that Bear Stearns had flawed

models for doing so which necessarily rendered its financial statements false and misleading.

### D.     Warren J. Spector

482.     As Co-President and Co-Chief Operating Officer and a director of Bear Stearns,

Defendant Spector participated in the issuance of, signed and certified as accurate and complete

as required by Sarbanes-Oxley, Bear Stearns' materially false and misleading SEC filings issued

during the Class Period.  Spector, due to his active involvement in the collapse of the Hedge

Funds, resigned his position on August 5, 2007 but remained a Bear Stearns employee and held

the title of Senior Managing Director.  During his tenure as Co-President and co-COO, all

divisions of the firm save investment banking reported to Spector, including the Hedge Funds.

Throughout the Class Period, Defendant Spector made a number of materially false and

misleading statements regarding Bear Stearns' ABS exposure as well as the effectiveness of its

risk monitoring procedures.

483.     Spector, due to his position as co-COO overseeing the Company's vertically-

integrated mortgage business, was in a unique position to understand the subprime mortgage

market.  As alleged in paragraph 143, disasters in a U.K. mortgage subsidiary brought home to

the Company the threat posed by lax underwriting standards to the values of its mortgages and

mortgage-backed assets.  Between April and June of 2006, the Company faced repeated crises in

its United Kingdom subsidiary as a result of poor performance of U.K. loans due to weak

underwriting standards.  As a result, the Company was left holding some $1.5 billion in

unsecuritized whole loans and commitments from this subsidiary.  According to CW 7, a former

head of model valuation at Bear Stearns at the time, top management at Bear Stearns were deeply concerned about the U.K. developments and defendant Spector personally made calls to investigate the crisis.

484.    As the co-COO, Spector oversaw BSAM, the subsidiary of Bear Stearns that managed the Hedge Funds.  Spector was fully aware of the serious problems at the Hedge Funds being concealed from both the Hedge Funds' investors and Bear Stearns' investors.

485.    As set out in paragraph 203 above, Spector personally made the decision to allow the High Grade Enhanced Fund to fail, while extending a $1.3 billion loan, in the form of a repurchase agreement, to the High Grade Hedge Fund.  Spector knew at the time Bear Stearns entered into the facility that the CDOs it had received as collateral were actually worth far less, in that he had already become aware of serious flaws in Bear Stearns' valuation methodologies.

486.    While Defendants told shareholders and investors that Bear Stearns' growth and concomitant expanding risk were prudent and keeping with sound risk control practices, Spector knew, or was reckless in not knowing, that Bear Stearns' risk control models were severely flawed and not up-to-date.  The Fixed Income division dealt with ABS and MBS.  The head of the Fixed Income division reported directly to Spector.  Spector knew, or was reckless in not knowing that Bear Stearns' own risk managers did not have an expertise in the very assets – ABS and MBS – upon which Bear Stearns had focused its investment strategy.  Further, Spector knew or was reckless in disregarding the fact that Bear Stearns' VaR was far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community.

**E.**    **Alan C. Greenberg**

487.    As a director and Chairman of the Executive Committee of Bear Stearns, Defendant Greenberg participated in the issuance of Bear Stearns' materially false and

misleading SEC filings issued during the Class Period.  The Executive Committee was responsible for running the day-to-day operations of Bear Stearns.

488.    Greenberg also participated in weekly meetings with the Company's risk managers during the Class Period, and knew or should have known that the Company had twice been criticized by the SEC for failing to review and update its inaccurate models.

489.    Throughout the Class Period, Defendant Greenberg made a number of materially false and misleading statements regarding the effectiveness of Bear Stearns' risk monitoring procedures, as stated in the Forms 10-K for 2006 and 2007 that he signed.

490.    On March 10, 2008, Greenberg, responding to the price liquidity rumors which caused shares of Bear Stearns to drop 10 percent in early trading, told CNBC that the liquidity rumors surrounding the Company are "totally ridiculous."  Greenberg had been informed, immediately before his announcement, that "[a]ll of Bear Stearns'] institutions are calling us, and we're in trouble."

491.    Bear Stearns shares responded and initially jumped on the news, only to lose more ground later in the day.

492.    Greenberg's statement that rumors of liquidity problems at Bear Stearns were "totally ridiculous" was made without any basis in fact, and with the motive to prop up the falling price of Bear Stearns' stock.  Indeed, while on March 10, 2008, the Company's liquidity pool had stood at $18.1 billion, by the close of March 11, 2008, it had declined to $11.5 billion - a one-day loss of more than $6 billion.

493.    While Defendants told shareholders and investors that Bear Stearns' growth and concomitant expanding risk were prudent and keeping with sound risk control practices,

Greenberg knew, or was reckless in not knowing, that Bear Stearns' risk control models had been failed to reflect downturns in the housing industry.

494.     Moreover, Greenberg knew, or was reckless in not knowing, that Bear Stearns' own risk managers did not have an expertise in the very assets upon which Bear had based its investment strategy.  Further, Greenberg knew or was reckless in disregarding the fact that Bear Stearns' VaR was far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community.

**F.     Michael J. Alix**

495.     As Chief Risk Officer of Bear Stearns during the Class Period, Defendant Alix had an intimate understanding of the risk management tools and processes in place at the Company.  Alix was global head of credit risk management from 1996 until February 2006, when he became Chief Risk Officer.  Alix made materially false and misleading statements during about Bear Stearns' risk management on an August 3, 2007 conference call.

496.     As Chief Risk Officer, Alix was ultimately responsible for the Company's VaR calculations.  Indeed, as alleged in paragraph 122, in 2004 Alix touted the benefits of the CSE program's adoption of VaR as a measure of assessing the "true risks" faced by investment banks. He stated that:

> the framework will permit securities firms registered under it to determine the regulatory capital for their broker-dealers by means of approved Value at Risk ("VaR") models.  This will better align capital requirements with the true risks of the securities business, with the added benefit of harmonizing the SEC's capital rules with global standards as represented by Basel II.

497.     As alleged in paragraph 101, prior to Bear Stearns' approval as a CSE in November 2005, OCIE found that Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models.

498.    As alleged in paragraph 104, after Alix became Chief Risk Officer, the SEC's TM division met with the Company's risk managers in September 2006 and concluded that the Company still had failed to improve the accuracy of the models it used to hedge against risk.  In fact, it was not until the end of 2007 that Bear Stearns developed a housing led recession scenario which it could incorporate into risk management and use for hedging purposes. Moreover, the SEC's Inspector General found that the mortgage-backed asset valuation component of the VaR models employed by the Company were not updated at any time before the Company's collapse.

499.    While Defendants told shareholders and investors that Bear Stearns' growth and concomitant expanding risk were prudent and keeping with sound risk control practices, Alix knew, or was reckless in not knowing, that Bear Stearns' risk control models were seriously flawed and not up-to-date.  Moreover, Alix knew, or was reckless in not knowing that, according to the SEC Inspector General, Bear Stearns' own risk managers did not have an expertise in the very assets upon which Bear Stearns had focused its investment strategy.  Further, Alix knew or was reckless in disregarding the fact that Bear Stearns' VaR was outdated, and far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community.

**G.    Jeffrey M. Farber**

500.    As Senior Vice President of Finance and Principal Accounting Officer since February 2007, and Controller of the Company since January 2004, Defendant Farber participated in the issuance of, and signed and certified as accurate and complete as required by Sarbanes-Oxley, Bear Stearns' materially false and misleading SEC filings issued during the Class Period, including all Forms 10-Q and 10-K.

501.    The quarterly and annual reports signed by Farber repeatedly touted the Company's risk management, including its use of internally-developed models to derive the fair value of the Company's financial instruments.

502.    As alleged in paragraphs 102 to 103, during the CSE application process, the SEC told Farber that "[w]e believe that it would be highly desirable for independent Model Review to carry out detailed reviews of models in the mortgage area."  These concerns were again communicated to the Farber in a December 2, 2005 memorandum from the SEC Office of Compliance Inspections and Examinations.  Farber therefore knew that the valuation models used to determine fair value of MBS were deficient.

503.    While Defendants told shareholders and investors that Bear Stearns' growth and concomitant expanding risk were prudent and keeping with sound risk control practices, Farber knew, or was reckless in not knowing, that Bear Stearns' risk control models were severely flawed and not up-to-date.  Moreover, Farber knew, or was reckless in not knowing that, according to the SEC Inspector General, Bear Stearns' own risk managers did not have an expertise in the very assets upon which Bear Stearns had focused its investment strategy. Further, Farber knew, or was reckless in disregarding, the fact that Bear Stearns' VaR was far below the industry average and failed to rise in tandem with the VaR reported by the Company's peers, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community.

### H.    Corporate Scienter

504.    Bear Stearns' knowledge need not be possessed by a single officer or agent; rather, the cumulative knowledge of all its agents is imputed to it.

505.    The facts alleged herein create a strong inference that one or more officers of the Company acted knowingly or recklessly in violating the securities laws.

506.     Among other things,  (1) although Defendant Farber was personally told by the SEC that Bear Stearns' mortgage valuation and Value at Risk models failed to reflect declines in the housing industry, he signed the Company's Forms 10-K for financial years 2006 and 2007 that set out artificially low VaR numbers and inflated asset values; (2) although Defendant Cayne was "intimately engaged" in the Company's risk management process and consequently was apprised of the SEC's criticism of Bear Stearns VaR and mortgage valuation models, he signed quarterly and annual financial statements that misrepresented the Company's Value at Risk and asset values; (3) although Defendant Alix was the global head of the Company's risk management department and consequently was aware that the Company had failed to review or revise its VaR and mortgage valuation models at any time before its collapse, he represented to the public in an August 3, 2007 conference call that  "we run risk analytics to demonstrate that [Bear Stearns] is well protected against further deterioration in both the subprime and Alt-A sectors across both whole loans and all securitization tranches;"; and (4) although Defendant Molinaro was told by the SEC that its public disclosures of its subprime mortgage exposure omitted material information to investors, he failed to disclose this information in the Form 10-K filed for fiscal year 2007.

## VI.     ADDITIONAL ALLEGATIONS SUPPORTING THE OFFICER DEFENDANTS' SCIENTER

### A.     General Allegations of Scienter

507.     The Officer Defendants were active participants in the fraudulent scheme alleged herein, in that:

(a)     each was privy to confidential proprietary information concerning Bear Stearns by virtue of their receipt of information reflecting the improper and fraudulent conduct described above and/or their failure to review information they had a duty to monitor;

(b)      each actually issued materially false and misleading statements; or

(c)      each had control over the Company's materially false and misleading

statements.

508.      The nature of Bear Stearns' business – and the importance to it of mortgages, mortgage-backed securities, and CDOs composed of mortgage-backed securities – strongly supports the inference that the Officer Defendants knew of or recklessly disregarded the Company's sorely deficient risk management over the valuation of mortgage-backed securities. Bear Stearns' mortgage-related business was vertically integrated, allowing it a uniquely detailed perspective into the entire process from mortgage origination (of subprime, Alt-A, and prime loans) through securitization.

509.      The fact that Bear Stearns suffered the first pains of the subprime mortgage meltdown – through the collapse of the Hedge Funds and the Company's subsequent assumption of the High Grade Fund's toxic assets – also raises a strong inference that the Officer Defendants knew of the need to scrutinize MBS and mortgage risk management, but knowingly or recklessly disregarded that function at the Company.

510.      Moreover, the Officer Defendants knew, or recklessly disregarded, that Bear Stearns had billions of dollars of exposure to subprime mortgage defaults as a result of the CDOs that Bear Stearns carried on its own books.  The Officer Defendants became aware that Bear Stearns' CDO modeling was inaccurate in June of 2007 when the Hedge Funds collapsed and Bear Stearns entered into a $1.3 billion repurchase agreement with the High Grade Hedge Fund, which required Bear Stearns to take title to assets that turned out to be worth substantially less than the amount of the loan.  Defendant Spector was directly responsible for the decision to extend the repurchase agreement to the High Grade Hedge Fund and was aware of the weakness

127

of the High Grade Fund's assets, which were almost identical to those assets held on Bear

Stearns' books at the time.

511.    Each of these Officer Defendants was keenly aware of the deteriorating

conditions in the U.S. subprime mortgage market and the effect of these conditions on the value

of securities linked to these mortgages and other asset backed securities.  As a consequence of

Bear Stearns' prominence and large market share of ABS, including securities originated by Bear

Stearns subsidiaries BEARRES and ECC and purchased and serviced by Bear Stearns subsidiary

EMC and securitized by Bear Stearns, the Officer Defendants knew that Bear Stearns' exposure

to drops in the value of ABS, including MBS  and CDOs containing ABS and MBS, was far

greater than otherwise disclosed.

512.    Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector, Alix and Farber also

knew or recklessly disregarded that the materially false and misleading statements and omissions

contained in Bear Stearns' public statements would adversely affect the integrity of the market

for Bear Stearns' common stock and would cause the price of Bear Stearns' common stock to be

artificially inflated.  Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector, Alix and

Farber acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon

Lead Plaintiff and other members of the Class.

513.    Moreover, as noted below, Cayne, Greenberg, Molinaro, Schwartz, Spector, Alix

and Farber were all aware that Bear Stearns was unable to accurately value these assets due to

weaknesses in its modeling and risk management systems.  In fact, the Officer Defendants made

material misstatements and omissions when asked direct questions by analysts about risk

management and ABS exposure.

514.     Each of the Officer Defendants either knew, or recklessly disregarded, the fact that the Company's disclosures relating to ABS were wholly misleading; there were billions of dollars in ABS exposure on Bear Stearns' balance sheets that were unaccounted for due to Bear Stearns' inability to accurately value asset backed securities.  Moreover, the Officer Defendants either knew that Bear Stearns' VaR was inaccurate because it was not reacting to the deteriorating conditions in the U.S. mortgage market or recklessly disregarded evidence that this was the case.

515.     The knowledge and/or recklessness of the Officer Defendants is also evident from the rapid firings and/or resignations following the disclosure to shareholders of Bear Stearns' exposure to declining ABS and CDO values.  For example, on August 5, 2007, less than 60 days after the Hedge Funds collapsed, due in large part to their investment in CDOs containing subprime RMBS, Bear Stearns fired Defendant Spector, who oversaw the failed Hedge Funds as head of BSAM.  Likewise, on January 8, 2008, Cayne was forced to resign as CEO, in part because of Bear Stearns' potentially large exposure to risky ABS.

### B.     Abnormal Profit Taking

516.     The Class Period sales of Bear Stearns stock by Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector and Farber were highly unusual, and therefore suspicious, as measured by (1) the amount and percentage of shares sold, (2) comparison with these Defendants' own prior trading history and that of other insiders, and (3) the timing of the sales. Such sales therefore provide strong evidence of scienter.

517.     To evaluate the selling activity of Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector and Farber, Lead Plaintiff used publicly available trading data required to be reported to the SEC on Form 4.  Lead Plaintiff analyzed the trading by insiders that occurred during the Class Period and during the equal-length period immediately preceding the Class

Period, beginning September 13, 2005 and ending December 13, 2006 (the "Control Period"). The Bear Stearns' Form 4s filed during the Class Period and Control Period are hereby incorporated herein by reference, and the transactions reported therein are set forth in Exhibit B, annexed hereto.

518.     The following methodologies were used to analyze these Defendants' sales.  First, Lead Plaintiff calculated total sales by each of the Individual Defendants, together with the cash proceeds from such sales, during the Control and Class Periods.  To calculate the amounts and percentages of shares sold, Lead Plaintiff then calculated holdings at the end of the Class Period by referencing Bear Stearns' Class Period annual proxy statements on Schedule 14A, which set forth shares owned and stock options exercisable by the Individual Defendants during the Class Period.  Such data were then adjusted to the Class Period end date using the purchase and sale data set forth in Bear Stearns' Form 4s.  "Holdings" were deemed to include both shares held and stock options that were vested but not yet exercised.  Class Period sales were then calculated as a percentage of total shares available for sale during the Class Period, *i.e.*, the sum of Class Period sales plus end-of-Class-Period holdings.  To compare Class Period sales with prior trading history, Lead Plaintiff compared sales by the these Defendants during the Class Period with their sales during the Control Period.  Lead Plaintiff also compared these Defendants' sales across the Control and Class Periods with those of lower-level (non-Defendant) reporting persons.

519.     Lead Plaintiff then determined whether the Class Period sales by Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector and Farber generated abnormal (that is, above-normal) profits.  Abnormal profits were evaluated using an event study methodology called the "market-adjusted method," which computes cumulative shareholder returns not explained by market factors.  Under this approach, if an insider buys a share of stock which then increases in

price from $100 to $120 (20%), and the benchmark index increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would be 19%.  Under the same analysis, if a company's stock price declines subsequent to a sale by a greater amount than the relevant benchmark index, then the sale enabled the insider to generate an abnormal profit by avoiding the decline.  For example, if an insider sells a share of stock which then declines from $100 to $80 (20%) while the relevant benchmark decreases from 1000 to 990 (1%), then the abnormal profit would again be 19%.  This methodology has been used extensively in the academic literature studying the profitability of insider trading.  In a typical study, abnormal profits are calculated using a 250 trading day period following the day of trade, measured against a value-weighted index of NYSE, AMEX and NASDAQ stocks for 2000-2008.  Due to Bear Stearns' collapse in March of 2008, the abnormal profits were calculated using a 125 trading day period following the day of trade.

520.    After calculating abnormal profits for the these Defendants' Class Period sales, Lead Plaintiff then calculated the probability that such abnormal profits resulted from random chance.  This probability was calculated by computing the trade-dollar-weighted residuals from the market-adjusted model for 125 trading days before and 125 trading days after the day of trade, and averaging these residuals across event days for each insider.  This data was then used to compute a "t-statistic" (a statistical tool) to infer the probability that the observed cumulative abnormal profits were due to random chance.

521.    By each analysis, each of these Defendants' Class Period sales was extremely large and highly unusual.  For one, the amount and percentage of shares sold during the class period was extraordinary.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Cayne sold 219,036 shares for a total realized value of $23,010,474.  During

131

the Class Period, when the price of Bear Stearns' shares was artificially inflated, Greenberg sold 371,986 shares for a total realized value of $34,594,027.  Greenberg sold 40.89% of his Bear Stearns shares during the two year Class Period as compared to 11.91% of his Bear Stearns shares during the Control Period.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Molinaro sold 38,552 shares for a total realized value of $4,230,828.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Schwartz sold 91,233 shares for a total realized value of $9,867,001.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Spector sold 116,255 shares for a total realized value of $19,066,373.  During the Class Period, when the price of Bear Stearns' shares was artificially inflated, Farber sold 3,324 shares for a total realized value of $362,000.

522.    Second, Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector and Farber generated enormous abnormal profits on their sales of Bear Stearns stock.  In all, by avoiding the declines associated with Bear Stearns' falling share value and by capitalizing on the false information when it was greatest, these Defendants recognized abnormal profits of approximately 86.3%, on average.  Molinaro, Farber, Cayne and Schwartz more then doubled their money by timing their sales either to days when inflation was highest or when the market declines were least.  Molinaro's were an astounding 173% higher than they otherwise would have been if the shares were not falsely inflated.  Farber's abnormal profit was 158%, Cayne's was 132% and Schwartz's was 115%.  In addition, Greenberg's abnormal profit was 73%, while Spector's profits were 35%.  These abnormal profits on the part of insiders who sold stock during a period of inflation of their own making is further evidence of scienter.

## VII.   DELOITTE'S DEFICIENT AUDITS OF
## BEAR STEARNS' FINANCIAL STATEMENTS

### A.   Overview of Allegations Against Deloitte

523.   As more fully set forth below, during the Class Period, Deloitte's audits of the Company's financial statements were so deficient that the audit amounted to no audit at all, were an egregious refusal to see the obvious or investigate the doubtful, and/or disregarded specific "red flags" that would have placed a reasonable auditor on notice that the Company was engaged in wrongdoing to the detriment of its investors.   Although auditing guidelines required that Deloitte give especially close scrutiny to the Company's fair value measurements, Deloitte deliberately or recklessly disregarded several red flags with respect to valuation, including the fact that the Company had persisted in using mortgage valuation models that the SEC had repeatedly criticized as inaccurate and outmoded.

524.   Similarly, although Deloitte was obliged to evaluate the statements of VaR set out in the MD&A section of the Company's regulatory filings, Deloitte deliberately or recklessly disregarded the fact that by at least November of 2005 the Company had been warned by the SEC that its VaR models failed to reflect key indicators in the housing market.

525.   Moreover, despite the fact that Deloitte was obliged to be especially skeptical of related party transactions such as the High Grade fund bailout, Deloitte deliberately or recklessly disregarded the fact that the collateral the Company had received as a result of the bailout was far less than the value of the loan Bear Stearns had offered to the High Grade Fund.

526.   Finally, in spite of multiple risk alerts that related to the Company's internal controls, internal audits, and disclosures, Deloitte deliberately or recklessly disregarded significant red flags in these areas as well.

B.    **Deloitte's Certifications**

527.    Deloitte issued a "clean opinion" pursuant to each of its audits of Bear Stearns'

financial statements for the fiscal years ended November 30, 2006 and November 30, 2007, and

issued similar certifications for each of the Company's quarterly statements during the Class

Period. In connection with the Company's Form 10-K for fiscal year 2006 Deloitte stated:

> We have audited the consolidated financial statements of The Bear
> Stearns Companies Inc. and subsidiaries (the "Company") as of
> November 30, 2006 and 2005, and for each of the three years in
> the period ended November 30, 2006, management's assessment of
> the effectiveness of the Company's internal control over financial
> reporting as of November 30, 2006, and the effectiveness of the
> Company's internal control over financial reporting as of
> November 30, 2006, and have issued our reports thereon dated
> February 12, 2007; such consolidated financial statements and
> reports are included in your 2006 Annual Report to Stockholders
> and are incorporated herein by reference. Our audits also included
> the financial statement schedule (Schedule I) of The Bear Stearns
> Companies Inc. (Parent Company Only), listed in Item 15. This
> consolidated financial statement schedule is the responsibility of
> the Company's management.  Our responsibility is to express an
> opinion based on our audits.  **In our opinion, such consolidated
> financial statement schedule, when considered in relation to
> the basic consolidated financial statements taken as a whole,
> presents fairly, in all material respects, the information set
> forth therein.**

528.    In connection with the Company Form 10-K for fiscal year 2007, Deloitte stated:

> We have audited the consolidated financial statements of The Bear
> Stearns Companies Inc. and subsidiaries (the "Company") as of
> November 30, 2007 and 2006, and for each of the three years in
> the period ended November 30, 2007, and the Company's internal
> control over financial reporting as of November 30, 2007, and have
> issued our reports thereon dated January 28, 2008 (such report on
> the consolidated financial statements expresses an unqualified
> opinion and includes an explanatory paragraph relating to the
> adoption of Statement of Financial Accounting Standards
> ("SFAS") No. 155, "Accounting for Certain Hybrid Instruments,
> an amendment of FASB Statements No. 133 and 140" and SFAS
> No. 157, "Fair Value Measurements"); such consolidated financial
> statements and reports are included in your 2007 Annual Report to
> Stockholders and are incorporated herein by reference. Our audits

134

also included the financial statement schedule (Schedule I) of The Bear Stearns Companies Inc. (Parent Company Only), listed in Item 15.  This financial statement schedule is the responsibility of the Company's management.  Our responsibility is to express an opinion based on our audits.  **In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.**

## C.    Overview of GAAS

529.    The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms.  On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, Generally Accepted Auditing Standards, and related interpretations in existence on that date.  Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003.  For simplicity, all references to GAAS hereinafter include the standards of the PCAOB.

530.    GAAS is comprised of ten basic standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit.  Auditors are required to follow those standards in each and every audit they conduct.

531.    The GAAS standards fall into three basic categories:  General Standards; Fieldwork Standards; and Reporting Standards.  The General Standards require, among other things, provide guidance planning and conducting an audit, and require that the auditor exercise professional skepticism.  The Field Work Standards  require, among other things, that an auditor obtain a sufficient understanding of the entity's business and operating environment to properly plan an audit in accordance with GAAS.  Finally, the Reporting Standards require that an auditor

express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed.

**D.**     **GAAS Required Deloitte to Consider Risk Factors as Part of Audit Planning**

532.     For purposes of planning and conducting its audits of Bear Stearns, Deloitte was required to give special consideration to risk factors identified in "Fraud Risk Alerts" and "Audit Risk Alerts" that may have resulted in material misstatements of the Company's financial statements (AU 316.14).  Fraud risk factors may be relevant to economic circumstances in general, an industry, or to a particular entity.  An understanding of applicable fraud risk factors is important for an auditor to be able to appropriately determine the nature, extent, and timing of audit procedures performed (AU 316.15).  Moreover, because Deloitte audited the books of the Hedge Funds and knew that BSAM had valued the Hedge Funds' assets, it should have been especially skeptical of the valuations that the Company provided for its own assets.

**1.**     **Fraud Risk Alerts Relevant to Deloitte's Audit of Bear Stearns**

533.     The fraud risk factors described above at paragraphs 331 to 348 relating to Bear Stearns' financial statements were also relevant to Deloitte's considerations of the nature, timing, and extent of its audit procedures.

534.     In addition, due to its role as the Company's independent auditor, there were supplemental fraud risk factors that should have been considered by Deloitte.  These included:

    (a)     The estimation of the fair value of investments (AU 316.39).  As described above, Bear Stearns' use of leverage caused these estimations to have material implications on reported Principal Transactions Revenue;

    (b)     The risk of transactions with related parties that do not have the substance or the financial strength to support a transaction without assistance from the entity under audit

(AU 316.67).  Accordingly, transactions that Bear Stearns may have entered into with its hedge funds, for example, warranted scrutiny by Deloitte;

(c)     The ever-present risk of management overriding internal controls (AU 316.08, 42, and 57-65).  For purposes of its audits of Bear Stearns, this risk should have caused Deloitte to perform specific procedures to address the internal controls related to the models used to determine the reported valuation of financial instruments; and

(d)     The risk that new regulatory requirements, such as the recently implemented CSE structure, may cause an incentive or pressure of fraudulent financial reporting (AU 316.85, A.2.a).  In this regard, Deloitte should have been familiar with nature of Bear Stearns' relationship with the TM and conducted certain procedures to understand the communications between those parties.

### 2.     Audit Risk Alerts Relevant to Deloitte's Audit of Bear Stearns

535.     The ARAs also addressed specific risk factors for Deloitte to consider in its audits of Bear Stearns.  The ARAs were released annually, typically in mid-summer, which enabled them to be considered for purposes of Deloitte's annual audits of Bear Stearns.  The SEC recognized the import of the ARAs and the need to consider the presented risks in the preparation and audits of financial statements.  The risks in the ARAs that were incrementally relevant to Deloitte for purposes of its audits of Bear Stearns included the following:

(a)     2005 ARA stated "…the auditor needs to be aware of any changes in the institution's loan profile (for example, prime vs. subprime, secured vs. unsecured, direct lending vs. indirect lending) and understand the institution's ability to identify, manage, and control the attendant risk for those credit profiles"  (2005 AAM 8050.28).

(b)     The 2006 ARA warned auditors to "Examine specific collateral surrounding the client investment portfolio and evaluate potential impairment."  (2006 AAM

8050.17)  The potential for impairment was particularly relevant for "products [that] assume a continued rise in home prices that may not continue."  (AAM 8050.35)  As a result, Deloitte should have been aware of the risk factors related to the valuation of Bear Stearns' financial instruments such as CDOs.

(c)     The 2007 ARA cautioned auditors to "Consider the pressures financial institutions are facing when planning and performing the audit engagement."  (2007 AAM 8050.16)  In addition, it apprised auditors of the need to "Consider the current real estate climate when conducting an audit of a mortgage company."  (2007 AAM 8050.30)  Thus, Deloitte should have been attuned to the risks associated with home price depreciation and the pressures on management to avoid the negative adjustments to liquidity and capital caused by reductions in the reported value of financial instruments.

### 3.     Deloitte's Experience Auditing the Hedge Funds

536.     In addition to its audits of Bear Stearns, Deloitte was also responsible for the audits of the Hedge Funds.  Based on knowledge gained during those audits, Deloitte knew that very large percentages of the hedge funds' holdings were valued by BSAM itself, with Bear Stearns' oversight.  In fact, in 2006, Deloitte issued audit opinions on the hedge funds stating that it was relying upon BSAM's representations of the fair market value of the vast majority of the funds' assets.

537.     Deloitte also knew that Bear Stearns was the source of the majority of the assets held by the hedge funds.  The notes to the financial statements of the High Grade Fund for the year ended December 31, 2006 stated:  "[t]he Master Fund may invest in securities issued by Bear, Stearns & Co., Inc. or an affiliate.  At December 31, 2006, $751,840,048 (approximately 81.96% of net assets) is invested in such securities."

538.     The notes to the financial statements of the High Grade Enhanced Fund for August 1, 2006 through December 31, 2006 similarly stated:  "[t]he Master Fund may invest in securities issued by Bear, Stearns & Co., Inc. or an affiliate.  At December 31, 2006, $473,302,969 (approximately 71.54% of net assets) is invested in such securities."

539.     Because Bear Stearns retained large amounts of the CDOs it sold on its own books, the collapse of the Hedge Funds should have put Deloitte on notice that Bear Stearns' books were vulnerable to the same extraordinary declines.

### E.     Red Flags Recklessly or Deliberately Disregarded by Deloitte

540.     Deloitte was required to performed an integrated audit of Bear Stearns in accordance with PCAOB Auditing Standards.[9]  Specifically, Deloitte was charged with evaluating the Company's fair value measurements, internal controls, internal audits, and financial disclosures.  In each area Deloitte's accounting audit practices were so deficient that it was deliberately or recklessly ignored significant red flags.

### 1.     Bear Stearns' Misleading Fair Value Measurements

541.     The most significant dollar-value asset on Bear Stearns' balance sheet was "Financial Instruments Owned, at Fair Value."  Accordingly, it was exceedingly important that the Company accurately determine the fair value of these assets.

542.     For purposes of both its 2006 and 2007 audits, GAAS required Deloitte to apply auditing procedures to Bear Stearns' financial instruments (GAAS including AU 328, "Auditing Fair Value Measurements and Disclosures" and AU 332, "Auditing Derivative Instruments, Hedging Activities, and Investments in Securities").  Among other things, GAAS required

---

[9] An integrated audit is a reference to the fact that the independent auditor opines on *both* the effectiveness of internal control over financial reporting and the consistency of the financial statements with GAAP.

Deloitte to evaluate management assumptions used in determining fair value and controls over the consistency, timeliness, and reliability of the data used in valuation models.

543.    GAAS also required Deloitte to test Bear Stearns' processes for preparing fair value measurements and the reasonableness, relevance, and timeliness of the information, assumptions, inputs and models (AU 328.23-.24).  Deloitte's audit testing should have included an evaluation of whether the fair value measurements were consistent with market information, were determined using an appropriate model, and included relevant information that was reasonably available at the time (AU 328.26).

544.    Deloitte's duties also included identification of those assumptions that had high sensitivities on valuation (AU 328.34).[10]  This duty should have focused Deloitte on Bear Stearns' stress testing or other sensitivity analysis as well as caused Deloitte to assess whether any sensitive assumptions had been excluded from the valuation process (AU 328.35).

545.    In addition, to the extent that the inputs and assumptions employed in Bear Stearns' valuation models were dependent upon historical data, GAAS required Deloitte to test whether reliance on historical financial information in the development of assumptions was justified (AU 328.37).[11]

546.    Standard audit procedure also required that Deloitte focus on testing the Company's pricing models to compute the reported fair value of Level 2 and Level 3 financial

---

[10] AU 328.34, "The auditor considers the sensitivity of the valuation to changes in significant assumptions, including market conditions that may affect the value. Where applicable, the auditor encourages management to use techniques such as sensitivity analysis to help identify particularly sensitive assumptions. If management has not identified particularly sensitive assumptions, the auditor considers whether to employ techniques to identify those assumptions."

[11] AU 328.37, "If management relies on historical financial information in the development of assumptions, the auditor considers the extent to which such reliance is justified. However, historical information might not be representative of future conditions or events, for example, if management intends to engage in new activities or circumstances change."

instruments, which included both mortgage-related securities and RIs. Deloitte also should have tested the Company's method of classification of financial instruments as either Level 2 and Level 3 since that information was material to users of the Company's financial statements.

547.    For these assets, GAAS recognize that "an entity may use its own assumptions as long as there are no contrary data indicating that marketplace participants would use different assumptions." (AU 328.06) Accordingly, Deloitte was required to assess whether Bear Stearns' assumptions were reasonable and reflected market-based information.

548.    Moreover, for purposes of Deloitte's 2007 audit of Bear Stearns, it was no longer possible for the auditors to ignore the fact that the housing market downturn was in full force and that the market for mortgage-related securities was illiquid. At that time, it was widely understood that particular scrutiny should be applied by independent auditors to pricing models used to determine the valuation of financial instruments. For example, in October 2007, the Center for Audit Quality ("CAQ"), which is associated with the AICPA, published an audit alert entitled "Measurements of Fair Value in Illiquid (Or Less Liquid) Markets."

549.    This alert observed in pertinent part,

> The level of defaults has, in many cases, exceeded the model-based projections originally used to structure and assign ratings to securities backed by subprime mortgage loans…and holders of existing loans and mortgage-backed securities have experienced sharp declines in their value.

550.    Thus, in advance of Deloitte's 2007 audit, Deloitte should have been alert that (1) Bear Stearns' mortgage-related valuation models may not have anticipated the rising level of defaults associated with the housing market downturn, and (2) the resultant fair value of related financial instruments should reflect appropriately increased conservatism.

551.    Indeed, during its audit of the Company's fair value measurements, Deloitte was confronted with significant red flags relating to measurement of fair value. According to the

2008 OIG Report, during the Class Period Bear Stearns failed to include crucial factors in its valuation models including, for example, inadequate consideration of default risk and scenarios of home price depreciation.  These missing assumptions would have been known to, and employed by, market participants, who were the focal audience for fair value measurements in accordance with GAAP.

552.    Moreover, as set out at paragraphs 124 to 126 above, in November of 2005 and again in December of 2006, Bear Stearns had been informed by the SEC that its models were critically deficient.  In conducting its audit, Deloitte either deliberately or recklessly disregarded the fact that the SEC had already warned the Company of these problems.

### 2.    Bear Stearns' Failures to Disclose Risks Inherent In Its Financial Statements

553.    Deloitte also had a professional obligation to assess whether other disclosures in documents containing the financial statements were materially inconsistent with the financial statements (AU 550, Other Information in Documents Containing Audited Financial Statements ¶ 4).

554.    Bear Stearns disclosed its VaR in the MD&A section of its regulatory filings with the SEC.

555.    As set out above at paragraphs 123 to 124, the Company had been warned by the SEC as early as November of 2005 that its VaR models failed to take into account critical inputs reflecting risk in the housing market.

556.    As set out in paragraphs 124 to 128 above, despite this warning, the Company did not complete any review of key inputs to its VaR models during the Class Period.

557.     In light of the significant deficiencies in Bear Stearns' VaR models that should have been identified during its testing of internal controls over financial reporting, Deloitte knew or should have known that the amounts reported as VaR were inaccurate and unreliable.

### 3.     Bear Stearns' Misleading Accounting Treatment of the Hedge Fund Bailout

558.     As a result of its bailout of the High Grade Fund that it managed, Bear Stearns had effectively assumed onto its books more than $1.3 billion in the Fund's subprime-backed collateral.  As set out above at paragraphs 214 to 216, less than a month later, the Company informed the Fund's investors that the Fund was virtually worthless.  Deloitte deliberately or recklessly disregarded the fact that the Company carried this worthless collateral on its books for months without taking an appropriate write down.

559.     Deloitte should have approached its testing of any related-party transactions with particular caution if they exhibited traits identified within GAAS to be of higher risk including (AU 334.06):

(a)     "An urgent desire for a continued favorable earnings record in the hope of supporting the price of the company's stock."

(b)     "Dependence on a single or relatively few products, customers, or transactions for the continuing success of the venture."

(c)     "A declining industry characterized by a large number of business failures."

560.     For purposes of its 2007 audit, Deloitte knew or should have known that on June 22, 2007 Bear Stearns had provided loans, in the form of a repo agreement, to the failing High Grade Hedge Fund.  As a result, Deloitte was required to obtain an understanding of the business purpose of the transactions and obtain satisfaction concerning the value of any related collateral

(AU 334.09).  Further, Deloitte was required to obtain information about the financial capability of the High Grade Hedge Fund (AU 334.10).

561.    In this case, Deloitte knew or should have known that the collateral provided by the High Grade Funds was clearly insufficient to guarantee the value of the loans extended by Bear Stearns.  The Company had informed the High Grade Fund investors in July of 2007 that the High Grade Fund "had very little value left."

562.    Moreover, Deloitte knew or should have known that the hedge funds were otherwise incapable of repaying those loans.  Indeed, as noted at paragraphs 211 to 213 above, the 2008 OIG Report noted that the hedge funds lacked the capability to repay the loans.

563.    As a result, Deloitte also should have considered that both GAAP and GAAS recognize the "importance of reporting transactions and events in accordance with their substance" and "whether the substance of transactions or events differs materially from their form."  (AU 411, "The Meaning of 'Present Fairly in Conformity with GAAP" ¶ 6). Accordingly, the substance of these transactions was that Bear Stearns had guaranteed the High Grade Fund by absorbing its worthless assets.  Deloitte should also have ensured that the loan value and related implications on reported capital were appropriately incorporated into Bear Stearns' financial statements.  Finally, Deloitte should have ensured that appropriate disclosure was provided to inform investors of the substance of Bear Stearns' related party transactions with the hedge funds (AU 334.02).

### 4.    Bear Stearns' Failure to Disclose Critical Information Relating to the Company's Valuation of Its Financial Instruments

564.    GAAS requires the presentation of financial statements in accordance with GAAP includes adequate disclosure of material matters.  (AU 431, *Adequacy of Disclosure in Financial*

*Statements*)  This particular standard is specifically referenced in AU 328 because fair value information is significant to users of financial statements.[12]

565.    GAAS further state "If an item contains a high degree of measurement uncertainty, the auditor assesses whether the disclosures are sufficient to inform users of such uncertainty."  (AU 328.45)

566.    Nevertheless, in light of the SEC's repeated warnings to the Company, Deloitte knew or should have known that Bear Stearns, in violation of GAAP, failed to disclose in its financial statements that:

(a)    Its pricing models failed to consider inputs that were critical to the determination of the fair value of material holdings of mortgage-related financial instruments such as default rates and liquidity risk;

(b)    Programs to review mortgage pricing models were not put into place prior to the collapse of Bear Stearns in March 2008;

(c)    There were questions as to the independence of risk management personnel and that risk management personnel lacked experience in valuing mortgage-related assets, which represented the most significant component of Bear Stearns' financial instruments; and

(d)    The Company did not implement stress-testing scenarios that addressed negative house pricing appreciation (HPA) assumptions and shocked credit spreads for certain mortgage-back securities.

---

[12] AU 328.43, "Disclosure of fair value information is an important aspect of financial statements. Often, fair value disclosure is required because of the relevance to users in the evaluation of an entity's performance and financial position."

567.    A further red flag came in September of 2007, when the SEC informed Bear Stearns that it was required to provide more information about its exposure to subprime investments.[13]  By virtue of its position as Bear Stearns' auditors, Deloitte would have been knowledgeable about the receipt and contents of the SEC's comment letter.

568.    While the resolution of the SEC Comment Letter pertained to the 2006 Form 10-K, Deloitte had been put on notice of the value of such disclosure in subsequent SEC filings. Accordingly, Deloitte's opinion that the 2007 financial statements were materially consistent with GAAP represented a significant shortcoming of due professional care because by then it was undeniable that at a minimum Bear Stearns' fair value related disclosures were inadequate.

569.    Indeed, Deloitte knew that Bear Stearns not only failed to provide users of its financial statements with any of this meaningful information, it further failed to acknowledge even the existence of the Unresolved SEC Comments.[14]

### 5.    Bear Stearns' Inadequate Internal Controls

570.    For purposes of its 2006 audit, Auditing Standard ("AS") No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements* was applicable to Deloitte.  AS 2 ¶ 4 states that  "[m]aintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment."  A

---

[13]  The 2008 OIG Report Stated that "[i]nvestors would have benefited from enhanced disclosures regarding [Bear Stearns] involvement in the subprime mortgage market and their potential exposures in this market."

[14]  Part I, Item 1B of the 2007 Form 10-K entitled "Unresolved Staff Comments" reported that there were "None."  The 2007 Form 10-K was filed January 29, 2008 – two days prior to the Company's initial response to the SEC Comment Letter of September 2007.  Bear Stearns' response solely related to the

*(continued . . . )*

material weakness is a significant deficiency that "results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected."[15]  (AS 2 ¶ 10)

571.    For purposes of its 2007 audit of Bear Stearns, AS No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, was applicable to Deloitte.  AS 5 ¶ 2 reflected substantially similar provisions as AS 2 ¶ 4.

572.    AS 2, ¶ 27 (No. 5, ¶7; No. 5, ¶62) describes components of internal controls and explains how an independent auditor should obtain a sufficient understanding of the internal controls for the purpose of assessing the risk of material misstatement and identifying deficiencies in internal control.  AS 2 ¶ 27 (No. 5, ¶7; No. 5, ¶62) states as follows:

> In an audit of internal control over financial reporting, the auditor must obtain sufficient competent evidence about the design and operating effectiveness of controls over all relevant financial statement assertions related to all significant accounts and disclosures in the financial statements.  The auditor must plan and perform the audit to obtain reasonable assurance that deficiencies that, individually or in the aggregate, would represent material weaknesses are identified.

573.    AS 2 ¶ 52 required Deloitte to test "Company-level controls" (AS 5 ¶ 22 refers to these controls as "Entity-level controls").  Company-level controls include management's risk assessment processes, controls to monitor the results of operations, controls to monitor other controls, including activities of the internal audit function, the audit committee, self-assessment

---

*( . . . continued)*
SEC's inquiry on subprime accounting issues extended over ten pages, which reflected the materiality of that information.

[15] AS 2 ¶ 9 defines a significant deficiency as "is a control deficiency, or combination of control deficiencies, that adversely affects the company's ability to initiate, authorize, record, process, or report external financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the company's annual or interim financial statements that is more than inconsequential will not be prevented or detected."

programs, the period-end financial reporting process, and Board-approved policies that address significant business control and risk management practices (AS 2 ¶ 53, AS 5 ¶ 23). Accordingly, Deloitte was required to include testing of Bear Stearns' risk management processes in its audit of internal controls over financial reporting.

574.    Moreover, AS 2 ¶ 108 precluded Deloitte from delegating the authority to perform procedures to assess the operating effectiveness of Bear Stearns' risk management personnel. While AS 5 ¶ 19 modified this standard slightly for purposes of the 2007 audit, the significance of the control risk addressed by the risk management function at Bear Stearns called for Deloitte to continue to perform procedures to assess the effectiveness of the internal controls constituted by risk management. Deloitte was required to consider its understanding of Bear Stearns' internal controls gained in prior periods for purposes of its 2007 audit.[16]

575.    AS 2 ¶ 60 (AS 5 ¶ 28) required Deloitte to perform targeted procedures to assess the internal controls over financial reporting related to the financial statement assertions of significant accounts. Bear Stearns' reported balance of financial instruments met the criteria of a significant account, which included the size and composition of the account, susceptibility of loss due to errors or fraud, accounting and reporting complexities associated with the account, and exposure to losses represented by the account (AS 2 ¶ 65, AS 5 ¶ 29). Accordingly, Deloitte was required to consider, among other factors, whether effective internal controls existed to

---

[16] AU 319.26, "The nature, timing, and extent of procedures the auditor chooses to perform to obtain the understanding will vary depending on the size and complexity of the entity, *previous experience with the entity*, the nature of the specific controls used by the entity including the entity's use of IT, the nature and extent of changes in systems and operations, and the nature of the entity's documentation of specific controls." (emphasis added)

ensure that the reported *valuation* of Bear Stearns' financial instruments was appropriate (AS 2 ¶ 68, AS 5 ¶ 28).[17]

576.    GAAS recognized audit risk stems in part from the "business risk that the institution does not properly understand the terms and economic substance of a significant complex investment.  Such misunderstandings could result in the incorrect pricing of a transaction and improper accounting for the investment or related income."  (D&L AAG 7.107) As implementation guidance, the D&L AAG notes that relevant control activities include:

        (a)      Procedures exist to identify and monitor credit risk, prepayment risk, and impairment.

        (b)      Current fair value of securities are obtained and reviewed on a timely basis.

        (c)      Securities are monitored on an ongoing basis and factors affecting income recognition and the carrying amount of the securities are analyzed periodically to determine whether adjustments are necessary.

577.    The D&L AAG also provides guidance for independent accountants when testing internal controls.  It states (Ch. 7 *Investments in Debt & Equity Securities* ¶ 111):

> Control activities that would contribute to internal controls over
> financial reporting in this area include the maintenance of
> management policies, adopted by the board of directors or its
> investment committee, that establish authority and responsibility
> for investments in securities.

578.    When reviewing such management policies, GAAS observes "…the independent accountant should be alert to potential abuses and override of policies and procedures when such circumstances exist."  (D&L AAG 7.113)

---

[17] AU326.07, Valuation or allocation assertions address whether balances and transactions presented

*(continued . . . )*

579.    Deloitte's internal controls testing should have addressed Bear Stearns' mortgage-underwriting and securitization practices.[18]  In doing so, Deloitte was on notice that it should take special care, as Bear Stearns was increasingly relying on non-conforming loans (i.e., the 2/28 Hybrid ARMs) (D&L AAG Ch. 8, Loans).[19]  This pattern was reflected in the growth of Bear Stearns' assets that were subject to management's subjective estimates.  These were the very types of investments explicitly identified in the ARAs as possessing higher degrees of inherent risk (2006 AAM 8050.35).  Moreover, Deloitte should have been attuned to material industry and Bear Stearns specific risks such as:[20]

(a)    The June 2006 meltdown of the Bear Stearns U.K. subsidiary that specialized in subprime originations;

(b)    The observations of the housing market downturn by the National Association of Realtors beginning in May 2006 described above; and

---

*( . . . continued)*

within the financial statements have been reflected using the appropriate amount.

[18] AU 319.49, "The auditor should obtain sufficient knowledge of the information system relevant to financial reporting to understand — The procedures, both automated and manual, by which transactions are initiated, recorded, processed, and reported from their ***occurrence to their inclusion*** in the financial statements."

[19] 2006 D&L AAG 8.06, "Internal factors—such as an institution's underwriting practices, credit practices, training, **risk management techniques**, familiarity and experience with its loan products and customers, the relative mix and geographic concentration of its loan portfolio and **the strength of its internal control**—also have a significant effect on an institution's ability to control and monitor its credit exposure." (emphasis added)  See also 8.07, which notes that concentrations of particular type of product increases credit risk.  Ch.8 in conjunction with AU 319 requires that the auditor gain an understanding of an entity's internal controls.

[20] AU 319.49, "The auditor should obtain sufficient knowledge of the information system relevant to financial reporting to understand — How the information system captures other events and conditions that are significant to the financial statements."

(c)      The FDIC reiteration that  "Bankers and bank regulators need to remember that rapid expansion in loan volumes often leads, over time, to declining credit quality."[21]

580.    A close scrutiny of the Company's internal controls relating to its securitization business should have placed Deloitte on notice that Bear Stearns was engaged in wrongdoing to the detriment of its investors.  The OIG identified a:

> Lack of expertise by risk managers in mortgage-backed securities at various times; lack of timely formal review of mortgage models; persistent understaffing; a proximity of risk managers to traders suggesting lack of independence; turnover of key personnel during times of crisis; and an inability or unwillingness to update models quickly enough to keep up with changing circumstances.

581.    In addition, the 2008 OIG Report found "Bear Stearns' concentration of mortgage securities was increasing for several years and was beyond its internal limits, and that a portion of Bear Stearns' mortgage securities (*i.e.*, adjustable rate mortgages) represented a significant concentration of market risk…".  Accordingly, Deloitte should have been aware of the red flag associated with the fact that Bear Stearns' holdings of MBS-related securities were in excess of its internal policy limits.

582.    In addition to the above, Deloitte should have taken notice of the varying risk management and pricing approaches taken by Bear Stearns' trading desks described at paragraphs 130 to 131 above.  The B&D AAG observed that this practice constitutes a fraud risk factor, which for purposes of Deloitte's audits of Bear Stearns should have become a red-flag.[22]

---

[21] http://www.fdic.gov/news/news/press/2006/pr06072.html

[22] Ch. 5, *Auditing Considerations*, Fraud Risk Factors, Appendix A, ¶ 5.195, Part 1 Fraudulent Financial Reporting, B.2.i, "Use of different valuations of same product in two related companies."

6.     **Bear Stearns' Deficient Internal Audit Function**

583.    GAAS recognize that the internal audit function serves an important role in monitoring the performance of an entity's controls (AU 322, *The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements*, ¶ 4).  Accordingly, GAAS states "the auditor should obtain an understanding of the internal audit function sufficient to identify those internal audit activities that are relevant to planning the audit."  (AU 322.04)

584.    Deloitte was subject to professional standards to evaluate the work performed by Bear Stearns' internal auditors.  Specifically, when the work of internal auditors is used, the independent auditor is required to evaluate:

(a)     The competence of those internal auditors (AU 322.09);

(b)     The procedures performed by internal audit to develop an understanding of relevant internal controls (AU 322.13).

585.    GAAS further specify that when there is a high risk of misstatement, such as with the valuation of assets, the external auditor is required to conduct its own testing.[23]  The auditor is similarly responsible for critical judgments such as inherent and control risks, and the materiality of misstatements.[24]

586.    In addition to the material weaknesses it observed with respect to Bear Stearns' risk management function, the SEC concluded that there were significant deficiencies of the

---

[23] AU 322.21, "However, for such assertions, the consideration of internal auditors' work cannot alone reduce audit risk to an acceptable level to eliminate the necessity to perform tests of those assertions directly by the auditor. Assertions about the valuation of assets and liabilities involving significant accounting estimates, and about the existence and disclosure of related-party transactions, contingencies, uncertainties, and subsequent events, are examples of assertions that might have a high risk of material misstatement or involve a high degree of subjectivity in the evaluation of audit evidence."

[24] AU 322.19, "Because the auditor has the ultimate responsibility to express an opinion on the financial statements, judgments about assessments of inherent and control risks, the materiality of

*(continued . . . )*

Company's internal audit function.  These deficiencies were observed relative to Bear Stearns'

Internal Audit's assessment of risk management controls.  Importantly, this conclusion was

reached on a contemporaneous basis as set forth in the 2008 OIG Report:

> TM's own memorandum dated November 2006 noted significant
> deficiencies in Bear Stearns internal auditors' work as follows:
> The audits for Market Risk Management, Credit Risk Management
> and Funding/Liquidity Risk Management are completed and the
> reports are in draft form.  ***At this point it can be noted the [sic]
> there appears to be significant deficiencies in the coverage for
> the review of liquidity and funding risk management*** which will
> be a focal point of our discussions of scope expansion in the 2007
> CSE audits. (emphasis added)

587.    Given applicable professional standards, Deloitte should have similarly identified

and addressed the red-flags constituted by the deficiencies in Bear Stearns' Internal Audit

function.  Deloitte should have been particularly sensitive to its review of the internal audit

reports regarding Bear Stearns' risk management because Sarbanes-Oxley as originally drafted

required the external auditor rather than internal auditors to perform this work.  In other words,

applicable standards anticipated that greater levels of independence and expertise were likely to

be necessary in the assessment of risk management than could be provided by internal audit

personnel.

588.    Risk control at Bear Stearns was inextricably linked to the effectiveness of risk

management and internal audit personnel as well as the procedures those functions carried out.

In consideration of the significant deficiencies identified by the SEC, Deloitte should have

known that Bear Stearns' internal audit function did not mitigate any of the shortcomings of the

Company's risk management function.  Critically, the ineffectiveness of Bear Stearns' oversight

---

*( . . . continued)*

misstatements, the sufficiency of tests performed, the evaluation of significant accounting estimates, and
other matters affecting the auditor's report should always be those of the auditor."

functions raised red-flags about the Company's internal controls and commitment to the effective

risk management operations it was reporting to users of its financial statements.

## VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.  Statements Relating to Fiscal Year 2006 and Fourth Quarter 2006

589.    The Company's deception of its investors began on December 14, 2006, with a

series of false statements regarding its 2006 results made in a press release and press conference.

It continued to misrepresent its results in the Form 10-K it filed with the SEC covering fiscal

year 2006.

### 1.    December 14, 2006 Press Release

590.    On December 14, 2006, Bear Stearns issued a press release regarding its fourth

quarter and fiscal year end results for 2006.  The Company stated:

> The Bear Stearns Companies Inc. (NYSE:BSC) today reported
> earnings per share (diluted) of $4.00 for the fourth quarter ended
> November 30, 2006, up 38% from $2.90 per share for the fourth
> quarter of 2005.  Net income for the fourth quarter of 2006 was
> $563 million, up 38% from $407 million for the fourth quarter of
> 2005.  Net revenues for the 2006 fourth quarter were $2.4 billion,
> up 28% from $1.9 billion for the 2005 fourth quarter.  The
> annualized return on common stockholders' equity for the fourth
> quarter of 2006 was 20.5%.
>
> For the fiscal year ended November 30, 2006, earnings per share
> (diluted) were a record $14.27, up 38% from $10.31 for fiscal
> 2005.  Net income for the fiscal year 2006 was $2.1 billion, up
> 40% from the $1.5 billion earned in the twelve-month period
> ended November 30, 2005.  Net revenues for fiscal year 2006 were
> $9.2 billion, an increase of 25% from $7.4 billion in the prior fiscal
> year.  The after-tax return on common stockholders' equity was
> 19.1% for fiscal 2006.
>
>                                    ***
>
> Net revenues in Capital Markets, which includes Institutional
> Equities, Fixed Income and Investment Banking, were $1.8 billion
> for the fourth quarter of 2006.

***

> Fixed income net revenues were $1.1 billion, up 25% from $839
> million in the fourth quarter of 2005.

591.    As a result, on December 14, 2006, Bear Stearns' stock closed at $159.96 per

share, up from a close of $155.89 per share the day before.  The following day, December 15,

2006, Bear Stearns' shares closed at $163.68.

**a.      December 14, 2006 Press Release Statements Regarding
the Company's Fourth Quarter 2006 Results                    **

592.    In the press release, Bear Stearns misstated its earnings per share, net income, and

net revenues.  Revenues from Capital Markets, specifically within the Fixed Income area, were

also falsely inflated.

593.    These statements were false and misleading because Bear Stearns achieved these

results by using misleading mortgage valuation models to value significant portions of its Level

3 assets, as described above at paragraphs 100 to 111.

594.    At the time of the statements, the Company's Level 3 assets represented 11% of

the Company's total assets held at market value, or a total of about $12.1 billion.  Because these

assets were highly leveraged, even a small decline in value would be vastly magnified, as set out

in paragraphs 77 to 80 above.

595.    The Company had been warned by the SEC that the models it used to value

mortgage-backed securities, the lion's share of these assets, did not reflect key factors relating to

the downturn in the housing industry, such as rising default rates.  As set out above at paragraphs

139 to 148, default rates and other signs of market declines had risen dramatically in the second

half of 2006.

155

596.    Accordingly, the values the Company assigned to this large group of assets was significantly higher  than they should have been, violating GAAP as set out at paragraphs 324 to 423 above.

### b.    Press Release Regarding Fiscal 2006 Results

597.    Bear Stearns also announced its fiscal year 2006 results in the December 14, 2006 press release.  For the 2006 fiscal year, Bear Stearns reported that it earnings per share (diluted) were a record $14.27, its net income was $2.1 billion and its net revenues for fiscal year 2006 were $9.2 billion.  These figures were false and misleading for the same reasons set out in paragraphs 593 to 596 above.

### 2.    Fourth Quarter 2006 Earnings Conference Call

598.    On December 14, 2006, Bear Stearns held its fourth quarter 2006 earnings conference call, conducted by defendant Molinaro, the Company's CFO.  During the call, Molinaro repeated the financial results set out in paragraphs 590 above.  These statements were false and misleading for the reasons set out above at paragraphs 593 to 596.

599.    During the call, an analyst asked Molinaro:

> There's obviously been a lot of worry in the investment community about slowing originations, the sub prime scare we've seen.  What's your overall take on that?  And if there's any way you can in some way scale the origination platform vis-à-vis the trading component and the other asset classes within MBS would be helpful.

600.    Molinaro responded that:

> [T]he sub prime sector does represent a relatively small piece of the overall mortgage market and the composition of the sub prime class representing an even smaller component of the overall market.  **While there's clearly been some issues in sub prime, as we have seen, the issue has really been more of a vintage issue as we've got some of the production that was originated maybe of what now looks like the top of the cycle with underwriting standards diminishing, experiencing some difficulties.  But I**

> **think that is and has been relatively well contained and not really spilling over into the broader market. In fact, I would say the broader market continues to be quite healthy and investor demand for the product continues to be quite robust.** I think a lot of the attention does appear to be somewhat overblown, certainly there are some issues in the sub prime segment, but I would say the broader market is – maybe we've seen the worst of it and I think it feels pretty good right now.

601. The statements above were materially false and misleading when made because the Company understood that the unusually risky loans it was continuing to purchase through its EMC subsidiary were not limited to any particular "vintage". As noted above in paragraph 59, CW 3 reported that during the latter part of 2006 and the beginning of 2007 EMC would "buying everything" without regard for the known riskiness of the loan. Moreover, the Company understood that its own loan origination practices had resulted in "cutting corners" on standard underwriting practices, as set out above at paragraphs 53 to 63.

602. An analyst at Sandler O'Neill, Jeff Harte, asked Molinaro about the Company's exposure to increased defaults on subprime mortgages:

> As we see some default rises in subprime land, and as we also see you originating more of the mortgages that you're actually securitizing and sending out, does the risk of defaulting mortgages coming back to you rise, or how do you look at that?

603. Molinaro responded by vastly understating Bear Stearns' exposure to increasing defaults in the subprime market:

> **Well, I don't – no, it doesn't. Because essentially we're originating and securitizing.** But I think the point we should make about what's happening in the subprime sector – in other words, the vintage class that seems to be experiencing the most difficulty certainly coming at the end at what appears to be the heights of the cycle when the lending standards were the most lenient. What's going on now in the market with a lot of the weaker hands getting forced out of the business, the business is really moving into stronger hands, who have improved underwriting standards and are not going to be stretching as much for businesses, maybe some of the other shops were who really,

their livelihood was focused on volume. **So what we saw in 2006, our activity in the subprime sector declined dramatically, largely because our standards was higher and our pricing was not at the Level that would generate a lot of business.** I think the good news in the subprime sector, as the business is moving into the hands of much stronger players in an environment where the underwriting standards are being tightened and the business should improve.

604.    The statements above in paragraph 603 were materially false and misleading when made because Bear Stearns did far more than originate and securitize subprime loans—it retained on its books large amounts of the riskiest tranches of RMBS and CDOs it produced. Indeed, as set out at paragraph 65 above, by November of 2006, the Company held $5.6 billion of the riskiest tranches of subprime-backed RMBS on its books.

605.    Moreover, Bear Stearns' own underwriting standards were not higher in 2006 than in previous years, and the Company understood that the loans it was continuing to purchase through its EMC subsidiary during the latter part of 2006 and the beginning of 2007 that were unusually risky, and in fact EMC was not tightening its underwriting standards.

### 3.    Form 10-K for Fiscal Year 2006

606.    On February 13, 2007, Bear Stearns filed its Form 10-K for the annual and quarterly period ended November 30, 2006. The 10-K was signed by, among others, defendants Greenberg, Cayne, Schwartz, Spector and Farber. The Form 10-K made misrepresentations regarding the Company's financial results, risk management practices, exposure to market risk, compliance with banking capital requirements, and internal controls. Finally, the 2006 Form 10-K contained false and misleading statements by the Company's auditor, Deloitte, relating to its review and certification of the Company's reported financial results.

158

607.     As a result, on February 13, 2007, Bear Stearns' stock closed at $160.10 per share, up from a close of $157.30 per share the day before.  The following day, February 14, 2007, Bear Stearns' shares closed at $165.81.

### a.     The Company's Financial Results and Assets

608.     The financial results, including revenues, earnings, and earnings per share reported by the Company in the Form 10-K for 2006 were misleading for the same reasons set out in paragraphs 593 to 596 above, relating to the Company's announced results for fiscal year 2006.

609.     Moreover, in the 2006 Form 10-K the Company was materially false and misleading in its assertions about the value of assets corresponding to Level 3.  The Company stated that:

> at November 30, 2006 and 2005, the total value of all financial instruments whose fair value is estimated based on internally developed models or methodologies utilizing significant assumptions or other data that are generally less readily observable from objective sources (primarily fixed income cash positions) aggregated approximately $12.1 billion and $7.1 billion, respectively, in "Financial Instruments Owned[.]

610.     As set out in paragraphs 100 to 111 above, by the date of this statement, the Company's Principal Accountant and Controller had already been informed that the models the Company used to value the mortgage-backed securities in this asset category failed to reflect dramatic declines in the housing market.

### b.     The Company's Risk Management Practices

611.     Bear Stearns' 2006 Form 10-K misled investors with respect to the Company's use of its VaR models and the accuracy and of its valuation models for assets linked to subprime mortgages.  The 2006 Form 10-K stated that:

members of the Controllers and Risk Management Departments perform analysis of internal valuations, typically on a monthly basis but often on an intra-month basis as well.  These departments are independent of the trading areas responsible for valuing the positions.  Results of the monthly validation process are reported to the MTM Committee, which is composed of senior management from the Risk Management and Controllers Departments.  **The MTM Committee is responsible for ensuring that the approaches used to independently validate the Company's valuations are robust, comprehensive and effective.**  Typical approaches include valuation comparisons with external sources, comparisons with observed trading, independent comparisons of key model valuation inputs, independent trade modeling and a variety of other techniques.

612.    In addition, the Company specifically asserted that:

The Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss.

613.    These statements were false and misleading when made because, as set out in paragraphs 123 to 127 above, by the time of this statement the SEC had repeatedly warned the Company that the models it used to assess risk, including its VaR and mortgage valuation models, failed to reflect key indicators of market declines.  According to the 2008 OIG Report, Bear Stearns' VaR models failed to include critical variables such as "housing price appreciation, consumer credit scores, patters of delinquency rates, and potential other data."  It was precisely these indicators that would have reflected the rapidly declining housing market.

614.    Moreover, according to the 2008 OIG Report, reviews of the Company's risk management models which should have taken place before the subprime market cratered were never completed at any time before the Company's collapse.

615.    Bear Stearns' 2006 Annual Report to Stockholders, attached as an Exhibit to the Form 10-K, misled investors with respect to Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management Department and senior trading managers monitor

exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer."

616.     In fact, Bear Stearns lacked risk management personnel and was unable to appropriately model for risk.  Even when Bear Stearns had the correct personnel in place, the 2008 OIG Report indicates that its risk managers were unable to effectively communicate with the traders who were responsible for taking on additional risk.  Bear Stearns did not have risk managers that had experience or were capable of valuing the MBS which were central to Bear Stearns' business models.

617.     Bear Stearns' 2006 Form 10-K also misled investors with respect to Bear Stearns' risk management procedures when it stated that "comprehensive risk management procedures have been established to identify, monitor and control [its] major risks."

618.     In fact, this statement was false and misleading when made because, according the 2008 OIG Report and verified independently by confidential witnesses, Bear Stearns did not have risk management personnel at the time capable of accurately valuing MBS.

619.     Bear Stearns' 2006 Form 10-K also stated that "The Treasurer's Department is independent of trading units and is responsible for the Company's funding and liquidity risk management. . . [m]any of the independent units are actively involved in ensuring the integrity and clarity of the daily profit and loss statements," and that:

> The Risk Management Department is independent of all trading areas and reports to the chief risk officer. . . [t]he department supplements the communication between trading managers and senior management by providing its independent perspective on the Company's market risk profile."

620.     In fact, as set out at paragraphs 129 to 136 above, in this period Bear Stearns' risk managers had little independence from its trading desk, and no ability to reign in the Company's accumulation of risk.

### c.   The Company's Exposure to Market Risk

621.    As reflected in the exchange of letters between the SEC and the Company described above at paragraphs 312 to 323, the Company's 2006 Form 10-K was also false and misleading in that it failed to disclose the Company's true exposure to the subprime market.  The SEC concluded in the 2008 OIG Report that, as a result, investors were deprived of "material information" that they could have used "to make well-informed investment decisions."

622.    Bear Stearns' 2006 Form 10-K also misled investors with respect to its exposure to "market risk."  In its 2006 Form 10-K the Company stated that it:

> mitigates its exposure to market risk by entering into hedging transactions, which may include over-the-counter derivative contracts or the purchase or sale of interest-bearing securities, equity securities, financial futures and forward contracts.  In this regard, the utilization of derivative instruments is designed to reduce or mitigate market risks associated with holding dealer inventories or in connection with arbitrage-related trading activities.

623.    These statements were false when made because Bear Stearns managers were aware that it was impossible to effectively hedge against declines in assets in light of deficiencies in its VaR and mortgage valuation models, as discussed above at paragraphs 100 to 111 and 123 to 128.

624.    Furthermore, because of the deficiencies in its VaR models, the Company's representation in its 2006 Form 10-K that it had an aggregate VaR of just $28.8 million, which was far lower than its peers, was materially false and misleading.  In fact, the Company knew that its VaR numbers failed to reflect its exposure to declining housing prices.

### d.   The Company's Compliance With Banking Regulations

625.    In its 2006 Form 10-K Bear Stearns stated that "the Company is in compliance with CSE regulatory capital requirements."  This statement was materially false and misleading

when made because, as set forth at paragraphs 427 to 452 above, the Company had misled

regulators into believing that it was meeting capital requirements only by repeatedly violating

banking regulations relating to the appropriate calculation of net capital.  As set forth in the 2008

OIG Report, the Company violated CSE rules by (i) inflating its profit and its capital by using

inflated marks on assets subject to mark disputes; and (ii) falsely inflating its net capital by using

misleading methods to calculate VaR.

e.      **The Company's Internal Controls**

626.    Defendants Cayne and Molinaro each made false and misleading statements when

they executed Sarbanes-Oxley Act certifications, annexed as an exhibit to the Form 10-K filing.

This certification stated that the 10-K report "does not contain any untrue statement of a material

fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period

covered by this report" and "the financial statements, and other financial information included in

this report, fairly present in all material respects the financial condition."

627.    Cayne and Molinaro also certified that the Company had:

> [d]esigned such internal control over financial reporting, or caused
> such internal control over financial reporting to be designed under
> our supervision, to provide reasonable assurance regarding the
> reliability of financial reporting and the preparation of financial
> statements for external purposes in accordance with generally
> accepted accounting principles."

628.    These statements were false and misleading, in that, despite repeated warnings

from the SEC, the Company had made no effort to address deficiencies that went to the heart of

the Company's ability to assess the value of its assets and its exposure to risk.  Moreover, the

encouraging revenue growth and earnings per share Bear Stearns reported in its certified

statements were only made possible as a result of Bear Stearns' ability to avoid taking losses by

163

relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets.

### f.  Deloitte's Certification

629.    As the Company's auditor Deloitte certified Bear Stearns' 2006 Form 10-K, as required by Sarbanes-Oxley, and, in so doing, knowingly and recklessly offered a materially misleading opinion as to the financial statements' accuracy.  As set out in detail at paragraphs 523 to 588 above, Deloitte knew or recklessly disregarded that these statements and certifications were materially false and misleading when made, perpetrating a fraud on the Company's investors.

### B.  Statements Relating to Fiscal Year 2007 Results

630.    In press releases, conference calls and SEC filings, Bear Stearns deceived investors with respect to its 2007 financial results.

### 1.  First Quarter 2007 Results

### a.  First Quarter 2007 Press Release

631.    On March 15, 2007, Bear Stearns issued a press release regarding its first quarter 2007 results.

> NEW YORK, NY – March 15, 2007 – The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $3.82 for the first quarter ended February 28, 2007, up 8% from $3.54 per share for the first quarter of 2006.  Net income for the first quarter of 2007 was $554 million, up 8% from $514 million for the first quarter of 2006.  Net revenues were $2.5 billion for the 2007 first quarter, up 14% from $2.2 billion in the 2006 first quarter.  The annualized return on common stockholders' equity was 18.3%.
>
> "We are pleased with this excellent performance, revenues for the first quarter were up for every business segment," said James E. Cayne, chairman and chief executive officer of The Bear Stearns Companies Inc. "Growing the company remains a core focus as we

continue to invest in the clearing, mortgage, international and asset
management franchises with successful results."

\*\*\*

Capital Markets net revenues for the first quarter of 2007 were
$2.0 billion, up 15% from $1.7 billion

\*\*\*

Fixed Income net revenues were $1.1 billion, up 27% from $907
million in the year-ago quarter.

632.    As a result, on March 15, 2007, Bear Stearns' stock closed at $148.50 per share,
up from a close of $145.29 per share the day before.  The following day, March 16, 2007, Bear
Stearns' shares closed at $145.48.

633.    In the press release, Bear Stearns misstated its earnings per share, net income, and
net revenues.  Bear Stearns' financial results for Capital Markets, specifically Fixed Income,
were also falsely inflated.

634.    These statements were false and misleading because Bear Stearns achieved these
results by using misleading mortgage valuation models to value its Level 3 assets, as described
above at paragraphs 100 to 111.

635.    At the time of the statements, the Company's Level 3 assets represented 11.64%
of the Company's total assets held at market value, or a total of about $15 billion.  Because these
assets were highly leveraged, even a small decline in value would be vastly magnified, as set out
in paragraphs 77 to 80 above.

636.    The Company had been warned by the SEC that the models it used to value
mortgage-backed securities, a large share of these assets, did not reflect key factors relating to
the downturn in the housing industry, such as rising default rates.  As set out above at paragraphs

139 to 148, default rates and other signs of market declines had risen dramatically in the second half of 2006 and into the first quarter of 2007.

637.    Accordingly, the values the Company assigned to this group of assets was significantly higher than they should have been, violating relevant GAAP as set out at paragraphs 324 to 423 above.  Because the Company was not reflecting these losses on its books, its revenues, earnings, and earnings per share were overstated.

<strong>b.      First Quarter 2007 Conference Call</strong>

638.    On March 15, 2007 Bear Stearns held its first quarter 2007 earnings conference call, conducted by defendant Molinaro, the Company's CFO.  During the call, Molinaro repeated the financial results described in paragraph 631.  For the reasons set out in 633 to 637 above, these statements were false and misleading.

639.    In the same call, Molinaro stated that Bear Stearns' internal origination platform:

> allows us to control the performance of the loans and it puts the servicing at very strong stable hands and historically **in periods of dislocation like this, the opportunities to buy pools of defaulted loans or semi- performing loans, have been there and that servicing capacity has been a key asset in our ability to generate return from those assets.**"

640.    These statements were false and misleading because the Company understood that the loans it was continuing to purchase through its EMC subsidiary were being bought with little due diligence.  As noted above in paragraph 59, CW 3 reported that during the latter part of 2006 and the beginning of 2007 EMC was "buying everything" without regard for the risk of the loan.  Moreover, as noted above at paragraphs 54 and 58 to 60, additional confidential witnesses have testified that Bear Stearns' own origination platforms were seriously flawed and were not accurately measuring the risk of the loans issued.  Additional Confidential Witnesses have

confirmed that Bear Stearns' internal origination platforms were not using prudent lending standards (paragraphs 54 and 58 to 60 above).

641.     In the same call, Molinaro also made false and misleading statements regarding the Company's exposure to risk connected with the Hedge Funds.  An unidentified analyst on the call asked, "Can you give any insight about whether you've seen or had issues with margin calls or any kind of difficulties in hedge fundland given how volatile the Markets have been the last few weeks?"

642.     Molinaro responded that "[w]e haven't seen any difficulties.  I would say it's been, obviously there's a lot of market volatility but we've had no difficulties there."  Barely two weeks earlier, Cioffi, a Senior Managing Director of BSAM and a member of Bear Stearns' Board of Directors, had written of the Funds' February results that "I can't believe anything has been this bad."

643.     In fact, as described at paragraphs 193 to 196 above, the Hedge Funds were in the midst of a disastrous collapse in the value of their assets.  The managers of these Hedge Funds reported directly to defendant Spector, the Co-President of the Company at the time.

644.     When asked to give details regarding Bear Stearns' exposure to subprime CDOs, Molinaro refused, saying "I think that we feel like we've got the situation in hand.  We think it's well hedged."

645.     This statement was false and misleading, in that Molinaro was aware that the VaR and valuation models, essential to meaningful hedging of risk, failed to reflect key data about housing declines.

### c.      First Quarter 2007 Form 10-Q

646.     In its report for the first quarter of 2007, signed by defendant Farber, the

Company materially misrepresented its financial results, its exposure to risk, its internal controls,

and its compliance with regulatory capital requirements.

### (i)      Financial Results

647.     In the Form 10-Q it filed on April 9, 2008, the Company stated that:

> Net revenues for Capital Markets increased 15.4% to $1.97 billion
> for the 2007 quarter compared with $1.70 billion for the 2006
> quarter.  Pre-tax income for Capital Markets increased 12.9% to
> $736.3 million for the 2007 quarter from $652.3 million for the
> comparable prior year quarter.  Pre-tax profit margin was 37.5%
> for the 2007 quarter compared with 38.3% for the 2006 quarter.
>
> * * *
>
> Fixed income net revenues increased 26.7% to $1.15 billion for the
> 2007 quarter from $907.1 million for the comparable prior year
> quarter.

648.     These statements were false and misleading because, as explained in paragraphs

100 to 111 above, Bear Stearns was able to achieve these results only by avoiding taking losses

on its Level 3 assets.  It did this by using misleading valuation models that did not accurately

reflect declines in the housing market.  This avoidance of loss permitted the Company to increase

its revenues and asset values, inflating the value of its stock.

649.     Because the Level 3 assets the Company reported for the period stood at $15.64

billion, the Company's knowing use of materially deficient models to value those assets had

grave repercussions for accuracy of the Company's financial reporting.  These effects were

magnified by the Company's leveraging practices.

650.     Moreover, the Company's assertion that its Level 3 assets stood at $15.64 billion was materially false and misleading, given that it was a product of a valuation model that did not reflect key declines in the market.

### (ii)     Exposure to Risk

651.     Bear Stearns' first quarter 2007 Form 10-Q also misled investors with respect to its assessment of risk exposure.  In the filing, Bear Stearns asserted that "The Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

652.     In fact, the Company had undertaken no such review, and its Controller and Principal Accountant, Farber, had been repeatedly warned by government regulators that the Company's VaR models were inaccurate and out of date.  According to the 2008 OIG Report, at no time before the Company collapsed in 2008 did Bear Stearns complete a review of its risk management models.

653.     As a result, according to the 2008 OIG Report, in this period Bear Stearns' VaR models failed to include critical variables such as "housing price appreciation, consumer credit scores, patters of delinquency rates, and potential other data."  Because these indicators would have reflected the ongoing collapse of the housing market, the Company's decision to omit them from its VaR calculations was materially misleading.

654.     In the Form 10-Q Bear Stearns reported the reassuringly low VaR numbers it had calculated for the first quarter of 2007, including an aggregate risk of just $27.9 million – far lower than its peers.  This statement was wildly misleading, in that the Company knew that its VaR modeling failed to reflect its exposure to declining housing prices.

655.     The first quarter 2007 Form 10-Q also misled investors with respect to Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management

Department and senior trading managers monitor exposure to market and credit risk for high

yield positions and establish limits and concentrations of risk by individual issuer."

656.    In fact, Bear Stearns lacked risk management personnel and was unable to

appropriately model for risk.  Even when Bear Stearns had the correct personnel in place, the

2008 OIG Report indicates that its risk managers were unable to effectively communicate with

the traders who were responsible for taking on additional risk.  Bear Stearns did not have risk

managers that had experience or were capable of valuing MBS which were central to Bear

Stearns' business models.

### (iii)    Compliance With Banking Regulations

657.    In its first quarter 2007 Form 10-Q Bear Stearns stated that "the Company is in

compliance with CSE regulatory capital requirements."  This statement was materially false and

misleading when made because Bear Stearns was only able to meet the CSE program's minimum

capital requirements by repeatedly violating CSE rules relating to the appropriate calculation of

net capital.  As set out in the 2008 OIG Report, the Company violated CSE rules by (i) inflating

its profit and its capital by using inflated marks on assets subject to mark disputes; and

(ii) falsely inflating its net capital by using misleading methods to calculate VaR.

### (iv)    Sarbanes-Oxley Certifications

658.    Defendants Cayne and Molinaro each made false and misleading statements when

they executed Sarbanes-Oxley Act certifications, annexed as an exhibit to the Form 10-Q filing

for the first quarter of 2007.  This certification stated that stated that the 10-Q report "does not

contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not

misleading with respect to the period covered by this report" and "the financial statements, and

other financial information included in this report, fairly present in all material respects the financial condition."

659.    Cayne and Molinaro also certified that the Company had:

> [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

660.    These statements were false and misleading, in that, despite repeated warnings from the SEC, the Company had made no effort to address deficiencies that went to the heart of the Company's ability to assess the value of its assets and its exposure to risk.  Moreover, the encouraging revenue growth and earnings per share Bear Stearns reported in its certified statements reported were only made possible by the fact that Bear Stearns was avoiding taking losses only by relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets.

### (v)    Deloitte's Certification

661.    As the Company's auditor Deloitte certified Bear Stearns' first quarter 2007 Form 10-Q, as required by Sarbanes-Oxley, and, in so doing, knowingly and recklessly falsely offered an opinion as to the financial statement's accuracy.  As set out in detail at paragraphs 523 to 588 above, Deloitte knew or recklessly disregarded that these statements and certifications were materially false and misleading when made, and perpetrated a fraud on Bear Stearns investors as a result.

2.      **Second Quarter 2007 Results**

a.      **Second Quarter 2007 Press Release**

662.    On June 14, 2007, Bear Stearns issued a press release regarding its second quarter

2007 results.

> NEW YORK – June 14, 2007 – The Bear Stearns Companies Inc.
> (NYSE:BSC) today reported earnings per share (diluted), after a
> non-cash charge, of $2.52 for the second quarter ended May 31,
> 2007, down 32% from $3.72 per share for the second quarter of
> 2006 . . .  Net income for the second quarter of 2007, after the non-
> cash charge, was $362 million.  Net income excluding the non-
> cash charge would have been $486 million, down 10% from $539
> million for the second quarter of 2006.  Net revenues for the 2007
> second quarter were a record $2.512 billion, up from the previous
> record of $2.499 billion reported for the 2006 second quarter.  The
> annualized return on common stockholders' equity for the second
> quarter of 2007 was 11.6%, and 16.4% for the trailing 12-month
> period ended May 31, 2007.
>
> ***
>
> Capital Markets net revenues for the second quarter of 2007 were
> $1.9 billion.
>
> ***
>
> Fixed Income net revenues were $962 million for the 2007 second
> quarter.

663.    As a result, on June 14, 2007, Bear Stearns' stock closed at $149.60 per share, up

from a close of $149.49 per share the day before.  The following day, June 15, 2007, Bear

Stearns' shares closed at $150.09.

664.    In the press release, Bear Stearns misrepresented its earnings per share, net

income, and net revenues – specifically its financial results for Capital Markets.

665.    These statements were false and misleading because Bear Stearns achieved these

results by using misleading mortgage valuation models to value its Level 3 assets, as described

above at paragraphs 100 to 111.

172

666.    At the time of the statements, the Company's Level 3 assets represented 10.55% of the Company's total assets held at market value, or a total of about $14.39 billion.  Because these assets were highly leveraged, even a small decline in value would be vastly magnified, as set out in paragraphs 77 to 80 above.

667.    The Company had been warned by the SEC that the models it used to value mortgage-backed securities, the lion's share of these assets, did not reflect key factors relating to the downturn in the housing industry, such as rising default rates.  As set out above at paragraphs 139 to 148, default rates and other signs of market declines had risen dramatically in the second half of 2006 and into the second quarter of 2007.

668.    Accordingly, the values the Company assigned to this large group of assets was significantly higher  than they should have been, violating relevant GAAP provisions as set out at paragraphs 324 to 423 above.  Because the Company was not reflecting these losses on its books, its revenues, earnings, and earnings per share were overstated.

### b.    <u>Second Quarter 2007 Conference Call</u>

669.    On June 14, 2007, Bear Stearns held its second quarter 2007 earnings conference call, conducted by defendant Molinaro, the Company's CFO.  During the call, Molinaro repeated the financial results described at paragraph 662 above.  These statements were false and misleading for the reasons set out at paragraphs 664 to 668 above.

670.    During the June 14, 2007 conference call, Molinaro also stated that the:

> During the quarter we adopted tighter underwriting standards in the origination of sub prime and Alt-A mortgages  which served to dramatically reduce the volume of 100% CLTV lending as well as stated income lending above 90% LTV, both important segments of the sub prime and Alt-A market.

671.    These statements were false and misleading because the Company understood that the loans it was continuing to purchase through its EMC subsidiary were unusually risky.  As

noted above in paragraph 59, CW 3 reported that during the latter part of 2006 and the beginning of 2007 EMC was "buying everything" without regard for the risk of the loan.  Moreover, as noted above, additional Confidential Witnesses have testified that Bear Stearns' own origination platforms were seriously flawed and were not accurately measuring the risk of the loans issued.  Additional Confidential Witnesses have confirmed that Bear Stearns' internal origination platforms were not using prudent lending standards.

**c.**      **June 22, 2007 Press Release**

672.     According to a June 22, 2007 press release announcing the Company's bailout of the High Grade Fund, Bear Stearns had provided the High Grade Hedge fund with a $1.6 billion credit line, secured by collateral worth more than $1.6 billion.  Bear Stearns reported that asset sales had reduced the loan balance to $1.345 billion.  This statement was false and misleading.

673.     As set out at paragraphs 212 to 213 above, according to the 2008 OIG Report, by the time of this statement the estimated value of the collateral securing the loan had deteriorated by nearly $350 million—that is, to approximately the value of the loan Bear Stearns had given the High Grade Fund.  Moreover, the High Grade Hedge fund had no assets other than the collateral Bear Stearns already held.

674.     Bear Stearns further misled investors during a June 22, 2007 conference call held to discuss the liquidity difficulties experienced by BSAM's in-house hedge funds.  During this conference call, Molinaro was asked "[t] what extent has this event caused you to relook at some of your practices overall for Bear Stearns since you are such a big player in the mortgage market?  I mean you have had the sub-prime problem for more than three months now.  Are there other trigger events we should pay attention to over the next year?"  Molinaro responded with the following:

> Well [] I don't know that it's causing us to have any different point of view on the activities in our mortgage business. Our mortgage business has basically been not affected by this and has not really been a part of this situation. So our mortgage business continues to operate in a very effective way. Albeit in a more in a lower volume environment and a more difficult operating environment given the macro picture in the marketplace.
>
> As it relates to our Asset Management division, we feel that we have adequate controls in place. Obviously if you have a problem like this, you are going to reassess those controls and look to strengthen them. But I think the simple point in this Fund is that or these two Funds, they are invested in an asset class that went through a period of severe distress.

675.    In fact, as set out above at paragraphs 139 to 148, by June of 2007 capital was ebbing from the subprime securitization market, reducing demand for the origination of subprime loans.

### d.    Second Quarter 2007 Form 10-Q

676.    In its report for the second quarter of 2007, signed by defendant Farber, the Company materially misrepresented its financial results, its exposure to risk, its compliance with regulatory capital requirements, its internal controls, and the effects of its bailout of the High Grade Fund. Deloitte also filed a materially false and misleading certification in connection with the Form 10-Q.

677.    As a result, on July 10, 2007, Bear Stearns' stock closed at $137.96 per share, down from a close of $143.89 per share the day before. The following day, July 11, 2007, Bear Stearns' shares closed at $138.03.

### (i)    Financial Results

678.    In the Form 10-Q it filed on July 10, 2007, the Company stated that:

> Net revenues for Capital Markets decreased 9.7% to $1.86 billion for the 200 quarter compared with $2.06 billion for the 2006 quarter.

* * *

> Fixed income net revenues decreased 21.3% to $962.3 million for
> the 2007 quarter from $1.22 billion for the comparable prior year
> quarter primarily due to a decrease in mortgage-related revenues.
> Secondary trading revenues decreased in the 2007 quarter
> compared with the 2006 quarter, particularly non-agency fixed rate
> whole loans and Adjustable-Rate Mortgages ("ARMs"), reflecting
> the challenges associated with the subprime mortgage sector.
> Partially offsetting these decreases were increases in primary
> revenues from commercial mortgage-backed securities and non-
> agency fixed rate whole loans.

679.    These statements were false and misleading because, as explained in paragraphs

100 to 111 above, in this period Bear Stearns avoided taking losses on its Level 3 assets by using

misleading mortgage valuation models, which did not accurately value its Level 3 assets.  This

avoidance of loss permitted the Company to increase its revenues and asset values, inflating the

value of its stock.

680.    At the time, the Level 3 assets the Company reported for the period stood at

$14.38 billion.  Moreover, just four months later, the residential mortgage component of the

Company's Level 3 assets stood at $5.8 billion.

681.    The Company's knowing use of materially deficient models to value its

mortgage-backed assets had grave repercussions for accuracy of the Company's financial

reporting.  These effects were magnified by the Company's leveraging practices.

682.    Moreover, the Company's assertion that its Level 3 assets stood at $14.38 billion

was itself materially false and misleading, given that it was a product of a valuation model that

did not reflect key declines in the market.

**(ii)**     <u>**Exposure to Risk**</u>

683.     Bear Stearns' second quarter 2007 Form 10-Q misled investors with respect to its assessment of risk exposure.  In the filing, Bear Stearns asserted that "The Company regularly evaluates and enhances [its] VaR models in an effort to more accurately measure risk of loss."

684.     In fact, the Company had undertaken no such review, and its Controller and Principal Accountant, Farber, had been repeatedly warned by government regulators that the Company's VaR models were inaccurate and out of date.  According to the 2008 OIG Report, at no time before the Company collapsed in 2008 did Bear Stearns complete a review of critical inputs into its risk management models.

685.     As a result, according to the 2008 OIG Report, in this period Bear Stearns' VaR models failed to include critical variables such as "housing price appreciation, consumer credit scores, patters of delinquency rates, and potential other data."  Because these indicators would have reflected the ongoing collapse of the housing market described at paragraphs 139 to 148 above, the Company's decision to omit these key variables from its VaR calculations was materially misleading.

686.     In the Form 10-Q Bear Stearns reported the reassuringly low VaR numbers it had calculated for the second quarter of 2007, including an aggregate risk of just $28.7 million – far lower than its peers.  This statement was materially misleading, in that the Company knew that its VaR modeling failed to reflect its exposure to declining housing prices.

687.     The second quarter 2007 Form 10-Q also misled investors with respect to Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer."

177

688.     In fact, Bear Stearns lacked risk management personnel and was unable to appropriately model for risk.  Even when Bear Stearns had the correct personnel in place, the 2008 OIG Report indicates that its risk managers were unable to effectively communicate with the traders who were responsible for taking on additional risk.  Bear Stearns did not have risk managers that had experience or were capable of valuing MBS which were central to Bear Stearns' business models.

### (iii)     Compliance With Banking Regulations

689.     In its second quarter 2007 Form 10-Q Bear Stearns stated that "the Company is in compliance with CSE regulatory capital requirements."  This statement was materially false and misleading when made because Bear Stearns met the CSE program's minimum capital requirements only by repeatedly violating CSE requirements relating to the appropriate calculation of net capital.  As set out in the 2008 OIG Report and at paragraphs 427 to 452 above, the Company violated CSE rules by failing to take appropriate capital charges related to its collapsed hedge funds; by inflating its profit and its capital by using inflated marks on assets subject to mark disputes; and, by falsely inflating its net capital by using misleading methods to calculate VaR.

### (iv)     The Company's Internal Controls

690.     Defendants Cayne and Molinaro each made false and misleading statements when they executed Sarbanes-Oxley Act certifications, annexed as an exhibit to the Form 10-Q filing for the second quarter of 2007.  This certification stated that stated that the Form 10-Q report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "the

financial statements, and other financial information included in this report, fairly present in all material respects the financial condition."

691.     Cayne and Molinaro also certified that the Company had:

> [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

692.     These statements were false and misleading, in that, despite repeated warnings from the SEC, the Company had made no effort to address deficiencies that went to the heart of the Company's ability to assess the value of its assets and its exposure to risk.  Moreover, the encouraging revenue growth and earnings per share Bear Stearns reported in its certified statements reported were only made possible by the fact that Bear Stearns was avoiding taking losses only by relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets.

### (v)     The High Grade Fund Bailout

693.     The second quarter 2007 Form 10-Q also contained false and misleading information about the financial impact of Bear Stearns' support of the High Grade Hedge Fund. The second quarter 2007 10-Q advised investors that Bear Stearns had entered into a $1.6 billion secured financing agreement with the High Grade Hedge Fund "in the form of collateralized repurchase agreements, enabled the High Grade Fund to replace existing secured financing, thereby improving the High Grade Fund's liquidity and allowing an orderly de-leveraging of the High Grade Fund in the marketplace.  Currently, we believe the High Grade Fund has sufficient assets available to fully collateralize the Facility."

694.     The statements in the above paragraph were materially false and misleading because Bear Stearns' management knew that the High Grade Fund did not have sufficient assets available to fully collateralize the facility.  The fact that the High Grade Fund did not have sufficient assets to collateralize the Facility was known to Bear Stearns management because the collateral that Bear Stearns took in the repurchase agreement were the same CDOs that had lost so much value, causing other lenders to make the margin calls that severally threatened the hedge fund's liquidity.

### (vi)     Deloitte's Certification

695.     As the Company's auditor Deloitte certified Bear Stearns' second quarter 2006 10-Q, and, in so doing, knowingly and recklessly falsely offered an opinion as to the financial statement's accuracy.  As set out in detail at paragraphs 523 to 588 above, Deloitte knew or recklessly disregarded that these statements and certifications were materially false and misleading when made.

### 3.     August 3, 2007 Press Release and Conference Call

696.     On August 3, 2007, Standard & Poor's cut Bear Stearns' credit rating outlook to negative.  In an effort to limit damage to its share price, Bear Stearns issued a press release which contained misleading statements with regard to Bear Stearns' liquidity and its risk controls.  The Company also hosted a conference call with analysts making similar misstatements.

697.     In the press release, the Company stated:

> The Bear Stearns Companies Inc. (NYSE: BSC) said today that it is disappointed with S&P's decision to change its outlook on Bear Stearns.  Most of the themes highlighted in its report are common to the industry and are not likely to have a disproportional impact on Bear Stearns.  S&P's specific concerns over issues relating to certain hedge funds managed by BSAM are unwarranted as these

were isolated incidences and are by no means an indication of broader issues at Bear Stearns.

* * *

our balance sheet is strong and liquid. . .With respect to operating performance and financial condition, the Company has been solidly profitable in the first two months of the quarter, while the balance sheet, capital base and liquidity profile have never been stronger.  Bear Stearns' risk exposures to high profile sectors are moderate and well-controlled.  The risk management infrastructure and processes remain conservative and consistent with past practices.

698.    These statements were false and misleading when made for at least two reasons.  First, because the Company knowingly used VaR models that would vastly underrepresent the risk the Company faced as a result of the declining housing market, it was reckless to assert that its liquidity and capital were sufficient to cover potential losses.

699.    Moreover, the Company's "solid" profits in fact resulted from the Company's use of misleading valuation models to avoid taking losses, resulting in an overstatement of earnings, as set out at paragraphs 100 to 111 above.

700.    On the conference call held on the same day, Company executives responded to analysts' concerns regarding the downgrade.  During the conference call, Defendant Alix, Bear Stearns' Chief Risk Officer, stated "we have long focused on the origination, transformation and redistribution of risk.  We've always managed the risk in this process by adjusting the intake, the origination of risk, to the demand for the end products."

701.    These statements were false and misleading because, as the head of the Company's Global Risk Management division, Alix knew that the VaR models the company employed to assess risk and hedge purchases did not reflect the reality of the collapsing real estate market.  Moreover, Alix knew that the Company had made no attempt to revise or update these defective models in years.

181

702.     During the same conference call, Molinaro made false and misleading statements regarding the collateral that Bear Stearns took in the repurchase agreement with the High Grade Fund, stating that "the market value of the inventory approximately reflects what the repo balance was."

703.     However, as noted above, Bear Stearns did not have accurate valuation models to value the Hedge Funds' subprime-backed collateral, and therefore, was at least reckless in offering any opinion on the market value of the highly illiquid collateral it had received from the Fund.  Moreover, given that barely two weeks earlier the Company had informed the High Grade Fund investors that the fund was worth almost nothing, the hedge fund collateral that the Company held on its books was worth closer to zero.

     **4.**     **Third Quarter 2007 Results**

     **a.**     **Third Quarter 2007 Press Release**

704.     On September 20, 2007, Bear Stearns issued a press release regarding its third quarter 2007 results.

> NEW YORK, NY – September 20, 2007 – The Bear Stearns Companies Inc. (NYSE:BSC) today reported earnings per share (diluted) of $1.16 for the third quarter ended August 31, 2007, down 62% from $3.02 per share for the third quarter of 2006.  Net income for the third quarter of 2007 was $171.3 million, down 61% from $438 million for the third quarter of 2006.  Net revenues were $1.3 billion for the third quarter, down 38% from $2.1 billion for the third quarter of 2006.  The annualized return on common stockholders' equity for the third quarter of 2007 was 5.3%, and 13.7% for the 12-month period ended August 31, 2007.  Third quarter results include approximately $200 million in losses and expenses related to the BSAM High Grade hedge...
>
>         * * *
>
> Net revenues for the Capital Markets segment were $1.0 billion for the quarter ended August 31, 2007.
>
>         * * *

> Fixed Income net revenues were $118 million for the 2007 third
> quarter.

705.    In light of statements made in connection with these disappointing results, Bear Stearns' stock closed at $115.46 per share, down just eighteen cents from its close of $115.64 per share the day before.  Indeed, the following day, September 21, 2007, Bear Stearns' shares closed up, at $117.32.

706.    In the press release, Bear Stearns falsely stated that, for the first quarter, its earnings per share were $1.16, net income was $171.3 million, and net revenues were $1.3 billion.  Financial results for Capital Markets, specifically Fixed Income, were also false and misleading.

707.    These statements were false and misleading because Bear Stearns achieved these results by using  misleading mortgage valuation models to value its Level 3 assets, as described above at paragraphs 100 to 111.

708.    At the time of the statements, the Company's Level 3 assets represented 13% percent of the Company's total assets held at market value, or a total of about $16.6 billion. According to a February 8, 2008 presentation by defendant Molinaro to Credit Suisse analysts, $5.8 billion of that figure was residential mortgage-backed securities.  Because these assets were highly leveraged, even a small decline in value would be vastly magnified, as set out in paragraphs 77 to 80 above.

709.    The Company had been warned by the SEC that the models it used to value mortgage-backed securities, more than a quarter of these assets, did not reflect key factors relating to the downturn in the housing industry, such as rising default rates.  As set out above at paragraphs 139 to 148, default rates and other signs of market declines had risen dramatically in the second half of 2006 and into the third quarter of 2007.

710.     Accordingly, the values the Company assigned to this large group of assets was significantly higher than they should have been, violating relevant GAAP as set out at paragraphs 324 to 423 above.  Because the Company was not reflecting these losses on its books, its revenues, earnings, and earnings per share were overstated as well.

**b.     Third Quarter 2007 Conference Call**

711.     On September 20, 2007 Bear Stearns also held its third quarter 2007 earnings conference call, conducted by Sam Molinaro, the Company's CFO.  During the call, Molinaro repeated the financial results set out in paragraph 704 above.  These results were false and misleading for the reasons set out in paragraphs 706 to 710 above.

712.     Also during the call, Molinaro made false and misleading statements regarding Bear Stearns' valuation methodology when he stated:

> At Bear Stearns we mark our inventory to market Levels that we can observe in the marketplace.  We've taken the view that the stress markets are the markets and that inventory should be marked at Levels that transactions are occurring.  Of course we do have inventory that does not actively trade in the market.  In those cases, we rely on valuation models that utilized observable market inputs in determining fair value.  These valuations can typically be benchmarked against transactions in similar products or assets taking place in the market."

713.     This statement was false and misleading because it disregarded the material fact, as noted in the 2008 OIG Report that Bear Stearns' valuation methodology did not take into account key market inputs and were more than ten years out of date.

714.     In the same call, Molinaro stated that Bear Stearns would take "$200 million of losses associated with the failure of the high-grade funds, representing the write-off of our investment and fees receivable, losses from the liquidation of the $1.6 billion repo facility."

715.     An analyst asked "and – and then on the – on the $200 million write down of the high-grade funds.  That effectively a write down what was last reported a $1.3 billion balance?"

716.     Molinaro responded that "about $100 million of that is the write-off of our investment in the fund and the write-off of receivables that we had from the funds related to predominantly related to management and performance fees that related to 2006."

717.     As set out above at paragraphs 212 to 216, this $100 million figure was $1.2 billion short of the Company's true losses due to the Hedge Fund collapse.  The Company did not disclose the full amount of its losses on the collateral for fear that its lenders and counterparties would realize that it had been consistently overvaluing its assets.

718.     In fact, even by the Company's own estimations regarding the write downs associated with the Hedge Fund, the numbers revealed to investors in September 2007 were misleading.  The 2008 OIG Report states that the Company's internal documents reflect that it ultimately took a $500 million write down in connection with the bailout in the fall of 2007.  However, the Company never disclosed this additional write down to investors.

### c.     Third Quarter 2007 Form 10-Q

719.     In its report for the third quarter of 2007, signed by defendant Farber, the Company materially misrepresented its financial results, its exposure to risk, its internal controls, and its compliance with regulatory capital requirements.  In addition, Deloitte made materially false statements to investors in certifying the Company's results for the quarter.

### (i)     Financial Results

720.     In the Form 10-Q it filed on October 10, 2007, the Company stated that:

> Net revenues for Capital Markets decreased 36.4% to $1.05 billion for the 2007 quarter compared with $1.65 billion for the 2006 quarter.

> * * *

> Fixed income net revenues decreased 87.6% to $117.6 million for the 2007 quarter from $945.0 million for the comparable prior year quarter.  The Company recognized approximately $700 million in

> net inventory markdowns during the 2007 quarter related to losses
> in the residential mortgage and leveraged finance areas.

721.    These statements were false and misleading because, as explained in paragraphs 100 to 111 above, in this period Bear Stearns avoided taking losses on its Level 3 assets by using misleading valuation models, which did not accurately value its Level 3 assets.  This avoidance of loss permitted the Company to increase its revenues and asset values, inflating the value of its stock.

722.    Because the Level 3 assets the Company reported for the period stood at $16.6 billion, the Company's knowing use of materially deficient models to value those assets had grave repercussions for accuracy of the Company's financial reporting.  These effects were magnified by the Company's leveraging practices.

723.    Moreover, the Company's assertion that its Level 3 assets stood at $16.6 billion was itself materially false and misleading, given that it was a product of a valuation model that did not reflect key declines in the market.

724.    Bear Stearns' revelation that it recognized "approximately $700 million in net inventory markdowns during the 2007 quarter primarily related to losses experienced in the mortgage-related and leveraged finance areas" was false and misleading when made because it grossly underrepresented the Company's true losses, including its losses on the worthless collateral it had received under the repurchase agreement with the High Grade Fund and the devalued and illiquid retained interests that it continued to carry on its books, as set out at paragraphs 212 to 216 above.

**(ii)**     **Exposure to Risk**

725.     Bear Stearns' third quarter 2007 Form 10-Q also misled investors with respect to its assessment of risk exposure.  In the filing, Bear Stearns asserted that "The Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss."

726.     In fact, the Company had undertaken no such review, and its Controller and Principal Accountant, Farber, had been repeatedly warned by government regulators that the Company's VaR models were inaccurate and out of date.  According to the 2008 OIG Report, at no time before the Company collapsed in 2008 did Bear Stearns complete a review of its risk management models.

727.     As a result, according to the 2008 OIG Report, in this period Bear Stearns' VaR models failed to include critical variables such as "housing price appreciation, consumer credit scores, patters of delinquency rates, and potential other data."  Because these indicators would have reflected the ongoing collapse of the housing market, the Company's decision to omit them from its VaR calculations was materially misleading.

728.     In the Third Quarter 2007 Form 10-Q Bear Stearns reported the reassuringly low VaR numbers it had calculated for the third quarter of 2007, including an aggregate risk of just $35 million – far lower than its peers.  This statement was materially misleading, in that the Company knew that its VaR modeling failed to reflect its accelerating exposure to declining housing prices.

729.     The third quarter 2007 Form 10-Q also mislead investors with respect to Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer."

730.     In fact, Bear Stearns lacked risk management personnel and was unable to appropriately model for risk.  Even when Bear Stearns had the correct personnel in place, the 2008 OIG Report indicates that its risk managers were unable to effectively communicate with the traders who were responsible for taking on additional risk.  Bear Stearns did not have risk managers that had experience or were capable of valuing MBS which were central to Bear Stearns' business models.

### (iii)     Compliance With Banking Regulations

731.     In its third quarter 2007 Form 10-Q Bear Stearns stated that "the Company is in compliance with CSE regulatory capital requirements."  This statement was materially false and misleading when made because Bear Stearns only CSE program's minimum capital requirements by violating CSE rules relating to the appropriate calculation of net capital.  As set out in the 2008 OIG Report and at paragraphs 427 to 452 above, the Company violated CSE rules by (i) failing to take appropriate capital charges related to its collapsed hedge funds; (ii) inflating its profit and its capital by using inflated marks on assets subject to mark disputes; and (iii) falsely inflating its net capital by using misleading methods to calculate VaR.

### (iv)     Internal Controls

732.     Defendants Cayne and Molinaro each made false and misleading statements when they executed Sarbanes Oxley Act certifications, annexed as an exhibit to the Form 10-Q filing for the third quarter of 2007.  This certification stated that stated that the Form 10-Q report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition."

733.     Cayne and Molinaro also certified that the Company had:

> [d]esigned such internal control over financial reporting, or caused
> such internal control over financial reporting to be designed under
> our supervision, to provide reasonable assurance regarding the
> reliability of financial reporting and the preparation of financial
> statements for external purposes in accordance with generally
> accepted accounting principles."

734.     These statements were false and misleading, in that, despite repeated warnings

from the SEC, the Company had made no effort to address deficiencies that went to the heart of

the Company's ability to assess the value of its assets and its exposure to risk.  Moreover, the

encouraging revenue growth and earnings per share Bear Stearns reported in its certified

statements reported were only made possible by the fact that Bear Stearns was avoiding taking

losses only by relying on misleading valuation models that failed to reflect the declining value of

its highly illiquid Level 3 assets.

### (v)     Deloitte's Certification

735.     As an auditor Deloitte also certified Bear Stearns' third quarter 2006 Form 10-Q,

as required by Sarbanes-Oxley, and, in so doing, knowingly and recklessly falsely offered an

opinion as to the financial statement's accuracy.  As set out in detail at paragraphs 523 to 588

above, Deloitte knew or recklessly disregarded that these statements and certifications were

materially false and misleading when made.

### 5.     November 14, 2007 Write Downs

736.     On November 14, 2007, Defendant Molinaro announced that Bear Stearns would

write down $1.2 billion of its assets in the fourth quarter.  However, Molinaro misleadingly

attempted to reassure investors by claiming that Bear Stearns had reduced its CDO holdings to

$884 million as of November 9, down from $2.07 billion at the end of August.  In fact, the

Company claimed that it now had a net negative exposure to the subprime market—that is, it would profit if the subprime market continued to decline.

737.     Molinaro's November 14, 2007 statements were false and misleading because he did not disclose the true extent of Bear Stearns' exposure from the repurchase collateral taken from the High Grade Fund.  Beyond the a $100 million write down in the hedge fund collateral in the quarter ending August 31, 2007, the Company disclosed no further writedowns of the $1.2 billion of toxic hedge fund assets it still held on its books.

738.     Moreover, these statements were materially false and misleading because the write downs the Company reported were far less than would have been required if the Company had been valuing its Level 3 mortgage-related assets using models that actually reflected the carnage in the housing market.

739.     Finally, Molinaro's statements were false and misleading in that the Company's faulty VaR models could not permit it to effective hedge against risk in the subprime market. This fact is confirmed by the Company's announcement barely a month later that it would in fact have to take an *additional* $700 million writedown on its mortgage-backed assets.

### 6.     Fourth Quarter and Fiscal Year 2007

#### a.     Press Release

740.     On December 21, 2007 Bear Stearns issued a press release regarding its fourth quarter and fiscal year end results for 2007.

> NEW YORK, NY - December 20, 2007 - The Bear Stearns Companies Inc. (NYSE:BSC) reported results today for the fiscal year and the fourth quarter ended November 30, 2007.  For the fiscal year the company reported $1.52 earnings per share (diluted), compared with $14.27 for fiscal 2006.  Net income for the fiscal year was $233 million compared with $2.1 billion earned in fiscal year ended November 30, 2006.  Net revenues for the 2007 fiscal year were $5.9 billion, compared with $9.2 billion in the prior fiscal year . . . In early November the company

announced that it anticipated write-downs of approximately $1.2 billion in mortgage inventory net of hedges.  At November 30, total net inventory write-downs were $1.9 billion.

\* \* \*

Net revenues in Capital Markets, which includes Institutional Equities, Fixed Income and Investment Banking, were a loss of $956 million in the fourth quarter of 2007

\* \* \*

Fixed Income net revenues were a loss of $1.5 billion, down from net revenues of $1.1 billion in the fourth quarter of 2006.

741.    On December 21, 2007, Bear Stearns' stock closed at $89.95 per share, down little from a close of $91.42 per share the day before.

742.    In the press release, Bear Stearns misrepresented its earnings per share, net income, and net revenues.  The Company's Losses in the Capital Market, specifically Fixed Income, were also understated.

743.    These statements were false and misleading because Bear Stearns achieved these reported results by using misleading mortgage valuation models to value its Level 3 assets, as described above at paragraphs 100 to 111.

744.    At the time of the statements, the Company's Level 3 assets represented 19.9% of the Company's total assets held at market value, or a total of about $24.41 billion.  Moreover, according to the Company's February 8, 2008 presentation to Credit Suisse analysts, $7.5 billion of this amount represented residential mortgages.  Because these assets were highly leveraged, even a small decline in value would be vastly magnified, as set out in paragraphs 77 to 80 above.

745.    The Company had been warned by the SEC that the models it used to value mortgages and mortgage-backed securities, a quarter of its Level 3 assets, did not reflect key factors relating to the downturn in the housing industry, such as rising default rates.  As set out

above at paragraphs 139 to 148, default rates and other signs of market declines had risen dramatically in the second half of 2006 and into the fourth quarter of 2007.

746.     Accordingly, the values the Company assigned to this large group of assets was significantly higher than they should have been, violating relevant GAAP as set out at paragraphs 324 to 423 above.  Because the Company was not reflecting these losses on its books, its revenues, earnings, and earnings per share were overstated as well.

747.     In addition, these statements were false and misleading because the Company still failed to disclose the true extent of Bear Stearns' exposure from the repurchase collateral taken from the High Grade Fund.  Beyond the $100 million write down in the hedge fund collateral in the quarter ending August 31, 2007, the Company had disclosed no further writedowns of the $1.2 billion of toxic hedge fund assets it still held on its books.

748.     Finally, these statements were materially false and misleading because the write downs the Company reported were far less than would have been required if the Company had been valuing its Level 3 mortgage-related assets using models that actually reflected the carnage in the housing market.

### b.     <u>Fourth Quarter 2007 Conference Call</u>

749.     Bear Stearns announced its fourth quarter 2007 results in a conference call on December 20, 2007.  During the call, Molinaro repeated the financial results described at paragraph 740.  These statements were false and misleading for the same reasons set out in paragraphs 742 to 748 above.

750.     Molinaro also made false and misleading statements when he stated that:

> On November 14, we announced we would take a $1.2 billion
> write-down on our mortgage securities inventories as a result of
> continuing deterioration and market conditions through the end of
> October.  During the month of November, market conditions

continued to deteriorate, which resulted additional write-downs, bringing total mortgage related losses to $1.9 billion.

751.    Further, Molinaro stated: "we believe our mortgage positions have been **conservatively** valued in light of current market conditions and expected levels of defaults and cumulative loss estimates."  (Emphasis added.)  Molinaro further stated "Overall this franchise is strong; smaller and more focused on restructuring than origination going forward, but our top talent is in place and we are confident in the underlying earnings potential of the mortgage business."

752.    These statements were false and misleading because they failed to disclose the Company's undisclosed losses from the worthless hedge fund collateral that it bore on its books.

753.    These statements were also false and misleading because the losses were minimized by the fact that Bear Stearns was relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets.

754.    Moreover, the lack of any schedule giving details regarding the nature of the write downs left investors with no information about the nature of the Company's true exposure and compounded the false and misleading statements by such omissions.  Write downs by other companies in the same period provided far more information, including the source of exposure (retained interest, derivatives, commitment to provide liquidity and/or credit support, or warehoused loans and mortgage-backed securities), the type of CDOs to which they were exposed (high grade, mezzanine, CDO-squared, etc.) and vintage of the subprime mortgages that underlie their CDO exposures.

### 7.    Fiscal Year 2007 Form 10-K

755.    On January 29, 2008, Bear Stearns filed its Form 10-K for the annual and quarterly period ended November 30, 2007.  The Form 10-K was signed by, among others,

defendants Greenberg, Cayne, Schwartz, Farber and Molinaro.  The Form 10-K made

misrepresentations regarding the Company's financial results, risk management practices,

exposure to market risk, compliance with banking capital requirements, and internal controls.

Finally, the 2007 Form 10-K contained false and misleading statements by the Company's

auditor, Deloitte, relating to its review and certification of the Company's reported financial

results.

### a.      The Company's Financial Results

756.    In the Form 10-K it filed on January 29, 2008, the Company stated that:

> Fiscal 2007 versus Fiscal 2006 Net revenues for Capital Markets
> decreased 46% to $3.92 billion for fiscal 2007, compared with
> $7.32 billion for fiscal 2006.
>
> * * *
>
> Fixed income net revenues decreased 84% to $685 million for
> fiscal 2007 from $4.19 billion for fiscal 2006.  Results for fiscal
> 2007 were heavily impacted by the severe market conditions
> across the fixed income sector.  The repricing of credit led to
> significantly lower net revenue levels due to illiquidity in the
> markets as trading levels deteriorated across the spectrum of fixed
> income products.  Mortgage-backed securities revenues decreased
> significantly during fiscal 2007 when compared with fiscal 2006
> due to weaker U.S. mortgage markets and challenges associated
> with the subprime mortgage sector.  Significant spread widening in
> the second half of fiscal 2007 served to reduce inventory values
> and activity levels.  Mortgage-related revenues reflect
> approximately $2.3 billion in net inventory write downs in the
> second half of fiscal 2007.  A large component of these write-
> downs were related to ABS CDOs and the unwinding of ABS
> CDO warehouse facilities.  As of November 30, 2007, all ABS
> CDO warehouse positions have been unwound.  The remaining
> write-downs were experienced across our U.S. and international
> residential and commercial inventories.

757.    As a result, on January 29, 2008, Bear Stearns' stock closed at $91.58 per share,

up from a close of $91.10 per share the day before.  The following day, January 30, 2008, Bear

Stearns' shares closed at $88.26.

758.    These statements were false and misleading because, as explained in paragraphs 100 to 111 above, in this period Bear Stearns avoided taking losses on its Level 3 assets by using misleading valuation models, which did not accurately value its Level 3 assets.  This avoidance of loss permitted the Company to increase its revenues and asset values and, for the fourth quarter and fiscal 2007, avoid additional losses, inflating the value of its stock.

759.    Moreover, in the 2007 Form 10-K the Company was materially false and misleading in its assertions about the value of assets corresponding to Level 3.  The Company stated that, as of November 30, 2006, it held $24.4 billion in Level 3 assets.  This statement was false and misleading because, by January of 2008, the Company had been informed that the models it used to value the more than $7.5 billion in mortgage-backed securities in this asset category failed to reflect dramatic declines in the housing market.

**b.    The Company's Risk Management Practices**

760.    Bear Stearns' 2007 Form 10-K mislead investors with respect to the models it used to value mortgage-backed assets and assess risk.  The 2007 Form 10-K stated that:

> Members of the Controllers and Risk Management Departments perform analysis of internal valuations, typically on a monthly basis but often on an intra-month basis as well.  These departments are independent of the trading areas responsible for valuing the positions.  Results of the monthly validation process are reported to the Mark-to-Market Committee ("MTMC"), which is composed of senior management from the Risk Management and Controllers Departments.  The MTMC is responsible for ensuring that the approaches used to independently validate the Company's valuations are robust, comprehensive and effective.  Typical approaches include valuation comparisons with external sources, comparisons with observed trading, independent comparisons of key model valuation inputs, independent trade modeling and a variety of other techniques.

761.    The Company specifically asserted that:

> The Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss.

762.    These statements were false and misleading when made because, as set out at paragraphs 124 to 126 above, by the time of this statement the SEC had repeatedly warned the Company that the models it used to assess risk, including its VaR and mortgage valuation models, failed to reflect key indicators of market declines.  According to the 2008 OIG Report, Bear Stearns' VaR models failed to include critical variables such as "housing price appreciation, consumer credit scores, patters of delinquency rates, and potential other data."  It was precisely these indicators that would have reflected the rapidly declining housing market.

763.    Moreover, according to the 2008 OIG Report, reviews of the Company's risk management models which should have taken place before the subprime market cratered were never completed at any time before the Company's collapse.

764.    Bear Stearns' 2007 Annual Report to Stockholders, attached as an Exhibit to the Form 10-K, misled investors with respect to Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer."

765.    In fact, Bear Stearns lacked risk management personnel and was unable to appropriately model for risk.  Even when Bear Stearns had the correct personnel in place, the 2008 OIG Report indicates that its risk managers were unable to effectively communicate with the traders who were responsible for taking on additional risk.  Bear Stearns did not have risk managers that had experience or were capable of valuing MBS which were central to Bear Stearns' business models.

766.    Bear Stearns' 2007 Form 10-K also misled investors with respect to Bear Stearns' risk management procedures when it stated that "Comprehensive risk management procedures have been established to identify, monitor and control each of [the] major risks."

767.    In fact, this statement was false and misleading when made because, according the 2008 OIG Report and verified independently by confidential witnesses, Bear Stearns did not have risk management personnel at the time capable of accurately valuing MBS.

768.    Bear Stearns' 2007 Form 10-K also stated that "The Treasurer's Department is independent of trading units and is responsible for the Company's funding and liquidity risk management. . . [m]any of the independent units are actively involved in ensuring the integrity and clarity of the daily profit and loss statements."

769.    Moreover, the Form 10-K stated that the:

> The Risk Management Department is independent of all trading areas and reports to the chief risk officer. . . [t]he department supplements the communication between trading managers and senior management by providing its independent perspective on the Company's market risk profile."

770.    In fact, as set out at paragraphs 129 to 136 above, during 2007 Bear Stearns' risk managers had little independence from its trading desk, and no ability to reign in the Company's accumulation of risk.

771.    Furthermore, despite the crucial deficiencies in the models Bear Stearns used to value the Company's Level 3 assets, the Company stated in its Form 10-K that it was "marking all positions to market on a daily basis" and that it had "independent verification of inventory pricing."

### c.    The Company's Exposure to the Market Risk

772.    The Company's 2007 Form 10-K was also false and misleading in that it failed to disclose the Company's true exposure to the subprime market by relying on valuation models

and VaR models that did not accurately reflect the current state of the subprime market.  The

SEC concluded in the 2008 OIG Report that, as a result, investors were deprived of "material

information" that they could have used "to make well-informed investment decisions."

773.    Bear Stearns' 2007 Form 10-K also mislead investors with respect to its exposure

to "market risk."  In its 2007 Form 10-K the Company stated that it:

> mitigates its exposure to market risk by entering into offsetting
> transactions, which may include over-the-counter derivative
> contracts or the purchase or sale of interest-bearing securities,
> equity securities, financial futures and forward contracts.  In this
> regard, the utilization of derivative instruments is designed to
> reduce or mitigate market risks associated with holding dealer
> inventories or in connection with arbitrage-related trading
> activities.

774.    These statements were false when made because Bear Stearns managers were

aware that it was impossible to effectively hedge against declines in assets in light of deficiencies

in its VaR and mortgage valuation models, as discussed above at paragraphs 100 to 111 and 123

to 128.

775.    Furthermore, because of the deficiencies in it VaR models, the Company was

false and misleading in its representation in its 2007 Form 10-K that it had an aggregate VaR of

just $69.3 million—still far lower than its peers.  In fact, the Company knew that its VaR

numbers failed to reflect its exposure to declining housing prices.

**d.    Compliance With Banking Regulations**

776.    In its 2007 Form 10-K Bear Stearns stated that "the Company is in compliance

with CSE regulatory capital requirements."  This statement was materially false and misleading

when made because, as set forth at paragraphs 427 to 452 above, the Company had misled

regulators into believing that it was meeting capital requirements only by repeatedly violating

regulatory requirements relating to the appropriate calculation of net capital.  As set forth in the

2008 OIG Report, the Company violated CSE rules by failing to take appropriate capital charges related to its collapsed hedge funds; by inflating its profit and its capital by using inflated marks on assets subject to mark disputes; and by falsely inflating its net capital by using misleading methods to calculate VaR.

**e.**      <u>**The Company's Internal Controls**</u>

777.    Defendants Cayne and Molinaro each made false and misleading statements when they executed Sarbanes-Oxley Act certifications, annexed as an exhibit to the Form 10-K filing. This certification stated that stated that the Form 10-K report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition."

778.    Defendants Cayne and Molinaro made false and misleading statements when they executed their Sarbanes-Oxley Act certifications, annexed as an exhibit to the Form 10-K filing, in stating that the Form 10-K report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition."

779.    Cayne and Molinaro also certified that the Company had:

> [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

199

780.    These statements were false and misleading, in that, despite repeated warnings from the SEC, the Company had made no effort to address deficiencies that went to the heart of the Company's ability to assess the value of its assets and its exposure to risk.  Moreover, the encouraging revenue growth and earnings per share Bear Stearns reported in its certified statements reported were only made possible by the fact that Bear Stearns was avoiding taking losses only by relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets.

### f.    Deloitte's Certification

781.    As an auditor Deloitte also certified Bear Stearns' 2007 Form 10-K, as required by Sarbanes-Oxley, and, in so doing, knowingly and recklessly falsely offered an opinion as to the financial statement's accuracy.  As set out in detail at paragraphs 523 to 588 above, Deloitte knew or recklessly disregarded that these statements and certifications were materially false and misleading when made.

### C.    Additional False and Misleading Statements in Calendar Year 2008

782.    Bear Stearns made additional false and misleading statements immediately before it collapsed in a desperate effort to dupe investors into holding on to their shares in Company stock.

783.    On January 31, 2008, Bear Stearns published a letter it had written to John Cash, Accounting Branch Chief of the SEC's Division of Corporate Finance, in response to certain concerns the SEC raised about Bear Stearns' exposure to subprime loans in its fiscal year 2006 Form 10-K.  The Company described its use of econometric models:

> Our objective is to securitize all originated and purchased loans.
> All securitized retained interests from our subprime originations
> are recorded as financial instruments owned, at fair value, along
> with any other investments in subprime securities purchased

through our trading operations.  Fair value is determined based on the net present value of a future stream of cash flows.

Econometric models are used by the trading desk and risk management to generate these expected cash flows.  Such models are primarily industry standard models that consider various assumptions, including time value, yield curve, volatility factors, prepayment speeds, default rates, loss severity, as well as other relevant economic factors.  A degree of subjectivity is required to determine the appropriate models or methodologies as well as the appropriate underlying assumptions.

Our models are estimated on a data sample of over [* * *] loans with performance history extending more than ten years.  To better capture the impact of risk layers in mortgage loans, these models are estimated and implemented at the loan level.  The underlying structure of the model is a competing hazards model with the prepayment and charge-off as the two possible terminal states for a mortgage.  The model parameters are recalibrated on a regular basis to reflect the most recent data.

784.    The statements in paragraph 783 above are materially false and misleading because the Company had actually subordinated its risk management function to the activities of its trading desks.  Specifically, these statements failed to disclose that the pricing of MBS at Bear Stearns' trading desks was based more on trading levels in the market than on models.  These statements did not disclose that the risk management models that Bear Stearns employed were not used by traders for pricing, and were insensitive to price fluctuations in the housing market, a factor critical to assessing the risk associated with these securities.  Its statements failed to disclose that the Company did not periodically evaluate its VaR models, and failed to timely update inputs to these models.

785.    In a March 10, 2008 press release the Company said that "[t]here is absolutely no truth to the rumors of liquidity problems that circulated today in the market" and suggested that the Company had some $17 billion in cash.

786.     The same day, Defendant Greenberg claimed during an interview with CNBC that the Company had no liquidity problems, calling such an assertion "ridiculous, totally ridiculous."

787.     According to figures released by former Chairman Cox of the SEC in a March 20, 2008 letter to the Basel Group, the Company's liquidity pool on March 11, 2008, even adjusting for the customer protection rule, stood at $15.8 billion.

788.     On March 12, 2008, Defendant Schwartz, Bear Stearns' CEO, appeared on CNBC and said that the Company's liquidity position and balance sheet had not weakened at all. "We finished the year, and we reported that we had $17 billion of cash sitting at the bank's parent Company as a liquidity cushion," he said. "As the year has gone on, that liquidity cushion has been virtually unchanged." Schwartz added that "We don't see any pressure on our liquidity, let alone a liquidity crisis."

789.     These statements were materially false and misleading. Chairman Cox concluded in his letter that the Company's liquidity pool actually stood at $12.4 billion the same day—a drop of more than $3 billion from the Company's position barely fifteen hours earlier. Its liquidity pool stood at nearly $5 billion less than it had on Monday, March 10, 2008. A day after Schwartz' CNBC appearance on March 13, the Company's liquidity pool, according to Chairman Cox, stood at $2 billion.

790.     As Schwartz was assuring investors on March 12 that the Company was experiencing no threats to its liquidity, $10 billion in cash was evaporating.

791.     Moreover, Schwartz specifically denied on March 12 that the Company's risk had scared away any counterparties:

> CNBC: Let me start off with this broad idea that's been in the market now for a few days and pressuring your stock. Namely, that counterparty risk is something – new counterparty risk is

something that a number of firms on Wall Street no longer want to take in terms of dealing with Bear Stearns.  Is that true?

SCHWARTZ:  No, it's not true.  We are – there's a been a lot of volatility in the market, a lot of disruption in the market, and that's causing some pressure administratively on getting some trades settled up, but we're workin' hard gettin' that done.  We're in a constant dialogue with all of the major dealers and the counterparties in the Street, and we're not being made aware of anybody who is not taking our credit as a counterparty.

CNBC:  All right, so when I'm told by a hedge fund that I know well, that last night they tried to close out a mortgage – a credit protection mortgage position with Goldman Sachs that they had bought a year ago, Bear Stearns was the low bid, and I'm told that Goldman would not accept the counterparty risk of Bear Stearns.  You're saying you're not aware that that would be the case.

SCHWARTZ: I'm not aware that, you know, on a specific trade from one counterparty to another and where you're a third-party, we have direct dealings with all of these institutions, and we have active markets going with each one, and our counterparty risk has not been a problem.

792.    At the time he made this statement, Schwartz, as the Company's CEO, was aware that on March 6, 2008, more than a week earlier, Rabobank Group, one of Bear Stearns' European lenders, told the brokerage that it would not renew a $500 million loan coming due later that week.  He also knew that ING had just pulled nearly half a billion in financing and that Goldman Sachs, once a principal source of cash for the Company, had at least temporarily halted covering any more Bear Stearns risk.

793.    Furthermore, according to the 2008 OIG Report, the Company informed TM on March 12, 2008, the same day as Schwartz's statement, that "Bear Stearns paid out $1.1 billion in disputes to numerous counterparties in order to squelch rumors that Bear Stearns could not meet its margin calls."

794.    On March 12, 2008 Bear Stearns' stock closed at $61.58 per share, down from a close of $62.97 per share the day before.  The following trading day, March 13, 2008, Bear Stearns' shares closed at $57.

## IX.    LOSS CAUSATION

795.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.  Throughout the Class Period, the market prices of Bear Stearns securities were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  When the truth became known, the prices of Bear Stearns securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Lead Plaintiff and members of the Class.  The chart below shows the fluctuation of the price of Bear Stearns common stock leading up to and during the Class Period:



796.    During the Class Period, Bear Stearns' common stock traded as high as $171.57 per share as recently as January 12, 2007.

797.    By early March 2008, Bear Stearns common stock was trading at above $60 per share and its management was vigorously denying rumors that Bear Stearns had any liquidity problems.  On March 10, 2008, Bear Stearns common stock fell $7.78, or 11%, to close the day at $62.30 on trading volume of 23 million shares.  Despite the Company's attempts to reassure the market, Bear Stearns stock price continued to fall by $5.30, or 8.5%, during the week as the rumors continued to intensify, eventually closing at $57.00 per share on March 13, 2008 on higher than normal volume.

798.    On March 14, 2008, Bear Stearns announced that its liquidity position had significantly deteriorated requiring the Company to seek financing via a secured loan facility from JPMorgan.  In response to this news, Bear Stearns' common stock price fell $27, or 47.3%, to close at $30.00 per share on particularly heavy trading volume of approximately 187 million shares (about eight times its three month average trading volume of 23 million shares).  On March 17, 2008, Bear Stearns' stock price fell an additional $25.19, or 84%, to close at $4.81 on particularly heavy trading volume of about 166 million shares following Bear Stearns' announcement on Sunday, March 16, 2008 that the Company would be acquired by JPMorgan for $2 per share.

799.    In all, as a consequence of the revelation of the truth concerning Bear Stearns during the Class Period, Bear Stearns' common stock lost in excess of $19.8 billion in market capitalization.

800.    Specific dates of adverse disclosure, and corresponding declines in the price of Bear Stearns' common and preferred stock, are set forth in Section IV above.

801.    Moreover, the adverse consequences of Bear Stearns' disclosures relating to its exposure to declines in the housing market, and the adverse impact of those circumstances on the

Company's business going forward, were entirely foreseeable to Defendants at all relevant times. Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Lead Plaintiff and members of the Class.

802.    As set forth above, the Company's failure to maintain effective internal controls, its substantially lax risk management standards, and its failure to report its 2006-2007 financial statements in accordance with GAAP not only were material, but also triggered foreseeable and grave consequences for the Company.  The financial reporting that was presented in violation of GAAP conveyed the impression that the Company was more profitable, better capitalized, and would have better access to liquidity than was actually the case.  The price of Bear Stearns' securities during the Class Period were affected by those omissions and false statements and were inflated artificially as a result thereof.  Thus, the precipitous declines in value of the securities purchased by the Class were a direct, foreseeable, and proximate result of the corrective disclosures of the truth with respect to Defendants' materially false and misleading statements.

## X.    **CLASS ACTION ALLEGATIONS**

803.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities which, between December 14, 2006 and March 14, 2008, inclusive (the "Class Period"), purchased or otherwise acquired the publicly traded common stock or other equity securities, or call options of or guaranteed by Bear Stearns, or sold Bear Stearns put options, either in the open market or pursuant or traceable to a registration statement, and were damaged thereby (the "Class").  The Class shall also include all persons who received Bear Stearns CAP Plan Units and Restricted Stock Plan Units that had fully vested, entitling them to

an equivalent number of shares of Bear Stearns Stock upon settlement at the end of a deferral period, as a part of their compensation as an employee with the Company and participation in its CAP and RSU Plans.  Excluded from the Class are the Defendants; the members of the immediate families of the Individual Defendants; the subsidiaries and affiliates of Defendants; any person who is an officer, director, partner or controlling person of Bear Stearns (including any of its subsidiaries or affiliates) or any other Defendant; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

804.    The members of the Class are so numerous that joinder of all members is impracticable.  As of March 14, 2008, Bear Stearns had approximately 136 million shares of common stock outstanding and actively trading on the NYSE with the ticker symbol "BSC." While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by Bear Stearns  or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

805.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

806.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

807.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the SEC filings, press releases and other public statements made to the investing public during the Class Period contained material misstatements or omitted to state material information;

(c)     whether and to what extent the Company's financial statements were not presented in conformity with GAAP during the Class Period;

(d)     whether and to what extent Deloitte's audits of the Company's financial statements and management's assessments of internal controls during the Class Period were not conducted in accordance with the standards of the Public Company Accounting Oversight Board;

(e)     whether and to what extent the market prices of Bear Stearns' common stock and other publicly traded securities were artificially inflated during the Class Period because of the material misrepresentations and/or omissions complained of herein;

(f)     whether, with respect to Lead Plaintiff's and the Class' claims for violations of the Exchange Act, the Defendants named in those claims acted with the requisite level of scienter;

(g)     whether, with respect to Lead Plaintiff's and the Class' claims pursuant to Section 20(a) of the Exchange Act, the Defendants named in those claims were controlling persons of Bear Stearns;

(h)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine; and

(i)     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

808.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    **PRESUMPTION OF RELIANCE**

809.    Lead Plaintiff and the Class are entitled to a presumption of reliance, because the claims asserted herein against Defendants are predicated in part upon omissions of material fact of which there was a duty to disclose.

810.    Alternatively, Lead Plaintiff and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because:

(a)     Bear Stearns' common stock was actively traded in an efficient market on the NYSE during the Class Period;

(b)     Bear Stearns' common stock traded at high weekly volumes during the Class Period;

(c)     As a regulated issuer, Bear Stearns filed periodic public reports with the SEC;

(d)      Bear Stearns regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e)      The market reacted promptly to public information disseminated by Bear Stearns;

(f)      Bear Stearns' securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms.  Each of these reports was publicly available and entered the public marketplace;

(g)      The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Bear Stearns' securities; and

(h)      Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased Bear Stearns securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

811.   In addition to the foregoing, Lead Plaintiff and the Class are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Bear Stearns' business, financial results and business prospects throughout the Class Period.

## XII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

812.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint.  The statements alleged to be false and misleading all relate to historical facts or existing conditions and were not identified as forward-looking statements.  To the extent any of the false statements alleged herein may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly "forward-looking" statements.  Alternatively, to the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, Defendants are liable for those materially false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker knew the statement was false or the statement was authorized or approved by an executive officer of Bear Stearns who knew that those statements were false.

## CLAIMS FOR RELIEF

### COUNT  I

**For Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

813.   Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against Bear Stearns, Cayne, Schwartz, Spector, Molinaro, Greenberg, Alix, Farber, and Deloitte ("Rule 10b-5 Defendants").

814.     During the Class Period, the Rule 10b-5 Defendants: (a) knowingly and recklessly deceived the investing public, including Plaintiffs, as alleged herein; (b) artificially inflated the market price of Bear Stearns' common stock; and (c) caused Lead Plaintiff and the Class to purchase or otherwise acquire Bear common stock at artificially-inflated prices.

815.     Each of the Rule 10b-5 Defendants, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), made untrue statements of material facts and/or omitted to state material facts necessary to make the statements made by the Rule 10b-5 Defendants not misleading, and/or substantially participated in the creation of the alleged misrepresentation, which operated as a fraud and deceit upon Lead Plaintiff and the Class, in an effort to maintain the artificially-inflated price of Bear Stearns' common stock during the Class Period.  The Rule 10b-5 Defendants' false and misleading statements (and omissions of material facts) are set forth in paragraphs 589 to 794, *supra*.

816.     As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, the Rule 10b-5 Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

817.     The Rule 10b-5 Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation/dissemination of, untrue statements of material fact as set forth herein, or with extreme recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

818.     The facts alleged herein give rise to a strong inference that each of the Rule 10b-5 Defendants acted with scienter.  Each of the Defendants knew or with extreme recklessness

disregarded that the Class Period statements set forth in Section VIII above were materially false and misleading for the reasons set forth herein.

819.    The Rule 10b-5 Defendants carried out a deliberate scheme to misrepresent the effectiveness of Bear Stearns' controls, the value of Bear Stearns' assets, and the risks to which the Bear Stearns' investors were being exposed.

820.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Bear Stearns' securities was artificially inflated throughout the Class Period.  Unaware that the market price of Bear Stearns' common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Rule 10b-5 Defendants, or upon the integrity of the markets in which Bear Stearns' common stock traded, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by the Defendants but not disclosed in their public statements, Plaintiffs purchased or acquired Bear Stearns' common stock at artificially-inflated prices.

821.    As a direct and proximate result of the Rule 10b-5 Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Bear Stearns' common stock during the Class Period, when the inflation in the price of Bear Stearns' common stock was gradually removed as the truth regarding the Rule 10b-5 Defendants' conduct was revealed causing the price of Bear Stearns' common stock to decline and thereby resulting in economic losses to Lead Plaintiff and the Class.

822.     By reason of the foregoing, the Rule 10b-5 Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Lead Plaintiff and the Class for damages suffered in connection with their transactions in Bear Stearns' common stock during the Class Period.

**COUNT  II**

**For Violation of Section 20(a) of the Exchange Act**
**(Against the Officer Defendants)**

823.     Plaintiffs repeat and reallege each and every allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against Cayne, Schwartz, Spector, Molinaro, Greenberg, Alix and Farber ("the Officer Defendants").

824.     Bear Stearns is a primary violator of Section 10(b) and Rule 10b-5, promulgated thereunder.

825.     The Officer Defendants acted as controlling persons of Bear Stearns within the meaning of Section 20(a) of the Exchange Act, as alleged herein,  by reason of their positions as officers and/or directors of Bear Stearns, their ability to approve the issuance of statements, their ownership of Bear Stearns securities and/or by contract.  As such, the Officer Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of Bear Stearns as set forth herein.  The Officer Defendants were provided with or had unrestricted access to copies of the Bear Stearns' reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Each of the Officer Defendants had direct and supervisory involvement in the day-to-day operations of Bear Stearns and, therefore, is presumed to have had the power to control or influence, and during the Class Period did exercise their power to control

and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.  The Officer Defendants prepared, or were responsible for preparing, the Bear Stearns' press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles and conference calls.  The Officer Defendants controlled Bear Stearns and each of its employees.

826.    By virtue of their positions as controlling persons of Bear Stearns, and by reason of the conduct described in this Count, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.

827.    As a direct and proximate result of the Officer Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Bear Stearns' common stock during the Class Period.

## COUNT  III

### For Violations of Section 20A of the Exchange Act
### (Against Defendants Cayne, Schwartz, Spector, Molinaro, Greenberg, and Farber)

828.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

829.    This Count is asserted pursuant to Section 20A of the Exchange Act against Cayne, Schwartz, Spector, Molinaro, Greenberg and Farber (the "Section 20A Defendants"), on behalf of Lead Plaintiff and all members of the Class who purchased Bear Stearns stock contemporaneously with any of these Defendants' sales of Bear Stearns stock during the Class Period.

830.    Each of the Section 20A Defendants sold substantial numbers of shares of Bear Stearns stock during the Class Period while in possession of material, adverse, nonpublic information.  This conduct violated Section 20A of the Exchange Act.

831.     As set forth in the annexed certifications of Lead Plaintiff and the annexed Exhibit A, Lead Plaintiff purchased shares of Bear Stearns stock on the same day as or close in time to sales of Bear Stearns stock made by the Section 20A Defendants while these defendants were in possession of material, adverse, nonpublic information.  These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

832.     Numerous other Class members also purchased Bear Stearns stock contemporaneously with the Section 20A Defendants' sales of stock during the Class Period.

833.     Accordingly, under Section 20A of the Exchange Act, the Section 20A Defendants named in this Count are each liable to Lead Plaintiff and the Class for all profits gained and losses avoided by them as a result of their stock sales.

834.     The Defendants named in this Count are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, respectfully prays for judgment as follows:

A.     Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP and Berman DeValerio as class counsel pursuant to Rule 23(g);

B.     Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.     Awarding preliminary and permanent injunctive relief in favor of Lead Plaintiff and the Class against Defendants and their counsel, agents and all persons acting under, in

concert with, or for them, including an accounting of and the imposition of a constructive trust and/or an asset freeze on Defendants' insider trading proceeds;

      D.      Ordering an accounting of Defendants' insider trading proceeds;

      E.      Disgorgement of Defendants' insider trading proceeds;

      F.      Restitution of investors' monies of which they were defrauded;

      G.      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

      H.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorney's fees and fees and costs incurred by consulting and testifying expert witnesses; and

      I.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiff, on behalf of itself and the Class, demands a trial by jury of all issues so

triable.

Dated: February 27, 2009                    Respectfully submitted,

**BERMAN DeVALERIO**                        **LABATON SUCHAROW LLP**

By: _Jeffrey C. Block_                      By: _____

Jeffrey C. Block (JCB-0387)                 Thomas A. Dubbs (TD-9868)
Patrick T. Egan                             James W. Johnson (JJ-0123)
Justin Saif                                 Javier Bleichmar (JB-0435)
One Liberty Square                          Michael W. Stocker (MS-1309)
Boston, Massachusetts 02109                 Alan I. Ellman (AE-7347)
Telephone:    (617) 542-8300                140 Broadway
Facsimile:    (617) 542-1194                New York, New York 10005
                                            Telephone:    (212) 907-0700
Joseph J. Tabacco, Jr. (JJT-1994)           Facsimile:    (212) 818-0477
Julie J. Bai
425 California Street
Suite 2100
San Francisco, California 94104
Telephone:    (415) 433-3200
Facsimile:    (415) 433-6382

*Lead Counsel for the Class and Attorneys for Lead Plaintiff*
*State of Michigan Retirement Systems*

# Exhibit A

**State of Michigan Retirement Systems**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Class Period Holdings** | | | 92,183 | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **1A. Pre-Class Period Holdings Sold Through End of Class Period** | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 1,600 | | Sale | 12/15/2006 | $162.323 | 1,600 | $ | 259,716.02 | 0 | | $ | 243,573.88 |
| Pre-Class Period Holdings | | | 300 | | Sale | 12/19/2006 | $163.753 | 300 | $ | 49,125.77 | 0 | | $ | 46,099.12 |
| Pre-Class Period Holdings | | | 900 | | Sale | 12/21/2006 | $163.646 | 900 | $ | 147,281.82 | 0 | | $ | 138,201.87 |
| Pre-Class Period Holdings | | | 300 | | Sale | 06/15/2007 | $150.878 | 300 | $ | 45,263.30 | 0 | | $ | 42,236.65 |
| Pre-Class Period Holdings | | | 2,600 | | Sale | 07/20/2007 | $135.051 | 2,600 | $ | 351,132.68 | 0 | | $ | 324,901.70 |
| Pre-Class Period Holdings | | | 3,200 | | Sale | 09/21/2007 | $117.088 | 3,200 | $ | 374,682.26 | 0 | | $ | 342,397.98 |
| Pre-Class Period Holdings | | | 200 | | Sale | 11/28/2007 | $99.448 | 200 | $ | 19,889.69 | 0 | | $ | 17,871.92 |
| Pre-Class Period Holdings | | | 2,300 | | Sale | 12/21/2007 | $91.013 | 2,300 | $ | 209,329.68 | 0 | | $ | 186,125.35 |
| Pre-Class Period Holdings | | | 200 | | Sale | 02/01/2008 | $90.390 | 200 | $ | 18,077.90 | 0 | | $ | 16,060.13 |
| **1A. Total** | | | **11,600** | | | | | **11,600** | **$** | **1,474,499.12** | **0** | | **$** | **1,357,468.61** |

**State of Michigan Retirement Systems**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Pre-Class Period Holdings Sold During "Lookback Period"** | | | | | | | | **Maximum of Actual or Average Closing Price between 03/17/2008 and date of sale** | | | | |
| Pre-Class Period Holdings | | | 80,583 | | Sale | 03/24/2008 | $10.505 | 80,583 | $ 846,539.25 | 0 | | $ 33,550.48 |
| **1B. Total** | | | **80,583** | | | | | **80,583** | **$ 846,539.25** | **0** | | **$ 33,550.48** |

State of Michigan Retirement Systems
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
The Bear Stearns Companies, Inc. Common Stock
Class Period: December 14, 2006 - March 14, 2008

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1C. Pre-Class Period Holdings Held at End of "Lookback Period"** | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 0 | | | | | | | 0 | | |
| **1C. Total** | | | **0** | | | | | **0** | **$        -** | **0** | | **$        -** |

**State of Michigan Retirement Systems**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Beginning: | | 12/14/2006 |
| Class Period End: | | 3/14/2008 |
| "Lookback Period" Beginning: | | 3/17/2008 |
| "Lookback Period" End: | | 5/15/2008 |
| Days in "Lookback Period": | | 60 |
| "Lookback Period" Average Closing Price: | | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**2A.  Class Period Purchases Sold Prior to End of Class Period**

| Purchase | | | | | | | | | | 0 | $ - | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| **2A.  Total** | | | **0** | **$   -** | | | | **0** | **$   -** | **0** | **$   -** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

State of Michigan Retirement Systems
First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis
The Bear Stearns Companies, Inc. Common Stock
Class Period: December 14, 2006 - March 14, 2008

| Class Period Beginning: | 12/14/2006 |
|---|---|
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2B.  Class Period Purchases Sold During "Lookback Period"** | | | | | | | Maximum of Actual or Average Closing Price between 03/17/2008 and date of sale | | | | | |
| Purchase | 03/16/2007 | $147.066 | 2,400 | $ 352,958.88 | Sale | 03/24/2008 | **$10.505** | 2,400 | $ 25,212.44 | | $ (327,746.44) | |
| Purchase | 07/18/2007 | $137.993 | 79,429 | $ 10,960,653.94 | Sale | 03/24/2008 | **$10.505** | 79,429 | $ 834,416.27 | | $ (10,126,237.67) | |
| Purchase | 07/18/2007 | $139.340 | 1,500 | $ 209,009.99 | Sale | 03/24/2008 | **$10.505** | 1,500 | $ 15,757.78 | | $ (193,252.21) | |
| Purchase | 07/18/2007 | $137.963 | 70,849 | $ 9,774,576.01 | Sale | 03/24/2008 | **$10.505** | 70,849 | $ 744,281.79 | | $ (9,030,294.22) | |
| Purchase | 07/18/2007 | $137.964 | 7,039 | $ 971,125.08 | Sale | 03/24/2008 | **$10.505** | 7,039 | $ 73,945.99 | | $ (897,179.09) | |
| Purchase | 07/18/2007 | $137.964 | 134,761 | $ 18,592,099.22 | Sale | 03/25/2008 | **$10.766** | 134,761 | $ 1,450,820.92 | | $ (17,141,278.30) | |
| Purchase | 07/18/2007 | $138.002 | 115,239 | $ 15,903,189.43 | Sale | 03/25/2008 | **$10.766** | 115,239 | $ 1,240,649.39 | | $ (14,662,540.04) | |
| **2B. Total** | | | **411,217** | **$ 56,763,612.55** | | | | **411,217** | **$ 4,385,084.57** | **0** | **$ (52,378,527.98)** $ | **-** |

**State of Michigan Retirement Systems**
**First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| Class Period Beginning: | 12/14/2006 |
|---|---|
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**2C.  Class Period Purchases Held At End of "Lookback Period"**

| Transaction Type | Trade Date | Price | Shares | | Total Cost | | | | | | Shares Retained @ 05/15/2008 | | Gain (Loss) [1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Purchase | 07/18/2007 | $138.002 | 15,332 | $ | 2,115,843.60 | | | | | | 15,332 | $ | (1,961,161.55) | |
| Purchase | 07/18/2007 | $139.340 | 1,900 | $ | 264,745.99 | | | | | | 1,900 | $ | (245,577.20) | |
| Purchase | 07/18/2007 | $139.340 | 1,400 | $ | 195,075.99 | | | | | | 1,400 | $ | (180,951.62) | |
| Purchase | 07/19/2007 | $139.143 | 9,722 | $ | 1,352,747.28 | | | | | | 9,722 | $ | (1,254,663.60) | |
| Purchase | 07/19/2007 | $139.143 | 10,561 | $ | 1,469,488.17 | | | | | | 10,561 | $ | (1,362,939.96) | |
| Purchase | 07/20/2007 | $135.980 | 44,068 | $ | 5,992,375.45 | | | | | | 44,068 | $ | (5,547,780.57) | |
| Purchase | 10/11/2007 | $126.330 | 200 | $ | 25,266.00 | | | | | | 200 | $ | (23,248.23) | |
| Purchase | 12/26/2007 | $87.614 | 200 | $ | 17,522.76 | | | | | | 200 | $ | (15,504.99) | |
| **2C. Total** | | | **83,383** | **$** | **11,433,065.24** | | | | **0** | **$** | **-** | **83,383** | **$** | **(10,591,827.72)** |

| State of Michigan Retirement Systems | | | | | | Class Period Beginning: | | | 12/14/2006 | | |
| First-In First-Out ("FIFO") Share Accounting Gain (Loss) Analysis | | | | | | Class Period End: | | | 3/14/2008 | | |
| The Bear Stearns Companies, Inc. Common Stock | | | | | | "Lookback Period" Beginning: | | | 3/17/2008 | | |
| Class Period: December 14, 2006 - March 14, 2008 | | | | | | "Lookback Period" End: | | | 5/15/2008 | | |
| | | | | | | Days in "Lookback Period": | | | 60 | | |
| | | | | | | "Lookback Period" Average Closing Price: | | | $10.0888 | | |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | 494,600 | $ 68,196,677.79 | | | | 411,217 | $ 4,385,084.57 | 83,383 | $ (62,970,355.71) | |
| **Grand Total** | | | 494,600 | $ 68,196,677.79 | | | | 503,400 | $ 6,706,122.94 | 83,383 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $10.0888 per share

State of Michigan Retirement Systems
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
The Bear Stearns Companies, Inc. Common Stock
Class Period: December 14, 2006 - March 14, 2008

| | | | |
|---|---|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Above Into Class $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pre-Class Period Holdings** | | | 92,183 | | | | | | | | | |
| | | | | | | | | | | | | |
| **1A. Pre-Class Period Holdings Sold Through End of Class Period** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 1,600 | | Sale | 12/15/2006 | $162.323 | 1,600 $ | 259,716.02 | 0 | | $ 243,573.88 |
| Pre-Class Period Holdings | | | 300 | | Sale | 12/19/2006 | $163.753 | 300 $ | 49,125.77 | 0 | | $ 46,099.12 |
| Pre-Class Period Holdings | | | 900 | | Sale | 12/21/2006 | $163.646 | 900 $ | 147,281.82 | 0 | | $ 138,201.87 |
| **1A. Total** | | | **2,800** | | | | | **2,800 $** | **456,123.61** | **0** | | **$ 427,874.87** |

**State of Michigan Retirement Systems**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss)[1] | Offset for Shares Sold Above Into Class $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1B. Pre-Class Period Holdings Sold During "Lookback Period"** | | | | | | | | Maximum of Actual or Average Closing Price between 03/17/2008 and date of sale | | | | |
| Pre-Class Period Holdings | | | 6,000 | | Sale | 03/25/2008 | $10.766 | 6,000 | $ 64,595.29 | | | $ 4,062.26 |
| **1B. Total** | | | **6,000** | | | | | **6,000** | **$ 64,595.29** | **0** | | **$ 4,062.26** |

**State of Michigan Retirement Systems**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1C.  Pre-Class Period Holdings Held at End of "Lookback Period"** | | | | | | | | | | | | |
| Pre-Class Period Holdings | | | 83,383 | | | | | | | 83,383 | | |
| **1C.  Total** | | | **83,383** | | | | | **0** | $          - | **83,383** | $          - | |

**State of Michigan Retirement Systems**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | | Total Cost | Transaction Type | Trade Date | Price | Shares | | Total Proceeds | Shares Retained @ 05/15/2008 | | Gain (Loss) [1] | | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2A. Class Period Purchases Sold Prior to End of Class Period** | | | | | | | | | | | | | | | | |
| Purchase | 03/16/2007 | $147.066 | 300 | $ | 44,119.86 | Sale | 06/15/2007 | $150.878 | 300 | $ | 45,263.30 | 0 | $ | 1,143.44 | | |
| Purchase | 07/20/2007 | $135.980 | 2,600 | $ | 353,548.52 | Sale | 07/20/2007 | $135.051 | 2,600 | $ | 351,132.68 | 0 | $ | (2,415.84) | | |
| Purchase | 07/20/2007 | $135.980 | 3,200 | $ | 435,136.64 | Sale | 09/21/2007 | $117.088 | 3,200 | $ | 374,682.26 | 0 | $ | (60,454.38) | | |
| Purchase | 10/11/2007 | $126.330 | 200 | $ | 25,266.00 | Sale | 11/28/2007 | $99.448 | 200 | $ | 19,889.69 | 0 | $ | (5,376.31) | | |
| Purchase | 07/20/2007 | $135.980 | 2,300 | $ | 312,754.46 | Sale | 12/21/2007 | $91.013 | 2,300 | $ | 209,329.68 | 0 | $ | (103,424.78) | | |
| Purchase | 12/26/2007 | $87.614 | 200 | $ | 17,522.76 | Sale | 02/01/2008 | $90.390 | 200 | $ | 18,077.90 | 0 | $ | 555.14 | | |
| **2A. Total** | | | **8,800** | **$** | **1,188,348.24** | | | | **8,800** | **$** | **1,018,375.51** | **0** | **$** | **(169,972.73)** | **$** | **-** |

State of Michigan Retirement Systems
Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis
The Bear Stearns Companies, Inc. Common Stock
Class Period: December 14, 2006 - March 14, 2008

| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2B.  Class Period Purchases Sold During "Lookback Period"** | | | | | | | | Maximum of Actual or Average Closing Price between 03/17/2008 and date of sale | | | | |
| Purchase | 07/18/2007 | $137.964 | 51,678 $ | 7,129,677.75 | Sale | 03/24/2008 | $10.505 | 51,678 $ | 542,886.90 | 0 $ | (6,586,790.85) | |
| Purchase | 07/18/2007 | $138.002 | 130,571 $ | 18,019,033.03 | Sale | 03/24/2008 | $10.505 | 130,571 $ | 1,371,672.39 | 0 $ | (16,647,360.64) | |
| Purchase | 07/18/2007 | $139.340 | 1,900 $ | 264,745.99 | Sale | 03/24/2008 | $10.505 | 1,900 $ | 19,959.85 | 0 $ | (244,786.14) | |
| Purchase | 07/18/2007 | $139.340 | 1,400 $ | 195,075.99 | Sale | 03/24/2008 | $10.505 | 1,400 $ | 14,707.26 | 0 $ | (180,368.73) | |
| Purchase | 07/19/2007 | $139.143 | 9,722 $ | 1,352,747.28 | Sale | 03/24/2008 | $10.505 | 9,722 $ | 102,131.40 | 0 $ | (1,250,615.88) | |
| Purchase | 07/19/2007 | $139.143 | 10,561 $ | 1,469,488.17 | Sale | 03/24/2008 | $10.505 | 10,561 $ | 110,945.25 | 0 $ | (1,358,542.92) | |
| Purchase | 07/20/2007 | $135.980 | 35,968 $ | 4,890,935.83 | Sale | 03/24/2008 | $10.505 | 35,968 $ | 377,850.46 | 0 $ | (4,513,085.37) | |
| Purchase | 03/16/2007 | $147.066 | 2,100 $ | 308,839.02 | Sale | 03/25/2008 | $10.766 | 2,100 $ | 22,608.35 | 0 $ | (286,230.67) | |
| Purchase | 07/18/2007 | $137.993 | 79,429 $ | 10,960,653.94 | Sale | 03/25/2008 | $10.766 | 79,429 $ | 855,123.18 | 0 $ | (10,105,530.76) | |
| Purchase | 07/18/2007 | $139.340 | 1,500 $ | 209,009.99 | Sale | 03/25/2008 | $10.766 | 1,500 $ | 16,148.82 | 0 $ | (192,861.17) | |
| Purchase | 07/18/2007 | $137.963 | 70,849 $ | 9,774,576.01 | Sale | 03/25/2008 | $10.766 | 70,849 $ | 762,751.92 | 0 $ | (9,011,824.09) | |
| Purchase | 07/18/2007 | $137.964 | 90,122 $ | 12,433,546.55 | Sale | 03/25/2008 | $10.766 | 90,122 $ | 970,242.75 | 0 $ | (11,463,303.80) | |
| **2B. Total** | | | **485,800** $ | **67,008,329.55** | | | | **485,800** $ | **5,167,028.53** | **0** $ | **(61,841,301.02)** $ | **-** |

**State of Michigan Retirement Systems**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | |
|---|---|
| Class Period Beginning: | 12/14/2006 |
| Class Period End: | 3/14/2008 |
| "Lookback Period" Beginning: | 3/17/2008 |
| "Lookback Period" End: | 5/15/2008 |
| Days in "Lookback Period": | 60 |
| "Lookback Period" Average Closing Price: | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2C.  Class Period Purchases Held At End of "Lookback Period"** | | | | | | | | | | | | |
| Purchase | | | | | | | | | | 0 $ | | - |
| **2C. Total** | | | 0 $ | - | | | | 0 $ | - | 0 $ | | - |

**State of Michigan Retirement Systems**
**Last-In First-Out ("LIFO") Share Accounting Gain (Loss) Analysis**
**The Bear Stearns Companies, Inc. Common Stock**
**Class Period: December 14, 2006 - March 14, 2008**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Period Beginning: | | | | | | | | | | | 12/14/2006 |
| Class Period End: | | | | | | | | | | | 3/14/2008 |
| "Lookback Period" Beginning: | | | | | | | | | | | 3/17/2008 |
| "Lookback Period" End: | | | | | | | | | | | 5/15/2008 |
| Days in "Lookback Period": | | | | | | | | | | | 60 |
| "Lookback Period" Average Closing Price: | | | | | | | | | | | $10.0888 |

| Transaction Type | Trade Date | Price | Shares | Total Cost | Transaction Type | Trade Date | Price | Shares | Total Proceeds | Shares Retained @ 05/15/2008 | Gain (Loss) [1] | Offset for Shares Sold Into Class Above $10.0888 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Class Period Purchase Total** | | | 494,600 | $  68,196,677.79 | | | | 494,600 | $  6,185,404.04 | 0 | $  (62,011,273.75) | |
| **Grand Total** | | | 494,600 | $  68,196,677.79 | | | | 503,400 | $  6,706,122.94 | 83,383 | | |

1 For Class Period Purchases held at end of Lookback Period, Gain (Loss) is based on holdings valued at $10.0888 per share

Total figures may differ from FIFO, as under LIFO, post-Class Period sales are first allocated to post-Class Period purchases, if any. These purchases and sales, if any, are not shown here.

# Exhibit B

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **CAYNE JAMES E** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director _____ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ X _ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **12/19/2005** | **Chairman of the Bd., CEO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 12/19/2005 | | M (1) | | 404213 | A | $0 | 5856589.00 | D | |
| **Common Stock** | 12/19/2005 | | S | | 202000 | D | $115.95 | 5654589.00 | D | |
| **Common Stock** | | | | | | | | 45669.00 | I | **By Spouse** |

### Table II - Derivative Securities Beneficially Owned ( *e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (2) | 12/19/2005 | | M (1) | | | 404213 | 11/30/2005 | 11/30/2005 | Common Stock | 404213.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1**)   Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2**)   This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **CAYNE JAMES E C/O BEAR, STEARNS & CO. INC.** | | | | |

| 383 MADISON AVENUE<br>NEW YORK, NY 10179 | X | | Chairman of the Bd., CEO | |

**Signatures**

| /s/ Cayne, James E. | 12/20/2005 |
| --- | --- |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **CAYNE JAMES E** | **BEAR STEARNS COMPANIES INC** [ BSC ] | X Director          10% Owner<br>X Officer (give title below)    Other (specify below)<br>Chairman of the Bd., CEO |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | |
| C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 12/22/2005 | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK    NY    10179 | | X Form filed by One Reporting Person<br>  Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2005) | (1) | 12/22/2005 | | A | | (2) 88,375 | | 11/30/2010 | 11/30/2010 | Common Stock | 88,375 | $116.5 | 88,375 | D | |
| Emp. Stock Option (Rt. to Buy) | $116.5 | 12/22/2005 | | A | | 56,573 | | 12/22/2008 | 12/22/2015 | Common Stock | 56,573 | $0 | 56,573 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/22/05) pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Cayne, James E.                    12/23/2005

** Signature of Reporting Person         Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| CAYNE JAMES E | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director   _____ 10% Owner |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ X _ Officer (give title below)   _____ Other (specify below) |
| C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE | 1/9/2006 | **Chairman of the Bd., CEO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK, NY 10179 | | _ X _ Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 1/9/2006 | | G | V | 2600 | D | $0 | 5651989.00 | D | |
| **Common Stock** | | | | | | | | 45669.00 | I | By Spouse |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | | |

**Explanation of Responses:**

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **CAYNE JAMES E C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE NEW YORK, NY 10179** | X | | **Chairman of the Bd., CEO** | |

**Signatures**

| /s/ Cayne, James E. | 1/10/2006 |
|---|---|
| | Date |

** Signature of Reporting Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue.
*See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person *  CAYNE JAMES E  (Last)   (First)   (Middle)  C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE  (Street)  NEW YORK, NY 10179  (City)   (State)   (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol  **BEAR STEARNS COMPANIES INC [ BSC ]**  3. Date of Earliest Transaction (MM/DD/YYYY)  2/8/2006  4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)  __ X __ Director _____ 10% Owner  __ X __ Officer (give title below) _____ Other (specify below)  **Chairman of the Bd., CEO**  6. Individual or Joint/Group Filing (Check Applicable Line)  _ X _ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (1) | 2/8/2006 | | A (2) | | 25809 | | 11/30/2005 | 11/30/2005 | Common Stock | 25809.00 | $0 | 25809.00 | D | |
| **CAP Units (2001)** | (1) | 2/8/2006 | | A (2) | | 2785 | | 11/30/2006 | 11/30/2006 | Common Stock | 2785.00 | $0 | 46415.00 | D | |
| **CAP Units (2002)** | (1) | 2/8/2006 | | A (2) | | 9708 | | 11/30/2007 | 11/30/2007 | Common Stock | 9708.00 | $0 | 161753.00 | D | |
| **CAP Units (2003)** | (1) | 2/8/2006 | | A (2) | | 9667 | | 11/30/2008 | 11/30/2008 | Common Stock | 9667.00 | $0 | 161078.00 | D | |
| **CAP Units (2004)** | (1) | 2/8/2006 | | A (2) | | 5906 | | 11/30/2009 | 11/30/2009 | Common Stock | 5906.00 | $0 | 98416.00 | D | |

**Explanation of Responses:**

( **1** )  This type of derivative security typically does not have a conversion or exercise price

( **2** )  CAP Units credited to Reporting Person's account (as of 2/8/06) based on Fiscal Year 2005 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | | | | |

| | Director | 10% Owner | Officer | | Other |
|---|---|---|---|---|---|
| **CAYNE JAMES E**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | **X** | | **Chairman of the Bd., CEO** | | |

**Signatures**

| /s/ Cayne, James E. | 2/9/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person *<br><br>**CAYNE JAMES E**<br><br>(Last)      (First)      (Middle)<br><br>**C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE**<br>(Street)<br><br>**NEW YORK, NY 10179**<br>(City)      (State)      (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br><br>**BEAR STEARNS COMPANIES INC [ BSC ]**<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>**2/23/2006**<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>__ X __ Director          _____ 10% Owner<br><br>__ X __ Officer (give title below)     _____ Other (specify below)<br>**Chairman of the Bd., CEO**<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_ X _ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 2/23/2006 | | M (1) | | 25809 | A | $0 | 5677798.00 | D | |
| **Common Stock** | 2/23/2006 | | S | | 25809 | D | $135.08 | 5651989.00 | D | |
| **Common Stock** | | | | | | | | 45669.00 | I | **By Spouse** |

### Table II - Derivative Securities Beneficially Owned ( *e.g.*, puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (2) | 2/23/2006 | | M (1) | | | 25809 | 11/30/2005 | 11/30/2005 | Common Stock | 25809.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1**)  Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2**)  This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **CAYNE JAMES E**<br>**C/O BEAR, STEARNS & CO. INC.** | | | | |

| | | | |
|---|---|---|---|
| **383 MADISON AVENUE** <br> **NEW YORK, NY 10179** | **X** | | **Chairman of the Bd., CEO** |

**Signatures**

| | |
|---|---|
| /s/ Cayne, James E. | 2/24/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **CAYNE JAMES E** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director _____ 10% Owner |
| (Last)    (First)    (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ X __ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **6/5/2006** | **Chairman of the Bd., CEO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City)    (State)    (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 6/5/2006 | | G | V | 300 | D | $0 | 5651689.00 | D | |
| **Common Stock** | | | | | | | | 45669.00 | I | By Spouse |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **CAYNE JAMES E C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE NEW YORK, NY 10179** | X | | **Chairman of the Bd., CEO** | |

**Signatures**

| /s/ Cayne, James E. | 6/6/2006 |
|---|---|
| | Date |

** Signature of Reporting Person

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| CAYNE JAMES E | BEAR STEARNS COMPANIES INC [ BSC ] | X Director          10% Owner |
| (Last)      (First)      (Middle) | | X Officer (give title below)   Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. | 3. Date of Earliest Transaction (Month/Day/Year) | Chairman of the Bd., CEO |
| 383 MADISON AVENUE | 11/15/2006 | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK   NY      10179 | | X Form filed by One Reporting Person |
| (City)     (State)     (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/15/2006 | | G | V | 30,000 | D | $0 | 5,621,689 | D | |
| Common Stock | | | | | | | | 45,669 | I | By Spouse |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Cayne, James E.                    11/17/2006
** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

**CAYNE JAMES E**

| (Last) | (First) | (Middle) |
|---|---|---|

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK    NY    10179

| (City) | (State) | (Zip) |
|---|---|---|

**BEAR STEARNS COMPANIES INC**

[ BSC ]

3. Date of Earliest Transaction (Month/Day/Year)
12/18/2006

4. If Amendment, Date of Original Filed (Month/Day/Year)

| X | Director | | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

Chairman of the Bd., CEO

6. Individual or Joint/Group Filing (Check Applicable Line)

| X | Form filed by One Reporting Person |
|---|---|
| | Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/18/2006 | | M (1) | | 46,415 | A | $0 | 5,668,104 | D | |
| Common Stock | 12/18/2006 | | S | | 46,415 | D | $164.72 | 5,621,689 | D | |
| Common Stock | | | | | | | | 45,669 | I | By Spouse |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 12/18/2006 | | M (1) | | | 46,415 | 11/30/2006 | 11/30/2006 | Common Stock | 46,415 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

| /s/ Cayne, James E. | 12/19/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* <br><br> CAYNE JAMES E <br><br> (Last)    (First)    (Middle) <br><br> C/O BEAR, STEARNS & CO. INC. <br> 383 MADISON AVENUE <br><br> (Street) <br><br> NEW YORK    NY    10179 <br><br> (City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br><br> BEAR STEARNS COMPANIES INC <br> [ BSC ] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 12/20/2006 <br><br> 4. If Amendment, Date of Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br><br> X  Director           10% Owner <br> X  Officer (give title below)    Other (specify below) <br><br> Chairman of the Bd., CEO <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br><br> X  Form filed by One Reporting Person <br>    Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2006) | (1) | 12/20/2006 | | A | | (2) 89,758 | | 11/30/2011 | 11/30/2011 | Common Stock | 89,758 | $0 | 89,758 | D | |
| Emp. stock option (rt. to buy) | $165.32 | 12/20/2006 | | A | | 35,788 | | 12/20/2009 | 12/20/2016 | Common Stock | 35,788 | $0 | 35,788 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/20/06 pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Cayne, James E.        12/21/2006

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

## FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* CAYNE JAMES E | 2. Issuer Name and Ticker or Trading Symbol BEAR STEARNS COMPANIES INC [ BSC ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)        (First)        (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | | X  Director                           10% Owner X  Officer (give title below)     Other (specify below) Chairman of the Bd., CEO |
| | 3. Date of Earliest Transaction (Month/Day/Year) 01/08/2007 | |
| (Street) NEW YORK    NY        10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X  Form filed by One Reporting Person    Form filed by More than One Reporting Person |
| (City)       (State)       (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,611,544 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,611,399 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,611,254 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,611,109 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,964 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,819 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,674 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,529 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,384 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,239 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,610,094 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,609,949 | D | |
| Common Stock | 01/08/2007 | | G | V | 145 | D | $0 | 5,609,804 | D | |
| Common Stock | | | | | | | | 45,669 | I | By Spouse |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Cayne, James E.                01/09/2007
** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| CAYNE JAMES E | BEAR STEARNS COMPANIES INC [ BSC ] | X Director    10% Owner |

(Last)  (First)  (Middle)

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK  NY  10179

(City)  (State)  (Zip)

3. Date of Earliest Transaction (Month/Day/Year)
02/14/2007

4. If Amendment, Date of Original Filed (Month/Day/Year)

X Officer (give title below)    Other (specify below)

Chairman of the Bd., CEO

6. Individual or Joint/Group Filing (Check Applicable Line)

X Form filed by One Reporting Person

Form filed by More than One Reporting Person

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (1) | 02/14/2007 | | A (2) | | 3,118 | | 11/30/2006 | 11/30/2006 | Common Stock | 3,118 | $0 | 3,118 | D | |
| CAP Units (2002) | (1) | 02/14/2007 | | A (2) | | 10,869 | | 11/30/2007 | 11/30/2007 | Common Stock | 10,869 | $0 | 172,622 | D | |
| CAP Units (2003) | (1) | 02/14/2007 | | A (2) | | 10,823 | | 11/30/2008 | 11/30/2008 | Common Stock | 10,823 | $0 | 171,901 | D | |
| CAP Units (2004) | (1) | 02/14/2007 | | A (2) | | 6,613 | | 11/30/2009 | 11/30/2009 | Common Stock | 6,613 | $0 | 105,029 | D | |
| CAP Units (2005) | (1) | 02/14/2007 | | A (2) | | 5,938 | | 11/30/2010 | 11/30/2010 | Common Stock | 5,938 | $0 | 94,313 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 2/14/07) based on Fiscal Year 2006 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Cayne, James E.                02/15/2007
** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| CAYNE JAMES E | BEAR STEARNS COMPANIES INC [ BSC ] | X  Director                    10% Owner |
| (Last)        (First)        (Middle) | | X  Officer (give title below)    Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 03/22/2007 | Chairman of the Bd., CEO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK    NY        10179 | | X  Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/22/2007 | | M (1) | | 3,118 | A | $0 | 5,612,922 | D | |
| Common Stock | | | | | | | | 45,669 | I | By Spouse |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 03/22/2007 | | M (1) | | | 3,118 | 11/30/2006 | 11/30/2006 | Common Stock | 3,118 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price.

**Remarks:**

/s/ Cayne, James E.                          03/23/2007

** Signature of Reporting Person                Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| CAYNE JAMES E | BEAR STEARNS COMPANIES INC [ BSC ] | X Director | 10% Owner |
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below) | Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 12/21/2007 | Chairman of the Bd., CEO | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| NEW YORK      NY      10179 | | X Form filed by One Reporting Person | |
| (City)       (State)       (Zip) | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2007 | | M (1) | | 172,621 | A | $0 | 5,785,543 | D | |
| Common Stock | 12/21/2007 | | S | | 172,621 | D | $89.01 | 5,612,922 | D | |
| Common Stock | | | | | | | | 45,669 | I | By Spouse |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (2) | 12/21/2007 | | M (1) | | | 172,621 | 11/30/2007 | 11/30/2007 | Common Stock | 172,621 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Cayne, James E.                    12/21/2007

** Signature of Reporting Person       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

**1. Name and Address of Reporting Person***

CAYNE JAMES E

(Last)    (First)    (Middle)

C/O BEAR, STEARNS & CO. INC.

383 MADISON AVENUE

(Street)

NEW YORK    NY    10179

(City)    (State)    (Zip)

**2. Issuer Name and Ticker or Trading Symbol**

BEAR STEARNS COMPANIES INC

[ BSC ]

**3. Date of Earliest Transaction (Month/Day/Year)**

01/09/2008

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

X Director        10% Owner

Officer (give title below)    X Other (specify below)

Chairman of the Board

**6. Individual or Joint/Group Filing (Check Applicable Line)**

X Form filed by One Reporting Person

Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (1) | 01/09/2008 | | A (2) | | 1,182 | | 11/30/2007 | 11/30/2007 | Common Stock | 1,182 | $0 | 1,182 | D | |
| CAP Units (2003) | (1) | 01/09/2008 | | A (2) | | 1,177 | | 11/30/2008 | 11/30/2008 | Common Stock | 1,177 | $0 | 173,078 | D | |
| CAP Units (2004) | (1) | 01/09/2008 | | A (2) | | 719 | | 11/30/2009 | 11/30/2009 | Common Stock | 719 | $0 | 105,748 | D | |
| CAP Units (2005) | (1) | 01/09/2008 | | A (2) | | 645 | | 11/30/2010 | 11/30/2010 | Common Stock | 645 | $0 | 94,958 | D | |
| CAP Units (2006) | (1) | 01/09/2008 | | A (2) | | 614 | | 11/30/2011 | 11/30/2011 | Common Stock | 614 | $0 | 90,372 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 1/9/08) based on Fiscal Year 2007 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Cayne, James E.                        01/09/2008

** Signature of Reporting Person            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person [*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **FARBER JEFFREY M** | **BEAR STEARNS COMPANIES INC [ BSC ]** | ____ Director _____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ **X** _ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **12/19/2005** | **Controller** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City) (State) (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 12/19/2005 | | M [(1)] | | 6244 | A | $0 | 6993.00 | D | |
| **Common Stock** | 12/19/2005 | | D | | 3800 | D | $116.22 | 3193.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | [(2)] | 12/19/2005 | | M [(1)] | | | 6244 | 11/30/2005 | 11/30/2005 | Common Stock | 6244.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1** ) Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** ) This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **FARBER JEFFREY M C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE** | | | **Controller** | |

**Signatures**

| /s/ Farber, Jeffrey M. | 12/20/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* |
|---|
| FARBER JEFFREY M |

(Last)          (First)          (Middle)

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK     NY          10179

(City)          (State)          (Zip)

| 2. Issuer Name **and** Ticker or Trading Symbol |
|---|
| BEAR STEARNS COMPANIES INC [ BSC ] |

3. Date of Earliest Transaction (Month/Day/Year)
12/22/2005

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

|   | Director |   | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) |   | Other (specify below) |

Controller

6. Individual or Joint/Group Filing (Check Applicable Line)

X   Form filed by One Reporting Person

☐   Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2005) | (1) | 12/22/2005 | | A | | 3,365 | | 11/30/2010 | 11/30/2010 | Common Stock | 3,365 | $116.5 | 3,365 | D | |
| Emp. Stock Option (Rt. to Buy) | $116.5 | 12/22/2005 | | A | | 3,931 | | 12/22/2005 | 12/22/2015 | Common Stock | 3,931 | $0 | 3,931 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/22/05) pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Farber, Jeffrey M.                    12/23/2005

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **FARBER JEFFREY M** | **BEAR STEARNS COMPANIES INC [ BSC ]** | ____ Director  ____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ **X** _ Officer (give title below)  ____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **2/8/2006** | **Controller** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person  __ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (1) | 2/8/2006 | | A (2) | | 382 | | 11/30/2005 | 11/30/2005 | Common Stock | 382.00 | $0 | 382.00 | D | |
| **CAP Units (2001)** | (1) | 2/8/2006 | | A (2) | | 124 | | 11/30/2006 | 11/30/2006 | Common Stock | 124.00 | $0 | 2078.00 | D | |
| **CAP Units (2002)** | (1) | 2/8/2006 | | A (2) | | 137 | | 11/30/2007 | 11/30/2007 | Common Stock | 137.00 | $0 | 2289.00 | D | |
| **CAP Units (2003)** | (1) | 2/8/2006 | | A (2) | | 139 | | 11/30/2008 | 11/30/2008 | Common Stock | 139.00 | $0 | 2318.00 | D | |
| **CAP Units (2004)** | (1) | 2/8/2006 | | A (2) | | 184 | | 11/30/2009 | 11/30/2009 | Common Stock | 184.00 | $0 | 3070.00 | D | |

**Explanation of Responses:**

( **1** )  This type of derivative security typically does not have a conversion or exercise price

( **2** )  CAP Units credited to Reporting Person's account (as of 2/8/06) based on Fiscal Year 2005 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | | | | |

| | Director | 10% Owner | Officer | Other |
|---|---|---|---|---|
| **FARBER JEFFREY M**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | | | **Controller** | |

**Signatures**

| | |
|---|---|
| /s/ Farber, Jeffrey M. | 2/9/2006 |
| \*\* Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **FARBER JEFFREY M** | **BEAR STEARNS COMPANIES INC [ BSC ]** | ____ Director ____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ **X** _ Officer (give title below) ____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **2/23/2006** | **Controller** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City) (State) (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 2/23/2006 | | M (1) | | 382 | A | $0 | 3575.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (2) | 2/23/2006 | | M (1) | | | 382 | 11/30/2005 | 11/30/2005 | Common Stock | 382.00 | $0 | 0.00 | D | |

## Explanation of Responses:

( **1** ) Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** ) This type of derivative security typically does not have a conversion or exercise price

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **FARBER JEFFREY M C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE NEW YORK, NY 10179** | | | **Controller** | |

**Signatures**

| | |
|---|---|
| **/s/ Farber, Jeffrey M.** | **2/24/2006** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| FARBER JEFFREY M | BEAR STEARNS COMPANIES INC [ BSC ] | Director ___ 10% Owner ___ <br> X Officer (give title below) ___ Other (specify below) ___ <br> Controller |
| (Last) (First) (Middle) <br> C/O BEAR, STEARNS & CO. INC. <br> 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) <br> 07/28/2006 | |
| (Street) <br> NEW YORK   NY   10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 07/28/2006 | | S | | 1,000 | D | $138.15 | 2,575 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

<table>
<tr><td></td><td>/s/ Farber, Jeffrey M.</td><td>07/28/2006</td></tr>
<tr><td></td><td>** Signature of Reporting Person</td><td>Date</td></tr>
</table>

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility
Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| FARBER JEFFREY M | BEAR STEARNS COMPANIES INC [ BSC ] | Director       10% Owner<br>X Officer (give title below)   Other (specify below)<br>Controller |
| (Last)    (First)    (Middle)<br>C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/18/2006 | |
| (Street)<br>NEW YORK   NY   10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X Form filed by One Reporting Person<br>Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/18/2006 | | M (1) | | 2,078 | A | $0 | 4,653 | D | |
| Common Stock | 12/18/2006 | | D | | 881 | D | $164.68 | 3,772 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 12/18/2006 | | M (1) | | | 2,078 | 11/30/2006 | 11/30/2006 | Common Stock | 2,078 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Farber, Jeffrey M.      12/19/2006

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| FARBER JEFFREY M | BEAR STEARNS COMPANIES INC [ BSC ] | Director ___ 10% Owner ___ |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below)   Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 12/20/2006 | Controller |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK   NY   10179 | | X Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2006) | (1) | 12/20/2006 | | A | | 4,536 | | 11/30/2011 | 11/30/2011 | Common Stock | 4,536 | $0 | 4,536 | D | |
| Emp. Stock Option (rt. to buy) | $165.32 | 12/20/2006 | | A | | 2,646 | | 12/20/2006 | 12/20/2016 | Common Stock | 2,646 | $0 | 2,646 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/20/06 pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Farber, Jeffrey M.                    12/21/2006
** Signature of Reporting Person            Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| FARBER JEFFREY M | BEAR STEARNS COMPANIES INC [ BSC ] | Director ___ 10% Owner ___ |

(Last)   (First)   (Middle)

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK   NY   10179

(City)   (State)   (Zip)

3. Date of Earliest Transaction (Month/Day/Year)
02/14/2007

X Officer (give title below)   Other (specify below) ___

Controller

4. If Amendment, Date of Original Filed (Month/Day/Year)

6. Individual or Joint/Group Filing (Check Applicable Line)

X Form filed by One Reporting Person
___ Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned** (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (1) | 02/14/2007 | | A (2) | | 139 | | 11/30/2006 | 11/30/2006 | Common Stock | 139 | $0 | 139 | D | |
| CAP Units (2002) | (1) | 02/14/2007 | | A (2) | | 154 | | 11/30/2007 | 11/30/2007 | Common Stock | 154 | $0 | 2,443 | D | |
| CAP Units (2003) | (1) | 02/14/2007 | | A (2) | | 156 | | 11/30/2008 | 11/30/2008 | Common Stock | 156 | $0 | 2,474 | D | |
| CAP Units (2004) | (1) | 02/14/2007 | | A (2) | | 206 | | 11/30/2009 | 11/30/2009 | Common Stock | 206 | $0 | 3,276 | D | |
| CAP Units (2005) | (1) | 02/14/2007 | | A (2) | | 226 | | 11/30/2010 | 11/30/2010 | Common Stock | 226 | $0 | 3,591 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 2/14/07) based on Fiscal Year 2006 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Farber, Jeffrey M.          02/15/2007

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

□ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

1. Name and Address of Reporting Person*

**FARBER JEFFREY M**

(Last)     (First)     (Middle)

C/O BEAR, STEARNS & CO. INC.

383 MADISON AVENUE

(Street)

NEW YORK     NY     10179

(City)     (State)     (Zip)

2. Issuer Name **and** Ticker or Trading Symbol

**BEAR STEARNS COMPANIES INC**

[ BSC ]

3. Date of Earliest Transaction (Month/Day/Year)
03/22/2007

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

|   | Director |   | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) |   | Other (specify below) |

Controller

6. Individual or Joint/Group Filing (Check Applicable Line)

X  Form filed by One Reporting Person

☐  Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/22/2007 | | M (1) | | 139 | A | $0 | 3,911 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 03/22/2007 | | M (1) | | | 139 | 11/30/2006 | 11/30/2006 | Common Stock | 139 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price.

**Remarks:**

/s/ Farber, Jeffrey M.          03/23/2007

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| FARBER JEFFREY M | BEAR STEARNS COMPANIES INC [ BSC ] | |

FARBER JEFFREY M

(Last)       (First)       (Middle)

C/O BEAR, STEARNS & CO. INC.

383 MADISON AVENUE

(Street)

NEW YORK      NY      10179

(City)      (State)      (Zip)

2. Issuer Name **and** Ticker or Trading Symbol

BEAR STEARNS COMPANIES INC [ BSC ]

3. Date of Earliest Transaction (Month/Day/Year)

12/21/2007

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

_____ Director       _____ 10% Owner

X Officer (give title below)     _____ Other (specify below)

Controller

6. Individual or Joint/Group Filing (Check Applicable Line)

X Form filed by One Reporting Person

_____ Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2007 | | M (1) | | 2,443 | A | $0 | 6,354 | D | |
| Common Stock | 12/21/2007 | | S | | 2,443 | D | $89.01 | 3,911 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (2) | 12/21/2007 | | M (1) | | | 2,443 | 11/30/2007 | 11/30/2007 | Common Stock | 2,443 | $0 | 0 | D | |
| CAP Units 2007 | (2) | 12/21/2007 | | A (3) | | 13,340 | | 11/30/2007 | 11/30/2012 | Common Stock | 13,340 | $0 | 13,340 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price
3. Deferral of compensation and credit to Reporting Person's Account (as of 12/21/07 pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Farber, Jeffrey M.                      12/21/2007

** Signature of Reporting Person      Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| FARBER JEFFREY M | BEAR STEARNS COMPANIES INC [ BSC ] | Director      10% Owner<br>X Officer (give title below)    Other (specify below)<br>Controller |
| (Last)      (First)      (Middle)<br>C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>01/09/2008 | |
| (Street)<br>NEW YORK    NY      10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X Form filed by One Reporting Person<br>Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (1) | 01/09/2008 | | A (2) | | 17 | | 11/30/2007 | 11/30/2007 | Common Stock | 17 | $0 | 17 | D | |
| CAP Units (2003) | (1) | 01/09/2008 | | A (2) | | 17 | | 11/30/2008 | 11/30/2008 | Common Stock | 17 | $0 | 2,491 | D | |
| CAP Units (2004) | (1) | 01/09/2008 | | A (2) | | 22 | | 11/30/2009 | 11/30/2009 | Common Stock | 22 | $0 | 3,298 | D | |
| CAP Units (2005) | (1) | 01/09/2008 | | A (2) | | 24 | | 11/30/2010 | 11/30/2010 | Common Stock | 24 | $0 | 3,615 | D | |
| CAP Units (2006) | (1) | 01/09/2008 | | A (2) | | 31 | | 11/30/2011 | 11/30/2011 | Common Stock | 31 | $0 | 4,567 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price.

2. CAP Units credited to Reporting Person's account (as of 1/9/08) based on Fiscal Year 2007 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Farber, Jeffrey M.          01/09/2008
** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
Washington, D.C. 20549

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP
## OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| **GREENBERG ALAN C** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director | _____ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below) | _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **9/14/2005** | | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person | |
| (City)      (State)      (Zip) | | ___ Form filed by More than One Reporting Person | |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Fwd Purchase Contract (oblig. to sell) (1) | (1) | 9/14/2005 | | J (1) | | | 103637 (1) | 11/30/2005 (1) | 11/30/2005 (1) | Common Stock (1) | 103637.00 (1) | (1) | (1) | 0.00 | D |

## Explanation of Responses:

**( 1 )** On 9/14/05, the Reporting Person entered into a forward contract pursuant to the CAP Plan with The Bear Stearns Companies Inc. (BSC) in which the Reporting Person agreed to sell up to 103,637 common shares of BSC issuable upon settlement of CAP Units pursuant to the CAP Plan to BSC. The forward contract is subject to BSCs satisfaction of certain performance goals for the 9 months ending 8/31/05. The forward contract will settle on 11/30/05. The per share price will be the average of the Daily Volume Weighted Average Prices of the common stock on each day that it trades between $90 and $115 during the period from 9/6/05 through 11/29/05 (Included Days). The number of shares purchased pursuant to the forward contract will be a fraction, the numerator of which is the number of Included Days and the denominator of which is the number of days the NYSE opens for trading between 9/6/05 and 11/29/05, multiplied by 103,637.

## Reporting Owners

| | Relationships | | | |
|---|---|---|---|---|
| Reporting Owner Name / Address | Director | 10% Owner | Officer | Other |
| **GREENBERG ALAN C C/O BEAR, STEARNS & CO. INC.** | X | | | |

**383 MADISON AVENUE**
**NEW YORK, NY 10179**

**Signatures**

| | |
|---|---|
| **/s/ Greenberg, Alan C.** | **9/14/2005** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person [*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **GREENBERG ALAN C** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director      _____ 10% Owner <br> _____ Officer (give title below)      _____ Other (specify below) |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **11/30/2005** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |
| (City)   (State)   (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 11/30/2005 | | M [(1)] | | 103637 | A | $0 | 118637.00 | D | |
| **Common Stock** | 11/30/2005 | | J [(2)] | | 103637 | D | $106.67 | 15000.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | [(3)] | 11/30/2005 | | M [(1)] | | | 103637 | 11/30/2005 | 11/30/2005 | Common Stock | 103637.00 | $0 | 0.00 | D | |

## Explanation of Responses:

**( 1 )** Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

**( 2 )** On September 14, 2005, the Reporting Person entered into a forward contract pursuant to the CAP Plan with The Bear Stearns Companies Inc. (BSC) in which the Reporting Person agreed to sell up to, and including, 103,637 common shares of BSC issuable upon settlement of CAP Units pursuant to the CAP Plan to BSC. The forward contract settled on November 30, 2005. On November 30, 2005, the Reporting Person delivered to BSC 103,637 common shares of BSC in settlement of its obligation under the forward contract at a purchase price of $106.6726 per share.

**( 3 )** This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
| --- | --- | --- | --- | --- |
| | Director | 10% Owner | Officer | Other |
| **GREENBERG ALAN C**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | **X** | | | |

**Signatures**

| | |
| --- | --- |
| /s/ Greenberg, Alan C. | 11/30/2005 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

□ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X  Director                10% Owner |
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | Officer (give title below)      Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. | 12/22/2005 | |
| 383 MADISON AVENUE | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (Street) | | X  Form filed by One Reporting Person |
| NEW YORK   NY       10179 | | Form filed by More than One Reporting Person |
| (City)     (State)    (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2005) | (1) | 12/22/2005 | | A | | (2) 48,633 | | 11/30/2010 | 11/30/2010 | Common Stock | 48,633 | $116.5 | 48,633 | D | |
| Emp. Stock Option (Rt. to Buy) | $116.5 | 12/22/2005 | | A | | 32,026 | | 12/22/2008 | 12/22/2015 | Common Stock | 32,026 | $0 | 32,026 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/22/05) pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Greenberg, Alan C.                    12/23/2005
** Signature of Reporting Person              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **GREENBERG ALAN C** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director _____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **1/3/2006** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City) (State) (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 1/3/2006 | | M (1) | | 40000 | A | $64.00 | 55000.00 | D | |
| **Common Stock** | 1/3/2006 | | S | | 40000 | D | $114.49 | 15000.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **Employee Stock Option (Right to Buy)** | $64.00 | 1/3/2006 | | M (1) | | | 40000 | 11/30/2005 | 11/30/2012 | Common Stock | 40000.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1** ) Exercise of Employee Stock Option (Right to Buy) granted 11/29/02 and distribution of common stock to Reporting Person pursuant to Issuer's Stock Award Plan, exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **GREENBERG ALAN C C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE** | X | | | |

**NEW YORK, NY 10179**

**Signatures**

| /s/ Greenberg, Alan C. | 1/3/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **GREENBERG ALAN C** | **BEAR STEARNS COMPANIES INC [ BSC ]** | __ X __ Director _____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **2/8/2006** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City) (State) (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (1) | 2/8/2006 | | A | (2) | 6617 | | 11/30/2005 | 11/30/2005 | Common Stock | 6617.00 | $0 | 6617.00 | D | |
| **CAP Units (2001)** | (1) | 2/8/2006 | | A | (2) | 1624 | | 11/30/2006 | 11/30/2006 | Common Stock | 1624.00 | $0 | 27064.00 | D | |
| **CAP Units (2002)** | (1) | 2/8/2006 | | A | (2) | 5584 | | 11/30/2007 | 11/30/2007 | Common Stock | 5584.00 | $0 | 93041.00 | D | |
| **CAP Units (2003)** | (1) | 2/8/2006 | | A | (2) | 5532 | | 11/30/2008 | 11/30/2008 | Common Stock | 5532.00 | $0 | 92184.00 | D | |
| **CAP Units (2004)** | (1) | 2/8/2006 | | A | (2) | 3348 | | 11/30/2009 | 11/30/2009 | Common Stock | 3348.00 | $0 | 55796.00 | D | |

**Explanation of Responses:**

( **1** )  This type of derivative security typically does not have a conversion or exercise price

( **2** )  CAP Units credited to Reporting Person's account (as of 2/8/06) based on Fiscal Year 2005 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|

| | Director | 10% Owner | Officer | Other |
|---|---|---|---|---|
| **GREENBERG ALAN C**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | X | | | |

**Signatures**

| /s/ Greenberg, Alan C. | 2/9/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **GREENBERG ALAN C** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X __ Director          _____ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)     _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **2/23/2006** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City)    (State)    (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 2/23/2006 | | M (1) | | 6617 | A | $0 | 21617.00 | D | |
| **Common Stock** | 2/23/2006 | | S | | 6617 | D | $135.08 | 15000.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (2) | 2/23/2006 | | M (1) | | | 6617 | 11/30/2005 | 11/30/2005 | Common Stock | 6617.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1** )   Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** )   This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **GREENBERG ALAN C**<br>**C/O BEAR, STEARNS & CO. INC.**<br>**383 MADISON AVENUE** | X | | | |

**Signatures**

| /s/ Greenberg, Alan C. | 2/24/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **GREENBERG ALAN C** | **BEAR STEARNS COMPANIES INC [ BSC ]** | __ X __ Director         _____ 10% Owner |
| (Last)       (First)       (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _____ Officer (give title below)    _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **9/20/2006** | |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Forward Purchase Contract - Obligation to Sell (1) | (1) | 9/20/2006 | | J (1) | | | 27063 (1) | 11/30/2006 (1) | 11/30/2006 (1) | Common Stock (1) | 27063.00 (1) | (1) | (1) | 0.00 | D |

### Explanation of Responses:

( **1** )  On 9/20/06, the Reporting Person entered into a forward contract pursuant to the CAP Plan with The Bear Stearns Companies Inc. (BSC) in which the Reporting Person agreed to sell up to, and including, 27,063 common shares of BSC issuable upon settlement of CAP Units pursuant to the CAP Plan to BSC. The forward contract is subject to BSCs satisfaction of certain performance goals for the nine months ended 8/31/06. The forward contract will settle on 11/30/06. The per share price will be the average of the Daily Volume Weighted Average Prices of the common stock on each day that it trades between $122 and $152 during the period 9/5/06 thrugh 11/29/06 (Included Days). The number of shares purchased pursuant to the forward contract will be a fraction, the numerator of which is the number of Included Days and the denominator of which is the number of days the NYSE opens for trading between 9/5/06 and 11/29/06, multiplied by 27,063.

### Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **GREENBERG ALAN C**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | X | | | | |

**Signatures**

| | |
|---|---|
| /s/ Greenberg, Alan C. | 9/20/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*     Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
|---|---|---|---|---|
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X  Director | | 10% Owner |
| (Last)      (First)      (Middle) | | Officer (give title below) | | Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 11/30/2006 | | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | | |
| NEW YORK      NY      10179 | | X  Form filed by One Reporting Person | | |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/30/2006 | | M (1) | | 21,295 | A | $0 | 36,295 | D | |
| Common Stock | 11/30/2006 | | J (2) | | 21,295 | D | $143.48 | 15,000 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (3) | 11/30/2006 | | M (1) | | | 21,295 | 11/30/2006 | 11/30/2006 | Common Stock | 21,295 | $0 | 5,769 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. On 9/20/06 Reporting Person entered into a forward contract pursuant to the CAP Plan with The Bear Stearns Companies Inc. (BSC) in which the Reporting Person agreed to sell up to, and including, 27,063 common shares of BSC issuable upon settlement of CAP Units pursuant to the CAP Plan to BSC. The forward contract settled on 11/30/06. On 11/30/06, the Reporting Person delivered to BSC 21,295 common shares of BSC in settlement of its obligation under the forward contract at a purchase price of $143.4715 per share.

3. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

|  | /s/ Greenberg, Alan C. | 11/30/2006 |
|---|---|---|
| | ** Signature of Reporting Person | Date |

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X Director             10% Owner |
| (Last)        (First)        (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | ___ Officer (give title below)   ___ Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 12/18/2006 | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK    NY        10179 | | X Form filed by One Reporting Person |
| (City)      (State)     (Zip) | | ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/18/2006 | | M (1) | | 5,768 | A | $0 | 20,768 | D | |
| Common Stock | 12/18/2006 | | D | | 5,768 | D | $164.68 | 15,000 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 12/18/2006 | | M (1) | | | 5,768 | 11/30/2006 | 11/30/2006 | Common Stock | 5,768 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Greenberg, Alan C.          12/19/2006
** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X  Director                    10% Owner<br>Officer (give title below)       Other (specify below) |
| (Last)    (First)    (Middle)<br>C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/20/2006 | |
| (Street)<br>NEW YORK    NY    10179<br>(City)    (State)    (Zip) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X  Form filed by One Reporting Person<br>    Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2006) | (1) | 12/20/2006 | | A (2) | | 46,047 | | 11/30/2011 | 11/30/2011 | Common Stock | 46,047 | $0 | 46,047 | D | |
| Emp. stock option (rt. to buy) | $165.32 | 12/20/2006 | | A | | 18,789 | | 12/20/2009 | 12/20/2016 | Common Stock | 18,789 | $0 | 18,789 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/20/06 pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Greenberg, Alan C.          12/21/2006

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* <br> **GREENBERG ALAN C** <br><br> (Last)    (First)    (Middle) <br> C/O BEAR, STEARNS & CO. INC. <br> 383 MADISON AVENUE <br> (Street) <br> NEW YORK    NY    10179 <br> (City)    (State)    (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> **BEAR STEARNS COMPANIES INC** <br> [ BSC ] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 01/03/2007 <br><br> 4. If Amendment, Date of Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br> X  Director          10% Owner <br> ___ Officer (give title below)   ___ Other (specify below) <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X  Form filed by One Reporting Person <br> ___ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/03/2007 | | M (1) | | 150,396 | A | $73.75 | 165,396 | D | |
| Common Stock | 01/03/2007 | | S | | 150,396 | D | $163.11 | 15,000 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Emp. Stock Option (Right to Buy) | $73.75 | 01/03/2007 | | M (1) | | | 150,396 | 12/15/2006 | 12/15/2013 | Common Stock | 150,396 | $0 | 0 | D | |

**Explanation of Responses:**

1. Exercise of Employee Stock Option (Right to Buy) granted 12/15/03 and distribution of common stock to Reporting Person pursuant to Issuer's Stock Award Plan, exempt under Rule 16b-3.

**Remarks:**

/s/ Greenberg, Alan C.                01/04/2007
** Signature of Reporting Person          Date

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

**1. Name and Address of Reporting Person***

GREENBERG ALAN C

(Last)          (First)          (Middle)

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK          NY          10179

(City)          (State)          (Zip)

**2. Issuer Name** and Ticker or Trading Symbol

BEAR STEARNS COMPANIES INC
[ BSC ]

**3. Date of Earliest Transaction (Month/Day/Year)**

02/14/2007

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer**
(Check all applicable)

X  Director          10% Owner

   Officer (give title below)          Other (specify below)

**6. Individual or Joint/Group Filing (Check Applicable Line)**

X  Form filed by One Reporting Person

   Form filed by More than One Reporting Person

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (1) | 02/14/2007 | | A (2) | | 1,818 | | 11/30/2006 | 11/30/2006 | Common Stock | 1,818 | $0 | 1,818 | D | |
| CAP Units (2002) | (1) | 02/14/2007 | | A (2) | | 6,252 | | 11/30/2007 | 11/30/2007 | Common Stock | 6,252 | $0 | 99,293 | D | |
| CAP Units (2003) | (1) | 02/14/2007 | | A (2) | | 6,194 | | 11/30/2008 | 11/30/2008 | Common Stock | 6,194 | $0 | 98,378 | D | |
| CAP Units (2004) | (1) | 02/14/2007 | | A (2) | | 3,749 | | 11/30/2009 | 11/30/2009 | Common Stock | 3,749 | $0 | 59,545 | D | |
| CAP Units (2005) | (1) | 02/14/2007 | | A (2) | | 3,268 | | 11/30/2010 | 11/30/2010 | Common Stock | 3,268 | $0 | 51,901 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 2/14/07) based on Fiscal Year 2006 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Greenberg, Alan C.          02/15/2007

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

| | |
|---|---|
| ☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b). | |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X Director      10% Owner     Officer (give title below)      Other (specify below) |
| (Last)      (First)      (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 03/22/2007 | |
| (Street) NEW YORK   NY      10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person    Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/22/2007 | | M (1) | | 1,818 | A | $0 | 16,818 | D | |
| Common Stock | 03/22/2007 | | S | | 1,818 | D | $151.26 | 15,000 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 03/22/2007 | | M (1) | | | 1,818 | 11/30/2006 | 11/30/2006 | Common Stock | 1,818 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

|  |  |
|---|---|
| /s/ Greenberg, Alan C. | 03/23/2007 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X Director    10% Owner<br>Officer (give title below)    Other (specify below) |

(Last) (First) (Middle)

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK   NY   10179

(City) (State) (Zip)

| 3. Date of Earliest Transaction (Month/Day/Year) |
|---|
| 12/21/2007 |

| 4. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|

| 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|
| X Form filed by One Reporting Person<br>Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2007 | | M (1) | | 99,293 | A | $0 | 114,293 | D | |
| Common Stock | 12/21/2007 | | S | | 99,293 | D | $89.01 | 15,000 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (2) | 12/21/2007 | | M (1) | | | 99,293 | 11/30/2007 | 11/30/2007 | Common Stock | 99,293 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Greenberg, Alan C.     12/21/2007
** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| GREENBERG ALAN C | BEAR STEARNS COMPANIES INC [ BSC ] | X Director          10% Owner<br>  Officer (give title below)    Other (specify below) |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year)<br>01/09/2008 | |
| C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| (Street)<br>NEW YORK    NY      10179 | | X Form filed by One Reporting Person<br>  Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | ( 1 ) | 01/09/2008 | | A ( 2 ) | | 680 | | 11/30/2007 | 11/30/2007 | Common Stock | 680 | $0 | 680 | D | |
| CAP Units (2003) | ( 1 ) | 01/09/2008 | | A ( 2 ) | | 673 | | 11/30/2008 | 11/30/2008 | Common Stock | 673 | $0 | 99,051 | D | |
| CAP Units (2004) | ( 1 ) | 01/09/2008 | | A ( 2 ) | | 408 | | 11/30/2009 | 11/30/2009 | Common Stock | 408 | $0 | 59,953 | D | |
| CAP Units (2005) | ( 1 ) | 01/09/2008 | | A ( 2 ) | | 355 | | 11/30/2010 | 11/30/2010 | Common Stock | 355 | $0 | 52,256 | D | |
| CAP Units (2006) | ( 1 ) | 01/09/2008 | | A ( 2 ) | | 315 | | 11/30/2011 | 11/30/2011 | Common Stock | 315 | $0 | 46,362 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 1/9/08) based on Fiscal Year 2007 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Greenberg, Alan C.                    01/09/2008

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person *  MOLINARO SAMUEL L JR  (Last)  (First)  (Middle)  C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE  (Street)  NEW YORK, NY 10179  (City)  (State)  (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol  **BEAR STEARNS COMPANIES INC [ BSC ]**  3. Date of Earliest Transaction (MM/DD/YYYY)  12/19/2005  4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)  ____ Director   _____ 10% Owner  _ X __ Officer (give title below)  _____ Other (specify below)  **EVP/CFO**  6. Individual or Joint/Group Filing (Check Applicable Line)  _ X _ Form filed by One Reporting Person  ___ Form filed by More than One Reporting Person |
|---|---|---|

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/19/2005 | | M (1) | | 56123 | A | $0 | 66427.00 | D | |
| Common Stock | 12/19/2005 | | D | | 41123 | D | $116.22 | 25304.00 | D | |
| Common Stock | | | | | | | | 1211.00 | I | By ESOP |
| Common Stock | | | | | | | | 13956.00 | I | Joint with wife |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2000) | (2) | 12/19/2005 | | M (1) | | | 56123 | 11/30/2005 | 11/30/2005 | Common Stock | 56123.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1** )   Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** )   This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |

**MOLINARO SAMUEL L JR**
**C/O BEAR, STEARNS & CO. INC.**

**383 MADISON AVENUE**
**NEW YORK, NY 10179**

**EVP/CFO**

**Signatures**

| | |
|---|---|
| **/s/ Molinaro Jr., Samuel L.** | **12/20/2005** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| MOLINARO SAMUEL L JR | BEAR STEARNS COMPANIES INC [ BSC ] | ☐ Director ☐ 10% Owner |
| (Last) (First) (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/22/2005 | ☒ Officer (give title below) ☐ Other (specify below) EVP/CFO |
| (Street) NEW YORK   NY        10179 (City) (State) (Zip) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) ☒ Form filed by One Reporting Person ☐ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/22/2005 | | G | V | 2,750 | D | $0 | 11,206 | I | Joint with wife |
| Common Stock | | | | | | | | 25,304 | D | |
| Common Stock | | | | | | | | 1,211 | I | By ESOP |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2005) | ( 1 ) | 12/22/2005 | | A | | 54,313 ( 2 ) | | 11/30/2010 | 11/30/2010 | Common Stock | 54,313 | $116.5 | 54,313 | D | |
| Emp. Stock Option (Rt. to Buy) | $116.5 | 12/22/2005 | | A | | 35,534 | | 12/22/2008 | 12/22/2015 | Common Stock | 35,534 | $0 | 35,534 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/22/05) pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Molinaro Jr., Samuel L.          12/23/2005

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person *<br><br>**MOLINARO SAMUEL L JR**<br><br>(Last)     (First)     (Middle)<br><br>**C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE**<br>(Street)<br><br>**NEW YORK, NY 10179**<br>(City)     (State)     (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol<br><br>**BEAR STEARNS COMPANIES INC [ BSC ]**<br><br>3. Date of Earliest Transaction (MM/DD/YYYY)<br><br>**2/8/2006**<br><br>4. If Amendment, Date Original Filed (MM/DD/YYYY) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br><br>____ Director     _____ 10% Owner<br>_ **X** _ Officer (give title below)  ____ Other (specify below)<br>**EVP/CFO**<br><br>6. Individual or Joint/Group Filing (Check Applicable Line)<br><br>_ **X** _ Form filed by One Reporting Person<br>___ Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (1) | 2/8/2006 | | A (2) | | 3557 | | 11/30/2005 | 11/30/2005 | Common Stock | 3557.00 | $0 | 3557.00 | D | |
| **CAP Units (2001)** | (1) | 2/8/2006 | | A (2) | | 1324 | | 11/30/2006 | 11/30/2006 | Common Stock | 1324.00 | $0 | 22063.00 | D | |
| **CAP Units (2002)** | (1) | 2/8/2006 | | A (2) | | 3681 | | 11/30/2007 | 11/30/2007 | Common Stock | 3681.00 | $0 | 61345.00 | D | |
| **CAP Units (2003)** | (1) | 2/8/2006 | | A (2) | | 4210 | | 11/30/2008 | 11/30/2008 | Common Stock | 4210.00 | $0 | 70155.00 | D | |
| **CAP Units (2004)** | (1) | 2/8/2006 | | A (2) | | 3086 | | 11/30/2009 | 11/30/2009 | Common Stock | 3086.00 | $0 | 51420.00 | D | |

**Explanation of Responses:**

( **1** )  This type of derivative security typically does not have a conversion or exercise price

( **2** )  CAP Units credited to Reporting Person's account (as of 2/8/06) based on Fiscal Year 2005 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | |
|---|---|---|---|
| | | | |

| | Director | 10% Owner | Officer | Other |
|---|---|---|---|---|
| **MOLINARO SAMUEL L JR**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | | | **EVP/CFO** | |

**Signatures**

| | |
|---|---|
| **/s/ Molinaro Jr., Samuel L.** | **2/9/2006** |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

## FORM 4

| | |
|---|---|
| Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b). | |

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| MOLINARO SAMUEL L JR | BEAR STEARNS COMPANIES INC [ BSC ] | Director _____ 10% Owner _____ X Officer (give title below) _____ Other (specify below) _____ |
| (Last)   (First)   (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/18/2006 | EVP/CFO |
| (Street) NEW YORK    NY        10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person _____ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/18/2006 | | M (1) | | 22,062 | A | $0 | 47,366 | D | |
| Common Stock | 12/18/2006 | | D | | 9,344 | D | $164.68 | 38,022 | D | |
| Common Stock | | | | | | | | 1,211 | I | By ESOP |
| Common Stock | | | | | | | | 11,206 | I | Joint with wife |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 12/18/2006 | | M (1) | | | 22,062 | 11/30/2006 | 11/30/2006 | Common Stock | 22,062 | $0 | 0 | D | |

Explanation of Responses:

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price.

Remarks:

| | |
|---|---|
| /s/ Molinaro Jr., Samuel L. | 12/19/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| MOLINARO SAMUEL L JR | BEAR STEARNS COMPANIES INC [ BSC ] | Director        10% Owner |

| (Last)     (First)     (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below)   Other (specify below) |
| --- | --- | --- |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 12/22/2006 | EVP/CFO |

| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| --- | --- | --- |
| NEW YORK   NY   10179 | | X Form filed by One Reporting Person |
| (City)     (State)     (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/22/2006 | | G | V | 1,250 | D | $0 | 36,772 | D | |
| Common Stock | 12/22/2006 | | G | V | 1,248 | D | $0 | 35,524 | D | |
| Common Stock | | | | | | | | 1,211 | I | By ESOP |
| Common Stock | | | | | | | | 11,206 | I | Joint with wife |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Molinaro Jr., Samuel L.        12/26/2006

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| MOLINARO SAMUEL L JR | BEAR STEARNS COMPANIES INC [ BSC ] | Director ___ 10% Owner ___ X Officer (give title below) ___ Other (specify below) ___ EVP/CFO |
| (Last)    (First)    (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 03/22/2007 | |
| (Street) NEW YORK    NY    10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |
| (City)    (State)    (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/22/2007 | | M (1) | | 1,482 | A | $0 | 37,006 | D | |
| Common Stock | 03/22/2007 | | S | | 1,482 | D | $151.26 | 35,524 | D | |
| Common Stock | | | | | | | | 1,211 | I | By ESOP |
| Common Stock | | | | | | | | 11,206 | I | Joint with wife |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 03/22/2007 | | M (1) | | | 1,482 | 11/30/2006 | 11/30/2006 | Common Stock | 1,482 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Molinaro Jr., Samuel L.     03/23/2007
** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| MOLINARO SAMUEL L JR | BEAR STEARNS COMPANIES INC [ BSC ] | Director ☐  10% Owner ☐ |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below)   Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 12/21/2007 | EVP/CFO/COO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK   NY   10179 | | X Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | ☐ Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2007 | | M (1) | | 65,468 | A | $0 | 74,176 | I | Joint with wife |
| Common Stock | 12/21/2007 | | S | | 27,726 | D | $89.01 | 46,450 | I | Joint with wife |
| Common Stock | 12/27/2007 | | G | | 3,000 | D | $0 | 43,450 | I | Joint with wife |
| Common Stock | | | | | | | | 38,022 | D | |
| Common Stock | | | | | | | | 1,211 | I | By ESOP |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (2) | 12/21/2007 | | M (1) | | | 65,468 | 11/30/2007 | 11/30/2007 | Common Stock | 65,468 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price.

**Remarks:**

/s/ Molinaro Jr., Samuel L.     12/27/2007

** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
|---|---|---|---|---|
| MOLINARO SAMUEL L JR | BEAR STEARNS COMPANIES INC [ BSC ] | | Director | 10% Owner |
| (Last)       (First)       (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X | Officer (give title below) | Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. | 01/09/2008 | | EVP/CFO/COO | |
| 383 MADISON AVENUE | | | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | | |
| NEW YORK    NY       10179 | | X | Form filed by One Reporting Person | |
| (City)       (State)       (Zip) | | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (1) | 01/09/2008 | | A (2) | | 448 | | 11/30/2007 | 11/30/2007 | Common Stock | 448 | $0 | 448 | D | |
| CAP Units (2003) | (1) | 01/09/2008 | | A (2) | | 512 | | 11/30/2008 | 11/30/2008 | Common Stock | 512 | $0 | 75,381 | D | |
| CAP Units (2004) | (1) | 01/09/2008 | | A (2) | | 376 | | 11/30/2009 | 11/30/2009 | Common Stock | 376 | $0 | 55,251 | D | |
| CAP Units (2005) | (1) | 01/09/2008 | | A (2) | | 397 | | 11/30/2010 | 11/30/2010 | Common Stock | 397 | $0 | 58,359 | D | |
| CAP Units (2006) | (1) | 01/09/2008 | | A (2) | | 454 | | 11/30/2011 | 11/30/2011 | Common Stock | 454 | $0 | 66,820 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price.

2. CAP Units credited to Reporting Person's account (as of 1/9/08) based on Fiscal Year 2007 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

|  | /s/ Molinaro Jr., Samuel L. | 01/09/2008 |
|---|---|---|
| | ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP
OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | **BEAR STEARNS COMPANIES INC [ BSC ]** | __ X __ Director          _____ 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | __ X __ Officer (give title below)   _____ Other (specify below) |
| C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE | 12/19/2005 | **Co-Pres./Co-COO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK, NY 10179 | | _ X _ Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | ___ Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 12/19/2005 | | M [(1)] | | 317266 | A | $0 | 1233331.00 | D | |
| **Common Stock** | 12/19/2005 | | D | | 250000 | D | $116.22 | 983331.00 | D | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | [(2)] | 12/19/2005 | | M [(1)] | | | 317266 | 11/30/2005 | 11/30/2005 | Common Stock | 317266.00 | $0 | 0.00 | D | |

## Explanation of Responses:

( **1** )   Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** )   This type of derivative security typically does not have a conversion or exercise price

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **SCHWARTZ ALAN D C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE** | X | | Co-Pres./Co-COO | |

**NEW YORK, NY 10179**

**Signatures**

| /s/ Schwartz, Alan D. | 12/20/2005 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*       Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

| | |
|---|---|
| | OMB APPROVAL |
| | OMB Number: 3235-0287 |
| | Expires: February 28, 2011 |
| | Estimated average burden hours per response 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | BEAR STEARNS COMPANIES INC [ BSC ] | X Director    10% Owner <br> X Officer (give title below)    Other (specify below) <br> Co-Pres./Co-COO |
| (Last)   (First)   (Middle) <br> C/O BEAR, STEARNS & CO. INC. <br> 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) <br> 12/22/2005 | |
| (Street) <br> NEW YORK   NY   10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X Form filed by One Reporting Person <br> Form filed by More than One Reporting Person |
| (City)   (State)   (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2005) | (1) | 12/22/2005 | | A | | (2) 83,644 | | 11/30/2010 | 11/30/2010 | Common Stock | 83,644 | $116.5 | 83,644 | D | |
| Emp. Stock Option (Rt. to Buy) | $116.5 | 12/22/2005 | | A | | 53,650 | | 12/22/2008 | 12/22/2015 | Common Stock | 53,650 | $0 | 53,650 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/22/05) pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Schwartz, Alan D.     12/23/2005

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| 1. Name and Address of Reporting Person* |
|---|
| SCHWARTZ ALAN D |
| (Last)        (First)        (Middle) |
| C/O BEAR, STEARNS & CO. INC. |
| 383 MADISON AVENUE |
| (Street) |
| NEW YORK    NY    10179 |
| (City)    (State)    (Zip) |

| 2. Issuer Name **and** Ticker or Trading Symbol |
|---|
| BEAR STEARNS COMPANIES INC [ BSC ] |

**3. Date of Earliest Transaction (Month/Day/Year)**
12/23/2005

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

| X | Director | | 10% Owner |
| X | Officer (give title below) | | Other (specify below) |

Co-Pres./Co-COO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

| X | Form filed by One Reporting Person |
| | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/23/2005 | | G | V | 15,000 | D | $0 | 968,331 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Schwartz, Alan D.          01/03/2006

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no
longer subject to Section 16.
Form 4 or Form 5
obligations may continue.
*See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP
OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * SCHWARTZ ALAN D | 2. Issuer Name **and** Ticker or Trading Symbol BEAR STEARNS COMPANIES INC [ BSC ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ X _ Director \_\_\_\_ 10% Owner |
| C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE | 1/9/2006 | _ X _ Officer (give title below) \_\_\_\_ Other (specify below) Co-Pres./Co-COO |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK, NY 10179 (City) (State) (Zip) | | _ X _ Form filed by One Reporting Person \_\_\_ Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 1/9/2006 | | G | V | 15000 | D | $0 | 953331.00 | D | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| SCHWARTZ ALAN D C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE NEW YORK, NY 10179 | X | | Co-Pres./Co-COO | |

**Signatures**

| /s/ Schwartz, Alan D. | 1/10/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*         If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*        Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

OMB APPROVAL

OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | **BEAR STEARNS COMPANIES INC [ BSC ]** | __ X __ Director _____ 10% Owner |
| (Last)  (First)  (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | __ X __ Officer (give title below) _____ Other (specify below) |
| C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE | 2/8/2006 | **Co-Pres./Co-COO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK, NY 10179 | | _ X _ Form filed by One Reporting Person |
| (City)  (State)  (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2000) | (1) | 2/8/2006 | | A | (2) | 20257 | | 11/30/2005 | 11/30/2030 | Common Stock | 20257.00 | $0 | 20257.00 | D | |
| CAP Units (2001) | (1) | 2/8/2006 | | A | (2) | 2620 | | 11/30/2006 | 11/30/2006 | Common Stock | 2620.00 | $0 | 43666.00 | D | |
| CAP Units (2002) | (1) | 2/8/2006 | | A | (2) | 9091 | | 11/30/2007 | 11/30/2007 | Common Stock | 9091.00 | $0 | 151483.00 | D | |
| CAP Units (2003) | (1) | 2/8/2006 | | A | (2) | 9126 | | 11/30/2008 | 11/30/2008 | Common Stock | 9126.00 | $0 | 152064.00 | D | |
| CAP Units (2004) | (1) | 2/8/2006 | | A | (2) | 5566 | | 11/30/2009 | 11/30/2009 | Common Stock | 5566.00 | $0 | 92744.00 | D | |

**Explanation of Responses:**

( **1** )  This type of derivative security typically does not have a conversion or exercise price

( **2** )  CAP Units credited to Reporting Person's account (as of 2/8/06) based on Fiscal Year 2005 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | | | | |

| | Director | 10% Owner | Officer | Other |
|---|---|---|---|---|
| **SCHWARTZ ALAN D**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | **X** | | **Co-Pres./Co-COO** | |

**Signatures**

| /s/ Schwartz, Alan D. | 2/9/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **SCHWARTZ ALAN D** | **BEAR STEARNS COMPANIES INC [ BSC ]** | \_ X \_ Director \_\_\_\_\_ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | \_ X \_ Officer (give title below) \_\_\_\_\_ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **2/23/2006** | **Co-Pres./Co-COO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | \_ X \_ Form filed by One Reporting Person |
| (City) (State) (Zip) | | \_\_ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 2/23/2006 | | M (1) | | 20257 | A | $0 | 973588.00 | D | |
| **Common Stock** | 2/23/2006 | | S | | 6400 | D | $135.08 | 967188.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (2) | 2/23/2006 | | M (1) | | | 20257 | 11/30/2005 | 11/30/2005 | Common Stock | 20257.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1** ) Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** ) This type of derivative security typically does not have a conversion or exercise price

## Reporting Owners

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **SCHWARTZ ALAN D** **C/O BEAR, STEARNS & CO. INC.** **383 MADISON AVENUE** | X | | Co-Pres./Co-COO | |

**Signatures**

| /s/ Schwartz, Alan D. | 2/24/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*      If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

| 1. Name and Address of Reporting Person * SCHWARTZ ALAN D | 2. Issuer Name **and** Ticker or Trading Symbol **BEAR STEARNS COMPANIES INC [ BSC ]** | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| (Last)      (First)      (Middle) C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE | 3. Date of Earliest Transaction (MM/DD/YYYY) 3/27/2006 | __ X __ Director          _____ 10% Owner __ X __ Officer (give title below)   _____ Other (specify below) Co-Pres./Co-COO |
| (Street) NEW YORK, NY 10179 (City)      (State)      (Zip) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) _ X _ Form filed by One Reporting Person ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 3/27/2006 | | G | V | 13857 | D | $0 | 953331.00 | D | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **SCHWARTZ ALAN D C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE NEW YORK, NY 10179** | **X** | | **Co-Pres./Co-COO** | |

**Signatures**

| /s/ Schwartz, Alan D. | 3/28/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

*       If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

**      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | BEAR STEARNS COMPANIES INC [ BSC ] | X Director        10% Owner X Officer (give title below)   Other (specify below) Co-Pres./Co-COO |
| (Last)        (First)        (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 10/27/2006 | |
| (Street) NEW YORK    NY       10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person   Form filed by More than One Reporting Person |
| (City)     (State)     (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 10/27/2006 | | G | V | 655 | D | $0 | 952,676 | D | |
| Common Stock | 10/30/2006 | | G | V | 20,000 | D | $0 | 932,676 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

| | /s/ Schwartz, Alan D. | 10/31/2006 |
|---|---|---|
| | ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | BEAR STEARNS COMPANIES INC [ BSC ] | X Director     10% Owner |
| (Last) (First) (Middle) C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/18/2006 | X Officer (give title below)    Other (specify below) Co-Pres./Co-COO |
| (Street) NEW YORK NY 10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) X Form filed by One Reporting Person    Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/18/2006 | | M (1) | | 43,666 | A | $0 | 976,342 | D | |
| Common Stock | 12/18/2006 | | S | | 21,833 | D | $164.72 | 954,509 | D | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 12/18/2006 | | M (1) | | | 43,666 | 11/30/2006 | 11/30/2006 | Common Stock | 43,666 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Schwartz, Alan D.                12/19/2006
** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

# FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

**1. Name and Address of Reporting Person***
SCHWARTZ ALAN D

(Last)         (First)         (Middle)
C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)
NEW YORK   NY        10179

(City)      (State)      (Zip)

**2. Issuer Name and Ticker or Trading Symbol**
BEAR STEARNS COMPANIES INC
[ BSC ]

**3. Date of Earliest Transaction (Month/Day/Year)**
12/20/2006

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

| X | Director | | 10% Owner |
| X | Officer (give title below) | | Other (specify below) |

Co-Pres./Co-COO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

| X | Form filed by One Reporting Person |
| | Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2006) | (1) | 12/20/2006 | | A (2) | | 84,769 | | 11/30/2011 | 11/30/2011 | Common Stock | 84,769 | $0 | 84,769 | D | |
| Emp. stock option (rt. to buy) | $165.32 | 12/20/2006 | | A | | 33,847 | | 12/20/2009 | 12/20/2016 | Common Stock | 33,847 | $0 | 33,847 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/20/06 pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Schwartz, Alan D.                12/21/2006
** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

| 1. Name and Address of Reporting Person* |
|---|
| SCHWARTZ ALAN D |
| (Last)      (First)      (Middle) |
| C/O BEAR, STEARNS & CO. INC. |
| 383 MADISON AVENUE |
| (Street) |
| NEW YORK   NY      10179 |
| (City)   (State)   (Zip) |

| 2. Issuer Name **and** Ticker or Trading Symbol |
|---|
| BEAR STEARNS COMPANIES INC [ BSC ] |

| 3. Date of Earliest Transaction (Month/Day/Year) |
|---|
| 12/21/2006 |

| 4. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|

| 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|
| X   Director            10% Owner |
| X   Officer (give title below)   Other (specify below) |
| Co-Pres./Co-COO |

| 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|
| X   Form filed by One Reporting Person |
| Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2006 | | G | V | 20,000 | D | $0 | 934,509 | D | |
| Common Stock | 12/21/2006 | | G | V | 1,815 | D | $0 | 932,694 | D | |
| Common Stock | 12/21/2006 | | G | V | 1,210 | D | $0 | 931,484 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Schwartz, Alan D.        12/22/2006

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

# FORM 4

| | |
|---|---|
| OMB APPROVAL | |
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

**1. Name and Address of Reporting Person***

SCHWARTZ ALAN D

(Last)     (First)     (Middle)

C/O BEAR, STEARNS & CO. INC.

383 MADISON AVENUE

(Street)

NEW YORK    NY     10179

(City)     (State)     (Zip)

**2. Issuer Name and Ticker or Trading Symbol**

BEAR STEARNS COMPANIES INC [ BSC ]

**3. Date of Earliest Transaction (Month/Day/Year)**

02/14/2007

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

X Director      10% Owner

X Officer (give title below)    Other (specify below)

Co-Pres./Co-COO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

X Form filed by One Reporting Person

☐ Form filed by More than One Reporting Person

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (1) | 02/14/2007 | | A (2) | | 2,934 | | 11/30/2006 | 11/30/2006 | Common Stock | 2,934 | $0 | 2,934 | D | |
| CAP Units (2002) | (1) | 02/14/2007 | | A (2) | | 10,179 | | 11/30/2007 | 11/30/2007 | Common Stock | 10,179 | $0 | 161,662 | D | |
| CAP Units (2003) | (1) | 02/14/2007 | | A (2) | | 10,217 | | 11/30/2008 | 11/30/2008 | Common Stock | 10,217 | $0 | 162,281 | D | |
| CAP Units (2004) | (1) | 02/14/2007 | | A (2) | | 6,232 | | 11/30/2009 | 11/30/2009 | Common Stock | 6,232 | $0 | 98,976 | D | |
| CAP Units (2005) | (1) | 02/14/2007 | | A (2) | | 5,620 | | 11/30/2010 | 11/30/2010 | Common Stock | 5,620 | $0 | 89,264 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 2/14/07) based on Fiscal Year 2006 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Schwartz, Alan D.      02/15/2007

** Signature of Reporting Person     Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, see Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, see Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

| | OMB APPROVAL |
|---|---|
| | OMB Number: 3235-0287 |
| | Expires: February 28, 2011 |
| | Estimated average burden hours per response 0.5 |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | BEAR STEARNS COMPANIES INC [ BSC ] | X Director       10% Owner |
| (Last)   (First)   (Middle) | | X Officer (give title below)   Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. | 3. Date of Earliest Transaction (Month/Day/Year) 03/22/2007 | Co-Pres./Co-COO |
| 383 MADISON AVENUE | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK   NY   10179 | | X Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/22/2007 | | M (1) | | 2,934 | A | $0 | 934,418 | D | |
| Common Stock | 03/22/2007 | | S | | 1,500 | D | $151.26 | 932,918 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 03/22/2007 | | M (1) | | | 2,934 | 11/30/2006 | 11/30/2006 | Common Stock | 2,934 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Schwartz, Alan D.                    03/23/2007

** Signature of Reporting Person                    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SCHWARTZ ALAN D | BEAR STEARNS COMPANIES INC [ BSC ] | X  Director                              10% Owner<br>X  Officer (give title below)       Other (specify below)<br>President |
| (Last)        (First)        (Middle)<br>C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>12/21/2007 | |
| (Street)<br>NEW YORK      NY        10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X  Form filed by One Reporting Person<br>Form filed by More than One Reporting Person |
| (City)        (State)        (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2007 | | M (1) | | 161,662 | A | $0 | 1,094,580 | D | |
| Common Stock | 12/21/2007 | | S | | 67,900 | D | $89.01 | 1,026,680 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (2) | 12/21/2007 | | M (1) | | | 161,662 | 11/30/2007 | 11/30/2007 | Common Stock | 161,662 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.
2. This type of derivative security typically does not have a conversion or exercise price.

**Remarks:**

/s/ Schwartz, Alan D.          12/21/2007
** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| SCHWARTZ ALAN D | BEAR STEARNS COMPANIES INC [ BSC ] | X Director | 10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below) | Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 01/09/2008 | CEO, President | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| NEW YORK    NY      10179 | | X Form filed by One Reporting Person | |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned** (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2002) | (1) | 01/09/2008 | | A (2) | | 1,107 | | 11/30/2007 | 11/30/2007 | Common Stock | 1,107 | $0 | 1,107 | D | |
| CAP Units (2003) | (1) | 01/09/2008 | | A (2) | | 1,111 | | 11/30/2008 | 11/30/2008 | Common Stock | 1,111 | $0 | 163,392 | D | |
| CAP Units (2004) | (1) | 01/09/2008 | | A (2) | | 677 | | 11/30/2009 | 11/30/2009 | Common Stock | 677 | $0 | 99,653 | D | |
| CAP Units (2005) | (1) | 01/09/2008 | | A (2) | | 611 | | 11/30/2010 | 11/30/2010 | Common Stock | 611 | $0 | 89,875 | D | |
| CAP Units (2006) | (1) | 01/09/2008 | | A (2) | | 580 | | 11/30/2011 | 11/30/2011 | Common Stock | 580 | $0 | 85,349 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 1/9/08) based on Fiscal Year 2007 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Schwartz, Alan D.                    01/09/2008

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **SPECTOR WARREN J** | **BEAR STEARNS COMPANIES INC [ BSC ]** | _ X _ Director _____ 10% Owner |
| (Last) (First) (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | _ X _ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | 12/19/2005 | Co-Pres./Co-COO |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City) (State) (Zip) | | ___ Form filed by More than One Reporting Person |

## Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| **Common Stock** | 12/19/2005 | | M (1) | | 385592 | A | $0 | 616398.00 | D | |
| **Common Stock** | 12/19/2005 | | D | | 385592 | D | $116.22 | 230806.00 | D | |

## Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (2) | 12/19/2005 | | M (1) | | | 385592 | 11/30/2005 | 11/30/2005 | Common Stock | 385592.00 | $0 | 0.00 | D | |

**Explanation of Responses:**

( **1** )   Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

( **2** )   This type of derivative security typically does not have a conversion or exercise price

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | Director | 10% Owner | Officer | Other |
| **SPECTOR WARREN J C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE** | X | | Co-Pres./Co-COO | |

**Signatures**

| | |
|---|---|
| /s/ Spector, Warren J. | 12/20/2005 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:  File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|
| SPECTOR WARREN J | BEAR STEARNS COMPANIES INC [ BSC ] | X Director | 10% Owner |
| (Last)      (First)      (Middle) | | X Officer (give title below) | Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year) 12/22/2005 | Co-Pres./Co-COO | |
| (Street) NEW YORK   NY   10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| | | X Form filed by One Reporting Person | |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2005) | (1) | 12/22/2005 | | A | | (2) 83,644 | | 11/30/2010 | 11/30/2010 | Common Stock | 83,644 | $116.5 | 83,644 | D | |
| Emp. Stock Option (Rt. to Buy) | $116.5 | 12/22/2005 | | A | | 53,650 | | 12/22/2008 | 12/22/2015 | Common Stock | 53,650 | $0 | 53,650 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/22/05) pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Spector, Warren J.                12/23/2005

\*\* Signature of Reporting Person              Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person[*] | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | |
|---|---|---|---|---|
| SPECTOR WARREN J | BEAR STEARNS COMPANIES INC [ BSC ] | X  Director | | 10% Owner |
| (Last)    (First)    (Middle) | | X  Officer (give title below) | | Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. | 3. Date of Earliest Transaction (Month/Day/Year) | Co-Pres./Co-COO | | |
| 383 MADISON AVENUE | 12/23/2005 | | | |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | | |
| NEW YORK    NY    10179 | | X  Form filed by One Reporting Person | | |
| (City)    (State)    (Zip) | | Form filed by More than One Reporting Person | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/23/2005 | | G | V | 150,000 | D | $0 | 80,806 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

|  | /s/ Spector, Warren J. | 01/03/2006 |
|---|---|---|
| | ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

## FORM 4

[ ] Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0287
Expires: January 31, 2008
Estimated average burden
hours per response... 0.5

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP OF SECURITIES

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public
Utility Holding Company Act of 1935 or Section 30(f) of the
Investment Company Act of 1940

| 1. Name and Address of Reporting Person * | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **SPECTOR WARREN J** | **BEAR STEARNS COMPANIES INC [ BSC ]** | __ X __ Director _____ 10% Owner |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (MM/DD/YYYY) | __ X __ Officer (give title below) _____ Other (specify below) |
| **C/O BEAR, STEARNS & CO. INC., 383 MADISON AVENUE** | **2/8/2006** | **Co-Pres./Co-COO** |
| (Street) | 4. If Amendment, Date Original Filed (MM/DD/YYYY) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| **NEW YORK, NY 10179** | | _ X _ Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | ___ Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.Title of Security (Instr. 3) | 2. Trans. Date | 2A. Deemed Execution Date, if any | 3. Trans. Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Beneficially Owned ( *e.g.* , puts, calls, warrants, options, convertible securities)

| 1. Title of Derivate Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Trans. Date | 3A. Deemed Execution Date, if any | 4. Trans. Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| **CAP Units (2000)** | (1) | 2/8/2006 | | A (2) | | 24620 | | 11/30/2005 | 11/30/2005 | Common Stock | 24620.00 | $0 | 24620.00 | D | |
| **CAP Units (2001)** | (1) | 2/8/2006 | | A (2) | | 2646 | | 11/30/2006 | 11/30/2006 | Common Stock | 2646.00 | $0 | 44096.00 | D | |
| **CAP Units (2002)** | (1) | 2/8/2006 | | A (2) | | 9145 | | 11/30/2007 | 11/30/2007 | Common Stock | 9145.00 | $0 | 152374.00 | D | |
| **CAP Units (2003)** | (1) | 2/8/2006 | | A (2) | | 9162 | | 11/30/2008 | 11/30/2008 | Common Stock | 9162.00 | $0 | 152651.00 | D | |
| **CAP Units (2004)** | (1) | 2/8/2006 | | A (2) | | 5586 | | 11/30/2009 | 11/30/2009 | Common Stock | 5586.00 | $0 | 93081.00 | D | |

**Explanation of Responses:**

( **1** )   This type of derivative security typically does not have a conversion or exercise price

( **2** )   CAP Units credited to Reporting Person's account (as of 2/8/06) based on Fiscal Year 2005 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Reporting Owners**

| Reporting Owner Name / Address | Relationships | | | |
|---|---|---|---|---|
| | | | | |

| | Director | 10% Owner | Officer | Other |
|---|:---:|:---:|---|:---:|
| **SPECTOR WARREN J**<br>**C/O BEAR, STEARNS & CO. INC.**<br><br>**383 MADISON AVENUE**<br>**NEW YORK, NY 10179** | X | | **Co-Pres./Co-COO** | |

**Signatures**

| /s/ Spector, Warren J. | 2/9/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\*        If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

\*\*      Intentional misstatements or omissions of facts constitute Federal Criminal Violations. *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note:   File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

SEC Form 4

## FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* <br><br> **SPECTOR WARREN J** <br><br> (Last) (First) (Middle) <br> **C/O BEAR, STEARNS & CO. INC.** <br> **383 MADISON AVENUE** <br> (Street) <br> **NEW YORK   NY      10179** <br> (City) (State) (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> **BEAR STEARNS COMPANIES INC** <br> [ BSC ] | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br> X  Director          10% Owner <br> X  Officer (give title below)   Other (specify below) <br> **Co-Pres./Co-COO** |
|---|---|---|
| | 3. Date of Earliest Transaction (Month/Day/Year) <br> **12/04/2006** | |
| | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X  Form filed by One Reporting Person <br> ☐  Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/04/2006 | | G | V | 36 | D | $0 | 80,770 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

Explanation of Responses:

/s/ Spector, Warren J.          12/05/2006

** Signature of Reporting Person       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

\* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

\*\* Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

## FORM 4

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* <br> **SPECTOR WARREN J** <br><br> (Last)      (First)      (Middle) <br> C/O BEAR, STEARNS & CO. INC. <br> 383 MADISON AVENUE <br><br> (Street) <br> NEW YORK    NY    10179 <br> (City)      (State)      (Zip) | 2. Issuer Name **and** Ticker or Trading Symbol <br> **BEAR STEARNS COMPANIES INC** <br> [ BSC ] <br><br> 3. Date of Earliest Transaction (Month/Day/Year) <br> 12/18/2006 <br><br> 4. If Amendment, Date of Original Filed (Month/Day/Year) | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br> X  Director      10% Owner <br> X  Officer (give title below)      Other (specify below) <br> Co-Pres./Co-COO <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X  Form filed by One Reporting Person <br> ☐  Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/18/2006 | | M (1) | | 44,096 | A | $0 | 124,866 | D | |
| Common Stock | 12/18/2006 | | D | | 44,096 | D | $164.68 | 80,770 | D | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 12/18/2006 | | M (1) | | | 44,096 | 11/30/2006 | 11/30/2006 | Common Stock | 44,096 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Spector, Warren J.    12/19/2006

** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| SPECTOR WARREN J | BEAR STEARNS COMPANIES INC [ BSC ] | X Director    10% Owner<br>X Officer (give title below)    Other (specify below)<br>Co-Pres./Co-COO |

| (Last) (First) (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) |
|---|---|
| C/O BEAR, STEARNS & CO. INC. | 12/20/2006 |
| 383 MADISON AVENUE | |

| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
|---|---|---|
| NEW YORK   NY    10179 | | X Form filed by One Reporting Person<br>Form filed by More than One Reporting Person |
| (City) (State) (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
*(e.g., puts, calls, warrants, options, convertible securities)*

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2006) | (1) | 12/20/2006 | | A | | 85,001 (2) | | 11/30/2011 | 11/30/2011 | Common Stock | 85,001 | $0 | 85,001 | D | |
| Emp. stock option (rt. to buy) | $165.32 | 12/20/2006 | | A | | 33,938 | | 12/20/2009 | 12/20/2016 | Common Stock | 33,938 | $0 | 33,938 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. Deferral of compensation and credit to Reporting Person's Account (as of 12/20/06 pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

| /s/ Spector, Warren J. | 12/21/2006 |
|---|---|
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4(b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

| | |
|---|---|
| Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b). | |

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP**

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| **SPECTOR WARREN J** | **BEAR STEARNS COMPANIES INC** [ BSC ] | X  Director      10% Owner |
| (Last)      (First)      (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X  Officer (give title below)    Other (specify below) |
| C/O BEAR, STEARNS & CO. INC. 383 MADISON AVENUE | 12/21/2006 | Co-Pres./Co-COO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| NEW YORK    NY    10179 | | X  Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 12/21/2006 | | M (1) | | 69,197 | A | $38.75 | 149,967 | D | |
| Common Stock | 12/21/2006 | | S | | 69,197 | D | $164.12 | 80,770 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Employee Stock Option (Right to Buy) | $38.75 | 12/21/2006 | | M (1) | | | 69,197 | 01/10/2003 | 01/10/2010 | Common Stock | 69,197 | $0 | 0 | D | |

**Explanation of Responses:**

1. Exercise of Employee Stock Option (Right to Buy) granted 01/10/00 and distribution of common stock to Reporting Person pursuant to Issuer's Stock Award Plan, exempt under Rule 16b-3.

**Remarks:**

| | |
|---|---|
| /s/ Spector, Warren J. | 12/21/2006 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

## FORM 4

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
| --- | --- | --- |
| SPECTOR WARREN J | BEAR STEARNS COMPANIES INC [ BSC ] | X Director  10% Owner<br>X Officer (give title below)  Other (specify below)<br>Co-Pres./Co-COO |
| (Last)        (First)        (Middle)<br>C/O BEAR, STEARNS & CO. INC.<br>383 MADISON AVENUE | 3. Date of Earliest Transaction (Month/Day/Year)<br>01/11/2007 | |
| (Street)<br>NEW YORK   NY      10179 | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X Form filed by One Reporting Person<br>☐ Form filed by More than One Reporting Person |
| (City)      (State)      (Zip) | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 01/11/2007 | | G | V | 5,900 | D | $0 | 74,870 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

**Remarks:**

/s/ Spector, Warren J.          01/16/2007
** Signature of Reporting Person       Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

## FORM 4

Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

**1. Name and Address of Reporting Person***

SPECTOR WARREN J

(Last)   (First)   (Middle)

C/O BEAR, STEARNS & CO. INC.

383 MADISON AVENUE

(Street)

NEW YORK   NY   10179

(City)   (State)   (Zip)

**2. Issuer Name** and Ticker or Trading Symbol

BEAR STEARNS COMPANIES INC
[ BSC ]

**3. Date of Earliest Transaction (Month/Day/Year)**

02/14/2007

**4. If Amendment, Date of Original Filed (Month/Day/Year)**

**5. Relationship of Reporting Person(s) to Issuer** (Check all applicable)

| X | Director | | 10% Owner |
| X | Officer (give title below) | | Other (specify below) |

Co-Pres./Co-COO

**6. Individual or Joint/Group Filing (Check Applicable Line)**

| X | Form filed by One Reporting Person |
| | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction (s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (1) | 02/14/2007 | | A (2) | | 2,962 | | 11/30/2006 | 11/30/2006 | Common Stock | 2,962 | $0 | 2,962 | D | |
| CAP Units (2002) | (1) | 02/14/2007 | | A (2) | | 10,238 | | 11/30/2007 | 11/30/2007 | Common Stock | 10,238 | $0 | 162,612 | D | |
| CAP Units (2003) | (1) | 02/14/2007 | | A (2) | | 10,258 | | 11/30/2008 | 11/30/2008 | Common Stock | 10,258 | $0 | 162,909 | D | |
| CAP Units (2004) | (1) | 02/14/2007 | | A (2) | | 6,255 | | 11/30/2009 | 11/30/2009 | Common Stock | 6,255 | $0 | 99,336 | D | |
| CAP Units (2005) | (1) | 02/14/2007 | | A (2) | | 5,620 | | 11/30/2010 | 11/30/2010 | Common Stock | 5,620 | $0 | 89,264 | D | |

**Explanation of Responses:**

1. This type of derivative security typically does not have a conversion or exercise price

2. CAP Units credited to Reporting Person's account (as of 2/14/07) based on Fiscal Year 2006 Net Earnings Adjustments pursuant to the Issuer's Capital Accumulation Plan for Senior Managing Directors (CAP Plan); exempt under Rule 16b-3.

**Remarks:**

/s/ Spector, Warren J.        02/15/2007

** Signature of Reporting Person        Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

SEC Form 4

**FORM 4**

□ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

### UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934, Section 17(a) of the Public Utility Holding Company Act of 1935 or Section 30(h) of the Investment Company Act of 1940

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Expires: | February 28, 2011 |
| Estimated average burden hours per response | 0.5 |

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|

**SPECTOR WARREN J**

| (Last) | (First) | (Middle) |
|---|---|---|

C/O BEAR, STEARNS & CO. INC.
383 MADISON AVENUE

(Street)

NEW YORK    NY        10179

| (City) | (State) | (Zip) |
|---|---|---|

2. Issuer Name **and** Ticker or Trading Symbol

**BEAR STEARNS COMPANIES INC**
[ BSC ]

3. Date of Earliest Transaction (Month/Day/Year)
03/22/2007

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

| X | Director | | 10% Owner |
|---|---|---|---|
| X | Officer (give title below) | | Other (specify below) |

Co-Pres./Co-COO

6. Individual or Joint/Group Filing (Check Applicable Line)

| X | Form filed by One Reporting Person |
|---|---|
| | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 03/22/2007 | | M (1) | | 2,962 | A | $0 | 77,832 | D | |
| Common Stock | 03/22/2007 | | S | | 2,962 | D | $151.26 | 74,870 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| CAP Units (2001) | (2) | 03/22/2007 | | M (1) | | | 2,962 | 11/30/2006 | 11/30/2006 | Common Stock | 2,962 | $0 | 0 | D | |

**Explanation of Responses:**

1. Settlement of CAP Units and distribution of common stock to Reporting Person pursuant to CAP Plan; exempt under Rule 16b-3.

2. This type of derivative security typically does not have a conversion or exercise price

**Remarks:**

/s/ Spector, Warren J.                03/23/2007

** Signature of Reporting Person          Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**