UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

IN RE BEAR STEARNS COMPANIES, INC.                08 MDL 1963
SECURITIES, DERIVATIVE, AND ERISA
LITIGATION

This Document Relates To:

    Securities Action, 08 Civ. 2793

-------------------------------------------X

SRM GLOBAL MASTER FUND LIMITED
PARTNERSHIP,

                  Plaintiff,          13 Civ. 2692

    -against-

THE BEAR STEARNS COMPANIES LLC (F/K/A
BEAR STEARNS COMPANIES INC.), ALAN D.              OPINION
SCHWARTZ, SAMUEL L. MOLINARO, JR., JAMES
CAYNE, WARREN SPECTOR and DELOITTE &
TOUCHE LLP,

                  Defendants.

-------------------------------------------X


A P P E A R A N C E S:


        Attorneys for Plaintiffs

        BOIES, SCHILLER & FLEXNER, LLP
        575 Lexington Avenue
        New York, NY 10022
        By:  Philip C. Korologos, Esq.
            Richard B. Drubel, Esq.
            Matthew J. Henken, Esq.

        KOREIN TILLERY, LLC
        205 North Michigan Avenue

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 2|5|14

```
Chicago, IL 60601
By:  George A. Zelcs, Esq.
     Stephen M. Tillery, Esq.
     Douglas R. Sprong, Esq.


Attorneys for Defendant The Bear Stearns Companies LLC

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
By:  Eric S. Goldstein, Esq.
     Brad S. Karp., Esq.
     Jessica S. Carey, Esq.
     Jonathan Hurwitz, Esq.


Attorneys for Defendant Alan D. Schwartz

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
By:  Susan Saltzstein, Esq.


Attorneys for Defendant Samuel L. Molinaro, Jr.

ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
By:  Pamela R. Chepiga, Esq.


Attorneys for Defendant James E. Cayne

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
By:  David S. Frankel, Esq.


Attorneys for Defendant Warren J. Spector

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
```

By:  David B. Anders, Esq.


Attorneys for Defendant Deloitte & Touche LLP

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
By:  Thomas G. Rafferty, Esq.
     Antony L. Ryan, Esq.
     Rachel G. Skaistis, Esq.

**Sweet, D.J.**

The defendants The Bear Stearns Companies LLC (F/K/A The Bear Stearns Companies Inc.) ("Bear Stearns"), Alan D. Schwartz, Samuel L. Molinaro, James Cayne, and Warren Spector (the "Individual Defendants") (collectively, the "Bear Stearns Defendants") and Deloitte & Touche LLP ("Deloitte") (collectively, with the Bear Stearns Defendants, the "Defendants") have moved pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss the Complaint filed by plaintiff SRM Global Master Fund Limited Partnership ("SRM" or the "Plaintiff"). Based on the conclusions set forth below, Defendants' motions are granted.

## I. <u>Prior Proceedings</u>

In the immediate wake of Bear Stearns' near-collapse in mid-March 2008, a series of securities fraud putative class actions were filed against Defendants in the Southern District of New York and other jurisdictions by purchasers of Bear Stearns common stock and stock options, and transferred to this Court by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings. <u>See</u> Transfer

3

Order, In re Bear Stearns Cos. Inc. Sec., Deriv. & ERISA Litig.,
No. 08 MDL 1963 (J.P.M.L. Aug. 19, 2008). Those actions were
consolidated on January 5, 2009 (the "Class Action"). In re Bear
Stearns Cos. Inc. Sec., Deriv. & ERISA Litig., 08 M.D.L. No.
1963(RWS), 2009 WL 50132 (Jan. 5, 2009). On February 27, 2009,
Lead Plaintiff State of Michigan Retirement Systems ("Class
Action Lead Plaintiff") filed the Consolidated Class Action
Complaint ("Class Action Complaint") asserting claims on behalf
of "all persons and entities that, between December 14, 2006 and
March 14, 2008 . . . purchased or otherwise acquired the
publicly traded common stock or other equity securities, or call
options of or guaranteed by Bear Stearns, or sold Bear Stearns
put options and were damaged thereby."

    The Court denied Defendants' motions to dismiss the
consolidated class action complaint on January 19, 2011. In re
Bear Stearns Cos. Inc. Sec., Deriv. & ERISA Litig., 763 F. Supp.
2d 423 (S.D.N.Y. 2011) [hereinafter Bear Stearns I]. The parties
then spent over fourteen months conducting discovery, resulting
in the production of over nine million pages of documents by
Defendants. In May 2012, the parties reached a settlement that
was approved by the Court in orders and final judgments dated
November 28, 2012 ("Class Action Settlement"). (No. 08 MDL 1963,

4

ECF Nos. 337-38, Exs. 10-11.) The Settlement Class was limited
to persons who transacted in Bear Stearns common stock, other
equity securities, or call or put options (the "Class Action
Settlement Class"). (See id. ¶ 3.) SRM did not participate in
any of the Class Action proceedings.

   SRM is a highly sophisticated "multi-billion dollar
hedge fund that takes 'a contrarian and long-term investment'
approach in 'companies or sectors that have been through periods
of stress and are out of favor with the market.'" SRM Global Fund
Ltd. P'ship v. Countrywide Fin. Corp., No. 09 Civ. 5064(RMB), 2010
WL 2473595, at *14 (S.D.N.Y. June 17, 2010) (quoting Tom Cahill &
Katherine Burton, Wood's SRM Global Fell 30% in January, Adding to
2007 Losses, BLOOMBERG (Feb. 6, 2008), http://www.bloomberg.com/
apps/news?pid=21070001&sid=aCPmITS7lZ8k), aff'd 448 F. App'x 116
(2d Cir. 2011). SRM is domiciled and registered as a private
investment fund in the Cayman Islands, and is based in Monaco.
(See Complaint ¶ 12, SRM, No. 09 Civ. 5064 (RMB) (S.D.N.Y. May 29,
2009), ECF No. 1; Carey Aff., Ex. 3.)

   SRM has been represented by its present counsel since at
least May 2009, when SRM sued Countrywide Financial seeking
recovery foe losses that SRM allegedly suffered in the financial

crisis because of an investment in Countrywide. (Complaint, SRM, No. 09 Civ. 5064 (RMB) (S.D.N.Y. May 29, 2009), ECF No. 1.) SRM submitted a request for exclusion from the Class Action Settlement Class in August 2012. SRM filed its complaint for the instant action on April 24, 2013 ("Complaint" or "Compl.").

The instant motions were heard and marked fully submitted on October 23, 2013.

## II. **Allegations of the Complaint**

The Complaint contains many of the same factual allegations as the Class Action Complaint. The facts regarding Bear Stearns' collapse is set forth in detail in this Court's opinion in Bear Stearns I, 763 F. Supp. 2d 423. SRM alleges that, from December 14, 2006 through approximately March 12, 2008, the Bear Stearns and Deloitte Defendants "fraudulently overstated": (i) "the value of [Bear Stearns'] mortgages, mortgage-and asset-backed securities and other derivative financial instruments;" (ii) "the adequacy of its liquidity and capital reserves;" and (iii) "the quality of [Bear Stearns'] risk management." (Compl. ¶ 2; see also id. ¶¶ 39-237.)

6

SRM alleges losses of two types. First, SRM alleges that it "owned shares of Bear [Stearns] stock at least as early as March 2007," and "continued to invest in Bear [Stearns]" until its near collapse. (Compl. ¶ 12.) Following Bear Stearns' near-collapse, it sold its "investment in Bear [Stearns]" between April 1, 2008 and June 2, 2008, and thereby "incur[red] losses of more than $200 million." (Compl. ¶ 6.) According to Defendants, SRM's request for exclusion from the Class Action Settlement Class states that SRM had made its last purchase of Bear Stearns common stock on September 24, 2007 and sold all of its Bear Stearns common stock on the same day, before Bear Stearns' stock price decreased significantly. (Def. Bear Stearns Br., at 6; Carey Aff., Ex. 9.)

Second, SRM alleges losses from its "purchase[ of] security-based swaps representing approximately 3.5 million shares of Bear Stearns common stock" ("Bear Stearns Swaps") between September 24, 2007 and March 12, 2008 (the "Swap Transactions"). (Id. ¶ 13.) SRM purchased its Bear Stearns Swaps by placing orders with UBS Securities LLC ("UBS") and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"). (Id. ¶ 14.) SRM's Bear Stearns Swaps were "total return swaps," which are synthetic instruments designed to mimic all aspects (i.e., the "total return") of a

7

stock as though the stock had been purchased itself. SRM's Bear Stearns Swaps were the functional equivalent of shares of Bear Stearns common stock. (Opp., at 4-5.)[1] SRM alleges that the Bear Stearns Swaps were inflated to precisely the same extent and by precisely the same misrepresentations and omissions as Bear Stearns stock itself, and when Bear Stearns' stock price collapsed, so did the value of SRM's Bear Stearns Swaps.

Deloitte was the independent outside auditor for Bear Stearns, and it provided audit, audit-related, tax and other services to Bear Stearns during fiscal years 2006 and 2007. SRM alleges that Deloitte "consented to and caused the incorporation by reference of its unqualified opinions on Bear[ Stearns'] financial statements for fiscal years 2006 and 2007" which contained misrepresentations and omissions that caused SRM loss. (Compl. ¶ 23.)

SRM alleges that its losses occurred, in part, due to SRM's reliance on Bear Stearns Defendants' false and misleading

---

[1] Citations to "Def. Bear Stearns Br." refer to the Bear Stearns Defendants' Memorandum of Law in Support of their Motion to Dismiss. Citations to "Def. Deloitte Br." refer to Deloitte's Memorandum of Law in Support of Its Motion to Dismiss. Citations to "Opp." refer to SRM's Memorandum of Law in Opposition. Citations to "Bear Stearns Reply" and "Deloitte Reply" refer to the Bear Stearns Defendants' and Deloitte's Reply Memorandum of Laws, respectively.

representations and omissions regarding Bear Stearns' Value at Risk ("VaR") amounts. (Compl. ¶¶ 59, 66.) SRM alleges that Bear Stearns knew the Securities and Exchange Commission ("SEC") had stated that Bear Stearns' VaR models were seriously flawed and the VaR models were never updated to reflect the housing and subprime mortgage downturn. From the VaR published in Bear Stearns' SEC filings, SRM concluded that Bear Stearns was subject to substantially less risk than was in fact the case, and SRM purchased and retained Bear Stearns stock and the Bear Stearns Swaps. (Id. ¶¶ 73, 177.) According to the Complaint and in conflict with SRM's request for exclusion from the Class Action Settlement Class, between April 1 and June 2, 2008, after Bear Stearns had collapsed, it is alleged that SRM sold its holdings of Bear Stearns stock and the Bear Stearns Swaps, at a significant loss. Plaintiff alleges losses of more than $200 million on its investment. (Compl. ¶ 243.)

Based on its allegations, SRM asserts claims against the Bear Stearns and Deloitte Defendants for alleged violations of: (i) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (id. ¶¶ 519-23); (ii) Section 18 of the Exchange Act, based on misrepresentations supposedly made in documents filed pursuant to

9

the Exchange Act (id. ¶¶ 524-30); and (iii) common law fraud (id. ¶¶ 535-48). SRM also asserts a claim against the Individual Defendants for alleged "control person" liability under Section 20(a) of the Exchange Act. (Compl. ¶¶ 531-34.)

## III.  Discussion

### a. The Rule 9(b) and 12(b) Standard

The Bear Stearns Defendants and Deloitte have moved to dismiss the Complaint pursuant to the Federal Rules of Civil Procedure 9(b) and 12(b)(6). On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . . .'" Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Though the Court must accept the factual allegations of a complaint as true, it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" Iqbal, 129 S. Ct. at 1950 (quoting Twombly, 550 U.S. at 555).

Rule 9(b) requires that averments of fraud be "state[d] with particularity." Fed. R. Civ. P. 9(b); see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). To satisfy this requirement, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks and citation omitted). General,

11

conclusory, or speculative allegations, unsupported by specific facts, are legally insufficient. Id. at 176.

### b. **SRM's Section 10(b) Claims Are Dismissed**

#### i. The 10(b) Claims Are Time-Barred

Private actions under Section 10(b) of the Exchange Act are subject to a two-year statute of limitations and a five-year statute of repose. "[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws [defined to include the Exchange Act] . . . may be brought not later than the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). See P. Stolz. Family P'Ship L.P. v. Daum, 355 F.3d 92, 104 (2d Cir. 2004) (interpreting the five-year limit in § 1658(b)(2) as a "statute of repose"); McCann v. Hy-Vee, Inc., 663 F.3d 926, 930-32 (7th Cir. 2011) (same); Arco Cap. Corp. v. Deutsche Bank AG, No. 12 Civ. 7270, 2013 WL 2467986, at *10 (S.D.N.Y. June 6, 2013) ("An action under Section 10(b) . . . is subject to a five-year statute of repose . . . which is independent of a plaintiff's

12

awareness of the violation and is not subject to equitable tolling."); In re Longtop Fin. Techs. Ltd. Sec. Litig., No. 11 Civ. 3658, 2013 WL 1410147, at *12 (S.D.N.Y. Apr. 8, 2013) ("'[C]ourts in this district have treated Section 1658(b)(2) as a statute of repose and [ ] stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made.'") (quoting Boudinot v. Shrader, No. 09 Civ. 10163, 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012)).

As described in the Complaint, SRM's claims are based on an alleged valuation fraud that revealed itself when Bear Stearns nearly collapsed in mid-March 2008. SRM asserts that Defendants made false and misleading statements about Bear Stearns' risk management and financial condition between December 14, 2006 and March 12, 2008. (Compl. ¶¶ 39-237; see also id. ¶¶ 484-515.) Under the five-year statute of repose, any Section 10(b) claims based on even the latest of these statements were required to be brought before March 12, 2013.

SRM has contended that the pendency of the Class Action tolled the statute of repose for its Section 10(b) claims pursuant to American Pipe & Construction Co. v. Utah, 414 U.S. 538, 94 S. Ct. 756, 38 L.Ed.2d 713 (1974). However, the Second

13

Circuit recently issued <u>Police & Fire Ret. Sys. of Detroit v.
IndyMac MBS, Inc.</u>, 721 F.3d 95 (2d Cir. 2013), relating to the
statute of repose under Section 13 of the Securities Act of 1933
("Securities Act"). The Second Circuit held that the statute of
repose was not tolled because although a statute of limitations
may be tolled, a statute of repose cannot be. <u>Id.</u>, 721 F.3d at
109-10.

> Statutes of limitations limit the availability of remedies
> and, accordingly, may be subject to equitable
> considerations, such as tolling, or a discovery rule. In
> contrast, statutes of repose affect the underlying right,
> not just the remedy, and thus they run without interruption
> once the necessary triggering event has occurred, even if
> equitable considerations would warrant tolling or even if
> the plaintiff has not yet, or could not yet have,
> discovered that she has a cause of action.

<u>Id.</u> at 106 (quoting <u>Fed. Hous. Fin. Agency v. UBS Ams. Inc.</u>, 712
F.3d 136, 140 (2d Cir. 2013)).

Thus, "in contrast to statutes of limitations,
statutes of repose 'create a substantive right in those
protected to be free from liability after a legislatively-
determined period of time.'" <u>Id.</u> (citation omitted). The Second
Circuit stated that "[t]his conceptual distinction carries
significant practical consequences . . . as most important here,

14

a statute of repose is 'subject only to legislatively created exceptions' and not to equitable tolling." Id. (quoting Stolz, 355 F.3d at 102); see also IndyMac at 107 ("[A] statute of repose . . . is said to be 'absolute.'").

Like Section 13, Section 10(b) is subject to two time periods: a two-year statute of limitations, which is subject to tolling or extension based on the plaintiff's lack of knowledge, and a five-year statute of repose, which is not. Here, the second time period of Section 10(b), the statute of repose, states that "[A] private right of action . . . may be brought not later than . . . 5 years after such violation."[2] 28 U.S.C. § 1658(b).

SRM has contended that IndyMac's holding is confined to the Section 13 statute of repose, because that was the only statute directly at issue. (Opp., at 12-17.) However, the Second Circuit's reasoning in IndyMac was based on general principles applicable to all statutes of repose. The Second Circuit reasoned that "in contrast to statutes of limitations, statutes of repose create a substantive right in those protected to be

_____

[2] SRM concedes that an "action under section 10(b) . . . is subject to a five-year statute of repose," and that its claim was filed outside the five-year statute of repose period. (Opp., at 10-11.)

15

free from liability" that are "subject only to legislatively created exceptions." IndyMac, 721 F.3d at 106 (quotation marks omitted). Because American Pipe tolling is not such a legislatively created exception, the court concluded that it did not apply to statutes of repose. Id. at 106-110.

SRM has also contended that "there is nothing in Section 1658(b)(2) creating a 'substantive' right different in kind from the right created by [Section 1658](b)(1)." (Opp., at 16.) But courts have repeatedly found that Section 1658(b)(2) is a statute of repose, see Stolz., 355 F.3d at 104; McCann, 663 F.3d at 930-32; Arco Cap. Corp., 2013 WL 2467986, at *10; In re Longtop, 2013 WL 1410147, at *12, which, according to IndyMac, does create a substantive right, and that Section 1658(b)(1) is merely a statute of limitations. See IndyMac, 721 F.3d at 106 ("[t]his conceptual distinction carries significant practical consequences.").

SRM has contended that the Second Circuit "emphasize[d]" the particular language in Section 13 in deciding whether the statute of repose could be tolled. (Opp., at 12.). However, the Court cited the specific language of the statute only in explaining why the statute was one of repose rather than

16

of limitations. See IndyMac 721 F.3d at 100 n.1, 107. The Second Circuit then reached its conclusion that American Pipe tolling did not apply based on reasoning applicable to all statutes of repose: that they create a substantive right to absolve from liability those protected after a period of time.[3] Id. at 106. Thus, the difference in language between the statue of repose in Section 1658(b)(2) and Section 13 is immaterial as both create a substantive right.

SRM also has relied on a statement in American Pipe suggesting that the application of tolling should turn "not [on] whether a time limitation is 'substantive' or 'procedural' but whether tolling the limitation in a given context is consonant with the legislative scheme," and argues that tolling would be consonant with the statutory scheme applicable to Section 10(b) claims. (Opp. 16 (quoting American Pipe, 414 U.S. at 557-58).)

---

[3] The Second Circuit did not find it necessary to resolve whether American Pipe tolling was "equitable" or "legal." The Court reasoned that if the American Pipe tolling rule is "properly classified as 'equitable,'" then application of tolling is barred by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S. Ct. 2773, 115 L.Ed.2d 321 (1991), which held that "equitable 'tolling principles do not apply to [statute of repose] period.'" IndyMac, 721 F.3d at 109 (quoting Lampf, 501 U.S. at 363, 111 S. Ct. at 2782). On the other hand, if American Pipe tolling is a "legal" rule, then tolling is barred from enlarging or modifying a substantive right by the Rules Enabling Act, 28 U.S.C. § 2072, which "provides the Supreme Court 'the power to prescribe general rules of practice and procedure,' id. § 2072(a), including the Federal Rules of Civil Procedure, which 'shall not abridge, enlarge or modify any substantive right,' id. § 2072(b)." IndyMac, 721 F.3d at 109.

17

The Second Circuit rejected this argument in IndyMac on the ground that tolling is never consonant with a statute of repose. See IndyMac, 721 F.3d at 109 n.17 (referencing same statement from American Pipe and stating "[t]he American Pipe Court, however, noted the procedural nature of . . . the statutory provision there at issue . . . before concluding 'that a judicial tolling of the statute of limitations does not abridge or modify a substantive right afforded by the antitrust acts.' American Pipe, 414 U.S. at 558 n.29. It did not consider whether procedural rules authorize tolling of a statute of repose defining a substantive right." (certain citations omitted)). SRM's policy arguments about the supposed benefits of tolling a statute of repose likewise were considered and rejected by the Second Circuit. IndyMac, 721 F.3d at 109-10.

SRM also has contended that American Pipe tolling was "statutorily enacted into the Exchange Act's limitations period" as part of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Pub. L. No. 107-204, 116 Stat. 745 (codified in scattered sections of 15 and 18 U.S.C.). According to SRM, Congress did "not [] make any substantive change" to the "basic standards of the law on a statute of limitation" except increasing the time in which plaintiffs could assert Section 10(b) claims. (Opp., at

18

12, 15.) However, if Sarbanes-Oxley did not change the statute of repose, aside from lengthening it, then it did not codify American Pipe tolling, as SRM suggests. Moreover, the statute of repose in Section 13 of the Securities Act was amended around the same time as Section 10(b)'s statute of repose, also by a statute that made no substantive changes but merely updated certain references. See Securities Litigation Uniform Standards Act of 1998, § 301, 112 Stat. 3227 (1998). Yet, as IndyMac holds, American Pipe tolling does not apply to Section 13.

The cases SRM has cited stand for the proposition that, in some circumstances, Congress is presumed to be aware of and adopt existing statutory interpretations when it legislates, but "that presumption applies only to 'settled judicial constructions.'" In re Century Brass Prods., Inc., 22 F.3d 37, 40 (2d Cir. 1994) (citation omitted) (refusing to hold that Congress adopted existing interpretations because "[w]e cannot conclude that such . . . decisions as had been rendered prior to the Code amendments sufficed to settle the law"). Here, there was no such settled judicial determination that American Pipe tolling applied to Section 10(b)'s statute of repose. One of the three district court cases SRM has cited expressly notes that "the availability of [American Pipe tolling] might be

19

questionable," but adopted tolling "[a]bsent guidance from the Fifth Circuit" (Prieto v. John Hancock Mut. Life Ins. Co., 132 F. Supp. 2d 506, 519 (N.D. Tex. 2001)); the second case only addressed the timeliness of plaintiff's claims, an issue raised for the first time in a surreply, in a footnote (In re Discovery Zone Sec. Litig., 181 F.R.D. 582, 600 n.11 (N.D. Ill. 1998)); and the third is from a district court outside of this circuit (Salkind v. Wang, Civ. A. No. 93-10912-WGY, 1995 WL 170122, at *3 (D. Mass. Mar. 30, 1995)). SRM has asserted that, after Sarbanes-Oxley's passage, "virtually all lower courts continued to hold that American Pipe tolling applied to the statute of repose in Section 1658(b)(2)," citing various cases from other circuits and a single case from this circuit. (Opp. 14 n.7.) The law in this circuit differs. See, e.g., In re Longtop, 2013 WL 1410147, at *13 (American Pipe tolling did not apply to § 1658, because although "[s]ome courts have held that the tolling rule of American Pipe . . . applies even to statutes of repose . . . [t]he trend in this District . . . is to hold a period of repose inviolable unless specifically modified by statute."); Plumbers, Pipefitters & MES v. Fairfax Holds., 886 F. Supp. 2d 328, 334-35 (S.D.N.Y. 2012) (holding that "[§ 1658's] plain language and legislative intent behind statutes of repose as well as Supreme Court and Second Circuit precedent" all indicated that statutes

20

of repose were not subject to American Pipe tolling). In re
Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152
(S.D.N.Y. 2012), cited by SRM, recognized that "[c]ourts in this
district are divided . . . as to whether the filing of a class
action complaint similarly tolls the applicable statute of
repose." Id. at 159 (comparing Int'l Fund Mgmt. S.A. v.
Citigroup Inc., 822 F. Supp. 2d 368, 380 (S.D.N.Y. 2011)
(American Pipe tolling applies), and In re Morgan Stanley Mortg.
Pass-Through Certificates Litig., 810 F. Supp. 2d 650, 667
(S.D.N.Y. 2011) (same), with In re Lehman Bros. Sec. & Erisa
Litig., 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011) (American Pipe
tolling does not apply), and Footbridge Ltd. Trust v.
Countrywide Fin. Corp., 770 F. Supp. 2d 618, 624 (S.D.N.Y. 2011)
(same)). The tension between these cases shows that there was no
settled judicial construction of American Pipe tolling on
Section 10(b)'s statute of repose when Sarbanes-Oxley was
enacted or subsequent to its enactment, and the authorities
cited by SRM do not establish "settled judicial construction."
See, e.g., United States v. Powell, 379 U.S. 48, 55 n.13 (1964)
(two district and two circuit court cases, contradicted by one
earlier district court case, "represent[ed] neither a settled
judicial construction, nor one which we should be justified in

21

presuming Congress, by its silence, impliedly approved"
(citation omitted)).

Even if there was a settled judicial construction that
American Pipe tolling applied to Section 10(b)'s statute of
repose, there is no evidence that Congress intended to adopt
that construction in Sarbanes-Oxley, or indeed to make any
substantive changes to the statute. To the contrary, as SRM
accepts, the legislative history shows that Congress was "not
suggesting changing the basic standards of the law on a statute
of limitation" and intended only to extend the length of that
statute. (Opp., at 15 (citing 148 CONG. REC. S6524, S6535 (daily
ed. July 10, 2002)).) Nothing in the text or legislative history
of this unrelated and intentionally narrow amendment suggests
that Congress intended to make a dramatic substantive change by
extending American Pipe tolling to the statute of repose. See
Century Brass, 22 F.3d at 40 (declining to find that Congress
adopted lower court decisions by enacting an unrelated amendment
because "we have seen no indication in the legislative history
that Congress focused at all on the question"); cf. Lorillard v.
Pons, 434 U.S. 575, 581, 98 S. Ct. 866, 870, 55 L. Ed. 2d 40
(1978) (holding that Congress enacted an existing judicial
interpretation of certain provisions because it "exhibited both

a detailed knowledge of the . . . provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation").

SRM also has referenced a Judiciary Committee Report for Sarbanes-Oxley, which, it claims, states that Section 10(b)'s statute of repose "was not subject to equitable tolling, but made no such statement regarding legal tolling, e.g. under American Pipe." (Opp., at 15.) However, the report made clear that no tolling applied, whether legal or equitable. S. Rep. No. 107-146, at 29 (2002) ("Where there is a bifurcated limitations period, with an inner limit running from the time when the fraud was or should have been discovered, the inner limit 'by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The [outer limit] is a period of repose inconsistent with tolling.'" (citing Lampf, 501 U.S. at 363, 111 S. Ct. at 2782 (1991))). As IndyMac makes clear, applying American Pipe to a statute of repose would violate a defendant's substantive rights, and there is no reason to believe that Congress intended to abrogate such rights, without any consideration or explanation, by passing an unrelated amendment that was intentionally limited to a different issue.

23

Moreover, American Pipe tolling can apply to a statute of limitations only when the earlier-filed class action "involved exactly the same cause of action subsequently asserted". Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 467, 95 S. Ct. 1716, 1723, 44 L.Ed.2d 295 (1975). Here, there can be no tolling of the five-year statute of limitations for SRM's Section 10(b) claims, see 28 U.S.C. § 1658(b)(2), based on the Bear Stearns Swaps because the Class Action did not involve swap claims. Claims based on unregistered derivative transactions, such as SRM's Bear Stearns Swaps, are fundamentally different from the claims asserted in the Class Action for common stock traded on the New York Stock Exchange. See, e.g., In re New Oriental Educ. & Tech. Grp. Sec. Litig., 2013 WL 1875102, at *4 (S.D.N.Y. May 6, 2013) (because class action only asserted claims for purchases of stock, not stock options, "the statute of limitations for options holders is running"). There is no way the Bear Stearns Defendants and Deloitte could have anticipated based on the pleadings in the Class Action that years after the Class Action a class member such as SRM (which is a class member by virtue of its losses on Bear Stearns common stock) would file an individual action and add separate swap claims.

24

Cullen v. Margiotta, 811 F.2d 698 (2d Cir. 1987), and Benfield v. Mocatta Metals Corp., 26 F.3d 19 (2d Cir. 1994), do not invite a contrary conclusion. In Cullen, tolling was granted for a civil RICO action after a state court class action was dismissed. 811 F.2d at 721. In Benfield, a class action's claims under the Commodities Exchange Act and for common law fraud tolled subsequent civil RICO claims. 26 F.3d at 23. But unlike Cullen and Benfield, SRM's claims regarding the Swap Transactions involved different financial instruments than those in the Class Action for Bear Stearns' common stock. Defendants did not receive the requisite fair notice "not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs" for claims based on swap transactions. American Pipe, 414 U.S. at 554; cf. Camotex, S.R.L. v. Hunt, 741 F. Supp. 1086, 1091 (S.D.N.Y. 1990) (declining to toll claims based on action alleging class of "all those who purchased or held silver futures, silver bullion, or refined silver in commercial quantities," because it did not sufficiently inform defendants of "the number and generic identity of potential plaintiffs in the action"). Thus, although the June 25, 2012 Class Notice purported to release, against all Defendants, claims "that

25

relate to the purchase of the publicly traded common stock or other equity securities . . . of Bear Stearns during the Class Period," American Pipe tolling can only apply where the same cause of action is asserted. Johnson, 421 U.S. at 467, 95 S. Ct. at 1723. Given such, SRM's cross claim did not toll its claims for damages arising out of the Swap Transactions.

Given such reasoning, American Pipe tolling does not apply to SRM's 10(b) claims, and SRM's claims are time-barred.

### ii.   There Is No Private Right of Action Under Section 10(b) For The Swap Transactions

Prior to the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763 (2000) (codified in scattered sections of 7, 11, 12, and 15 U.S. Code), the anti-fraud provisions in the federal securities laws, including Section 10(b), did not regulate conduct in connection with swap transactions. Caiola v. Citibank, N.A., 137 F. Supp. 2d 362, 371 (S.D.N.Y. 2001) ("[T]he authority to pursue fraud in connection with security-based swaps did not exist prior to the CFMA."), rev'd on other grounds, 295 F.3d 312 (2d Cir. 2002). The CFMA changed that position by extending Section 10(b) to proscribe conduct in

26

connection with "security-based swap agreements," in addition to securities. In making that change, however, the CFMA drew a distinction between swap agreements and securities. See 15 U.S.C. § 78j(b) (prohibiting the use or employment of manipulative or deceptive devices "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any security-based swap agreement"). The CFMA made clear that swap agreements were not considered securities. See 15 U.S.C. § 78c-1(b)(1) ("The definition of 'security' . . . does not include any security-based swap agreement."); CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 654 F.3d 276, 307 (2d Cir. 2011) (Winter, J., concurring) (stating that the CFMA demonstrated "Congress's then perception of a lack of an equivalence between . . . swaps and ownership of the underlying securities"). Ten years later, in 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified in various sections of 7, 12 and 15 U.S.C.), Congress amended the rules to include security-based swaps in the Exchange Act's definition of a security. See 15 U.S.C. § 78c(10) (now defining "security" as including any "security-based swap").

27

To apply the Dodd-Frank's definition of security to Plaintiff's swaps claims would be to apply the definition retroactively to create liability under Section 10(b) that did not exist when the conduct at issue allegedly took place (in this case, between 2006 and 2008). See Caiola, 295 F.3d at 327 (noting that plaintiff faced a "substantial burden" in arguing that the CFMA's changes to Section 10(b) applied retroactively, because it contravened "[e]lementary considerations of fairness" and courts should "apply th[e] time-honored presumption against retroactive legislation unless Congress has clearly manifested its intent to the contrary." (citation omitted)). There is no indication in Dodd-Frank that its new definition of "security" should apply retroactively. Dodd-Frank states that the definition "shall take effect . . . 360 days after the date of the enactment of this subtitle." See Pub. L. No. 111-203 §§ 774, 761(a)(2), 124 Stat. 1376, 1754-55, 1802 (2010).

By expressly excluding swaps from the definition of "securities" in the CFMA, Congress also excluded conduct in connection with swaps from the private right of action under Section 10(b), which was for some time recognized as being limited to conduct in connection with the purchase and sale of securities. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S.

28

723, 731-32, 95 S. Ct. 1917, 1923, 44 L. Ed. 2d 539 (1975) (agreeing with "virtually all lower federal courts facing the issue in the hundreds of reported cases presenting this question over the past quarter century [which] have reaffirmed [the] conclusion that the plaintiff class for purposes of 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities"). The CFMA gave the SEC enforcement authority over conduct relating to swaps by expanding the scope of conduct prohibited by Section 10(b) to cover "security-based swap agreements," see 15 U.S.C. § 78j(b), but it did not alter the scope of the existing, well-defined private right of action relating to securities. If Congress had wanted to equate securities with swaps such that the implied private right of action would apply to both, or to otherwise make clear that parties to swap agreements could bring a private right of action, it did not do so explicitly. See CSX, 654 F.3d at 293 (Winter, J., concurring) ("Congress has been well aware of legal issues involving swaps for years and has repeatedly passed legislation regarding them.").

The Supreme Court has cautioned that, when interpreting the private right of action under Section 10(b), courts "must give 'narrow dimensions . . . to a right of action

29

Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.'" Janus Capital Grp., Inc. v. First Deriv. Traders, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 167, 128 S. Ct. 761, 774, 196 L. Ed. 2d 627 (2008)) (alteration in original); see also Stoneridge, 552 U.S. at 165, 128 S. Ct. at 773 ("Concerns with the judicial creation of a private cause of action caution against its expansion . . . the § 10(b) private right should not be extended beyond its present boundaries."). In the absence of any express statutory language indicating that the limited private right of action under Section 10(b) extended to swap transactions, such an extension will not be implied.

Even if a private right of action for parties to swap transactions under Section 10(b) were implied, that action should be narrowly circumscribed to apply only against persons directly involved in swap transactions, as in Caiola, where a customer alleged that the defendant bank defrauded him in the representations it made about its hedging strategy for the swaps the customer entered into with the bank. See Caiola, 295 F.3d at 315-19. Issuers such as Bear Stearns and auditors such as Deloitte have no relationship or knowledge of the activities of

30

swap parties on a traditional security which are necessarily limited by the issuer's market capitalization and arise out of market transactions. There is no limit on claims based on swap transactions referencing a security, which could involve amounts many times that of capitalization. Cf. Blue Chip Stamps, 421 U.S. at 739, 95 S. Ct. at 1927 (expressing the concern that Rule 10b-5 claims could "lead to large judgments, payable in the last analysis by innocent investors, for the benefit of speculators and their lawyers." (citation omitted)). Because registration of security-based swap agreements was not required during the relevant time period, the issuer of the underlying securities (and others uninvolved in the swap transactions) would have no ability to determine the number of swap transactions in existence, let alone the identity of parties to the swap transactions or the amounts involved in their transactions. The Swap Transactions were private transactions, not registered on any exchange, not disclosed to any regulator, third party, Bear Stearns or Deloitte.

SRM has not disputed that prior to the CFMA "virtually all lower federal courts . . . in the hundreds of reported cases . . . over the past quarter century have reaffirmed . . . that . . . 10(b) and Rule 10b-5 private damage actions [are] limited

31

to purchasers and sellers of securities." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731-32, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975). SRM also has not contested the principle that courts must "give narrow dimensions" to a 10(b) implied right of action and that the right "should not be extended beyond its present boundaries." (Def. Bear Stearns Br. 11-12.)

The cases that SRM has cited are inapposite. One case, O'Hagan, 521 U.S. 642, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997), noted that "only actual purchasers or sellers of securities may maintain a private civil action under § 10(b)" because of "a longstanding limitation on private § 10(b) suits." Id., 521 U.S. at 664, 117 S. Ct. at 2213 (citing Blue Chip Stamps, 421 U.S. 723, 95 S. Ct. 1917, 44 L. Ed. 2d 539); (see Opp., at 3, 22). SRM also refers to dictum in Caiola, 295 F.3d at 327, suggesting that swap transactions "clearly would . . . be covered under Rule 10b-5" after the CFMA, id., but Caiola involved a claim against a counterparty directly involved in a swap transaction, rather than a claim against a third party issuer and the issuer's auditor, as SRM seeks to assert here.

Further, SRM has not identified text or legislative history of the CFMA indicating that Congress intended, when it

32

amended Section 10(b), to extend the private right of action against a securities issuer or auditor to parties of security-based swap agreements. Instead, Congress expressly distinguished between the two. SRM has quoted statements in the CFMA indicating that rules and judicial precedents decided under Section 10(b) "that prohibit fraud . . . shall apply to security-based swap agreement to the same extent as they apply to securities," 15 U.S.C. § 78j(b); (Opp., at 22), but this language refers to the scope of the conduct "prohibit[ed]" by Section 10(b), not the enforcement of that prohibition through an implied right of action.

SRM has contended that Dodd-Frank "was a mere clarification of what was already in CFMA," and that it should apply retroactively. (Opp., at 24); see also Leshinsky v. Telvent GIT, S.A., 873 F. Supp. 2d 582, 590-91 (S.D.N.Y. 2012) (noting that there is a presumption that "a new statute does not apply retroactively" but that "when an amendment merely clarifies existing law, rather than effecting a substantive change to the law, then retroactivity concerns do not come into play"). However, Dodd-Frank was the first time swaps were included in the definition of securities. Numerous sections of Dodd-Frank are expressly described as "clarification[s]," see,

33

e.g., Dodd-Frank §§ 406, 912, 919, 928, 1045, 124 Stat. at 1574,
1824, 1837, 1852, 2017, but the section introducing swap
agreements into the definition of securities is not described as
such, id. § 761, 124 Stat. at 1754-55. Moreover, as noted above,
swap parties were not entitled to assert a private action,
including actions against an issuer, until Dodd-Frank amended
the definition "securities" under the Exchange Act. Dodd-Frank
thus introduced a substantive change to the existing rights and
liabilities and was not a mere clarification. The Caiola Court
addressed an analogous argument, whether the CFMA could be
applied retroactively, and found that the argument faced "a
substantial burden." 295 F.3d at 327. Plaintiff has not met that
burden here.

SRM has cited Leshinsky for the proposition that Dodd-
Frank merely clarifies the CFMA. However, Leshinsky involved an
unrelated issue concerning Dodd-Frank's whistleblower protection
provisions and stated that "[t]he Court today does not express
any view about the retroactive application of Dodd-Frank in
general, or of any other specific provisions of Dodd-Frank." 873
F. Supp. 2d at 601. Accordingly, under all the reasoning given
above, SRM does not have a private right of action against the

34

Defendants for its Section 10(b) claims arising from the Swap Transactions.

### iii. The Section 10(b) Elements

To state a claim under Section 10(b) of the Exchange Act, plaintiffs must plead that defendants "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)). Such claims are subject to the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) and the PSLRA. See GE Investors v. General Elec. Co., 447 F. App'x 229, 230 (2d Cir. 2011).

As previously noted, SRM's Section 10(b) claims are time-barred and SRM does not have a private right of action against Defendants for the Swap Transactions. The court declines to opine on whether SRM would have otherwise met the 10(b) elements against the Defendants at this time.

35

### c. SRM's Section 18 Claims Are Dismissed

#### i. The Section 18 Claims Are Time-Barred

Section 18 provides that "[n]o action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c). The one-year limitations period begins when "plaintiff is put on either actual notice or constructive notice, also known as inquiry notice, of the facts giving rise to his claim." In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402, 421 (S.D.N.Y. 2005); see also In re Fed. Nat'l Mortgage Assoc. Sec., Deriv. & ERISA Litig., 503 F. Supp. 2d 25, 35 (D.D.C. 2007). Section 18 applies only to Exchange Act filings. See 15 U.S.C. § 78r(a).

As previously noted, SRM's claims accrued more than three years prior to the filing of the Complaint. The last Exchange Act filing cited by SRM is Bear Stearns' 2007 10-K, filed on January 29, 2008. (Compl. ¶¶ 211-212.) The last of SRM's Section 18 claims therefore accrued at that time, and

became time-barred on January 29, 2011. Even if SRM's claims accrued when it made its last purchase of Bear Stearns stock (September 24, 2007) or entered into its last Swap Transaction (March 12, 2008), those claims are still time-barred, because the three-year period expired, at the latest, on June 2, 2011.

Regarding the one-year limitations period, the Complaint shows that it had such knowledge since at least March 2008: SRM alleges that there was a series of "partial corrective disclosures" from June 2007 to March 2008 that purportedly revealed to the market Defendants' alleged fraud, (Compl. ¶¶ 482-515), and SRM alleges that the last of these disclosures took place on March 16, 2008. (Id. ¶ 513.)

American Pipe tolling does not save SRM's Section 18 claims. Section 18's three-year post-accrual time period is a statute of repose, see Fujisawa Pharm. Co. v. Kapoor, 115 F.3d 1332, 1336 (7th Cir. 1997); Oaktree Cap. Mgmt., L.P. v. KPMG, No. 2:12-CV-956 JCM (GWF), 2013 WL 4006437, at *15 n.14 (D. Nev. Aug. 5, 2013) ("15 U.S.C. § 78r(c) contains a three-year statute of repose for § 18 claims."); In re Enron Corp. Sec., Derivative & "ERISA" Litig., 540 F.Supp.2d 800, 820 (S.D. Tex. 2007) ("The § 18 claims are subject to a one-year limitations period and a

37

three-year period of repose."), and a statute of repose cannot be tolled by the pendency of a class action in this Circuit. See supra. Class Action Lead Plaintiff also did not assert Section 18 claims in the Class Action, they asserted claims under Sections 10(b) and 20(a), and, as discussed above, only the claims asserted in a class action are tolled under American Pipe. Swap transaction claims were also never asserted in the Class Action.

SRM has not disputed that its Section 18 claim is subject to a three-year subject of repose and that its claim was filed well after the repose period expired. (Opp., at 26.) IndyMac's reasoning applies with equal force to Section 18's statue of repose as Section 10(b)'s, and SRM's Section 18 claims are time-barred for the same reason.

### ii.  There Are No Section 18 Claims For The Swap Transactions

"The Section 18 cause of action requires plaintiffs to plead 'that (1) a false or misleading statement was contained in a document filed pursuant to the Exchange Act (or any rule or regulation thereunder); (2) defendant made or caused to be made the false or misleading statement; (3) plaintiff relied on the

38

false statement; and (4) the reliance caused loss to the plaintiff.'" Int'l Fund, 822 F. Supp. 2d at 385 (quoting Alstom, 406 F. Supp. 2d at 478); see also Ross v. A.H. Robins Co., 607 F.2d 545, 556 (2d Cir. 1979). A plaintiff must also plead that he or she "purchased or sold a security" based on that reliance. 15 U.S.C. § 78r(a). The CFMA did not amend Section 18 to cover security-based swap agreements and, as discussed above, expressly excluded them from the definition of a "security." See 15 U.S.C. § 78c-1(b)(1).

As contended by the Defendants, at all relevant times, Section 18 provided a right of action only where a plaintiff had "purchased or sold a security," not a security-based swap agreement. (Def. Bear Stearns Br., at 19.) SRM has not responded to this contention. Accordingly, for the same reasons applicable to SRM's Section 10(b) claims, SRM does not have a private right of action for its Section 18 claims for the Swap Transactions.

### iii. SRM Has Failed To Adequately Plead Reliance For Its Section 18 Claims

The reliance alleged in a Section 18 claim must be "actual reliance, i.e., 'that [it] actually read and relied on the filed document. Constructive reliance is not sufficient.'"

39

Int'l Fund Mgmt., 822 F. Supp. 2d at 385; see also 15 U.S.C. § 78r(a); In re Marsh & McLennan Cos., Inc. Sec. Litig., 501 F. Supp. 2d 452, 493 (S.D.N.Y. 2006) ("Unlike Section 10(b)'s relaxed standard for pleading reliance . . . Section 18 requires that plaintiffs allege actual reliance on specific statements in covered Exchange Act filings."). SRM's Section 18 claims, which sound in fraud, are subject to the more stringent pleading requirements of Fed R. Civ. P. 9(b). Alstom, 406 F. Supp. 2d at 483 n.45 ("[C]ourts in this Circuit have without hesitation applied Rule 9(b)'s heightened pleading requirements to Section 18 claims.").

SRM's Section 18 claim fails to plead reliance with the specificity required. Although "SRM expressly disavow[ed] any claim of fraudulent or intentional conduct in connection with its Section 18 claim, (Opp., at 26), Rule 9(b) applies whenever "the wording and imputations" of a claim involves fraud, and the rule "is not limited to allegations styled or denominated as fraud." Rombach, 355 F.3d at 171-72. SRM's Complaint makes no attempt to distinguish the factual allegations supporting its Section 18 claim from its Section 10(b) and common law fraud claims (see Compl. ¶ 524), and all three claims are predicated on exactly the same allegations of a

40

"valuation fraud" that defendants supposedly committed with an "intent of deceiving the investing public," (Compl. ¶¶ 2, 5.) Those claims sounding fraud are subject to Rule 9(b). SRM has not cited a case from this circuit to the contrary, and "courts in this circuit have without hesitation applied Rule 9(b)'s heightened pleading requirements to Section 18 claims." Alstom, 406 F. Supp. 2d at 483 n.45.

The Complaint contains the most particularized allegation in its discussion of SRM's reliance on alleged misrepresentations in the Bear Stearns 2006 Form 10-K. (Compl. ¶ 73.) SRM alleges that it "read" and "relied" on the alleged misrepresentations in the 2006 10-K "in deciding whether it should purchase Bear Securities," (id.), which it admits occurred over a year-long period from March 2007 through March 2008, (Opp., at 4-5, 9 n.5). SRM does not link its review of any particular statements in that document or any other document to any actual purchases of Bear Stearns securities and does not identify a particular transaction that it allegedly made in reliance on the document or any other document. SRM's generic response that "every SRM purchase of Bear securities was in reliance on the specific misrepresentations and omissions identified in the Complaint," (Opp., at 29), is not sufficiently

41

particularized.[4]   Given   the   Complaint's   inadequate   pleadings
regarding reliance, SRM has failed to adequately state Section
18 claims against the Defendants.


### d. SRM's Common Law Fraud Claims Are Dismissed


#### i. The Common Law Fraud Claims Are Time-Barred


Under   New   York   law,   the   statute   of   limitations   for
common law fraud is six years from accrual or two years from
actual   or   imputed   discovery.   N.Y.   C.P.L.R.   §   213(8)   (McKinney
2013).   The   six-year   period   runs   from   "the   commission   of   the
fraud".   Peidra   v.   Vanover,   579   N.Y.S.2d   675,   677   (2d   Dep't
1992).   SRM's   common   law   fraud   claims   are   time-barred   to   the
extent they are based on alleged misstatements before April 23,
2007 as SRM's complaint was filed on April 24, 2013. Its fraud

---

[4] SRM also alleges that Deloitte provided "unqualified opinions" on the
quarterly financial statements included in Bear Stearns' Forms 10-Q. (Compl.
¶ 346.) Deloitte's reports in the 10-Qs stated that Deloitte's review was
"substantially less in scope than an audit" and expressly disclaimed "the
expression of an opinion regarding [Bear Stearns'] financial statements taken
as a whole." (Bear Stearns 10-Q dated April 9, 2007, 08 M.D.L. No. 1963
(RWS), ECF No. 69-19, at 32; see also 08 M.D.L. No. 1963 (RWS), ECF Nos. 69-
20 and 69-21.) Moreover, Bear Stearns' 10-Qs did not contain an opinion by
Deloitte on Bear Stearns' quarterly financial statements. Quarterly review
reports with this language "by definition cannot be considered as either an
unqualified opinion or as a qualified opinion and cannot have been relied on
by the Plaintiffs." In re Integrated Res. Real Estate Ltd. P'ships Sec.
Litig., 815 F. Supp. 620, 669 (S.D.N.Y. 1993).

claims therefore must have accrued after April 23, 2007 in order
to be timely.

All of SRM's claims against the Defendants in this
action accrued prior to April 23, 2007. SRM's claims are
premised almost exclusively on alleged statements and supposed
wrongdoing prior to April 23, 2007. (See, e.g., Compl. ¶¶ 24-34,
39-108, 134-38, 199, 263, 279-81, 309-10, 317, 327, 330, 337,
419-20, 430-31, 445-46, 455, 461-62, 470.) SRM relies heavily on
statements in the report indicating that the SEC questioned Bear
Stearns' mortgage and VaR models. (See, e.g., Compl. ¶¶ 49, 50,
70, 419-20, 430-31, 445-46, 455, 461-62, 470.) But, as the
report notes, those criticisms were only made on two occasions,
in 2005 and 2006. (See Compl., Ex. A at 20-21, ECF No. 1-3.)

SRM has identified alleged misrepresentations made by
the Defendants after April 23, 2007 in its Complaint, (see
Compl. ¶¶ 171, 172, 174, 176, 193, 195, 197, 202, 203, 210, 211,
345, 346), and contends that its common law fraud claims are
timely if it alleged "any misrepresentations or omissions on or
after April 24, 2007." (Opp., at 31.) However, SRM cites no case
supporting its position, and there are authorities to the
contrary. See, e.g., Fromer v. Yogel, 50 F. Supp. 2d 227, 245

43

(S.D.N.Y. 1999) ("To the extent [common law fraud] allegations
in the Complaint rely on statements made prior to the six-year
statute of limitations applicable under New York law, see
C.P.L.R. § 213, the motions to dismiss the claim for common law
fraud, as to those statements, are granted"); Bastys v.
Rothschild, No. 97 Civ. 5154 CMGAY, 2000 WL 1810107, at *46
(S.D.N.Y. Nov. 21, 2000) (finding that plaintiff's claims that
relied on alleged misrepresentations made prior to the six-year
limitations period time-barred). The only document that SRM
specifically alleges it relied on in deciding to purchase
securities or the Bear Stearns Swaps is the Bear Stearns 2006
Form 10-K, (Compl. ¶ 73), which was filed on February 13, 2007,
more than six years prior to the filing of the Complaint. SRM
also has not sufficiently pled that it "discovered" the alleged
fraud within two-years prior of the Complaint's filing, and it
cannot avail itself of the two-year discovery rule.


        Similarly, SRM's common law fraud claims against
Deloitte can only rely on Deloitte's opinion in Bear Stearns'
2006 Form 10-K, filed on February 13, 2007, and Deloitte's
opinion in Bear Stearns' 2007 Form 10-K, filed on January 29,
2008. (Compl. ¶¶ 345-346.) For claims against auditors, the New
York Court of Appeals has held that each year's audit is a

44

separate engagement, and the cause of action accrues on the date each year's audit opinion is issued. See Williamson v. PricewaterhouseCoopers LLP, 872 N.E.2d 842, 845 (N.Y. 2007) (accrual for malpractice under N.Y. C.P.L.R. § 214(6)). Thus, for the common law fraud claims against Deloitte based on the 2006 audit opinion, the six-year period began to run on February 13, 2007, and SRM was required to commence the action by February 13, 2013, more than two months before SRM filed its Complaint. The statute of limitations thus bars SRM from bringing common law fraud claims against Deloitte based on the purchase of Bear Stearns stock as a result of the 2006 audit opinion.

For the 2007 audit opinion, the six-year period began to run on January 29, 2008, and the six-year limitations period will run out on January 30, 2014. To the extent SRM's common law fraud claims against Deloitte are based on the 2007 audit opinion, they are timely.[5]

---

[5] SRM last purchased Bear Stearns common stock in September 2007, (see Carey Decl., Ex. 9), before the 2007 audit opinion. Given such, SRM cannot bring claims regarding its purchase of Bear Stearns common stock by asserting reliance on the 2007 audit opinion unless under "holder" claim liability, discussed below.

SRM fares no better for its claims based on the 2006 audit opinion with the alternative limitations period, which is two years from when the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). Here, a reasonably diligent plaintiff could have discovered the alleged fraud in 2008, when Bear Stearns nearly collapsed, or by February 27, 2009, when the Class Action Lead Plaintiff added a federal securities fraud claim against Deloitte in the Class Action. (08 M.D.L. No. 1963 (RWS), ECF No. 61.) Under the two-year discovery rule, SRM's claims based on the 2006 audit are untimely.

SRM's common law fraud claims are not tolled by the pendency of the Class Action as a matter of New York law. American Pipe tolling does not apply to SRM's state claims because it only applies to federal law causes of action. See Casey v. Merck & Co., 653 F.3d 95, 100 (2d Cir. 2011) ("[A] federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction.").

46

In certain circumstances, a New York statute of limitations may be tolled by the pendency of a class action, but New York currently does not recognized tolling where that class action is filed outside New York state court (so-called "cross-jurisdictional tolling"). See Soward v. Deutsche Bank AG, 814 F. Supp. 2d 272, 281-82 (S.D.N.Y. 2011) (refusing to toll state law fraud claims because of earlier class action filed in the S.D.N.Y., as the court "cannot say that New York would adopt cross-jurisdictional tolling and [therefore] declin[ing] to import the doctrine into New York's law"); see also In re Fosamax Prods. Liab. Litig., 694 F. Supp. 2d 253, 258 (S.D.N.Y. 2010), aff'd, Casey v. Merck & Co., 678 F.3d 134 (2d Cir. 2012). (refusing to recognize cross-jurisdictional tolling under Virginia law because "federal courts generally have been disinclined to import cross-jurisdictional tolling into the law of a state that has not ruled on the issue" and "few states . . . currently recognize cross-jurisdictional class action tolling"); Vincent v. Money Store, No. 915 F. Supp. 2d 553, 569-70 (S.D.N.Y. 2013) (quoting Fosamax in a case involving California law).[6] Cross-jurisdictional tolling is at issue

---

[6] Primavera Familienstiftung v. Askin Cap. Mgmt., L.P., 130 F. Supp. 2d 450 (S.D.N.Y. 2001) recognized cross-jurisdictional tolling by directly applying American Pipe to a state statute of limitations, but was decided before Casey and the Second Circuit's clarification that the tolling of state statutes of limitation is not governed by American Pipe. See Casey, 653 F.3d at 100

47

whenever a court considers the timeliness of state law claims originally filed outside that state's courts. See Centaur Classical Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp., 878 F. Supp. 2d 1009, 1017 (C.D. Cal. 2011) (holding that cross-jurisdictional tolling applies even where the class action and subsequent action were both filed in the same federal court, because cross-jurisdictional tolling "includes all situations where a class action is filed outside the . . . state court system").

Judges in this district have declined to recognize cross-jurisdictional tolling under state law, because such tolling can be applied only if it is clearly recognized by authoritative state court decisions. In Vincent v. Money Store, for example, the Honorable John Koeltl refused to recognize cross-jurisdictional tolling under California law, citing compelling policy reasons against such tolling:

> [U]nless all states simultaneously adopt the rule of cross-jurisdictional class action tolling, any state which independently does so will invite into its courts a disproportionate share of suits which the federal courts have refused to certify as class actions after the statute of limitations has run.

(expressly departing from Primavera); Soward, 814 F. Supp. 2d at 281-82 (distinguishing Primavera as having been superseded by Casey).

915 F. Supp. 2d at 569-70 (quoting Hatfield v. Halifax PLC, 564 F.3d 1177, 1187 (9th Cir. 2009)); see also In re Fosamax, 694 F. Supp. 2d at 258. Other federal courts have taken the same approach. See, e.g., Wade v. Danek Med., Inc., 182 F.3d 281, 287-88 (4th Cir. 1999) (refusing to recognize cross-jurisdictional tolling in the absence of clear guidance from the Virginia Supreme Court, because of forum-shopping concerns); Patterson v. Novartis Pharm. Corp., 909 F. Supp. 2d 116, 123 (D.R.I. 2012) ("Without a 'well-plotted' path showing an 'avenue of relief' that the Massachusetts Supreme Judicial Court would take on cross jurisdictional class-action tolling, and with no apparent consensus among the few states that have addressed the question, this Court . . . refuses to embark into an 'unexplored frontier' and import cross jurisdictional class-action tolling into Massachusetts state law.").

SRM has not distinguished the cases cited by the Bear Stearns Defendants and Deloitte. (Def. Bear Stearns Br., at 23-24; Opp., at 30-31.) As established by those authorities, "most [federal courts] have refused to extend the doctrine into a state that has yet to consider it." Soward, 814 F. Supp. 2d at 281-82. Moreover, SRM has conceded that New York courts "have

49

not yet spoken authoritatively on this issue." (Opp., at 30.) Given such, the Court declines to find that SRM's common law fraud claims were tolled by the Class Action, and SRM's common law fraud claims are time-barred against the Bear Stearns Defendants and Deloitte to the extent they rely on any alleged misrepresentations made before April 24, 2007.

### ii. SRM Has Failed To Adequately Plead Reliance

To plead common law fraud, a plaintiff must allege with particularity that it actually relied upon the supposed misstatements. See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 850 F. Supp. 1199, 1221 (S.D.N.Y. 1994) (holding that applying a presumption of reliance would "improperly . . . incorporate the standards for Rule 10b-5 into a common law fraud claim"); Turtur v. Rothschild Registry, Int'l, Inc., No. 92 Civ. 8710 (RPP), 1993 WL 338205, at *6 (S.D.N.Y. Aug. 27, 1993) ("[O]n Rule 9(b) motion . . . plaintiff must establish that it or its agent 'in fact read and relied on the [misrepresentation] . . . .'" (alteration in original) (quoting Devaney v.Chester, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989)). SRM's common law fraud claims are subject to the Rule 9(b) pleading requirements.

50

As previously noted, SRM's Complaint makes no attempt to distinguish the factual allegations supporting its Section 18 claim from its Section 10(b) and common law fraud claims. (See Compl. ¶ 524.) And as noted above, SRM has not sufficiently pled reliance in its Complaint. Only one document, Bear Stearns' 2006 Form 10-K, has been pled with particularity by SRM as a document upon which it relied in deciding whether it should purchase Bear Stearns securities. (Compl. ¶ 73.) Moreover, SRM does not allege that it actually purchased any particular Bear Stearns securities on any particular date in reliance on any particular alleged misstatements in the 2006 Form 10-K. Such pleadings are not adequate for SRM's common law fraud claims. See Int'l Fund, 822 F. Supp. 2d at 386 (holding that allegations of reliance were defective because they were "incredibly broad" and "lack[ed] supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations.").

SRM has contended that Rule 9(b) does not apply to the reliance element of its common law fraud claim, because reliance is a "condition[] of a person's mind" that may be alleged generally. (Opp., at 27.) SRM has cited to no case from this district supporting this argument, and has conceded that

51

"[a]dmittedly, scattered decisions (including decisions of this Court) have suggested that 9(b)'s particularity requirement applies to allegations of reliance." (Opp., at 27 n.16.) Courts in this district have consistently held that reliance does not simply involve a state of mind; it involves specific action or inaction, and therefore must be pleaded with particularity. See, e.g., Granite Partners, L.P. v. Bear, Stearns & Co., 58 F. Supp. 2d 228, 258 (S.D.N.Y. 1999) (plaintiffs must plead "facts [that] underlie . . . reliance"); Int'l Fund, 822 F. Supp. 2d at 386-87 (S.D.N.Y. 2011) (dismissing Section 18 and common law fraud claims because plaintiffs' reliance allegations were "too conclusory to state a claim to relief").[7] Given SRM's insufficient pleadings, SRM has not sufficiently pled reliance in its common law fraud claims.

### iii. SRM's Cannot Bring A Common Law Fraud Claim Against Deloitte For The Swap Transactions

---

[7] SRM also has argued that its pleadings of reliance are sufficient under the test applied in cases considering "transaction causation." (Opp. 28.) All of those cases concern claims under Section 10(b) and Rule 10b-5, which are subject to a presumption of reliance. See ATSI Commc'ns, 493 F.3d 87; Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005); Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2003) (applying the "transaction causation" standard to federal Section 10(b) claims). SRM's Section 18 and common law fraud claims are not subject to that presumption, and actual reliance therefore must be pleaded with the particularly required by Rule 9(b).

52

An auditor who consents to the filing of its audit opinion with the SEC is exposed to potential liability for fraud to prospective investors in registered securities. However, extension of that liability to purchasers of unregistered swaps whose existence the auditor did not expect and had no reason to expect inappropriately stretches that liability: an auditor's liability for common law fraud is limited to the "the persons or class of persons" to whom the auditor intends to communicate its representations. Ultramares Corp. v. Touche, 174 N.E. 441, 446-47 (N.Y. 1931) (Cardozo, J.); see also Restatement (Second) of Torts § 531 (liability for fraud limited to class of persons engaging "in the type of transaction in which [the defendant] intends or has reason to expect their conduct to be influenced"). An auditor can be liable in negligence to parties only with a party whom the auditor is in privity, or a relationship "so close as to approach that of privity". Ultramares, 174 N.E. at 446.

Deloitte did not expect, and did not have any reason to expect, reliance by parties engaging in swap transactions, and the Complaint has not averred any such expectation. As previously explained, swaps are different from purchases of common stock, and the Swap Transactions were a fundamentally

53

different type of transaction from the sale and purchase of common stock and other registered securities Deloitte anticipated when it consented to the inclusion of its audit opinions in Bear Stearns' SEC filings. Liability cannot arise from such an unanticipated transaction. See, e.g., Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 578-80, 583 (Tex. 2001) (holding that an auditor who consented to inclusion of its audit opinion in the Form 10-K filed by its client, company A, had no "reason to expect" reliance on that audit opinion by purchasers of notes issued by company B (the plaintiff purchased the notes after B merged into A, when A had become obligated on the notes) because "the transaction sued upon" (the purchase of notes issued by B) was not "the type the defendant contemplated" in auditing company A's financial statements).

SRM contends that the passage of the CFMA put Deloitte on notice of the potential reliance by third parties on Deloitte's audit reports for swap transactions. (Opp., at 35.) However, as previously noted, the CFMA did not create a private right of action for swap transactions against issuers of the underlying securities or its auditors, and Deloitte cannot be put on notice by a statute that did not apply. Indeed, the CFMA

54

prohibited the SEC from imposing on swaps the registration and reporting requirements applicable to securities. See CFMA § 302(a), 114 Stat. at 2763A-451 to -452 (codified at 15 U.S.C. § 77b-1).

Given that the Swap Transactions could not have been foreseen by Deloitte as a transaction in which parties would have relied on its audit reports, Deloitte is not liable to SRM for the Swap Transactions based on any representations it made in its Bear Stearns audit reports. In addition, the only trades SRM states that it made after the issuance of Deloitte's 2007 audit opinion are the Swap Transactions. (Carey Aff., Ex. 9.) Given the expiration of the statute of limitations on any common law fraud claim based on Deloitte's 2006 audit opinion, see supra, SRM has failed to state a claim against Deloitte for its Bear Stearns securities and the Swap Transactions under common law fraud and the claims are dismissed.

### iv. Defendants' Motions To Dismiss The Holder Claims Are Granted

SRM contends, for purposes of its common law fraud claims, that it was defrauded into making its initial investment in Bear Stearns and also in retaining its investment. (See,

55

e.g., Compl. ¶¶ 541–42, 543, 546.) However, New York may have
barred all "holder" claims, a claim "in which the plaintiffs
allege that material misrepresentations or omissions caused them
to retain ownership of securities that they acquired prior to
the alleged wrongdoing." In re WorldCom, Inc. Sec. Litig., 336
F. Supp. 2d 310, 318–23 (S.D.N.Y. 2004). Starr Foundation v. Am.
Int'l Group, Inc., 901 N.Y.S.2d 246, 250 (N.Y. App. Div. 2010),
suggests that New York does not recognize such claims. See,
e.g., id. at 261 (Moskowitz, J., dissenting) ("Under the
majority's reasoning, holder claims could never be viable.");
see also Tradex Global Master Fund SPC Ltd. v. Titan Capital
Group III, LP, 944 N.Y.S.2d 527, 529 (N.Y. App. Div. 2012)
("[U]nder New York law, such a 'holder claim' would be precluded
under the out-of-pocket rule."); Irvin v. Jones, 966 N.Y.S.2d
346 (N.Y. Sup. Ct. 2012) ("[T]o the extent that such cause of
action may be read as asserting 'holder' claims, i.e., that the
plaintiffs were wrongfully induced by the defendants to hold
rather than sell . . . such claims are not actionable under New
York law."). In Starr Foundation, the First Department held that
a fraud claim asserting that plaintiff would have disposed of an
investment before it decreased in value, had defendant disclosed
certain facts, failed "as a matter of law" because it was
"virtually the paradigm of the kind of claim" barred by "New

56

York's longstanding out-of-pocket rule," which precludes recovery of "undeterminable and speculative" losses. 901 N.Y.S.2d at 248-49 ("[Plaintiff] seeks to recover the value it might have realized from selling its shares during a period when it chose to hold, under hypothetical market conditions . . . (assuming disclosures different from those actually made) that never existed. A lost bargain more 'undeterminable and speculative' than this is difficult to imagine."). The New York Court of Appeals has not resolved whether New York law recognizes such a theory of fraud. See Matana v. Merkin, No. 13 Civ. 1534(PAE), 2013 WL 3940825, at *11 (S.D.N.Y. July 30, 2013).

SRM has asserted that "New York law has long recognized holder fraud claims," (Opp., at 33), but has not cited an authority from the New York Court of Appeals recognizing such a claim. SRM has characterized Matana, 2013 WL 3940825, the only post-Starr case it cites, as holding that Starr only barred "a holder claim seeking to recover lost profits." Id. at *11. However, Matana recognized that "[t]he decision in Starr may be read . . . as precluding holder claims regardless of whether they seek to recover lost profits or simply losses." Matana dismissed plaintiff's claim because,

57

"even assuming that New York law would permit a satisfactorily pled holder claim," plaintiff's claim failed for unrelated reasons. Id. at *11-12. SRM has also cited Prime Mover Capital Partners, L.P. v. Elixir Gaming Tech., Inc., 793 F. Supp. 2d 651, 672 n.108 (S.D.N.Y. 2011) suggesting that a holder claim may have been viable, but as the Prime Mover Court made clear, the issue was not relevant because plaintiffs had "neither argued nor pleaded such a 'holder' claim"; moreover, the Prime Mover Court did not mention the recent decision in Starr. SRM has sought to distinguish Tradex, 944 N.Y.S.2d 527, by noting that plaintiffs in Tradex were "seeking to recover lost profits." (Opp., at 35 n.22.) However, plaintiffs in Tradex, like SRM, sought losses that they allegedly suffered by retaining an investment because of supposedly misleading statements. (See Complaint ¶ 37, No. 652127/2010 (N.Y. Sup. Ct. Dec. 8, 2010).) Similarly, SRM also characterizes Irvin, 2012 WL 6634476, as involving lost profits, but in Irvin plaintiffs' entire holder claim, i.e., "[d]amages for all losses associated with alleged imprudent investments" allegedly caused by defendants' misconduct, including an initial $200,000 investment, was barred by Starr. Id. at *2, *11.

58

Given the uncertainty of the New York law with respect to holder claims, Judge Moskowitz's views in his dissent in Starr on the current state of holder claims in New York is most persuasive, and SRM's holder claims are dismissed.

### e. The Section 20 Control Person Claims Are Dismissed

SRM has asserted a claim against the Individual Defendants for "control person" liability under Section 20(a) of the Exchange Act. To state a claim under Section 20(a), SRM must plead, inter alia, a timely predicate violation of the Exchange Act. ATSI Commc'ns, 493 F.3d at 108; Dodds v. Cigna Secs., Inc., 12 F.3d 346, 350 n.2 (2d Cir. 1993). As noted above, SRM has not pled a timely, viable primary violation of the Exchange Act; as such, SRM's claim under Section 20(a) fails. See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 207 (2d Cir. 2009) (granting defendant's motion to dismiss under Section 20(a) for failure to adequately allege a primary violation of the Exchange Act).

IV.  **Conclusion**

Based on the conclusions set forth above, Defendants' motions to dismiss are granted.

It is so ordered.

New York, NY
~~January~~  , 2014
February 3

_____

ROBERT W. SWEET

60