UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

IN RE THE BEAR STEARNS COMPANIES, INC.
SECURITIES, DERIVATIVE, AND ERISA          Master File No.:
LITIGATION                                 08 MDL 1963 (RWS)

This Document Relates To:
    Securities Action, No. 08 Civ. 2793        ECF CASE

----------------------------------------X

BRUCE S. SHERMAN,

                Plaintiff,                 09 Civ. 8161 (RWS)
                                           SEALED OPINION

    - against -

BEAR STEARNS COMPANIES, INC., JAMES
CAYNE, WARREN SPECTOR, AND DELOITTE
& TOUCHE LLP,

                Defendants.

----------------------------------------X

A P P E A R A N C E S:

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _____ |

Attorneys for Plaintiff

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
By:  Philip C. Korologos, Esq.

BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH 03755
By:  Richard B. Drubel, Esq.
     Matthew J. Henken, Esq.

KOREIN TILLERY LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601

1

By:  George A. Zelcs, Esq.

KOREIN TILLARY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
By:  Stephen M. Tillary, Esq.
     Douglas R. Sprong, Esq.


Attorneys for Defendants

PAUL WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
By:  Brad S. Karp, Esq.
     John F. Baughman, Esq.
     Jessica S. Carey, Esq.
     Jonathan H. Hurwitz, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
BY: David S. Frankel, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY 10019
By: David B. Anders, Esq.

**Sweet, D.J.**

Defendants the Bear Stearns Companies ("Bear Stearns" or "Bear"), James Cayne, and Warren Spector (collectively, "Defendants") have moved to exclude the report and testimony of Plaintiff's expert John D. Finnerty pursuant to Federal Rules of Evidence 702 and 403, to exclude the September 25, 2008 report by the Securities and Exchange Commission, Office of Inspector General, Office of Audits pursuant to Federal Rules of Evidence 803(8)(b) and 403, and for summary judgment pursuant to Federal Rule of Civil Procedure 56. Based on the conclusions set forth below, the motion to exclude the SEC Report is denied, the motion to exclude Finnerty and the Finnerty Report is granted, and the motion for summary judgment is granted in part and denied in part.

## I.    **Prior Proceedings**

The procedural history and factual background of the underlying multidistrict litigation has been detailed extensively in various opinions by this Court. See e.g. In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig., No. 08 CIV. 2793, 2014 WL 4443458, at *1 (S.D.N.Y. Sept. 9, 2014) (hereinafter, "In re Bear Stearns"); In re Bear Stearns,

3

909 F. Supp. 2d 259, 263 (S.D.N.Y. 2012); In re Bear Stearns, 763 F. Supp. 2d 423 (S.D.N.Y. 2011), on reconsideration, No. 07 CIV. 10453, 2011 WL 4072027 (S.D.N.Y. Sept. 13, 2011), and on reconsideration, No. 07 CIV. 10453, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011). Familiarity with these facts is assumed and the following details provide only a brief retelling for the purpose of approaching the instant motions.[1]

Plaintiff Bruce Sherman ("Plaintiff" or "Sherman") filed his complaint in this court on September 24, 2009.[2] Sherman, the Chief Executive Officer and Chief Investment Officer of Private Capital Management ("PCM"), purchased a large block of Bear common shares between June 25, 2007 and March 13, 2008 at prices ranging from $53.77 to $140.76 per share. He sold 229,150 shares of Bear common stock on March 19, 2008 at the price of $5.23 per share. Plaintiff's claims concern the decline of Bear Stearns in March 2008. Sherman alleges Defendants misrepresented Bear's financial condition, including the value of Bear's mortgage assets, the nature of its risk management, and the adequacy of

---

[1] The facts that follow are drawn from filings in this case and are not in material dispute except as noted.
[2] Sherman elected to opt-out of the settlement of the related securities class action in In re Bear Stearns, 08 MDL 1963 (S.D.N.Y.) (RWS). ECF No. 338. This Court sustained the claims in the securities class action in an opinion on Defendant's motion to dismiss dated January 29, 2011. See 763 F. Supp. 2d 423.

4

Bear's capital and liquidity, leading Sherman to purchase and
retain Bear common stock, ultimately suffering massive losses.
Sherman seeks to prove his claims via a report titled "SEC's
Oversight of Bear Stearns and Related Entities: The Consolidated
Supervised Entity Program" ("SEC Report," or the "Report").
Sherman has also proffered Professor John D. Finnerty
("Finnerty") as an expert in loss causation and the damages
Sherman suffered as a result of the conduct alleged.

Defendants seek to exclude both the Report and Finnerty,
and ultimately, summary judgment in their favor. Defendants
filed the instant motions on August 17, 2015. The motions were
argued on March 24, 2016 at which time they were deemed fully
submitted.

## II.  **Applicable Standards**

Defendants seek to exclude the Report on the basis of
Federal Rules of Evidence 803(8)(B) and 403, and to exclude
Finnerty on the basis of Federal Rule of Evidence 702 and
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579
(1993).

Rule 803(8) provides an exception to the rule against

hearsay, establishing presumptive admissibility for public
records[3] where "the opponent does not show that the source of
information or other circumstances indicate a lack of
trustworthiness." Fed. R. Evid. 803(8)(B). The rule "assumes
admissibility in the first instance but with ample provision for
escape if sufficient negative factors are present." Fed R. Evid.
803, Advisory Comm. Notes to Paragraph (8). "As with any
exception to the rule against hearsay, Rule 803(8)[B] is to be
applied in a commonsense manner, subject to the district court's
sound exercise of discretion in determining whether the hearsay
document offered in evidence has sufficient independent indicia
of reliability to justify its admission." City of New York v.
Pullman Inc., 662 F.2d 910, 914 (2d Cir. 1981)(citing LeRoy v.
Sabena Belgian World Airlines, 344 F.2d 266, 272 (2d Cir. 1965);
Swietlowich v. Bucks Cty., 610 F.2d 1157, 1165 (3d Cir. 1979);
Weinstein and Berger, 4 Weinstein's Evidence P. 803(8)(03)
(1979)).

     Federal Rule of Evidence 403 permits the Court to exclude
otherwise relevant evidence "if its probative value is

---

[3] Defendants agree that the Report is a public record prepared by
a public agency under the ambit of Rule 803(8). See Defs.' Mem.
of Law in Supp. Mot. to Exclude Evid. Concerning the SEC's
Office of Inspector General, Office of Audits' Report at 10
("Defs.' SEC Report MOL").

6

substantially outweighed by a danger of one or more of the
following: unfair prejudice, confusing the issues, misleading
the jury, undue delay, wasting time, or needlessly presenting
cumulative evidence." Fed. R. Evid. 403. In deciding whether to
exclude otherwise relevant evidence under Rule 403, the court
"balance[es] the probative value of and need for the evidence
against the harm likely to result from its admission." Id.,
Advisory Comm. Notes.


   The standard for the admissibility of expert testimony at
trial is set forth in Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to
> determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product
> of reliable principles and methods; and (d) the expert has
> reliably applied the principles and methods to the facts of
> the case.

Fed. R. Evid. 702.


   Rule 702 was the subject of extensive analysis by the
Supreme Court in Daubert and Kumho Tire Co. v. Carmichael, 526
U.S. 137 (1999). The Court emphasized in Daubert that

> [t]he inquiry envisioned by Rule 702 is . . . a flexible
> one.  Its overarching subject is the scientific validity
> and thus the evidentiary relevance and reliability of the
> principles that underlie a proposed submission.  The focus,
> of course, must be solely on principles and methodology,

7

not on the conclusions that they generate.

509 U.S. at 594-95.  The Federal Rules of Evidence assign to the district court the responsibility to act as a gatekeeper and to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Id. at 597.

"[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).  However, "[t]he Rules' basic standard of relevance ... is a liberal one," Daubert, 509 U.S. at 587.  "A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule."  Fed.R.Evid. 702, Advisory Comm. Notes.

Finally, summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient

8

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y. City Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original). "In assessing the record to determine whether there is a genuine issue to be tried, [the court is] required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson, 477 U.S. at 255).

### III. The Motion to Exclude the SEC Report is Denied

Following Bear's collapse in March 2008, on April 2, 2008, Senator Charles E. Grassley, then Ranking Member of the Senate Committee on Finance, wrote to the Hon. David Kotz, Inspector General of the Securities and Exchange Commission ("SEC") with a Congressional Audit Request. Borner Decl. Ex. 2 ("Grassley Letter"). Noting press coverage of the SEC's failure to bring a case against Bear for improperly valuing mortgage-related investments, Grassley requested an investigation of the SEC Enforcement Division's decision not to pursue enforcement action against Bear, a final report as to whether any misconduct occurred, and an audit of the Division of Trading and Markets. Id.

Defendants argue the Report is untrustworthy for four reasons: (1) it was prepared for a purpose other than the one for which it is being proffered by Plaintiff in this action; (2) the Report is anonymous; (3) the Report was not adjudicated and no hearing was held allowing Bear an opportunity to respond; and (4) elements of the SEC itself deemed the report untrustworthy. See Defs.' SEC Report MOL.

10

The Rule 803(8) analysis begins at a foundational point of presumed admissibility. Fed. R. Evid. 803, Advisory Comm. Notes to Paragraph (8). The Rule "is based upon the assumption that public officers will perform their duties, that they lack motive to falsify, and that public inspection to which many such records are subject will disclose inaccuracies." Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (quoting 31 Michael H. Graham, Federal Practice and Procedure § 6759, at 663-64 (Interim ed. 1992)). Thus, public records containing factual findings and "made pursuant to legal authority" are deemed presumptively admissible not because such documents are presumptively unassailable, but because their source is one of presumptive integrity subject to public review.

The Advisory Committee has suggested three factors to guide analysis of the trustworthiness of evaluative reports: (1) the timeliness of the investigation; (2) the special skill or experience of the official; [and] (3) whether a hearing was held and the level at which conducted." Fed. R. Evid. 803, Advisory Comm. Notes to Paragraph 8.

The shortcomings Defendants identify do not outweigh the presumptive admissibility and trustworthiness of a government report that generally meets these criteria. First, the Report is

11

indisputably timely, submitted less than six months from the
date of Senator Grassley's letter. See Borner Decl. Ex. 1
("Audit Report") (dated September 25, 2008). Second, the SEC
Office of Inspector General is tasked by Congress as the agency
designed and equipped to evaluate the conduct of the SEC and
relevant factual circumstances. See Grassley Letter; Inspector
General Act of 1978, 5 U.S.C. § APP. 3 § 4(a); 17 C.F.R.
200.16a(a). Though no hearing was held on the report, that fact
does not defeat the other elements of credibility present. See
Bridgeway Corp., 201 F.3d at 143.

Defendants submit that the Audit Report was intended to
address SEC oversight of Bear Stearns, not the cause and
circumstances of Bear's collapse, and therefore cannot be deemed
trustworthy with respect to these facts. Defs.' SEC Report MOL
at 11-12. The distinction is a formalistic one. Analysis and
findings regarding the details of Bear's collapse were the
factual underpinning to a review of the propriety of the SEC's
oversight of Bear during that period. In the words of Senator
Grassley, "Given the [2008] collapse and federally backed bail-
out of Bear Stearns, Congress needs to understand more about
this case and why the SEC ultimately sought no enforcement
action." Grassley Letter at 54. The facts of Bear's collapse
cannot be disaggregated from review of the SEC's conduct with

12

specific respect to those events. Plaintiff seeks to admit the Report for purpose of establishing those facts, and thus the purpose of the Report and the purpose for which Plaintiff relies on it are congruent. To the extent the Office of Audits was somehow biased, deficient, or non-comprehensive, those issues go to weight, not admissibility.

Second, Rule 803(8) does not demand that a public record be admitted for the same purpose for which it was drafted.[4] While a public record admitted in litigation for the same purpose for which it was drafted would be particularly trustworthy, it does not follow that the record is less trustworthy if admitted for another purpose. The public officers that generated the record had no more incentive to falsify, no less duty to their office in the event that a record is admitted for a purpose they did not have in mind at the time the record was created. The record

---

[4] Defendants submit City of New York v. Pullman Inc. establishes such a requirement. See 662 F.2d 910 (2d Cir. 1981). Pullman concerned the denied admission of an interim report prepared by the Urban Mass Transit Administration. Id. The Interim Report was based on appellant's own data, not on the UTMA's independent investigation, and constituted only a review of proposals for correction of problems regarding train car undercarriages. Id. at 914-15. The Audit Report is not comparable to the UTMA Interim Report. The Audit Report was not only prepared by an agency, but by the Office of Inspector General, the entity tasked with fact gathering and investigation of the SEC. Its conclusions were final and based on its own audit and the retained expert opinion of Professor Albert S. (Pete) Kyle. The retention of Professor Kyle will be addressed infra.

13

is no less public or subject to criticism.

Next, that the report was authored by an institution specifically tasked with performing such audits does not make it anonymous or its authors inexpert.[5] The Report was drafted by the Office of Inspector General Office of Audits, the only entity capable and expert in auditing SEC conduct. Defendants submit that the Office of Audits was not qualified to review the circumstances catalyzing that conduct, which as reasoned above, is an unpersuasively narrow perspective of the office's capabilities.

Nevertheless, the Report exhaustively describes reliance on its retained expert, Professor Kyle, the only contributor not included in the institutional attribution to the Office of Audits. See Audit Report at vii. Defendants argue that Kyle's inclusion demonstrates the Office of Audits' lack of expertise.

---

[5] Defendants cite a non-binding, out-of-district case to support their argument, Coughlin v. Tailhook Association. 1994 WL 780904 (D. Nev. Sept. 2, 1994). In Coughlin, the court rejected the admission of a report authored by the Department of Defense Inspector General given there was "no basis" upon which that court could "meaningfully assess [the] skills and experience" of the investigators." Id. Unlike the Audit Report, that report was based on facts derived from law enforcement investigative practice, such as polygraphs, undercover operations, consensual monitoring, and computer analysis "with no clear indication of the qualifications of the persons performing these tasks." Id.

However, that the Report identifies Professor Kyle (who it relied on due to "the complexity of the subject matter") bolsters rather than hinders its trustworthiness. Where the Office of Audits was expert in reviewing the SEC's conduct and the factual predicates to such SEC conduct, Professor Kyle supplemented those qualifications by offering specific experience in capital markets (established by the Report's own summary and Professor Kyle's attached C.V.). Kyle's inclusion cures any concern that the Report was drafted without an expert understanding of the specific factual circumstances of Bear's collapse. That the Report discloses not only Professor Kyle's involvement, but the specific purpose for which he contributed and factual issues he addressed, makes the Report all the more transparent and facilitates an assessment of the skill and expertise of the author of the report. The Office of Audits and Professor Kyle together possess the sufficient experience and skill that the Report cannot be deemed untrustworthy on this basis.

Finally, Defendants argue that the SEC's own internal criticism of the Report demonstrates its lack of trustworthiness. Defs.' SEC Report MOL at 14-15. Defendants submitted a two part argument on this point: first, that "the Chief Administrative Law Judge [Murray] of the Commission

15

concluded that the entire [OIG Investigative Report] was flawed." Id. at 14. Second, the Division of Trading and Markets opposed the Report's findings and issued a long response in the form of a commentary. Id.

Chief Administrative Law Judge Murray's conclusions as to the OIG Investigative Report, a separate and distinct Report from the Audit Report, have no bearing on the trustworthiness of the Audit Report. Defendants argue that the two reports were written by the same people, at the same time, and submitted in response to the same inquiry. Carey Decl. in Supp. Defs.' Mem. of Law in Supp. Mot. for Summ. J. ("Defs.' MSJ"), Ex. 29 at 6:24-7:8 ("Finnerty Tr."). Nevertheless, the Audit Report must be judged on its own merits.

The SEC's Division of Trading and Markets took issue with elements of the Report, particularly findings regarding the cause of Bear's collapse. Borner Decl., Ex. 1b ("T&M Commentary"). For example, "The Division of Trading and Markets concurs with [the Report's first Recommendation], even though we believe it is based on a fundamentally flawed understanding of the Bear Stearns crisis," id. at 86, "the OIG Report's assumptions regarding leverage . . . are inaccurate," id. at 87, "the OIG Report's conclusion regarding the interaction of

16

capital and secured finding is misguided," id. at 88. There is little doubt that Trading and Markets disagreed with the Report's factual understanding of Bear's collapse. It should be noted, however, that the Report addressed the propriety of the conduct of the Division of Trading and Markets. Its recommendations, the majority of which Trading and Markets adopted, were largely directed at the Division. The fact that Trading and Markets disagreed with criticism of its conduct does not itself demand that their perspective be adopted as to whether the Report's findings were trustworthy.[6] The conflict amounts to a dispute of fact as to the circumstances of Bear's collapse. The dispute is not alone grounds to reject the presumptive trustworthiness of the Report.

Finally, Defendants submit that the Report's probative value is substantially outweighed by the danger of unfair prejudice. Defs.' SEC Report MOL at 17-19. Defendants first argue that "risk of unfair prejudice arises when government reports are offered." Id. at 17. As a general rule, this may be true. However, the Report is somewhat unlike other public records that may carry an aura of officiality that may bias a

---

[6] As Miles' Law cautions, "where you stand depends on where you sit." Rufus E. Miles, Jr., The Origin and Meaning of Miles' Law, 38 Public Administration Review 399, 399 (1978).

17

jury. Most significantly, it was an investigation about whether
impropriety had occurred within the very agency that produced
the report. An internally critical government record does not
carry the same risk of unfair prejudice as other government
records, as its very genesis is a result of the plausibility
that an element of the Government may have in some way erred. In
short, the Report itself negates the assumption that a piece of
evidence obtained from the government is any less assailable
than a document obtained from another party. Defendants
explicitly state that they intend to present the same evidence
and arguments to the jury presented in the instant motion,
presumably including seeking introduction of the contradictory
commentary produced by Trading and Markets. In this instance,
little risk of unfair prejudice exists, and any remaining risk
can be cured with a limiting instruction if necessary.

Second, Defendants submit admission of the Report would
result in a further protracted trial and confuse the jury. As
reasoned above, the factual findings of the Report are central
to the foundation of Plaintiff's claims. That Defendants intend
to refute them by attacking the Report's trustworthiness is more
likely to expound necessary factual disputes for the fact finder
than confuse or lead to undue delay. Defendants similarly point
to Plaintiff's use of the Report to attribute knowledge to the

18

SEC demonstrates a likelihood of confusion. This is proof only of the labyrinthine nature of the SEC's hierarchy.[7] Confusion that may arise from the Office's placement in the government, rather than the nature or findings of the Report, is not grounds to exclude it.

Based on the conclusions set forth above, the Report is admissible under Federal Rule of Evidence 803(8) and its probative value outweighs any danger of unfair prejudice under Rule 403.

## IV.  The Finnerty Report is Inadmissible

The Report submitted by Plaintiff's expert has proposed a damage calculation based on leakage to satisfy Sherman's requirement to show loss causation. The theory, based on assumption, fails to do so under Federal Rule of Civil Procedure 702 and is therefore inadmissible.

---

[7] The Office of Audits sits within the Office of the Inspector General, a sub-office of the Securities and Exchange Commission. U.S. Securities and Exchange Commission, Office of the Inspector General, (May 17, 2016) https://www.sec.gov/oig.

## A.    Finnerty and the Leakage Methodology

Plaintiff has proffered John D. Finnerty as an expert as to loss causation and damages. Finnerty is Managing Direction at AlixPartners, LLP, a financial and operational consulting firm. Carey Decl. in Supp. Carey Decl. in Supp. Defs.' Mot. for Summ. J., Ex. 2 ¶ 1 ("Finnerty Report"). He holds a Ph.D. in Operations Research from the Naval Postgraduate School, a B.A. and M.A. in Economics from Cambridge University, where he was a Marshall Scholar, and an A.B. in Mathematics from Williams College. Finnerty Decl. App'x A at 2. He specializes in securities class actions, business valuation, securities valuation, derivatives valuation, solvency analysis, calculation of damages, and has published extensively in these and related areas of finance. Finnerty Report ¶ 1. Finnerty has served as Partner of the Financial Advisory Services Group of PricewaterhouseCoopers, and is a tenured Professor of Finance at the Fordham University Gabelli School of Business, where he also served as Founding Director of the School's Master of Science in Quantitative Finance Program. Id. ¶ 3; Finnerty Decl. App'x A. Finnerty has taught and published extensively on analysis and valuation of securities, has served as an editor or board member of several finance journals, and served in a management capacity of several finance associations. Finnerty Decl. App'x A at 3,

20

11-20. Finnerty has provided expert advice in over 40 cases in
the last four years. Id. at 5-10. He is demonstrably qualified.

This case involves a complex web of relevant facts related
to Bear's 2008 crisis. In particular, Plaintiff must demonstrate
that the alleged misrepresentations or omissions "proximately
caused the plaintiff's economic loss." Id. Finnerty's report and
testimony set forth analysis of the efficiency of the market for
Bear common stock between December 14, 2006 through March 14,
2008, a loss causation analysis determining the substantial
cause of the declines in the price of Bear common stock on the
alleged disclosure dates, and a calculation of damages sustained
by Sherman traceable to the alleged fraud and leakage.

Finnerty's loss causation method uses a finance theory-
approach to analyze the market impact of "leakage" (that is, the
dissemination of information over time before and not limited to
corrective disclosures). Finnerty Report at ¶¶ 186-89.
Defendants submit that the leakage model is not "endorsed by the
courts," "generally accepted," or "peer reviewed." Defs.' Mem.
of Law in Supp. Mot. to Exclude Finnerty ("Defs.' Finnerty MOL")
at 8-9.

Defendants contend "no court has ever endorsed Finnerty's

21

leakage model for loss causation and damages, and the only two
Circuit Courts to have addressed leakage models have found that
they 'did not adequately account for the possibility that firm-
specific, nonfraud related information may have affected the
decline in [the] relevant period.'" Defs.' Finnerty MOL at 9
(citing Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d
408, 423 (7th Cir. 2015), reh'g denied (July 1, 2015)).


Notwithstanding that courts have rejected particular
leakage analyses as lacking, they have commented upon the
concept's validity. See e.g. Dura, Dura Pharm., Inc. v. Broudo,
544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ("if,
say, the purchaser sells the shares quickly before the relevant
truth begins to leak out, the misrepresentation will not have
led to any loss."; In re Flag Telecom Holdings, Ltd. Sec.
Litig., 574 F.3d 29, 41 (2d Cir. 2009) ("We do not take issue
with the plausibility of Plaintiffs' 'leakage' theory."); Levine
v. AtriCure, Inc., 508 F. Supp. 2d 268, 273n.5 (S.D.N.Y. 2007)
("the possibility that declines in stock price prior to broad
public disclosure may be reflective of leaking of relevant
information into the marketplace."). If the efficient market
hypothesis is accepted as valid, then the broad notion that
shifts in stock price may be attributable to gradual information
leakage has rhetorical force. However, in matters of fact,

22

evidence is determinative.

The Seventh Circuit in Glickenhaus, which both Plaintiff and Defendants cite, is instructive. It engaged in a thorough analysis of the two loss causation models conducted by the plaintiff's expert, a leakage model and a specific-disclosure model. 787 F.3d at 415-23. The specific-disclosure model yielded the measured effect of each particular disclosure on the particular day on which it occurred, while the leakage model (which the jury ultimately adopted) calculated the difference between predicted returns and actual returns during the entire disclosure period, assuming an efficient market reaction to more gradual information diffusion. The court accepted the leakage model's approach, but remanded the case for a new trial as to loss-causation because the expert's particular model did not inspire sufficient faith that firm-specific, nonfraud related information were isolated from the results. Id. at 419-423 ("As things stand, the record reflects only the expert's general statement that any such information was insignificant. That's not enough."). The Seventh Circuit was explicit:

> If the plaintiffs' expert testifies that no firm-specific, nonfraud related information contributed to the decline in stock price during the relevant time period and explains in nonconclusory terms the basis for this opinion, then it's reasonable to expect the defendants to shoulder the burden of identifying some significant, firm-specific, nonfraud related information that could have affected the stock

23

price.
Id. at 422.


The Tenth Circuit's decision in In re Williams accords. In re Williams Sec. litigation-WCG Subclass, 558 F.3d 1130 (10th Cir. 2009). In affirming the lower court's rejection of an expert leakage analysis, the court prefaced its holding with an analysis of Dura:

> Loss causation is easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops—assuming, of course, that the plaintiff could isolate the effects from any other intervening causes that could have contributed to the decline. Dura did not suggest that this was the only or even the preferred method of showing loss causation, though; it acknowledged that the relevant truth can "leak out," . . . which would argue against a strict rule requiring revelation by a single disclosure. By premising [the analysis in question] on a leakage theory rather than a corrective disclosure theory, therefore, [the leakage expert's] methodology does not automatically run afoul of Dura.

Id. at 1137-38. In re Williams rejected the leakage analysis in question for "failure to describe how the market was alerted to the fraud" during the class period but before the first potential corrective disclosure." Id. at 1138. In simple terms, while a bare claim that "the market must have known" will not suffice, a leakage theory supported by a plausible mechanism or set of facts showing how the market was gradually alerted to the fraud is a sufficient theory of loss causation. See id.

24

**B.    The Finnerty Report Fails to Qualify Under Rule 702
For Lack of General Acceptance and For Not Having Been
Subject to Peer-Review**

Rule 702, as amended, codifies the holdings of Daubert v.

Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and its progeny.

Under Rule 702 and Daubert, "the district court functions as the

gatekeeper for expert testimony." Major League Baseball Props.,

Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008)

(internal quotation marks and citation omitted). The trial judge

must ensure that expert testimony (1) "rests on a reliable

foundation," and (2) "is relevant to the task at hand." Daubert,

509 U.S. at 597. The proponent of expert testimony has "the

burden of establishing that the pertinent admissibility

requirements are met by a preponderance of the evidence." Fed.

R. Evid. 702 advisory committee's note (2000 Amend.) (citing

Bourjaily v. United States, 483 U.S. 171 (1987)).


To assess the reliability and validity of an expert's

method, a court may consider: (1) "whether it can be (and has

been) tested;" (2) "whether it has been subjected to peer review

and publication;" (3) "the known or potential rate of error . .

. and the existence and maintenance of standards controlling the

technique's operation;" and (4) whether the method has achieved

"general acceptance" within the relevant community, though this

factor is not a requirement. Daubert, 509 U.S. at 593-94
(internal citations omitted).

Courts consider additional factors when assessing the
reliability of expert testimony, including "whether experts are
'proposing to testify about matters growing naturally and
directly out of research they have conducted independent of the
litigation, or whether they have developed their opinions
expressly for purposes of testifying.'" Fed. R. Evid. 702
advisory committee's note (2000 Amend.) (quoting Daubert v.
Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995));
see also Kumho Tire, 526 U.S. at 152 (holding an expert must
"employ[] . . . the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field").
Daubert's reliability standards apply not only where an expert
relies on a specific scientific methodology, but also where an
expert "relies 'on skill- or experience-based observation.'"
Kumho Tire, 526 U.S. at 151 (citation omitted).

Our circuit has not endorsed the leakage theory, and in all
due deference in spite of the clarity of its analysis for the
reasons set forth above, this court cannot accept the
assumptions underlying the 7th Circuit's opinion in Glickenhaus.
From this vantage point the leakage theory, sans evidence,

26

eliminates the loss causation requirement.

In addition, Finnerty's leakage model has not achieved "general acceptance" within the relevant scientific community or "been subjected to peer review and publication." See Daubert, 509 U.S. at 593-94.

Finnerty has cited in his analysis, an article by Bradford Cornell and R. Gregory Morgan entitled *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883 (1990). See Carey Decl. Ex. 82. That article, however, does not refer to the particular methodology contained in the Finnerty Report to estimate stock price inflation and to calculate damages due to leakage. Finnerty has stated that he has "extended" the approach outlined by Cornell and Morgan in order to eliminate "potential bias" in the inflation calculation. Finnerty Report ¶ 191 n.310. Although Finnerty has written numerous expert reports concerning loss causation and damages, and has testified as an expert between 100 and 150 times, he has not before testified about leakage, and has written about leakage in only one prior expert report. Finnerty Tr. at 29:4-30:4, 309:8-310:11. In that report, per the plaintiff's request, he calculated the abnormal return on the stock price during the leakage period, but was instructed by the

27

plaintiff not to use the leakage damages in his damages
calculation. Id. at 309:8-310:11.


   Courts, including the Second Circuit, have precluded expert
opinions that fail peer review and scientific community
acceptance. See, e.g., Zaremba v. Gen. Motors Corp., 360 F.3d
355, 358 (2d Cir. 2004) (affirming exclusion of expert testimony
where expert's proposed methodology was not subject to peer
review and had not attained general acceptance in the field); In
re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 593 F. Supp.
2d 549, 561 (S.D.N.Y. 2008) (excluding expert testimony in part
because expert could "not name another scientist who ha[d] ever
employed, much less approved of," his method); Gary Price
Studios, Inc. v. Randolph Rose Collection, Inc., 2006 WL
1319543, at *8 (S.D.N.Y. 2006) (noting economic expert's theory
that had not been subject to peer review where there "appear[ed]
to be no prior application of his theories or methodology").


   The Plaintiff contends that "leakage analysis" has been
endorsed by the courts and accepted by the relevant scientific
community, citing a handful of cases and academic articles that
generally recognize the possibility of losses where the truth
begins to "leak out" to the market. Pl.'s Opp. to Mot. to
Exclude Finnerty ("Pl.'s Finnerty Opp.") at 7-8. However,

leakage as a potential theory of loss causation has never been written about or acknowledged by courts employing Finnerty's methodology for estimating loss causation and damages based on leakage. None of the cases or academic literature cited by plaintiff are to the contrary. See Ferrell Decl. ¶ 17. While Finnerty claims to have controlled for confounding factors, not having been generally accepted or subject to peer review, Finnerty's leakage methodology must be excluded.

### C. The Finnerty Methodology Does Not Qualify Under Rule 702 For Failure to Control For Non-Fraud Factors

One Rule 702 requirement established specific to the leakage theory is that it is necessary to compensate for other factors affecting price. It was the failure to appropriately do so that caused the reversal by the 7th Circuit in Glickenhaus. Finnerty has acknowledged that "it is very important to exclude company-specific information that it is not related to the alleged fraud from the damage calculation." Finnerty Report. ¶ 190. Professor Allen Ferrell, the Defendants' expert, has explained the flaws in Finnerty's methodology on this point. "The portion of the stock return explained by Bear-specific non-fraud related information cannot, by definition, be caused by the alleged fraud." Ferrell Decl. ¶ 9.

29

As Ferrell explains, according to Finnerty, he has excluded
the effects of Bear-specific non-fraud related information by
adjusting his estimate of Bear stock's true value (the value
Bear's stock would have had but for the alleged fraud) on days
he designates as "non-fraud related news days." Finnerty Report
¶¶ 190-91, n.310. Finnerty claims "even if I were to reclassify
certain days during the Leakage Period as non-fraud-related news
days to address Defendants' criticisms, the damages amounts
would not be substantially different from my original damage
calculation." Finnerty Decl. ¶ 36. The adjustment Finnerty makes
on days involving no fraud-related news has admittedly no
substantial impact on Finnerty's damages calculation. Ferrell
replicated Finnerty's model and assumed no day during the
Leakage Period qualified as a non-fraud related news day. The
estimate of the inflation that leaked from the Bear stock price
changed by only 2%. Ferrell Decl. ¶ 11. Ferrell ran the opposite
scenario, classifying every day during the period as a non-fraud
related news day, finding the model's estimated inflation that
leaked out of the Bear stock price changed by 14%, or $27.53.
Id. "[E]ven if Bear's actual return were completely explained by
non-fraud factors on every day of the Purported Leakage Period,
. . . Finnerty's model would mechanically find that 'leakage'
caused Bear's stock price to fall by $27.53." Id.

Finnerty's model therefore fails to adequately account for the impact of non-fraud related information and effects, including market and industry effects. This is a result of a fundamental flaw in the "backwardation method" used to estimate the impact of leakage on the fraud. Finnerty's "backwardation method" estimates Bear's "true value" on each day of the purported Leakage Period by taking his estimate of the true value of Bear's stock at the close of the last day of the period and then back-casting this price to previous days based on either Bear's actual return (for non-fraud related news days) or the return due to market and industry factors (on all other days). Because Finnerty purports to find that the true value of Bear's stock was such a small fraction of Bear's stock price at the end of the Leakage Period ($10.41 when the stock price was $57), the change in the model's estimated "true value" is minimal on each day of the Leakage Period. In turn, this has the mechanical result in his model of attributing almost all of the actual declines in Bear's stock price to the alleged fraud, despite the actual effects on Bear's stock price of market and industry factors and company-specific non-fraud related news. As a result of this fundamental flaw, Finnerty's backwardation posits that the alleged fraud caused Bear's stock price to decline during the Leakage Period regardless of whether there was any identifiable leakage. This is most starkly illustrated

31

by the three days shown in Exhibit B to the Finnerty Report
where Finnerty attributes substantial price declines to leakage
even though his own event study found the portion of Bear's
return not caused by market and industry factors (i.e., the
abnormal return) was positive.

Ferrell notes that Bear's cumulative abnormal return over
the purported Leakage Period (prior to March 10, 2008) was not
statistically significant as measured by Professor Finnerty's
study. Because Finnerty's event study did not find that the
cumulative abnormal return was statistically significant, it did
not rule out the possibility that the cumulative abnormal return
was caused by chance and, consequently, it did not establish
that the alleged fraud caused Bear's stock price to decline over
the purported Leakage Period (prior to the week of March 10,
2008). In his declaration, Professor Finnerty responds that
"[i]f the substantially positive abnormal return for [January
22, 2008 through January 25, 2008] was excluded from the Leakage
Period, Bear Stearns's cumulative abnormal return during the
Leakage Period excluding the week of March 10, 2008 would be -
14.56% and statistically significant at the 5% level." Finnerty
Decl. ¶ 41.

However, Ferrell's calculation of the cumulative abnormal

32

return already excluded January 22, 2008 through January 25, 2008, along with all of the days designated by Professor Finnerty as non-fraud related news days. Ferrell excluded these dates to be consistent with Professor Finnerty's methodology for estimating the cumulative abnormal return in Finnerty's initial report. Specifically, in his initial report Professor Finnerty defined the cumulative abnormal return for the purported Leakage Period as "the portion of the decline in Bear Stearns' share price over the entire Leakage Period that is attributable to the leakage of information concerning the alleged fraud after controlling for market-wide and industry-wide factors and Company-specific information that is unrelated to the alleged fraud." Finnerty Report ¶ 236. Professor Finnerty estimated "the cumulative abnormal return (CAR) for the entire Leakage Period" in Attachment 34 to his report. To replicate this estimate, Ferrell excluded days Finnerty designated as non-fraud related news days, including January 22, 2008 through January 25, 2008, from the calculation. Professor Finnerty recalculated the cumulative abnormal return during the purported Leakage Period in Attachment C to his Declaration. Ferrell replicated the result and found that Finnerty again excluded all days designated as non-fraud related news days. Excluding non-fraud news days is consistent with Finnerty's admonition that "it is very important to exclude company-specific information that is

33

not related to the alleged fraud from the damage calculation."
Finnerty Report ¶ 190.

Ferrell replicated Finnerty's calculation that "Bear
Stearns's cumulative abnormal return during the Leakage Period
excluding the week of March 10, 2008 would be -14.56% and is
statistically significant at the 5% level," Finnerty Decl. ¶41,
and concluded that he needed to include every non-fraud related
news day (except January 22, 2008 through January 25, 2008) and
make no adjustments for non-fraud related news. This finding is
consistent with Professor Finnerty's admission at note 43 of his
declaration that he did not "control for Bear Stearns specific
non-fraud related information" in this analysis.

Thus, Professor Finnerty was only able to find that "the
cumulative abnormal return during the Leakage Period excluding
the week of March 10, 2008 [and January 22, 2008 through January
25, 2008]" was statistically significant by applying a
methodology that is inconsistent with his report and the rest of
his declaration and which he admits does not control for non-
fraud related information. See Finnerty Decl. ¶ 41. Because
Finnerty fails to establish that the cumulative abnormal return
in Bear's stock price from December 20, 2007 through March 7,
2008, even excluding January 22, 2008 through January 25, 2008,

34

was not caused by non-fraud factors, Finnerty likewise fails to establish that it was caused by leakage of the alleged fraud.

While Plaintiff argues that the days in the Leakage Period prior to March 10, 2008 were reasonably included in Finnerty's analysis, a comparison of the fluctuations in Bear Stearns's stock price versus the stock prices of its peer firms prior to March 10 shows that they followed similar trajectories until Bear Stearns experienced a run on the bank the week of March 10. Finnerty Report ¶ 59, Ex. 7. There simply is no evidence that any of the stock price declines between December 20, 2007 and March 7, 2008 were due to leakage rather than other factors, and Plaintiff will not be permitted to use the results during the week of March 10, 2008 to create the impression of an abnormal return where there was none.

## V.   The Motion for Summary Judgment is Granted in Part and Denied in Part

On a motion for summary judgment, "the substantive law will identify which facts are material." Anderson, 477 U.S. at 248. Plaintiff has alleged claims under Sections 10(b) and 18 of the Securities Exchange Act of 1934, SEC Rule 10b-5 and common law fraud against all Defendants, and claims under Section 20(a) of

35

the Exchange Act against the individual defendants. The elements
of each claim, recited below, are similar.

With respect to the 10(b) cause of action, "plaintiff must
prove (1) a material misrepresentation or omission by the
defendant; (2) scienter; (3) a connection between the
misrepresentation or omission and the purchase or sale of a
security; (4) reliance upon the misrepresentation or omission;
(5) economic loss; and (6) loss causation." Stoneridge Inv.
Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157, 128 S. Ct.
761, 768, 169 L. Ed. 2d 627 (2008). Rule 10b-5 encompasses only
conduct already prohibited by § 10(b). Id. "Courts in the Second
Circuit have found that the elements of common law fraud are
essentially the same as those which must be pleaded to establish
a claim under § 10(b) and Rule 10b-5." Fezzani v. Bear, Stearns
& Co. Inc., 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008), aff'd in
part, vacated in part, 716 F.3d 18 (2d Cir. 2013), and aff'd in
part, vacated in part, 527 F. App'x 89 (2d Cir. 2013) (internal
quotation marks omitted).[8]

---

[8] Specifically, a New York state common law fraud claim requires
a plaintiff to show "(1) an omission or misrepresentation of a
material fact, (2) which defendants knew to be false when made,
(3) which defendants made with the intent to induce
plaintiff['s] reliance, (4) upon which plaintiff reasonably
relied, and (5) which caused injury to plaintiff." Carroll v.
LeBoeuf, Lamb, Greene & MacRae, LLP, 623 F. Supp. 2d 504, 510
(S.D.N.Y. 2009)

"The Section 18 cause of action requires plaintiff[] to
plead that (1) a false or misleading statement was contained in
a document filed pursuant to the Exchange Act (or any rule or
regulation thereunder); (2) defendant made or caused to be made
the false or misleading statement; (3) plaintiff relied on the
false statement; and (4) the reliance caused loss to the
plaintiff. Int'l Fund Mgmt. S.A. v. Citigroup Inc., 822 F. Supp.
2d 368, 385 (S.D.N.Y. 2011) (citing In re Alstom SA, 406
F.Supp.2d 433, 478 (S.D.N.Y. 2005) (internal quotation marks
omitted).

Finally, "under § 20(a), a plaintiff must show: (1) a
primary [Section 10(b)] violation by a controlled person; (2)
control of the primary violator by the defendant; and (3) that
the controlling person was in some meaningful sense a culpable
participant in the primary violation." Ross v. Lloyds Banking
Grp., PLC, No. 11 CIV. 8530 PKC, 2012 WL 4891759, at *11
(S.D.N.Y. Oct. 16, 2012), aff'd, 546 F. App'x 5 (2d Cir. 2013).

Defendants argue Plaintiff has failed to show actionable
misstatements or omissions and loss causation sufficient to
sustain any claims. Defs.' MSJ at 11-29. Defendants
alternatively seek to carve out parts of Plaintiff's claims on
the following individualized basis: (1) failure to show loss

37

causation for claims arising from the period between March 14 and 17, 2008; (2) the Section 18 claims are time-barred; (3) New York State common law fraud does not recognize "holder" claims (that is, claims that an investor was defrauded into retaining an investment); (4) purchases of Bear Stearns shares on August 15, 2007 by the Bruce & Cynthia Sherman Charitable Foundation (the "Foundation"), not a party to this action; and (5) Sherman's purchase of Bear Stearns shares on March 11, 2008, and March 13, 2008 in his capacity as a trustee.

## A. Plaintiff Fails to Establish Loss Causation Via Leakage Theory

### 1. The Loss Causation Requirement

One of the critical elements to be established in every action alleging a violation of the securities law is loss causation. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407, 189 L. Ed. 2d 339 (2014) (internal citations and quotation marks omitted).

To show loss causation, "the plaintiffs had the burden to establish that the price of the securities they purchased was 'inflated' – that is, it was higher than it would have been without the false statements – and that it declined once the

38

truth was revealed." Glickenhaus, 787 F.3d at 415 (citing Dura, 544 U.S. at 342-44); Ray v. Citigroup Global Mkts., Inc., 482 F.3d 991, 995 (7th Cir. 2007)). "A plaintiff's causal losses are measured by the amount the share price was inflated when he bought the stock minus the amount it was inflated when he sold it." Id. (citing Dura, 544 U.S. at 342-44, 125 S.Ct. 1627).

The causal nexus is inescapable. Plaintiff must show that "the defendant's misrepresentation . . . proximately caused the plaintiff's economic loss." Dura, 544 U.S. at 346; see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 175 (2d Cir. 2005) (holding plaintiff must show "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security" (citation omitted)). In order to prove that his losses were caused by the alleged fraud, the plaintiff must establish that the decline in stock price that resulted in his losses was a result of the market learning of the alleged fraud, see In re Worldcom, Inc. Sec. Litig., 2005 WL 2319118, at *23 (S.D.N.Y. 2005), and that it was the alleged fraud, and not "other intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events'" that caused the stock price to decline. Halliburton Co., 563 U.S. at 812-13.

39

"Loss causation is typically shown by the reaction of the market to a 'corrective disclosure' which reveals a prior misleading statement, but may also be shown by the 'materialization of risk' method, whereby a concealed risk— such as a liquidity crisis—comes to light in a series of revealing events that negatively affect stock price over time." Solow v. Citigroup, Inc., 827 F. Supp. 2d 280, 292 (S.D.N.Y. 2011) (internal quotation marks and brackets omitted) (citing In re Vivendi Universal, S.A., Sec. Litig., 765 F.Supp.2d 512, 555 (S.D.N.Y. 2011); Heller v. Goldin Restructuring Fund, L.P., 590 F.Supp.2d 603, 623-24 (S.D.N.Y. 2008)). Loss causation, in short, is based on an identifiable fact or facts.

### 2.   The Finnerty Report Fails to Meet the Loss Causation Requirement

Finnerty used the Corrective Disclosures of March 14 and March 17, 2008 to initially calculate his damage calculation but then attributes his calculation to the loss of the inflated value due to fraud during the period of December 20, 2007 to March 13, 2008 (the "Leakage Period"), to leakage.

The Finnerty Report contains no evidence that the Bear Stearns stock price actually moved in reaction to the leakage of any factual information. Rather, Finnerty's calculation is based

40

on an estimated inflation amount of Bear stock resulting from
fraud between December 14, 2006 (the date of Bear's 2006 10-K
filing containing alleged misstatements) and March 14, 2008 (the
date it was announced JPMorgan Chase & Co. would acquire Bear at
$2 per share).

Finnerty calculates the inflation in the stock price on the
last day of the Relevant Period (March 17, 2008) and proceeds
backwards, calculating the inflation on the immediately
preceding trading day (i.e., March 14, 2008) and adding the
inflation from March 17 to his calculation of inflation on March
14, to get the total stock price inflation on March 14, as
follows: For March 17, 2008, Finnerty multiplies the closing
price of Bear Stearns stock on March 14, 2008 ($30.00) by the
abnormal return on the stock on March 17, 2008 (-77.24%) which
results in inflation of $23.17 per share. For March 14, 2008,
Finnerty completes the same steps, multiplying the closing price
of Bear Stearns stock on March 13, 2008 ($57.00) by the abnormal
return on the stock on March 14, 2008 (41.08%), which equals
$23.42. He then adds $23.42 to the inflation from March 17, 2008
($23.17) to get total inflation of $46.59 per share on March 14,
2008. Finnerty Report at ¶ 267, Finnerty Tr. at 160:14-161:5.

Finnerty continues to work backwards as he calculates stock

41

price inflation due to the alleged fraud during his Leakage
Period. Finnerty Report Attachs. 31, 34. Finnerty concludes that
the abnormal return on the stock price on each Corrective
Disclosure Date, and the stock price's cumulative abnormal
return during his Leakage Period, are statistically significant.
Id. ¶ 236, Attach. 34.

However, as Defendants argue, Finnerty is unable to
establish that the decline in Bear Stearns's stock price during
the Leakage Period was due to the market learning of the alleged
fraud. This flaw is fatal to loss causation. See, e.g., In re
Williams, 558 F.3d at 1138 (citing In re World com, 2005 WL
2319118) ("[Plaintiff must] establish that his losses were
attributable to some form of revelation to the market of the
wrongfully concealed information."). Finnerty has stated that he
cannot factually pinpoint the cause of changes to Bear Stearns'
stock price on any given day:

> I'm comparing [how I would expect the price to behave in
> the absence of fraud] to the actual behavior and that
> difference in any given day is the amount of inflation.
> What actually causes that day to day I don't know because
> there aren't press releases that identify what's being
> disclosed. But what I can see is that, I can see the
> decline in the price of the stock, the persistent price in
> the decline of the stock over the leakage period.

Finnerty Tr. At 228:10-22. His report contains no evidence of
trading on the allegedly leaked news. Finnerty has simply

42

assumed that the market was reacting to leakage of the fraud
throughout the entire Leakage Period. Id. at 227:14-228:22;
258:15-260:13; 261:19-266:20.[9]

Finnerty's opinions on loss causation rely entirely on his
model based on the assumption of leakage. Using his model,
Finnerty attempts to control for market- and industry-wide
effects on Bear Stearns's stock price, as well as Bear Stearns-
specific news that he does not attribute to the alleged fraud.
Id. at 228:6-12; see also Finnerty Report ¶ 235. He then
concludes that any inflation in Bear Stearns's stock price -
after application of these controls - is attributable to leakage
of the alleged fraud.

As discussed at length supra § IV, the assumption inherent
in Leakage as set forth by Finnerty would vitiate the loss
causation requirement contrary to controlling precedent.
Consequently, Plaintiffs have failed to establish loss causation
via the leakage theory. However, a genuine dispute of material
fact exists with respect to loss causation as a result of the

---

[9] Early in my exposure to the federal requirements to prove a
cause as an Assistant United States Attorney, I was tutored
unforgettably by the Honorable J. Edward Lumbard, then United
States Attorney, later Chief Judge of our Circuit, 'Never assume
a g__ d__ thing.' This dictate may found this decision.

alleged corrective disclosures.

## B. A Genuine Dispute of Material Fact Exists as to Material Statements and Omissions

Defendants argue disclosure defeats Plaintiff's claims of misstatements or omissions. Defs.' MSJ at 11-15. That is, to whatever extent Bear Stearns was poorly managed as evidenced by its excessive leverage, reliance on repo financing, and exposure to mortgage assets, these risks were nonetheless publically known as a result of Bear Stearns' disclosures.

Defendants' opposition and cited disclosures demonstrate textbook disputes of material fact sufficient to defeat a motion for summary judgment. For example, both Plaintiff and Defendants point to a disclosure stating "inability to raise money in the long-term or short-term debt markets, or to engage in repurchase agreements or securities lending, could have a substantial negative effect on [Bear Stearns'] liquidity." Defs.' MSJ at 12; Pl.'s Mem. in Opp. Defs.' Mot. Summ J. ("Pl.'s MSJ Opp.") at 6. Defendants frame this as sufficient disclosure to alert Plaintiff to risks, defeating the possibility of a misstatement or omission. Plaintiff emphasizes that Defendants disclosed only the possibility but not the certainty that Bear Stearns was

44

already experiencing negative pressure as a result of its

reliance on repo financing. Id. at 6-7. Plaintiff points to SEC

comment criticizing lack of disclosure with respect to Bear

Stearns' exposure to subprime loans. Id. at 7-8. Defendants

again point to disclosures that Bear Stearns was net short

subprime mortgage assets to argue that such risk was known.

Defs.' MSJ at 11-15. With respect to mortgage valuations,

Defendants argue the factual accuracy of Bear Stearns' reported

asset values. Defs.' MSJ at 15-20. With respect to risk

management, the parties explicitly disagree and marshal their

own evidence to demonstrate the accuracy and timely updating of

value at risk models. Defs.' MSJ at 23; Pl.'s MSJ Opp. at 15-6.

Plaintiff submits that Bear's actual stress testing practices

were not consistent with disclosures regarding stress testing.

Id. at 17. With respect to liquidity, Plaintiff points to

discrepancies between representations that Bear Stearns had

sufficient liquidity[10] and evidence from inside Bear

---

[10] Defendants contend that the statements Plaintiff identifies
amount to non-actionable opinion. Defs.' MSJ at 24.
"[E]xpression[s] of optimism" are generally "too indefinite to
be actionable under the securities laws." In re Int'l Bus.
Machines Corp. Sec. Litig., 163 F.3d 102, 108 (2d Cir. 1998).
However, the Court notes there is a distinction between the
cases Defendants cite rejecting statements that liquidity was
"impressive" or strong" and some of the statements Plaintiff has
identified, such as that Bear had "ample liquidity" and "didn't
need to raise capital" Pl.'s MSJ at 21. These statements imply
numerical reference points, which is less vague than "strength."
Regardless, Plaintiff argues that Bear's liability on the

45

demonstrating an active attempt to hide facts contradicting those statements when they were made. Pl.'s Opp. to MSJ at 21-22.

"Nothing short of a complete failure of proof concerning an essential element of the nonmoving party's case will be sufficient to award summary judgment." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The disclosures Bear has identified are not so forthright and comprehensive that it can be said no dispute of material fact exists. The run-on-the-bank notwithstanding, the staggering damage wrought as a result of Bear Stearns' collapse belies the argument that it is indisputably clear on the record that the market was alerted to the danger and degree of what was occurring at Bear Stearns during the relevant period. The evidence Plaintiff has produced bridges the distance between the possibility that Bear's disclosures were insufficient and adequate proof of his claim such that, drawing all inferences in his favor, the claims cannot be defeated on summary judgment.

---

liquidity issue stems from the fact that Bear knew damaging facts regarding its liquidity situation that were not disclosed to the public. Pl.'s MSJ Opp. at 21-22. An opinion regarding "strength" may be actionable were it is not sincerely held. Ross, 2012 WL 4891759, at *6 (citing City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67 (2d Cir. 2012)). Omissions are actionable irrespective of public statements of opinion.

46

Regulatory compliance and accurate disclosure, while possibly
demonstrative of good faith efforts, do not themselves establish
complete disclosure meeting the dictates of securities law. See
United States v. Rigas, 490 F.3d 208, 220 (2d Cir. 2007).

The non-comprehensive list of aforementioned disputes
demonstrates that central questions remain with regard to each
of Plaintiff's alleged material misstatements and omissions. Not
least of which: when the known disclosures Defendants have
identified are compared to the information Plaintiff argues was
material, do they match? Or was there information that remained
undisclosed that would have been significant to investors
sufficient to establish liability? It is precisely these
discrepancies of scope, between what was disclosed and what
constituted the whole material truth of the relevant
circumstance, that the parties dispute. See e.g., Pl.'s 56.1 ¶
26, 28, 30-34, 38-9, 45, 49-52, 59-60, 63, 64-7, 71-3, 72. Some
disclosure does not necessarily indicate complete disclosure,
and Plaintiff has marshaled evidence to suggest that such a
discrepancy may have existed. Id. A jury may ultimately decide
that the appropriate risks were disclosed and ignored, and thus
Plaintiff will be unable to recover for his losses.
Nevertheless, a genuine dispute of material fact exists such
that it is the jury's decision to make.

47

Defendants argue that the March 14, 2008 and March 16, 2008 statements are not corrective disclosures, and thus, Plaintiff cannot establish that his losses between March 14 and 17 resulted from disclosure of previously unknown risk. Defs.' MSJ at 29-33. Defendants allege incongruity; that the March 14 disclosure that liquidity had deteriorated and the March 16 announcement of Bear's merger with JPMorgan lack a sufficient nexus to the misrepresentations Plaintiff has alleged. Id. Defendants posit the run-on-the-bank "was a materialization of *disclosed* risks coupled with a sharp deterioration in market conditions." Defs.' MSJ at 32.

The requirement of nexus between a corrective disclosure and the alleged misstatement or omission is not such a narrow dictate as to require an explicit confession to establish loss causation. In re Bear Stearns, 763 F. Supp. 2d at 520-21 (collecting citations).

As reasoned above, Plaintiff has sufficiently argued actionable misstatements and omissions existed. Consequently, Plaintiff's corrective disclosure-based loss causation theory cannot be defeated by the argument that only disclosed risks came to light on March 14 and 16 unless the March 14 and 16 information did not implicate the alleged misstatements and

48

omissions. Plaintiff has submitted Bear Stearns failed to fully
disclose its liquidity position, and has provided evidence to
show that facts that should have been disclosed were withheld
from the public. The corrective disclosures alleged clearly
relate to the alleged misstatements and omissions. Pl.'s 56.1 at
176. There is sufficient nexus between the disclosures and
alleged fraud relating to liquidity such that a jury could
reasonably conclude the March 14 and 16 events disclosed
information previously unknown to the public that caused the
losses between March 14 and 17, 2008.

Based on the conclusions set forth above, Defendants'
motion for summary judgment on the grounds that Plaintiff has
failed to show loss causation or material misstatements or
omissions is denied. Defendants argue that Plaintiff's Section
20 claims fall for failure to establish a primary violation of
securities law. Pl.'s MSJ at 36. Accordingly, the motion for
summary judgment with regard to Plaintiff's Section 20 claim is
denied.

**C.   Plaintiff's Section 18 Claims are Time-Barred**

By statute, Section 18 claims must be "brought within one
year after the discovery of the facts constituting the cause of

49

action and within three years after such cause of action
accrued." 15 U.S.C. § 78r(c). Defendants submit that Plaintiff
was on notice of his claim "by at least March 16, 2008," more
than a year before the filing of his September 24, 2009
complaint. Defs.' MSJ at 33; see generally In re Bear Stearns
Companies, Inc. Sec., Derivative, & ERISA Litig., 995 F. Supp.
2d 291, 307 (S.D.N.Y. 2014) (SRM Global Masters Fund Ltd. P'ship
v. The Bear Stearns Companies, hereinafter "SRM Global")
(dismissing similar §18 claims as time-barred). Plaintiff "does
not contest Defendants' argument that his Section 18 claims are
time-barred." Pl.'s MSJ Opp. at 6n.4. Accordingly, Plaintiff's
Section 18 claims are dismissed.

## D.    Defendants are Entitled to Summary Judgment on Plaintiff's Holder Claims

Plaintiff's common law fraud claims allege in part that
Sherman was defrauded into retaining his Bear Stearns
investment. Pl.'s MSJ Opp. at 36-37; Compl. ¶264. This Court has
previously addressed the viability of such "holder" claims. See
SRM Global, 995 F. Supp. 2d at 314-15. Recognizing "the
uncertainty of the New York law" on the issue, this Court held
that the most persuasive reading of relevant law barred holder
claims. Id.

50

Plaintiff makes the same arguments the Court found
unpersuasive in SRM Global. Compare id. with Pl.'s MSJ Opp. at
36-8. Plaintiff submits that SRM Global is currently on appeal
before the Second Circuit, and thus caution is warranted.
However, each new source Plaintiff cites bolsters the reasoning
in SRM Global.

Issued a month after SRM Global, Beach cited that holding
in acknowledging that "[s]ince Starr Foundation was decided,
state and federal courts applying New York law have split on the
question of whether the decision forecloses all holder claims,
or only holder claims alleging hypothetical lost profits." Beach
v. Citigroup Alternative Investments LLC, No. 12 CIV. 7717 PKC,
2014 WL 904650, at *17 (S.D.N.Y. Mar. 7, 2014) (citations
omitted). Bank Hapoalim, issued six months after SRM Global, is
at best dicta for Plaintiff, and at worst accords:

> [t]his case is essentially a 'holder' fraud case—that is,
> the alleged fraud is that the structured investment
> vehicles held their assets instead of liquidating them. As
> a result, plaintiffs suffered no out-of-pocket loss.
> Moreover, since plaintiffs' case depends on an attenuated
> chain of events and series of hypothetical transactions,
> they have not pleaded the causation element with sufficient
> particularity.

Bank Hapoalim B.M. v. WestLB AG, 121 A.D.3d 531, 535, 995
N.Y.S.2d 7, 11 (2014), leave to appeal denied, 24 N.Y.3d 914, 26
N.E.3d 783 (2015) (internal citations omitted). Similarly, Varga
cited Starr Foundation and Bank Hapoalim to find "[a]llegations

51

that Defendants' inaction somehow caused the [Plaintiff] to
hold, rather than sell, the securities are too undeterminable
and speculative to constitute a cognizable basis for damages and
such 'holder' claims are not actionable." <u>Varga v. McGraw Hill
Fin. Inc.</u>, 2015 WL 4627748, at *12 (N.Y. Sup. Ct. 2015).

The Court declines to revisit its holding at this time
without further direction from the New York Court of Appeals or
the Second Circuit. In the event the Second Circuit overturns
the Court's holding with respect to holder claims, the issue can
be renewed at that time. Plaintiff's holder claims are
accordingly dismissed.

### E.  Sherman Does Not Have Standing to Pursue the Foundation's Damages

Sherman included 7,000 shares purchased August 15, 2007 on
behalf of the Bruce & Cynthia Sherman Charitable Foundation,
Inc. (the "Foundation") in his opt-out letter, intending to
exclude them from settlement in the Securities Class Action.
Pl.'s MSJ Opp. at 38; 56.1 ¶ 6, 9. Defendants submit Plaintiff
lacks standing to seek damages on those shares. Defs.' MSJ at
37. Sherman does not dispute that the shares were purchased on
behalf of the Foundation, but argues that Sherman has third-

party standing to pursue the claims on the Foundation's behalf.
Pl.'s MSJ Opp. at 38.

"[T]he irreducible constitutional minimum of standing
consists of three elements. The plaintiff must have (1) suffered
an injury in fact, (2) that is fairly traceable to the
challenged conduct of the defendant, and (3) that is likely to
be redressed by a favorable judicial decision." Spokeo, Inc. v.
Robins, No. 13-1339, 2016 WL 2842447 (U.S. May 16, 2016)
(internal quotation marks and citations omitted). The injury in
fact must be both "particularized" and "concrete." Id. To be
particularized, an injury "must affect the plaintiff in a
personal and individual way." Id. (internal quotation marks and
citations omitted). "As a general rule," this means "plaintiff
must have personally suffered." W.R. Huff Asset Mgmt. Co., LLC
v. Deloitte & Touche LLP, 549 F.3d 100, 107 (2d Cir. 2008)
(citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 n.1, 112
S. Ct. 2130, 2136 n.1, 119 L. Ed. 2d 351 (1992).

Any injury traceable to losses for the Foundation's shares
undoubtedly do not accrue to Plaintiff personally. Nevertheless,
Plaintiff submits he should be permitted to stand in for the
Foundation. It is worth quoting at length from the case
Plaintiff relies on to establish third-party standing. In W.R.

53

_Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP_, the Second

Circuit held:

> There are, indeed, a few well-recognized, prudential
> exceptions to the "injury-in-fact" requirement. These
> exceptions permit third-party standing where the plaintiff
> can demonstrate (1) a close relationship to the injured
> party and (2) a barrier to the injured party's ability to
> assert its own interests. . . . We reject Huff's assertion
> of a prudential exception based on 'investment manager
> standing.' First, the investment advisor-client
> relationship is not the type of close relationship courts
> have recognized as creating a 'prudential exception' to the
> third-party standing rules. Second, Huff has failed to
> demonstrate that, absent a recognition of its standing
> claim, there is a 'hindrance' to the Beneficial Owners'
> ability to protect their own interests. Rather, the
> Beneficial Owners are relatively sophisticated parties with
> a demonstrated capacity to protect their own interests in
> the absence of Huff's intervention.

549 F.3d at 110.

Sherman argues ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Pl.'s MSJ Opp. at 39. This argument is not materially

different from the investment advisor-client relationship in

_W.R. Huff_, where the Second Circuit rejected the plaintiff's

argument that it "qualifie[d] for the prudential exception to

the injury-in-fact requirement because of its authority to make

investment decisions on behalf of its clients." _W.R. Huff_, 549

F.3d at 109.

Plaintiff also submits that "the Foundation is hindered because, like a trust, it lacks the practical ability to sue outside of a decision by those who control it." Pl.'s MSJ Opp. at 39. Non-natural entities are capable of initiating litigation, and the sole fact of their being controlled by individuals does not alone hinder them from asserting their own independent interests. Plaintiff cites Powers v. Ohio to support his hindrance argument based on "practical barriers." Id. As part of a multifaceted analysis awarding third-party standing to permit a white juror to challenge discriminatory exclusion of seven black venirepersons on the basis of their race, this part of Powers reasoned that individual jurors impermissibly subjected to racial exclusion are unlikely to be willing or able to sufficiently vindicate their rights. 499 U.S. 400, 414, 111 S. Ct. 1364, 1373, 113 L. Ed. 2d 411 (1991). One sentence of that reasoning compared the economic burdens of litigation to the low financial stake of the impermissibly excluded juror. Id. at 415 ("And, there exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation."). The "practical barriers" that the Foundation must act through its Officers and Directors, whatever they may be, are not comparable.

55

Third-party standing being inappropriate in this instance and contrary to the Second Circuit's direction in W.R. Huff, Plaintiff has failed to establish standing to pursue losses traceable to the Foundation's shares. Accordingly, summary judgment is granted with respect to the Foundation's shares.

**F.    Defendants Are Not Entitled to Summary Judgment on Claims Related to the Shares Held in Escrow**

On March 11, 2008 and March 13, 2008 Plaintiff purchased an approximate total of 700,000 Bear Stearns shares with funds in an escrow account (the "Account"). The Account was created in 2001 pursuant to a contract between Sherman and Legg Mason for the sale of Sherman's investment management business to Legg Mason. Pl.'s MSJ Opp. at 39; Defs.' MSJ at 38-39; 56.1 ¶ 11-12. Legg Mason placed funds into the escrow account which were to be released over time as PCM met its targets. Defs.' MSJ at 39; 56.1 ¶¶13-4. ███████████████████████████████
████████████████████████████ Pl.'s MSJ Opp. at 39-40; Defs.' MSJ at 39; 56.1 ¶17-8. ████████████████████████
██████████████████████████████████████████████
████████████  ██████████████████████████████
████████████████████████████ Defs.' MSJ at 39. Therefore, Legg Mason, not Plaintiff, suffered the losses from

the Bear Stearns trades. Id. Indeed, in the fall of 2008, $68.4
million of the escrowed funds were returned to Legg Mason. Id.

Nevertheless, the sum value and loss in the accounts did
not belong to Legg Mason at the time of the losses only because
return was likely. Defendants' position turns on whether the
terms and circumstances of the Account amount to an intervening
or superseding cause breaking the proximate causal chain between
the Bear Stearns losses and Plaintiff. Ultimate value to both
Legg Mason and Plaintiff depended on ███████████████████

██ ██████████   ████████████████████████████████████

███████████████████████████████████████   █████████

████████████   See id. Thus Sherman's obligation to Legg Mason
certainly depended on the unrelated element of PCM's
performance. However, Defendant's argument would equally apply
to Legg Mason, resulting in the impossible construction that no
party could recover for the losses to the shares in escrow
because they were bundled in a larger complex deal. Regardless
of what Plaintiff ultimately owed Legg Mason as a result of
PCM's performance, the losses were borne by him and were not
altered by PCM's performance. Proximate cause therefore exists
between Plaintiff and any escrow share losses.

57

## VI.  Conclusion

Based on the conclusions set forth above, Defendants'
motion to exclude the SEC Report is denied and the motion to
exclude Finnerty is granted.  Defendants' motion for summary
judgment is granted in part and denied in part as set forth
above.

In light of the confidentiality stipulation and order
entered in this case, the parties are directed to jointly submit
a redacted version of this opinion to be filed publicly or
otherwise notify the Court that no redactions are necessary
within two weeks of the date of distribution of this opinion.

58

It is so ordered.

New York, NY
July 5 , 2016

ROBERT W. SWEET
U.S.D.J.